SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Jay M. Goffman
Mark A. McDermott
Shana A. Elberg
Suzanne D.T. Lovett
Four Times Square
New York, New York 10036
(212) 735-3000

Proposed Counsel for Debtors and
  Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                         :

In re:                            :     Chapter 11
                                         :

NAUTILUS HOLDINGS LIMITED, et al.,    :     Case No. 14-22885 (RDD)
                                         :

                                         :

                Debtors.[1]        :     (Motion for Joint Administration Pending)
                                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS UNDER 11 U.S.C. § 364, BANKRUPTCY RULES 4001 AND 9014, AND LOCAL BANKRUPTCY RULE 4001-2 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING AND (II) SCHEDULING A FINAL HEARING

Nautilus Holdings Limited and certain of its affiliates, the debtors and debtors in

possession in the above-captioned cases (collectively, the "Debtors"), hereby move (the

---

[1]    The Debtors and, where applicable, the last four digits of their Hong Kong taxpayer identification codes are as follows: Nautilus Holdings Limited, Nautilus Holdings No. 2 Limited, Nautilus Shipholdings No. 1 Limited, Nautilus Shipholdings No. 2 Limited, Nautilus Shipholdings No. 3 Limited, Able Challenger Limited (8877), Charming Energetic Limited (0936), Dynamic Continental Limited (0928), Earlstown Limited (1898), Findhorn Osprey Limited (8075), Floral Peninsula Limited (4549), Golden Knighthead Limited (6376), Magic Peninsula Limited (0950), Metropolitan Harbour Limited (7969), Metropolitan Vitality Limited (9019), Miltons Way Limited (6180), Perpetual Joy Limited (0897), Regal Stone Limited (3636), Resplendent Spirit Limited (8114), Superior Integrity Limited (0934), and Vivid Mind Limited (7935). The Debtors maintain offices at 445 Hamilton Avenue, 11th Floor, White Plains, New York, 10601; 16/F-19/F Prince's Building, 10 Chater Road, Central, Hong Kong; and Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda.

"Motion") this Court for entry of an interim order (the "Interim Order"), substantially in the form of Exhibit A hereto, and a final order substantially in the form of the Interim Order (the "Final Order") under section 364(c) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Bankruptcy Rule 4001-2 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Southern District of New York ("Local Bankruptcy Rules") (a) authorizing the Debtors to execute and enter into a secured debtor-in-possession credit agreement (the "DIP Agreement", together with the other documents entered into in connection therewith, the "DIP Documents")[2] and to obtain subordinated (with respect to prepetition secured obligations), secured postpetition financing in the form of a revolving credit facility thereunder (the "DIP Facility"); (b) authorizing the Debtors to immediately obtain revolving loans under the DIP Facility in accordance with the terms of the DIP Agreement in an aggregate principal amount not to exceed $550,000; and (c) scheduling a final hearing for approval of the Final Order.  In support of the Motion, the Debtors rely upon and incorporate by reference the first-day declaration (the "First-Day Declaration"), filed with the Court concurrently herewith.  In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

---

[2]    Capitalized terms not defined herein have the meaning ascribed to them in the DIP Agreement, a copy of which is annexed hereto as Exhibit B.

2.      The predicates for the relief requested herein are section 364(c) of the Bankruptcy Code, Bankruptcy Rules 4001 and 9014, and Local Bankruptcy Rule 4001-2.

## BACKGROUND

**A.  The Chapter 11 Filing**

3.      On the date hereof (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.  The Debtors have requested joint administration of these Chapter 11 Cases by motion filed concurrently herewith.  No trustee or examiner has been appointed in these Chapter 11 Cases.  As of the date hereof, no creditors' committee has been appointed.  The factual background regarding the Debtors is set forth in the First-Day Declaration.

**B.      The DIP Facility**

4.      As a general matter, the Debtors generate enough cash to pay their ongoing expenses in the ordinary course of business.  However, in the normal course of the Debtors' business operations, there are sometimes timing discrepancies between the receipt of revenue and the need to pay expenses, resulting in times during which a Debtor may experience temporary liquidity constraints.  Additionally, a Debtor may be exposed to unanticipated expenses due to unforeseen events, which may also create temporary or minor liquidity issues.  During a period of tight liquidity, without access to additional cash, a Debtor may be unable to pay its expenses and continue normal operations.  The modest $5,000,000 DIP Facility offered by Synergy Management Services Limited ("Synergy" or the "DIP Lender"), at an annual

interest rate of 3.25% per annum, will allow the Debtors to satisfy cash needs that may arise,

without prejudicing the rights of the Debtors' prepetition secured lenders.

5.      Synergy is owned by  Reminiscent Ventures S.A ("Reminiscent").  Reminiscent

also owns 100% of Nautilus Holdings No. 2 Limited ("NH2L") and  49.9% of Nautilus Holdings

Limited ("NHL"), each a Debtor in these Chapter 11 Cases and  the two ultimate parents of all of

the other Debtors.  Synergy's chairman, Andreas Papathomas, is also the chief executive officer

of NHL and NH2L and a director of NHL, NH2L, and each of the intermediate holding

companies that sits below NHL and NH2L.

6.      Synergy's offer of the DIP Facility clearly demonstrates the Debtors' majority

equity holder's belief in the Debtors' enterprise and operations, as well as confidence in a unified

and successful restructuring of the Debtors under chapter 11.  Synergy has agreed to provide the

DIP Facility on a subordinated (with respect to prepetition secured obligations), secured basis as

follows, in each case subject to the Carve-Out (defined below) described herein:

(a)     Synergy will be granted a first priority security interest in and lien upon all

tangible and  intangible prepetition and postpetition property and assets of the

Debtors and their respective estates, and any proceeds and products thereof,

whether existing on the Petition Date or thereafter acquired, that is not subject to

valid, perfected, non-avoidable and enforceable liens in existence immediately

prior to the Petition Date, excluding avoidance actions under Chapter 5 of the

Bankruptcy Code, but upon entry of the Final Order, including the proceeds of

such avoidance actions.

(b)     Synergy will be granted a junior security interest in and lien upon all tangible and

intangible prepetition and postpetition property and assets of the Debtors and their

4

respective estates, and any proceeds and products thereof, whether now existing

or hereafter acquired, that is subject to valid, perfected and unavoidable liens in

existence immediately prior to the Petition Date or to valid and unavoidable liens

in existence immediately prior to the Petition Date that are perfected after the

Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively,

the "Existing Liens").

(c)     The obligations of the Debtors under the DIP Agreement and the other DIP

Documents (collectively, the "DIP Obligations") shall be given superpriority

treatment above other administrative expenses of the estate.

(d)     Synergy's liens and security interests will have priority over any liens or security

interests granted pursuant to any interim or final orders of the Court, including

any order authorizing the use of cash collateral under section 363 of the

Bankruptcy Code.

7.      The Debtors submit that the terms of the DIP Facility are reasonable, fair to the

Debtors' estates, and were obtained in good faith. The Debtors did not "shop" a DIP loan prior to

a filing in order to avoid the possibility of precipitous action by certain prepetition lenders with

respect to the Debtors' significant cash reserves.

8.      Thus, the Debtors determined that the DIP Facility from Synergy was the Debtors'

best option for postpetition financing at this time, and negotiated in good faith with Synergy,

which agreed to provide financing on a subordinated basis with respect to prepetition secured

obligations.  Because of the subordinated nature of the DIP Facility, the prepetition secured

lenders will not be prejudiced.  Moreover, the Debtors are only seeking use of a modest

$550,000 on an interim basis and would entertain discussions, prior to the final hearing on this

Motion, with other potential lenders regarding a DIP loan under superior terms than the DIP

Facility.

## RELIEF REQUESTED

9.      By this Motion, the Debtors request entry of an Interim Order and Final

Order (a) authorizing the Debtors to execute and enter into the DIP Agreement and to obtain

secured postpetition financing under the DIP Facility; (b) authorizing the Debtors to immediately

obtain revolving loans under the DIP Facility in accordance with the terms of the DIP Agreement

in an aggregate principal amount not to exceed $550,000; and (c) scheduling a final hearing for

approval of the Final Order.  The Debtors propose to serve a copy of the Interim Order granting

this Motion within three (3) business days after entry thereof.  The Debtors further request that

the Court (a) set a deadline for filing objections to the Motion and entry of the Final Order

thereon, (b) set a final hearing on the Motion, and (c) enter the Final Order on this Motion at or

after such final hearing.

## CONCISE STATEMENT OF RELIEF REQUESTED

10.      Material provisions of the DIP Agreement are set out at the following sections of

the DIP Agreement and/or the Interim Order, pursuant to Bankruptcy Rule 4001(c)(1)(B) and

Local Bankruptcy Rule 4001-2:[3]

| Term | Description |
|------|-------------|
| **Borrowers**<br>*DIP Agreement Definitions* | All Debtors |

---

[3]     The terms of the Final Order will be substantially similar to the terms of the Interim Order. The summary of the DIP Facility is provided for the benefit of the Court and other parties in interest.  To the extent that there are any conflicts between this summary and the DIP Facility or the DIP Documents, the terms of the DIP Documents shall govern.

| Term | Description |
|---|---|
| | |
| **DIP Lender** *DIP Agreement Definitions* | Synergy Management Services Limited |
| **Maturity Date** *DIP Agreement Definitions; Bankruptcy Rule 4001(c)(1)(B)* | Earlier of: (a)    the date that is twelve (12) months after the Petition Date; or (b)    the date that the Commitments of the DIP Lender under are terminated pursuant to the exercise of remedies under the DIP Agreement as a result of the occurrence of an Event of Default which is continuing. |
| **Borrowing Limits** *DIP Agreement § 2.01 and DIP Agreement Definitions; Interim Order ¶ 5; Bankruptcy Rule 4001(c)(1)(B)* | Interim: $550,000  Total:    $5,000,000 |
| **Interest Rate** *DIP Agreement § 2.06; Bankruptcy Rule 4001(c)(1)(B).* | 3.25% per annum |
| **Fees and Reimbursement of Expenses** *DIP Agreement §§ 6.04 and 12.01; Local Rule 4001-2(a)(3)* | The Borrowers will reimburse the DIP Lender in respect of all legal and other expenses incurred by it in connection with the preparation of the DIP Agreement and any related documents, the consummation and administration of the transactions contemplated thereby and the enforcement of the DIP Agreement and any related documents. |
| **Events of Default** *DIP Agreement § 10; Bankruptcy Rule 4001(c)(1)(B)* | Customary Events of Default, including failure to make payments when due, [defaults under other post-petition debt agreements,] noncompliance with covenants, material inaccuracies of representations and warranties, judgments in excess of specified amounts, impairment of security interests in collateral, invalidity of any Guaranty, "change of control", dismissal or conversion of the Chapter 11 Cases and certain other bankruptcy matters, in each case, subject to baskets, thresholds, qualifications and customary exceptions and grace periods set forth in the DIP Agreement. |
| **Liens** *DIP Agreement §§ 2.08 and 11;* | The Borrowers will enter into Security Documents granting the DIP Lender security in respect of their obligations under the DIP Agreement, subject to the Carve-Out.  The liens and security |

| Term | Description |
|------|-------------|
| *Interim Order ¶¶ 8, 10;*<br>*Bankruptcy Rule 4001(c)(1)(B)* | interests granted under the Security Documents shall have the status afforded by sections 364(c)(1), (2) and (3) of the Bankruptcy Code.<br><br>The liens are deemed valid and perfected at the time and on the date of entry of the Interim Order.<br><br>The liens shall have priority over any liens or security interests granted pursuant to any interim or final orders of the Court, including any order authorizing the use of cash collateral under section 363 of the Bankruptcy Code. |
| **Superpriority Claims**<br>*Interim Order ¶ 7(a);*<br>*Bankruptcy Rule 4001(c)(1)(B)(i)* | Pursuant to section 364(c)(1) of the Bankruptcy Code, subject to the Carve-Out, the obligations of the Borrowers under the DIP Agreement shall constitute obligations of the Borrowers with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims under sections 105, 326, 328, 330, 331, 506(c), 507(a) or 726 of the Bankruptcy Code. |
| **Carve-Out**<br>*DIP Agreement § 2.08; Bankruptcy Rule 4001(b)(1)(B)(iii);Local Bankruptcy Rules 4001-2(a)(5)and 4001-2(d)* | The liens and claims of or granted to the DIP Lender in the Interim Order and the DIP Documents will be subject and subordinate to the payment, without duplication, of the following fees and claims (the amounts set forth below, together with the limitations set forth therein, collectively, the "Carve-Out"):<br><br>(a)    the claims of the respective retained professionals of the Borrowers and any statutory committee appointed in these Chapter 11 Cases (collectively, the "Retained Professionals") for fees and expenses incurred at any time on and after the Petition Date and prior to the occurrence of an Event of Default and delivery of a notice from the DIP Lender to the Borrowers that the DIP Lender desires to trigger the Carve-Out; provided that, in each case, such fees and expenses of the Retained Professionals are ultimately allowed on a final basis by the Court under sections 327, 328, 330, 331 or 363 of the Bankruptcy Code.  (Interim Order, Section 10(a)).<br><br>(b)    (i) the claims of the Retained Professionals for fees and expenses which were incurred on and after the occurrence of an Event of Default and delivery of a notice from the DIP Lender to the Borrowers that the DIP Lender desires to trigger the Carve-Out; provided that, in each case, such fees and expenses of the Retained Professionals are ultimately allowed on a final basis by the Court under sections 327, 328, 330, 331 |

| Term | Description |
|------|-------------|
|  | or 363 of the Bankruptcy Code and do not exceed $1,000,000 in the aggregate plus (ii) the fees and expenses incurred by any professionals engaged by any successor to the Borrowers, including, without limitation, any trustee appointed under chapter 11 or 7 of the Bankruptcy Code or any examiner with expanded powers, in an aggregate amount not to exceed $250,000.  (Interim Order, Section 10(b).<br><br>(c)    the unpaid fees payable to the United States Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of title 28 of the United States Code.  (Interim Order, Section 10(c));<br><br>provided, that, except as otherwise provided in the Interim Order or Final Order, no portion of the Carve-Out shall be utilized for the payment of professional fees and expenses incurred in connection with any challenge to the amount, extent, priority, validity, perfection or enforcement of the Indebtedness (as defined in the DIP Agreement) of the Debtors owing to the DIP Lender or indemnified parties under the DIP Facility or to the collateral securing the DIP Facility; provided further that so long as no Event of Default shall have occurred and be continuing, the Debtors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as long as the same may be due and payable, and the same shall not reduce the Carve-Out.  The foregoing shall not be construed as an authorization to the allowance of any fees and expenses referred to above and shall not affect the right of any parties to object to the allowance and payment of such amounts. |

| Term | Description |
|---|---|
| **Conditions**<br><br>*DIP Agreement*<br>*§§ 5,6; Bankruptcy*<br>*Rule 4001(c)(1)(B);*<br>*Local Bankruptcy*<br>*Rule 4001-2(a)(2)* | Conditions to Initial Borrowing Date:<br><br>(a)  Delivery to DIP Lender of executed DIP Agreement and, if requested by DIP Lender, Note;<br><br>(b)  Entry of Interim Order by the Court, which shall be in full force and effect and shall not have been amended, modified, stayed or reversed;<br><br>(c)  Validity of Liens of the DIP Lender;<br><br>(d)  Compliance with Margin Regulations;<br><br>(e)  No conflict with or default under any material agreement or contractual or other restriction, except as permitted by DIP Order;<br><br>(f)  No Material Adverse Effect since the Petition Date<br><br>Conditions to Subsequent Borrowing:<br><br>(a)  Absences of a Default or Event of Default and material accuracy of representations and warranties;<br><br>(b)  Notice of Borrowing received by DIP Lender;<br><br>(c)  (i) If prior to Final Order being entered by the Court, Interim Order shall be in full force and effect and shall not have been vacated, reversed or stayed, or modified or amended in any material respect, and if (ii) if after Final Order has been entered, Final Order shall be in full force and effect and shall not have been vacated, reversed or stayed, or modified or amended in any material respect;<br><br>(d)  Borrowers have paid all costs, fees, expenses and other compensation to DIP Lender pursuant to DIP Agreement to the extent then due and invoiced at least three Business Days prior;<br><br>(e)  Requested Loans, together with other Loans outstanding, shall not exceed the amount authorized by the Interim Order or Final Order, as applicable; and<br><br>(f)  No Material Adverse Effect since the Petition Date |

| Term | Description |
|---|---|
| **Waiver of the Automatic Stay** *DIP Agreement § 10; Interim Order ¶ 9; Bankruptcy Rule 4001(c)(1)(B)(iv); Local Rule 4001-2(c).* | Modified to permit the DIP Lender to exercise, upon the occurrence of an Event of Default all rights and remedies under the DIP Documents, subject to seven days' written notice to the Borrowers and the United States Trustee. |
| **Indemnification** *DIP Agreement § 12.01; Bankruptcy Rule 4001(c)(1)(B)(ix)* | The Borrowers to keep the DIP Lender and its related parties fully indemnified against all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including reasonable attorneys' and consultants' fees and disbursements) incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of any investigation, litigation or other proceeding related to the entering into and/or performance of DIP Agreement or the proceeds of any Loans thereunder or the consummation of any transactions contemplated in the DIP Agreement or the exercise of any of their rights or remedies provided in the DIP Agreement. |
| **Joint Liability** *DIP Agreement §§ 2.09 and 10; Local Rule 4001-2(a)(14)* | The obligations and liabilities of the Borrowers under the DIP Agreement are joint and several and shall be construed accordingly. |

## APPLICABLE AUTHORITY

### A.      Entering Into the DIP Agreement Is Necessary

11.      As provided above, the Debtors generally produce enough cash to pay their expenses in the ordinary course of business as they become due.  However, due to variances in the timing of receipt of revenues and need to satisfy expenses, the Debtors sometimes face periods of tight liquidity.  Additionally, unforeseen events, although infrequent, may result in unexpected expenses.  Approval of the DIP Agreement and the modest funding provided thereunder will provide the Debtors with immediate and ongoing access to cash they may need during the course of these cases.

11

12.    Section 364(c) of the Bankruptcy Code provides that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the Court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364(c).  The Debtors propose to obtain the financing set forth in the DIP Agreement by providing superpriority claims and junior and senior secured liens pursuant to sections 364(c) of the Bankruptcy Code.

13.    Specifically, subject to the Carve-Out, the DIP Facility shall be secured by a junior lien on property of the estate that is subject to Existing Liens and a senior lien on property of the estate that is not subject to Existing Liens.  The liens and security interests provided for under the DIP Facility will be granted priority over any liens or security interests granted pursuant to any other orders entered by the Court, including any order granting the Debtors' Motion For Entry of Interim and Final Orders Under 11 U.S.C. §§ 105, 361, 362, 363, 507 and 552, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014 and Local Rule 4001-2 (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, and (III) Scheduling a Final Hearing.  Additionally, subject to the Carve-Out, the obligations of the Debtors under the DIP Agreement shall constitute obligations of the Debtors with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims under sections 105, 326, 328, 330, 331, 506(c), 507(a) or 726 of the Bankruptcy Code.

14.     As described above, due to the nature of the filing and the Debtors' ability to secure subordinated DIP financing, the Debtors determined that the DIP Facility from Synergy was the Debtors' best option for postpetition financing at this time.  Due to the risk of a material precipitous action by a prepetition lender, including, but not limited to, a draw-down of the Debtors' cash, the Debtors did not believe it would be in their best interests to solicit financing proposals prior to a filing.  Further, the Debtors did not believe financing would be available on only an unsecured or administrative priority basis.  Thus, the Debtors negotiated with Synergy, in good faith, to procure a modest $5,000,000 million subordinated  (with respect to prepetition secured obligations), secured credit facility to fund the Debtors' operations and restructuring expenses during the Chapter 11 Cases. The DIP Facility is being provided for the benefit of all of the Debtors and each of the Debtors will be jointly and severally liable for obligations under the DIP Agreement.[4]

15.     Provided that a debtor's judgment in choosing its postpetition financing does not violate the provisions of, and policies underlying the Bankruptcy Code, courts grant a debtor considerable deference.  See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest").

16.     Here, the terms of the DIP Agreement and the Interim Order related thereto are fair and reasonable, and were negotiated in good faith by the Debtors, Synergy, and

---

[4]     Pursuant to the DIP Agreement, if one Debtor's liability under the DIP Facility is ultimately for the benefit of another Debtor, the Debtor undertaking the liability would have an intercompany claim against the benefitting Debtor.

their respective counsel, and reflect the Debtors' reasonable exercise of business judgment consistent with their fiduciary duties. Indeed, the Collateral to be provided to the DIP Lender is to be secured on a junior basis with respect to prepetition secured obligations and does not prejudice any of the Debtors' prepetition secured lenders. Accordingly, the relief is warranted under the circumstances.

## IMMEDIATE RELIEF IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM

17.    Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain post-petition credit and provides, in relevant part:

> *The court may commence a final hearing on a motion for authorization to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a preliminary hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.*

Fed. R. Bankr. P. 4001(c)(2).

18.    Local Bankruptcy Rule 4001-2(g) also requires that the Debtors show that immediate or irreparable harm will be caused to the Debtors' estates if immediate relief is not granted before the final hearing. It is indisputable, based on the record before the Court, that the Debtors have an immediate need for the DIP as it is necessary to continue normal business operations, satisfy critical payment obligations, and preserve its global assets. Accordingly, the Debtors request that the Court conduct a preliminary hearing on the Motion and authorize the Debtors, from the entry of the Interim Orders until the Final Hearing, to enter into the DIP Agreement in order to obtain the necessary credit to avoid irreparable harm to their estates.

## REQUEST FOR FINAL HEARING

19.    Notice of this Motion shall be given to (a) Togut, Segal & Segal LLP, as counsel to the DIP Lender; (b) the Office of the United States Trustee for the Southern District of New York; (c) the parties listed in the consolidated list of thirty (30) largest unsecured creditors filed by the Debtors in these Chapter 11 Cases; (d) the Internal Revenue Service; (e) HSH Nordbank, AG, Gerhart-Hauptmann-Platz 50, 20095 Hamburg, Germany; (f) UniCredit Bank AG, Global Shipping, Neuer Wall 64, 20354 Hamburg, Germany; (g) Commerzbank AG, PO Box 11 19 13, 20419 Hamburg, Germany; (h) DVB Bank AG, 80 Cheapside, London EC2V 6EE; Platz der Republik 6, 60325 Frankfurt/Main, and P.O. Box 11 05 32, 60040 Frankfurt/Main, Germany; (i) Citibank, N.A., Citigroup Centre, 33 Canada Square, Canary Wharf, London E14 5LB; (j) Citibank International plc, Attn: Loans Agency, European Loans Agency Office, Securities and Banking, Citigroup Centre, 33 Canada Square, Canary Wharf, London, United Kingdom E14 5LB; (k) Bank of Scotland plc, Corporate, Marine Finance, Pentland House, 8 Lochside Avenue, Edinburgh EH12 9DJ; 6th Floor, 33 Old Broad Street, London, United Kingdom EC2N 1HZ; and Faryners House, 25 Monument Street, London, United Kingdom EC3R 8BQ; (*l*) Lloyds TSB Bank plc, 10 Gresham Street, London EC2V 7AE; New Uberior House, 11 Earl Grey Street, Edinburgh, United Kingdom EH3 9BN; and 6th Floor, 33 Old Broad Street, London, United Kingdom EC2N 1HZ; (m) Goldman Sachs Bank (Europe) Plc, Hardwicke House, Upper Hatch Street, Dublin 2, Ireland; (n) Goldman Sachs International Bank, Peterborough Court, 133 Fleet Street, London EC4A 2BB; (o) Sculptor Investments S.a.r.l., 2 Rue J. Hachin, C-1746 Luxemburg, c/o Och-Ziff Capital Management Group, 9 West 57th Street, 13th Floor, New York, NY 10019 USA and (p) any such other party entitled to notice pursuant to Local Bankruptcy Rule 9013-1(b) (the "Initial Notice Parties"). The Debtors submit that no other or further notice need be provided.

20.     The Debtors further respectfully ask that the Court schedule the Final Hearing and authorize them to mail copies of the signed Interim Order, which fixes the time, date and manner for filing objections to (a) the Initial Notice Parties, (b) counsel to any statutory committees appointed in these chapter 11 cases, and (c) any party who filed a request for notices in these chapter 11 cases pursuant to Bankruptcy Rule 2002 prior to the date set forth in the Interim Order for the Final Hearing.

## NO PRIOR REQUEST

21.     No prior request for the relief requested herein has been made to this Court or any other court.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto, granting the relief requested in this Motion and such other and further relief as may be just and proper.

Dated: White Plains, New York
      June 23, 2013

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:    */s/ Jay M. Goffman*
       Jay M. Goffman
       Mark A. McDermott
       Suzanne D.T. Lovett
       Four Times Square
       New York, New York 10036
       (212) 735-3000

       Proposed Counsel for Debtors and
        Debtors in Possession

995049-CHISR02A - MSW

## EXHIBIT A

**Proposed Interim Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
In re:                                        : Chapter 11
                                              :
NAUTILUS HOLDINGS LIMITED, et al.,            : Case No. 14-22885 (RDD)
                                              :
          Debtors.[1]                         :
                                              : (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**INTERIM ORDER (I) SCHEDULING A FINAL HEARING PURSUANT
TO BANKRUPTCY RULES 4001 AND 9014 AND (II) AUTHORIZING
DEBTORS TO OBTAIN POSTPETITION FINANCING
PURSUANT TO SECTION 364(c) OF THE BANKRUPTCY CODE**

Upon the Motion[2] of the Debtors for entry of an interim order pursuant to section

364(c) of the Bankruptcy Code, Rules 4001 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules), and Rule 4001-2 of the Local Bankruptcy Rules for the

Southern District of New York (the "Local Bankruptcy Rules") seeking, among other things:

          (1)      pursuant to Bankruptcy Rule 4001, that an interim hearing (the

"Interim Hearing") on the Motion be held before this Court to consider entry of this

interim order (the "Interim Order");

          (2)      authority, pursuant to the Interim Order, to execute and enter into

the secured debtor-in-possession credit agreement (the "DIP Agreement," the DIP

---

[1]    The Debtors and, where applicable, the last four digits of their Hong Kong taxpayer identification codes are as
       follows: Nautilus Holdings Limited, Nautilus Holdings No. 2 Limited, Nautilus Shipholdings No. 1 Limited,
       Nautilus Shipholdings No. 2 Limited, Nautilus Shipholdings No. 3 Limited, Able Challenger Limited (8877),
       Charming Energetic Limited (0936), Dynamic Continental Limited (0928), Earlstown Limited (1898), Findhorn
       Osprey Limited (8075), Floral Peninsula Limited (4549), Golden Knighthead Limited (6376), Magic Peninsula
       Limited (0950), Metropolitan Harbour Limited (7969), Metropolitan Vitality Limited (9019), Miltons Way
       Limited (6180), Perpetual Joy Limited (0897), Regal Stone Limited (3636), Resplendent Spirit Limited (8114),
       Superior Integrity Limited (0934), and Vivid Mind Limited (7935). The Debtors maintain offices at 445
       Hamilton Avenue, 11th Floor, White Plains, New York, 10601; 16/F-19/F Prince's Building, 10 Chater Road,
       Central, Hong Kong; and Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

Agreement, together with the other documents entered into in connection therewith, the "DIP Documents") and to obtain subordinated (with respect to prepetition secured obligations), secured postpetition financing in the form of a revolving credit facility (the "DIP Facility") on the terms and conditions set forth in the DIP Agreement;

(3)        authority, pursuant to this Interim Order, to immediately obtain revolving loans under the DIP Facility up to a maximum aggregate principal amount outstanding of $550,000 to pay postpetition operating expenses of and restructuring costs of the Debtors (including DIP Lender's costs) to the extent that such operating expenses and restructuring costs are in excess of the Debtors' operating revenue,  in accordance with the terms and conditions set forth in the DIP Agreement; and

(4)        that this Court schedule a final hearing on the Motion (the "Final Hearing") to consider entry of a final order (the "Final Order") granting all of the relief requested in the Motion on a final basis and authorizing the Debtors to obtain subordinated (with respect to prepetition secured obligations), secured postpetition financing on substantially the same terms as the Interim Order;

and it appearing that the relief requested in the Motion is necessary to provide the Debtors with sufficient capital to continue operations, to preserve the going concern value of their businesses and to continue their restructuring efforts; and it further appearing that notice of the Motion was provided in the form and manner set forth in the Motion; and it also appearing that notice of the Interim Hearing and copies of the proposed form of order approving the Motion and a draft of the DIP Agreement were filed and served on the Initial Notice Parties, and any other party that filed a request for notices with this Court; and such notice constituting good and sufficient notice of the Interim Hearing under the circumstances in accordance with Bankruptcy Rules 4001(c)

2

and 4001(d), section 102(1) of the Bankruptcy Code, and Local Bankruptcy Rule 4001-2, as required by section 364(c) of the Bankruptcy Code in light of the nature of the relief requested in the Motion; and for good cause shown;

Upon the record made by the Debtors at the Interim Hearing and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    *Jurisdiction*.  This Court has jurisdiction over the Debtors' chapter 11 cases (the "Chapter 11 Cases"), the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ l57(b) and 1334.  Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § l57(b)(2).  The statutory predicates for the relief granted herein are section 364 of the Bankruptcy Code, Bankruptcy Rules 4001 and 9014, and Local Bankruptcy Rule 4001-2.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    *Notice*.  Under the circumstances, the notice given by the Debtors of the Motion and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001 (c) and (d) and Local Bankruptcy Rule 4001-2, and no other notice is required or need be given.

3.    *Findings Regarding the Financing*.

(a)    Good and sufficient cause has been shown for the entry of this Interim Order.

(b)    The Debtors have an immediate need to obtain financing under the DIP Agreement in order to permit, among other things, the orderly continuation of the operation of their businesses, to pay the fees and expenses of their restructuring and to satisfy other working

capital and operational needs.  The immediate access of the Debtors to sufficient working capital and liquidity through the incurrence of additional indebtedness for borrowed money is vital to the preservation and maintenance of the going concern values of the Debtors and to complete their restructuring efforts.

(c)    The terms of the DIP Agreement appear to be fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(d)    The DIP Agreement has been negotiated in good faith between the Debtors and Synergy Management Services Limited (the "DIP Lender"), and all of the  Debtors' obligations and indebtedness arising under, in respect of or in connection with the DIP Facility and the DIP Documents, shall be deemed to have been extended by the DIP Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(e)    Absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Documents is therefore in the best interest of the Debtors' estates.

4.    *Withdrawal/Denial of Objections; Approval of the Motion*.  Except to the extent related to final approval of the DIP Documents, any objections and reservations of rights contained therein that have not been withdrawn and/or settled as set forth on the record of the Interim Hearing are hereby overruled.  The Motion is granted in all respects on an interim basis.

5.    *Authorization of the DIP Agreement*.

4

(a)    The DIP Agreement is approved in all respects.  The Debtors are hereby authorized to enter into and execute the DIP Documents.  The Debtors are hereby authorized to immediately borrow money pursuant to and subject to the terms of the DIP Agreement up to a maximum aggregate principal amount of $550,000 (in accordance with the terms of the DIP Agreement), subject to any limitations of borrowings under the DIP Documents, and in accordance with the terms of this Interim Order and the DIP Documents, which shall be used solely in accordance with the terms of the DIP Documents.

(b)    In furtherance of the foregoing and without further approval of this Court, each Debtor is expressly authorized and directed on an interim basis to perform all acts, to make, execute and deliver all instruments and documents, to perform all obligations thereunder and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Agreement, including, without limitation:

(i)    the negotiation, execution, delivery and performance of the DIP Documents, and

(ii)    the performance of all other acts required under or in connection with the DIP Agreement.

6.    Upon execution and delivery of the DIP Documents and the entry of this Interim Order, each of the DIP Documents shall constitute a valid and binding obligation of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of such DIP Document.  The DIP Obligations of the Debtors shall be joint and several.

7.    *Superpriority Claims.*  Pursuant to section 364(c)(1) of the Bankruptcy Code, the obligations of the  Debtors under the DIP Agreement and the other DIP Documents (collectively, the "DIP Obligations") shall constitute obligations of the Debtors with priority over

5

any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the

Bankruptcy Code, and over any and all administrative expenses or other claims under sections

105, 326, 328, 330, 331, 506(c), 507(a) or 726 of the Bankruptcy Code (the "Superpriority

Claims"); provided that all Superpriority Claims shall be subject to the Carve-Out (as defined

below).  The Superpriority Claims shall be payable from all property of each Debtor's estate

except avoidance actions under Chapter 5 of the Bankruptcy Code.

8.    *DIP Liens*.  As security for the Debtors' DIP Obligations as provided for

under the DIP Documents, effective and perfected upon the date of the Interim Order and

without the necessity of the execution by the Debtors of mortgages, security agreements, pledge

agreements, financing statements or other similar documents, the DIP Lender is hereby granted

the following security interests and liens, subject in each case to the Carve-Out (all property

identified in clauses (a) and (b) below being collectively referred to as the "Collateral"; and all

such liens and security interests granted to the DIP Lender pursuant to this Interim Order and the

DIP Documents, the "DIP Liens"):

(a)    First Lien on Unencumbered Property.   A valid, binding, continuing,

enforceable, fully-perfected first priority security interest in and lien upon all tangible and

intangible prepetition and postpetition property and assets of the Debtors and their respective

estates wherever located, and any proceeds and products thereof, whether existing on the date of

filing of the Debtors' chapter 11 petitions (the "Petition Date") or thereafter acquired, that is not

subject to valid, perfected, non-avoidable and enforceable liens in existence immediately prior to

the Petition Date; provided, however, the Collateral shall not include avoidance actions under

Chapter 5 of the Bankruptcy Code.

(b)    <u>Liens Junior to Existing Liens</u>.  A valid, binding, continuing, enforceable, fully-perfected junior security interest in and lien upon all tangible and intangible prepetition and postpetition property and assets of the Debtors and their respective estates wherever located, and any proceeds and products thereof, whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens (if any) in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date but perfected thereafter as permitted by section 546(b) of the Bankruptcy Code (collectively, the "<u>Existing Liens</u>").

9.    *DIP Lien Priority.* The DIP Liens shall be senior to any liens granted by any Debtor on or after the Petition Date (including, without limitation, any liens granted pursuant to an order of this Court, including an order approving the use of any cash collateral).

10.    *Protection of DIP Lender's Rights*.

(a)    The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to permit the DIP Lender to exercise, during the continuance of an Event of Default, all rights and remedies under the DIP Documents provided, that, notwithstanding anything to the contrary contained herein or in the DIP Documents, no less than seven days written notice shall first be provided to counsel to the Debtors, counsel to any statutory creditors' committee appointed in these Chapter 11 Cases, counsel to the administrative agents (the "<u>Agents</u>") that are party to the Debtors' six prepetition secured loan agreements (the "<u>Prepetition Facilities</u>), counsel to the lenders that are parties to the Prepetition Facilities (the "<u>Prepetition Lenders</u>"), and the United States Trustee prior to the exercise of any such right.

(b)    In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of

Default has occurred and is continuing, and the Debtors hereby waive their right to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Lender set forth in this Interim Order or the DIP Documents.  In no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

11.     *Perfection of DIP Liens*.  The DIP Lender is hereby authorized, but not required, to file or record financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to it hereunder.  Whether the DIP Lender shall, in its sole discretion, choose to file such financing statements, mortgages, notices of lien or similar instruments or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid and perfected at the time and on the date of entry of the Interim Order.

12.     *Carve-Out*.  Notwithstanding anything to the contrary contained in this Interim Order or other order of this Court, the liens and claims of or granted to the DIP Lender in this Interim Order and/or the DIP Documents shall be subject and subordinate to the payment, without duplication, of the following fees and claims (the amounts set forth below, together with the limitations set forth therein, collectively, the "Carve-Out"):

(a)     the claims of the respective retained professionals of the Debtors and any statutory committee appointed in the Chapter 11 Cases (collectively, the "Retained Professionals") for fees and expenses incurred at any time on and after the Petition Date and prior to the occurrence of an Event of Default and delivery of a notice from the DIP Lender to the Debtors that the DIP Lender desires to trigger the Carve-Out; provided that, in each case,

8

such fees and expenses of the Retained Professionals are ultimately allowed on a final basis by

this Court under sections 327, 328, 330, 331 or 363 of the Bankruptcy Code;

(b)       (i) the claims of the Retained Professionals for fees and expenses which

were incurred on and after the occurrence of an Event of Default and delivery of a notice from

the DIP Lender to the Debtors that the DIP Lender desires to trigger the Carve-Out; provided

that, in each case, such fees and expenses of the Retained Professionals are ultimately allowed on

a final basis by this Court under sections 327, 328, 330, 331 or 363 of the Bankruptcy Code and

do not exceed $1,000,000 in the aggregate plus (ii) the fees and expenses incurred by any

professionals engaged by any successor to the Debtors, including, without limitation, any trustee

appointed under Chapter 11 or 7 of the Bankruptcy Code or any examiner with expanded

powers, in an aggregate amount not to exceed $250,000; and

(c)       the unpaid fees payable to the United States Trustee and Clerk of the

Bankruptcy Court pursuant to Section 1930 of Title 28 of the United States Code;

provided that, except as otherwise provided herein or in the Final Order, no portion of the Carve-

Out shall be utilized for the payment of professional fees and expenses incurred in connection

with any challenge to the amount, extent, priority, validity, perfection or enforcement of the

Indebtedness (as defined in the DIP Agreement) of the Debtors owing to the DIP Lender or

indemnified parties under the DIP Facility or to the collateral securing the DIP Facility; provided

further that so long as no Event of Default shall have occurred and be continuing, the Debtors

shall be permitted to pay compensation and reimbursement of expenses allowed and payable

under sections 330 and 331 of the Bankruptcy Code, as long as the same may be due and

payable, and the same shall not reduce the Carve-Out; provided, however, that the foregoing

shall not be construed as authorization to the allowance of any fees and expenses referenced

9

herein and shall not affect the right of any parties to object to the allowance and payment of such

amounts.

13.  *Events of Default*.  Except as otherwise provided herein, or to the extent

the Lender may otherwise agree in writing, (i) any violation of any of the terms of this Interim

Order, or (ii) any occurrence of an "Event of Default" under the DIP Agreement or the DIP

Documents, as applicable, shall be deemed to be an Event of Default under this Interim Order.

14.  *Order Governs*.  In the event of any conflict between the provisions of the

DIP Documents and this Interim Order, the provisions of this Interim Order shall govern.

15.  *Binding Effect; Successors and Assigns*.  The DIP Documents and the

provisions of this Interim Order, including, without limitation, all findings herein, shall be

binding upon all parties in interest in these Cases, including, without limitation, the DIP Lender,

any creditors' committee appointed in these Chapter 11 Cases, any other committee appointed in

these Chapter 11 Cases, the Agents, the Prepetition Lenders, and the Debtors and their respective

successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or

elected for the estate of any of the Debtors) and shall inure to the benefit of the DIP Lender and

the  Debtors and their respective successors and assigns; *provided*, *however*, that the DIP Lender

shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible

person appointed for the estates of the Debtors.

16.  *No Third Party Rights*.  Except as explicitly provided herein, this Interim

Order does not create any rights for the benefit of any third party, creditor, equity holder or any

direct, indirect or incidental beneficiary.

17.  *No Deemed Control*.  In making decisions to advance any extensions of

credit under the DIP Facility, or in taking any other actions related to this Interim Order or the

DIP Documents, the DIP Lender shall have no liability to any third party and shall not be deemed to be in control of the operations of the Debtors and the DIP Lender's relationship with the Debtors shall not constitute or be deemed to constitute a joint venture or partnership of any kind.  Further, the Debtors are authorized and directed to indemnify Lender against any liability arising in connection with the DIP Agreement or the DIP Documents to the extent set forth in the DIP Agreements and the DIP Documents.

18.    *Final Hearing*.  The Final Hearing is scheduled for _____ __, 2014 at __:__ _.m. before this Court.

19.    The Debtors shall promptly mail copies of this Interim Order and a notice of the Final Hearing (which shall constitute adequate notice of the Final Hearing) to the Initial Notice Parties.

20.    Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) the U.S. Trustee for the Southern District of New York; (b) Skadden, Arps, Slate, Meagher & Flom LLP; (c) Togut, Segal & Segal LLP, Att'n: Frank A. Oswald, Esq. and Brian F. Moore, Esq., One Penn Plaza, Suite 3335 New York, NY 10119, as counsel to the DIP Lender; (d) the parties listed in the consolidated list of thirty (30) largest unsecured creditors filed by the Debtors in these chapter 11 cases; (e) the Securities Exchange Commission; (f) HSH Nordbank, AG, Gerhart-Hauptmann-Platz 50, 20095 Hamburg, Germany; (g) UniCredit Bank AG, Global Shipping, Neuer Wall 64, 20354 Hamburg, Germany; (h) Commerzbank AG, PO Box 11 19 13, 20419 Hamburg, Germany; (i) DVB Bank AG, 80 Cheapside, London EC2V 6EE; Platz der Republik 6, 60325 Frankfurt/Main, and P.O. Box 11 05 32, 60040 Frankfurt/Main, Germany; (j) Citibank, N.A., Citigroup Centre, 33 Canada Square, Canary Wharf, London E14 5LB; (k) Citibank

11

International plc, Attn: Loans Agency, European Loans Agency Office, Securities and Banking,

Citigroup Centre, 33 Canada Square, Canary Wharf, London, United Kingdom E14 5LB; (*l*)

Bank of Scotland plc, Corporate, Marine Finance, Pentland House, 8 Lochside Avenue,

Edinburgh EH12 9DJ; 6th Floor, 33 Old Broad Street, London, United Kingdom EC2N 1HZ;

and Faryners House, 25 Monument Street, London, United Kingdom EC3R 8BQ; (m) Lloyds

TSB Bank plc, 10 Gresham Street, London EC2V 7AE; New Uberior House, 11 Earl Grey

Street, Edinburgh, United Kingdom EH3 9BN; and 6th Floor, 33 Old Broad Street, London,

United Kingdom EC2N 1HZ; (n) Goldman Sachs Bank (Europe) Plc, Hardwicke House, Upper

Hatch Street, Dublin 2, Ireland; (o) Goldman Sachs International Bank, Peterborough Court, 133

Fleet Street, London EC4A 2BB; (p) Sculptor Investments S.a.r.l., 2 Rue J. Hachin, C-1746

Luxemburg, c/o Och-Ziff Capital Management Group, 9 West 57th Street, 13th Floor, New York,

NY 10019 USA and shall be filed with the Clerk of the United States Bankruptcy Court,

Southern District New York, in each case to allow actual receipt by the foregoing no later than

_____ __, 2014 at 4:00 p.m., prevailing Eastern time.



Dated:  White Plains, New York
         _____, 2014


         _____
         UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT B</u>**

**DIP Agreement**

**$5,000,000**

**SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**among**

**NAUTILUS HOLDINGS LIMITED,**
**as a Borrower**

**NAUTILUS HOLDINGS NO. 2 LIMITED,**
**as a Borrower,**

**and**

**THE OTHER BORROWERS PARTY HERETO FROM TIME TO TIME,**
**as Borrowers,**

**and**

**SYNERGY MANAGEMENT SERVICES LIMITED,**

**as the Lender**

_____

**Dated as of [_____], 2014**

_____

# TABLE OF CONTENTS

Page

SECTION 1. Definitions and Accounting Terms ...........................................................................1

    1.01    Defined Terms .............................................................................................2

SECTION 2. Amount and Terms of DIP Facility; Lien Priority ....................................................8

    2.01    The Commitments....................................................................................8
    2.02    Minimum Amount of Each Borrowing.....................................................8
    2.03    Notice of Borrowing ................................................................................8
    2.04    Disbursement of Funds ...........................................................................9
    2.05    Notes .......................................................................................................9
    2.06    Interest.....................................................................................................9
    2.07    No Discharge; Survival of Claims ........................................................10
    2.08    Priority and Liens..................................................................................10
    2.09    Joint and Several ...................................................................................12

SECTION 3. Reductions of Commitment ....................................................................................13

    3.01    Voluntary Termination of Commitments................................................13
    3.02    Mandatory Reduction of Commitments..................................................13

SECTION 4. Prepayments; Payments; Taxes; Application of Proceeds .......................................13

    4.01    Voluntary Prepayments..........................................................................13
    4.02    Mandatory Repayments and Commitment Reductions ..........................13
    4.03    Method and Place of Payment ...............................................................13
    4.04    Net Payments; Taxes..............................................................................13
    4.05    Application of Proceeds .........................................................................15

SECTION 5. Conditions Precedent to the Initial Borrowing Date ...............................................15

    5.01    Effective Date; Notes .............................................................................15
    5.02    Validity of Liens ...................................................................................15
    5.03    Margin Regulations...............................................................................16
    5.04    No Conflicts ..........................................................................................16
    5.05    Material Adverse Change ......................................................................16

SECTION 6. Conditions Precedent to All Credit Events .............................................................16

    6.01    No Default; Representations and Warranties..........................................16
    6.02    Notice of Borrowing .............................................................................16
    6.03    Orders....................................................................................................16
    6.04    Expense Reimbursement, etc. ................................................................17
    6.05    Outstanding Loans ................................................................................17

|  |  |  |
|---|---|---|
| 6.06 | Material Adverse Change | 17 |
| | **SECTION 7. Representations, Warranties and Agreements** | 17 |
| 7.01 | Corporate/Limited Liability Company/Limited Partnership Status | 17 |
| 7.02 | Corporate Power and Authority | 18 |
| 7.03 | No Violation | 18 |
| 7.04 | Governmental Approvals | 18 |
| 7.05 | Material Adverse Change | 19 |
| 7.06 | Litigation | 19 |
| 7.07 | Use of Proceeds; Margin Regulations | 19 |
| 7.08 | Tax Returns and Payments | 19 |
| 7.09 | The Security Documents | 19 |
| 7.10 | Compliance with Statutes, etc. | 19 |
| 7.11 | Insurance | 20 |
| 7.12 | Concerning the Collateral Vessels | 20 |
| 7.13 | Orders | 20 |
| 7.14 | Appointment of Trustee or Examiner; Liquidation | 20 |
| 7.15 | Perfection of Security Interest | 21 |
| 7.16 | Liens | 21 |
| | **SECTION 8. Affirmative Covenants** | 21 |
| 8.01 | Maintenance of Property; Insurance | 21 |
| 8.02 | Compliance with Statutes, etc. | 21 |
| 8.03 | Use of Proceeds | 21 |
| 8.04 | Performance of Post-Petition Obligations | 21 |
| 8.05 | Payment of Taxes | 21 |
| | **SECTION 9. Negative Covenants** | 21 |
| 9.01 | Liens | 21 |
| 9.02 | Consolidation, Merger, Purchase or Sale of Assets, etc. | 23 |
| 9.03 | Indebtedness | 24 |
| 9.04 | Advances, Investments and Loans | 24 |
| 9.05 | Transactions with Affiliates | 24 |
| 9.06 | Pre-Petition Payments | 25 |
| 9.07 | Final Bankruptcy Court Order; Administrative Priority; Lien Priority; Payment of Claims | 25 |
| | **SECTION 10. Events of Default** | 25 |
| 10.01 | Payments | 25 |
| 10.02 | Representations, etc. | 25 |
| 10.03 | Covenants | 25 |
| 10.04 | Security Documents | 26 |
| 10.05 | Guarantees | 26 |
| 10.06 | Judgments | 26 |

-ii-

10.07    Change of Control..........................................................................26
10.08    Dismissal or Conversion of Chapter 11 Case ...........................26
10.09    Relief from Automatic Stay ........................................................26
10.10    Orders...........................................................................................26
10.11    Pre-Petition Payments .................................................................27
10.12    Invalid Plan .................................................................................27
10.13    Disgorgement ..............................................................................27
10.14    Sale of Assets ..............................................................................27
10.15    Breach of Management Agreements............................................27

SECTION 11.  Grant of Liens ...............................................................28

SECTION 12.  Miscellaneous.................................................................28

12.01    Payment of Expenses, etc. ..........................................................28
12.02    Right of Setoff.............................................................................29
12.03    Notices .........................................................................................29
12.04    Benefit of Agreement...................................................................30
12.05    No Waiver; Remedies Cumulative ..............................................30
12.06    Calculations; Computations ........................................................31
12.07    **GOVERNING LAW; SUBMISSION TO JURISDICTION;**
         **VENUE;  WAIVER OF JURY TRIAL** ....................................31
12.08    Counterparts.................................................................................32
12.09    Effectiveness................................................................................32
12.10    Headings Descriptive ..................................................................33
12.11    Amendment or Waiver; etc..........................................................33
12.12    Survival ........................................................................................33
12.13    Confidentiality .............................................................................33
12.14    Register ........................................................................................34
12.15    Judgment Currency ......................................................................34
12.16    Language.......................................................................................34
12.17    Waiver of Immunity.....................................................................34
12.18    Order .............................................................................................35
12.19    Parties Including Trustees; Bankruptcy Court Proceedings ........35

SECTION 13.  Guaranty..........................................................................35

13.01    Guaranty........................................................................................35
13.02    Nature of Liability........................................................................36
13.03    Independent Obligation................................................................36
13.04    Authorization ...............................................................................37
13.05    Continuing Guaranty and Reliance ..............................................38
13.06    Subordination................................................................................38
13.07    Payments ......................................................................................39
13.08    Reinstatement ...............................................................................39
13.09    Contribution .................................................................................39
13.10    Limitation on Obligations ...........................................................40

Schedules:

| | | |
|---|---|---|
| SCHEDULE I | - | Borrowers |
| SCHEDULE II | - | Collateral Vessels |

THIS SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of [_____], 2014, among NAUTILUS HOLDINGS LIMITED, as a borrower ("NH1"), NAUTILUS HOLDINGS NO. 2 LIMITED, as a borrower ("NH2"), the other co-borrowers identified on Schedule I hereto, as borrowers (collectively with NH1 and NH2, the "Borrowers," and each, a "Borrower"), and SYNERGY MANAGEMENT SERVICES LIMITED, as the lender (the "Lender").  All capitalized terms used herein and defined in Section 1 are used herein as therein defined.

W I T N E S S E T H:

WHEREAS, on June 23, 2014 (the "Petition Date"), the Borrowers commenced voluntary cases (collectively, the "Chapter 11 Case") under Title 11 of the United States Code, 11 U.S.C. §§101, et. seq. (as now or hereafter in effect, or any successor thereto, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and such Borrowers continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrowers have requested that the Lender provide a secured debtor-in-possession revolving credit facility to the Borrowers in an aggregate principal amount not to exceed $5,000,000 (the "DIP Facility") to (i) fund operating expenses and general corporate and working capital requirements of the Borrowers, and administrative expenses of the Chapter 11 Case, in each case in compliance with the terms hereof, (ii) make any Pre-Petition Payments to the extent expressly permitted hereunder, (iii) pay restructuring fees and expenses, and (iv) pay costs, expenses, interest and other Obligations owing to the Lender under the DIP Facility;

WHEREAS, the Lender is willing to make certain loans at the request of the Borrowers in an aggregate principal amount not to exceed the Commitments under the DIP Facility upon the terms and conditions set forth herein;

WHEREAS, the Borrowers are willing to guarantee all of the Obligations of the other Borrowers to the Lender under the Credit Documents;

WHEREAS, each Borrower acknowledges that it will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrowers as provided in this Agreement; and

WHEREAS, to provide security for the repayment of all obligations of any kind of the Borrowers hereunder and under the other Credit Documents, each of the Borrowers will provide to the Lender the Liens, status and protection set forth in Sections 2.08 and 7.16.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

SECTION 1. Definitions and Accounting Terms.

1.01    <u>Defined Terms</u>. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"<u>Acceptable Plan</u>" shall mean a plan of reorganization of the Borrowers pursuant to Chapter 11 of the Bankruptcy Code which provides for the payment in full in cash of the DIP Facility, on or prior to the Maturity Date.

"<u>Affiliate</u>" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding anything to the contrary contained above, for purposes of Section 9.05, neither the Lender nor any of its affiliates shall be deemed to constitute an Affiliate of any Borrower in connection with the Credit Documents or its dealings or arrangements relating thereto.

"<u>Agreement</u>" shall mean this Secured Debtor-in-Possession Credit Agreement, as modified, supplemented, amended or restated from time to time.

"<u>Avoidance Actions</u>" shall mean actions for preferences, fraudulent conveyances, and other avoidance power claims under Sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code.

"<u>Bankruptcy Code</u>" shall have the meaning provided in the Recitals hereto.

"<u>Bankruptcy Court</u>" shall have the meaning provided in the Recitals hereto.

"<u>Borrowers</u>" shall have the meaning provided in the first paragraph of this Agreement.

"<u>Borrowing</u>" shall mean the borrowing of Loans from the Lender on a given date.

"<u>Borrowing Date</u>" shall mean each date on which a Credit Event occurs.

"<u>Business Day</u>" shall mean any day except Saturday, Sunday and any day which shall be in New York City or London a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close.

"<u>Capital Expenditures</u>" shall mean, with respect to any Person, all expenditures by such Person which should be capitalized in accordance with IFRS.

"<u>Carve-Out</u>" shall have the meaning provided in Section 2.08(a).

"<u>Change of Control</u>" shall mean (i) either NH1 or NH2 shall at any time and for any reason fail to own, directly or indirectly, 100% of the Equity Interests of each Borrower which owns a Collateral Vessel, (ii) the sale, lease or transfer of all or

2

substantially all of NH1 or NH2's assets to any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), (iii) the liquidation or dissolution of NH1 or NH2 or (iv) an event or series of events occurring after the Effective Date by which any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) excluding Permitted Holders becomes the Beneficial Owner, directly or indirectly, of 50% or more of the equity securities of NH1 or NH2 entitled to vote for members of the board of directors or equivalent governing body of such Borrower on a fully-diluted basis. As used herein, "Permitted Holders" means (i) with respect to NH1 or NH2, Reminiscent Ventures S.A. or any of its affiliates and (ii) with respect to NH1, ELQ Investors II Limited, NHL Investors (MD), Ltd., NHL Investors (ME) Ltd., Och-Ziff Management Europe Limited, Goldman Sachs International, Eton Park Capital Management, Eton Park Master Fund, LP and Eton Park Fund, LP and any of their respective affiliates.

"Chapter 11 Case" shall have the meaning provided in the Recitals hereto.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to the Code are to the Code, as in effect at the date of this Agreement and any subsequent provisions of the Code amendatory thereof, supplemental thereto or substituted therefor.

"Collateral" shall mean, all now owned or hereafter acquired assets and property, whether real or personal, of the Borrowers including, without limitation, each Collateral Vessel, all assets and property pledged under the Credit Documents, and all cash, any investment of such cash, inventory, accounts receivable, including intercompany accounts (and all rights associated therewith), other rights to payment whether arising before or after the Petition Date, contracts, contract rights, chattel paper, goods, investment property, inventory, deposit accounts (including the cash collection, "lockbox" and "concentration" accounts provided for in the Credit Documents), "core concentration accounts," "cash collateral accounts", and in each case all amounts on deposit therein from time to time, equity interests, securities accounts, securities entitlements, securities, commercial tort claims, books, records, plants, equipment, general intangibles, documents, instruments, interests in leases and leaseholds, interests in real property, fixtures, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter of credit rights, supporting obligations, machinery and equipment, patents, copyrights, trademarks, tradenames, other intellectual property, all licenses therefor, and all proceeds, rents, profits, products and substitutions, if any, of any of the foregoing. For the avoidance of doubt, the Collateral shall not include Avoidance Actions, but shall, upon entry of a Final Order, include the proceeds of Avoidance Actions.

"Collateral Vessel" shall mean, at any time, each of the Vessels listed on Schedule II that is owned by any Borrower.

"Commitment" shall mean $5,000,000, as the same may be reduced from time to time or terminated pursuant to Sections 3.02 and/or 10, as applicable.

"Credit Documents" shall mean this Agreement, each Note, each Security Document and, after the execution and delivery thereof, each additional guaranty or additional security document executed pursuant to this Agreement.

"Credit Event" shall mean the making of any Loan.

"Default" shall mean any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"DIP Facility" shall have the meaning provided in the Recitals hereto.

"Dollars" and the sign "$" shall each mean lawful money of the United States.

"Effective Date" shall have the meaning provided in Section 12.09.

"Equity Interests" shall mean (i) in the case of a corporation, corporate stock, (ii) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents of corporate stock and (iii) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited).

"Event of Default" shall have the meaning provided in Section 10.

"Event of Loss" shall mean any of the following events: (x) the actual or constructive total loss of a Collateral Vessel or the agreed or compromised total loss of a Collateral Vessel; or (y) the capture, condemnation, confiscation, requisition, purchase, seizure or forfeiture of, or any taking of title to, a Collateral Vessel. An Event of Loss shall be deemed to have occurred: (i) in the event of an actual loss of a Collateral Vessel, at the time and on the date of such loss or if that is not known at noon Greenwich Mean Time on the date which such Collateral Vessel was last heard from; (ii) in the event of damage which results in a constructive or compromised or arranged total loss of a Collateral Vessel, at the time and on the date of the event giving rise to such damage; or (iii) in the case of an event referred to in clause (y) above, at the time and on the date on which such event is expressed to take effect by the Person making the same.

"Existing Liens" shall have the meaning provided in Section 2.08(a)(iii).

"Final Order" shall mean, collectively, the final order or orders entered by the Bankruptcy Court with respect to the Borrowers in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2), authorizing and approving the DIP Facility and the terms of this Agreement and the other Credit Documents (including the payment of interest, costs, expenses and other Obligations hereunder and thereunder) and granting the Liens, status and protections set forth in Section 2.08 and 7.16 hereof and provided for in the Security Documents, which order is in effect and not stayed, and as to which the time to appeal, petition for certiorari, or move for re-argument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for re-argument or rehearing shall then be pending, or, if pending, no stay pending appeal shall have been granted, as the same may be amended, modified or supplemented from time to

4

time in accordance with the terms hereof. The Final Order and all extensions and material modifications and amendments thereto shall be in form and substance reasonably satisfactory to the Lender.

"<u>Final Order Entry Date</u>" shall mean the date on which the Final Order shall have been entered on the docket of the Bankruptcy Court.

"<u>Guaranty</u>" shall mean the guaranty of the Borrowers pursuant to Section 13.

"<u>IFRS</u>" shall have the meaning provided in Section 12.06(a).

"<u>Indebtedness</u>" shall mean, as to any Person, without duplication, (i) all indebtedness of such Person for borrowed money, (ii) the maximum amount available to be drawn under all letters of credit or bank guaranties issued for the account of such Person and all unpaid drawings in respect of such letters of credit or bank guaranties, (iii) all guaranties of Indebtedness of the types described in clause (i) and (ii) of this definition secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person (to the extent of the value of the respective property); <u>provided</u> that Indebtedness shall in any event not include trade payables and expenses accrued in the ordinary course of business.

"<u>Initial Borrowing Date</u>" shall mean the date occurring on or after the Effective Date on which the initial Credit Event hereunder occurs.

"<u>Interim Order</u>" shall mean, collectively, the interim order or orders entered by the Bankruptcy Court with respect to the Borrowers in the Chapter 11 Case, together with all extensions, modifications and amendments thereto, in form and substance reasonably satisfactory to the Lender, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Borrowers to execute and perform under the terms of this Agreement and the other Credit Documents, as applicable, and incur (and guarantee) and secure the Loans and other Obligations in connection therewith.

"<u>Investments</u>" shall have the meaning provided in Section 9.04.

"<u>Lender</u>" shall have the meaning provided in the first paragraph of this Agreement.

"<u>Lien</u>" shall mean any mortgage, pledge, hypothecation, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever.

"<u>Loan</u>" shall have the meaning provided in Section 2.01(a).

"<u>Margin Regulations</u>" shall have the meaning provided in Section 5.03.

"<u>Margin Stock</u>" shall have the meaning provided in Regulation U of the Board of Governors of the Federal Reserve System.

5

"Material Adverse Effect" shall mean a material adverse effect on (a) the business, property, assets, liabilities, condition (financial or otherwise) or prospects of the Borrowers taken with respect to the Obligations as a whole, (b) the rights and remedies of the Lender or (c) the ability of the Borrowers or the Borrowers, taken as a whole, to perform their Obligations, in any such case, other than as a result of (i) events leading up to, resulting from and following the commencement of the Chapter 11 Case or the continuation and prosecution thereof, and (ii) any items that are publicly available on or prior to the Petition Date.

"Maturity Date" shall mean the earlier to occur of (a) the Stated Maturity Date and (b) the date of termination of the Commitments of the Lender and its obligations to make Loans pursuant to the exercise of remedies under Section 10 as a result of the occurrence of an Event of Default which is continuing.

"Moody's" shall mean Moody's Investors Service, Inc. and its successors.

"Note" shall have the meaning provided in Section 2.05(a).

"Notice of Borrowing" shall have the meaning provided in Section 2.03.

"Notice Office" shall mean the office of the Lender located at Synergy Management Services Limited, Lapithion Tower, 5 Deligiorgi Street, 1066 Nicosia – Cyprus, Tel: +357-22666147, Fax: +357-22666173, E-mail: amaroulletis@synergy-marine.com.cy, Attention: Andreas Maroulletis, with a copy to (other than with respect to notices delivered pursuant to Section 2) Togut Segal & Segal LLP, One Penn Plaza Suite 3335, New York, New York 10119 U.S.A., Tel: 212-594-5000, Fax: 212-967-4258, E-mail: frankoswald@teamtogut.com, Attention: Frank A. Oswald, or such other office as the Lender may hereafter designate in writing as such to the other parties hereto.

"Obligations" shall mean (x) the principal of, premium, if any, and interest on the Loans made to, the Borrowers under this Agreement and (y) all other obligations, liabilities and indebtedness owing by the Borrowers to the Lender under this Agreement and each other Credit Document to which any Borrower is a party (including, without limitation, indemnities and interest thereon (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for in this Agreement, whether or not such interest is an allowed claim in any such proceeding)), whether now existing or hereafter incurred under, arising out of or in connection with this Agreement and any such other Credit Document.

"Orders" shall mean, together, the Interim Order and the Final Order.

"Permitted Encumbrance" shall mean easements, rights-of-way, restrictions, encroachments, exceptions to title and other similar charges or encumbrances on any Collateral Vessel or any other property of any Borrower arising in the ordinary course of business which do not materially detract from the value of such Collateral Vessel or the property subject thereto.

"Permitted Liens" shall have the meaning provided in Section 9.01.

"Person" shall mean any individual, partnership, joint venture, firm, corporation, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"Petition Date" shall have the meaning provided in the Recitals hereto.

"Post-Petition" shall mean the time period beginning immediately upon the filing of the Chapter 11 Case.

"Post-Petition Indebtedness" shall mean the obligations of the Borrowers arising on or after the Petition Date relating to the Borrowers' bankruptcy estates, including related to the Post-Petition operation of the Borrowers' business (including the Obligations).

"Pre-Petition" shall mean the time period prior to filing of the Chapter 11 Case.

"Pre-Petition Payment" shall mean a direct or indirect payment, redemption, purchase, defeasance or acquisition for value (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Pre-Petition (i) Indebtedness, (ii) "critical vendor payments" or (iii) trade payables (including, without limitation, in respect of reclamation claims), or other Pre-Petition claims against any Borrower.

"Register" shall have the meaning provided in Section 12.14.

"Returns" shall have the meaning provided in Section 7.08.

"S&P" shall mean Standard & Poor's Financial Services LLC, and its successors.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Security Documents" shall mean the Orders, Section 11 of this Agreement and, after the execution and delivery thereof, each additional security document executed pursuant to this Agreement.

"Stated Maturity Date" shall mean the date that is one year following the Petition Date (or if such date is not a Business Day, the next succeeding Business Day).

"Subsidiary" shall mean, as to any Person, (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% equity interest at the time.

"Tax Benefit" shall have the meaning provided in Section 4.04(c).

"Taxes" shall have the meaning provided in Section 4.04(a).

"Transaction" shall mean, collectively, (i) the entering into of this Agreement and the other Credit Documents, as applicable, on the Effective Date and (ii) the payment of all costs and expenses in connection with the foregoing.

"UCC" shall mean the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

"United States" and "U.S." shall each mean the United States of America.

"Vessel" shall mean, individually and collectively, all sea going vessels and tankers at any time owned by the Borrowers, and, individually, any of such vessels.

SECTION 2. Amount and Terms of DIP Facility; Lien Priority.

2.01    The Commitments. (a) Subject to and upon the terms and conditions set forth herein and the Orders, the Lender agrees to make, at any time and from time to time on or after the Effective Date and prior to the Maturity Date, a revolving loan or revolving loans (each, a "Loan" and, collectively, the "Loans") to the Borrowers, which Loans (i) shall be denominated in Dollars, (ii) may be repaid and reborrowed in accordance with the provisions hereof, and (iii) shall not exceed at any time that aggregate principal amount outstanding which equals the Commitment of the Lender at such time.

(b)    Notwithstanding anything to the contrary set forth herein, prior to the Final Order Entry Date the aggregate outstanding principal amount of Loans incurred by the Borrowers shall not exceed $550,000.

2.02    Minimum Amount of Each Borrowing. The aggregate principal amount of each Borrowing of Loans shall not be less than $50,000 unless otherwise agreed to by the Lender.

2.03    Notice of Borrowing. (a) Whenever the Borrowers desire to incur Loans hereunder, they shall give the Lender at its Notice Office at least one Business Day's (or less with the consent of the Lender) prior written notice of each Loan to be incurred hereunder, provided that any such notice shall be deemed to have been given on a certain day only if given before 11:00 A.M. (London time) (or later with the consent of the Lender). Each such written notice (each a "Notice of Borrowing") shall be irrevocable and shall be given by the Borrowers in a form specifying (i) the aggregate principal amount of the Loans to be incurred pursuant to such Borrowing, (ii) the date of such Borrowing (which shall be a Business Day), and (iii) to which account the proceeds of such Loans are to be deposited.

(b)    Without in any way limiting the obligation of the Borrowers to deliver a written Notice of Borrowing in accordance with Section 2.03(a), the Lender may act without liability upon the basis of telephonic notice of such Borrowing, believed by the Lender in good faith to be from any Borrower.

8

2.04    Disbursement of Funds. No later than 1:00 P.M. (London time) (or such earlier time as the Lender agrees) on the date specified in each Notice of Borrowing, the Lender will make available in Dollars and in immediately available funds to the Borrowers each such Borrowing requested to be made on such date, in the account specified in the applicable Notice of Borrowing.

2.05    Notes. (a) The Borrowers' obligation to pay the principal of, and interest on, the Loans made by the Lender shall be evidenced in the Register maintained by the Lender pursuant to Section 12.14 and shall, if requested by the Lender, also be evidenced by a promissory note duly executed and delivered by the Borrowers substantially in form and substance reasonably acceptable to the Lender (the "Note").

(b)    The Note issued to the Lender shall (i) be executed by the Borrowers, (ii) be payable to the Lender or its registered and permitted assigns and be dated the Effective Date, (iii) be in a stated principal amount equal to the Commitment of the Lender (or, if issued after the termination thereof, be in a stated principal amount equal to the outstanding Loans of the Lender at such time) and be payable in the outstanding principal amount of the Loans evidenced thereby, (iv) mature on the Maturity Date, (v) bear interest as provided in Section 2.06 in respect of the Loans evidenced thereby, (vi) be subject to voluntary prepayment as provided in Section 4.01, and mandatory repayment as provided in Section 4.02, and (vii) be entitled to the benefits of this Agreement and the other Credit Documents.

(c)    The Lender will note on its internal records the amount of each Loan made by it and each payment in respect thereof and will, prior to any transfer of the Note, endorse on the reverse side thereof the outstanding principal amount of Loans evidenced thereby. Failure to make any such notation or any error in any such notation or endorsement shall not affect the Borrowers' obligations in respect of any Loans made or repaid pursuant to this Agreement and the other Credit Documents.

(d)    No failure of the Lender to request or obtain a Note evidencing its Loans to the Borrowers shall affect or in any manner impair the obligations of the Borrowers to pay the Loans (and all related Obligations) incurred by the Borrowers that would otherwise be evidenced thereby in accordance with the requirements of this Agreement, and shall not in any way affect the security or guarantees therefor provided pursuant to the Credit Documents. At any time (including, without limitation, to replace any Note that has been destroyed or lost) when the Lender requests the delivery of a Note to evidence any of its Loans, the Borrowers shall promptly execute and deliver to the Lender the requested Note in the appropriate amount or amounts to evidence such Loans; provided that, in the case of a substitute or replacement Note, the Borrowers shall have received from the Lender (i) an affidavit of loss or destruction and (ii) a customary lost/destroyed Note indemnity, in each case in form and substance reasonably acceptable to the Borrowers and the Lender, and duly executed by the Lender.

2.06    Interest. (a) The Borrowers agree to pay interest in respect of the unpaid principal amount of each Loan from the date the proceeds thereof are made

available to the Borrowers until the maturity (whether by acceleration or otherwise) of such Loan at a rate per annum equal to 3.25%.

(b)    If the Borrowers fail to pay any amount payable by them under a Credit Document on its due date, then at the written election of the Lender by notice to the Borrowers, interest shall accrue on the overdue amount (in the case of overdue interest to the extent permitted by law) from the due date up to the date of actual payment (both before and after judgment) at a rate which is 2% plus, in the case of any overdue principal amount on any Loan, the interest rate payable on such Loan pursuant to Section 2.06(a).  Any interest accruing under this Section 2.06(b) shall be immediately payable by the Borrowers on demand by the Lender.

(c)    Default interest (if unpaid) arising on an overdue amount will be compounded with the overdue amount on the last Business Day of each calendar month but will remain immediately due and payable.

(d)    Accrued and unpaid interest shall be payable in respect of each outstanding Loan on the last Business Day of each calendar month ending after such Loan is made, on any repayment or prepayment (on the amount repaid or prepaid), at maturity (whether by acceleration or otherwise) and, after such maturity, on demand.

2.07    No Discharge; Survival of Claims.  Until the Obligations are paid in cash in full and the Commitments have been terminated, the Borrowers agree that (i) their Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization (and each Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Liens granted to the Lender pursuant to the Orders and pursuant to this Agreement and the other Credit Documents shall not be affected in any manner by the entry of an order confirming any plan of reorganization that does not provide for the Obligations to be paid in cash in full and the Commitments to be terminated.

2.08    Priority and Liens.

(a)    Liens and Priority.  Each of the Borrowers hereby covenants, represents and warrants that, upon entry of the Orders, the Obligations authorized by the Orders of the Borrowers under the Credit Documents:

(i)    pursuant to Section 364(c)(1) of the Bankruptcy Code, the obligations of the Borrowers hereunder shall constitute obligations of the Borrowers with priority over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims under Sections 105, 326, 328, 330, 331, 506(c), 507(a) or 726 of the Bankruptcy Code;

(ii)    pursuant to Section 364(c)(2) of the Bankruptcy Code and the Security Documents, shall be secured by, and each Borrower shall have granted to the Lender a perfected first priority Lien on all presently owned and hereafter acquired unencumbered tangible and intangible property and assets of the Borrowers

10

and their respective estates wherever located, and any proceeds and products thereof, including, without limitation, accounts, deposit accounts, cash, chattel paper, investment property, letter-of-credit rights, securities accounts, commercial tort claims, causes of action (other than Avoidance Actions, but including, in any case, the proceeds of such Avoidance Actions, subject to entry of the Final Order), investments, instruments, documents, inventory, contract rights, general intangibles, intellectual property, real property, fixtures, goods, equipment, vessels and other fixed assets and proceeds and products of all of the foregoing (including earnings and insurance proceeds); and

(iii)   pursuant to Section 364(c)(3) of the Bankruptcy Code and the Security Documents, shall be secured by, and each Borrower shall have granted to the Lender a perfected junior Lien on, all presently owned and hereafter acquired tangible and intangible property and assets of the Borrowers and their respective estates wherever located, and any proceeds and products thereof, including, without limitation, accounts, deposit accounts, cash, chattel paper, investment property, letter-of-credit rights, securities accounts, commercial tort claims, causes of action (other than Avoidance Actions, subject to the last sentence in the definition of "Collateral"), investments, instruments, documents, inventory, contract rights, general intangibles, intellectual property, real property, fixtures, goods, equipment, vessels and other fixed assets and proceeds and products of all of the foregoing (including earnings and insurance proceeds) that are subject to (x) valid and perfected Liens in existence immediately prior to the Petition Date or (y) valid Liens in existence immediately prior to the Petition Date but perfected thereafter as permitted by Section 546(b) of the Bankruptcy Code, if any (the "Existing Liens").

The Lien of the Lender securing the Obligations shall be senior to any Liens granted by any Borrower on or after the Petition Date (including, without limitation, any replacement Liens granted pursuant to a Bankruptcy Court order approving the use of any cash collateral).

The liens and claims of or granted to the Lender in the Orders and the Credit Documents will be subject and subordinate to the payment, without duplication, of the following fees and claims (the amounts set forth below, together with the limitations set forth therein, collectively, the "Carve-Out"):

(x)   the claims of the respective retained professionals of the Borrowers and any statutory committee appointed in the Chapter 11 Case (collectively, the "Retained Professionals") for fees and expenses incurred at any time on and after the Petition Date and prior to the occurrence of an Event of Default and delivery of a notice from the Lender to the Borrowers that the Lender desires to trigger the Carve-Out; provided that, in each case, such fees and expenses of the Retained Professionals are ultimately allowed on a final basis by the Bankruptcy Court under Sections 327, 328, 330, 331 or 363 of the Bankruptcy Code;

(y) (i) the claims of the Retained Professionals for fees and expenses which were incurred on and after the occurrence of an Event of Default and delivery of a notice from

11

the Lender to the Borrowers that the Lender desires to trigger the Carve-Out; provided that, in each case, such fees and expenses of the Retained Professionals are ultimately allowed on a final basis by the Bankruptcy Court under Sections 327, 328, 330, 331 or 363 of the Bankruptcy Code and do not exceed $1,000,000 in the aggregate plus (ii) the fees and expenses incurred by any professionals engaged by any successor to the Borrowers, including, without limitation, any trustee appointed under chapter 11 or 7 of the Bankruptcy Code or any examiner with expanded powers, in an aggregate amount not to exceed $250,000; and

(z)    the unpaid fees payable to the United States Trustee and Clerk of the Bankruptcy Court pursuant to Section 1930 of Title 28 of the United States Code;

provided that, except as otherwise provided in the Orders, no portion of the Carve-Out shall be utilized for the payment of professional fees and expenses incurred in connection with any challenge to the amount, extent, priority, validity, perfection or enforcement of the Indebtedness of the Borrowers owing to the Lender or indemnified parties under the DIP Facility or to the collateral securing the DIP Facility. The Lender agrees that so long as no Event of Default shall have occurred and be continuing, the Borrowers shall be permitted to pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. § 330 and 11 U.S.C. § 331, as the same may be due and payable, and the same shall not reduce the Carve-Out. The foregoing shall not be construed as a consent to the allowance of any fees and expenses referred to above and shall not affect the right of the Lender to object to the allowance and payment of such amounts.

(b)    Collateral Security Perfection. Each of the Borrowers agrees to take all action that the Lender may reasonably request as a matter of nonbankruptcy law to perfect and protect the Lender's Liens, upon the Collateral and for such Liens to obtain the priority therefor contemplated hereby.  Each Borrower hereby irrevocably authorizes the Lender at any time and from time to time to file in any filing office in any jurisdiction any initial financing statements and amendments thereto that (a) use collateral descriptions such as "all personal property" or "all assets", in each case "whether now owned or hereafter acquired", words of similar import or any other description the Lender, in its sole discretion, so chooses in any such financing statements, and (b) provide any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether such Borrower is an organization, the type of organization and any organization identification number issued to such Borrower and, (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates. Such Borrower agrees to furnish any such information to the Lender promptly upon request. Notwithstanding the provisions of this Section 2.08(b), the Lender shall have the benefits of the Interim Order and the Final Order as set forth in Section 5.02 hereof.

2.09    Joint and Several. The obligations of each of the Borrowers as a "Borrower" hereunder and under the other Credit Documents are joint and several. Without limiting the generality of the foregoing, reference is hereby made to the Guaranty, to which the obligations of the Borrowers are subject.

12

SECTION 3. <u>Reductions of Commitment</u>.

3.01    <u>Voluntary Termination of Commitments</u>. Upon at least three Business Days' prior notice to the Lender at its Notice Office, the Borrowers shall have the right, at any time or from time to time, without premium or penalty, to terminate or reduce the unutilized portion of the Commitments, in whole or in part, in integral multiples of $50,000 in the case of partial reductions thereto.

3.02    <u>Mandatory Reduction of Commitments</u>. In addition to any other mandatory commitment reductions pursuant to Section 4.02, the Commitment shall terminate in its entirety on the Maturity Date.

SECTION 4. <u>Prepayments; Payments; Taxes; Application of Proceeds</u>.

4.01    <u>Voluntary Prepayments</u>. The Borrowers shall have the right to prepay the Loans, without premium or penalty except as provided by law, in whole or in part at any time and from time to time on the following terms and conditions:

(a)    the Borrowers shall give the Lender prior to 12:00 Noon (London time) at its Notice Office at least one Business Day's prior written notice (including e-mail notice or telephonic notice promptly confirmed in writing) of its intent to prepay such Loans and the date and amount of such prepayment; and

(b)    each prepayment shall be in an aggregate principal amount of at least $50,000 or, if less, any remaining principal amount of Loans outstanding.

4.02    <u>Mandatory Repayments and Commitment Reductions</u>. On any day on which the aggregate outstanding principal amount of all Loans (after giving effect to all other repayments thereof on such date) exceeds the Commitment as then in effect (after giving effect to all other reductions thereof on such date), the Borrowers shall repay principal of Loans in an amount equal to such excess.

4.03    <u>Method and Place of Payment</u>. Except as otherwise specifically provided herein, all payments under this Agreement or any Note shall be made to the Lender not later than 3:00 p.m. (London time) on the date when due and shall be made in Dollars in immediately available funds at the Notice Office of the Lender or such other office as the Lender may hereafter designate in writing. Whenever any payment to be made hereunder or under any Note shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable at the applicable rate during such extension.

4.04    <u>Net Payments; Taxes</u>. (a) All payments made by any Borrower hereunder or under any Note will be made without setoff, counterclaim or other defense. All such payments will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments (but

13

excluding, except as provided in the second succeeding sentence, any tax imposed on or measured by the net income, net profits or any franchise tax based on net income, net profits or net worth, of the Lender pursuant to the laws of the jurisdiction in which it is organized or the jurisdiction in which the principal office or applicable lending office of the Lender is located or any subdivision thereof or therein) and all interest, penalties or similar liabilities with respect to such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges (all such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges being referred to collectively as "Taxes"). If any Taxes are so levied or imposed, the Borrowers agree to pay the full amount of such Taxes, and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement or under any Note, after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein or in such Note. If any amounts are payable in respect of Taxes pursuant to the preceding sentence, the Borrowers agree to reimburse the Lender, upon the written request of the Lender, for taxes imposed on or measured by the net income, net profits or any franchise tax based on net income, net profits or net worth, of the Lender pursuant to the laws of the jurisdiction in which the Lender is organized or in which the principal office or applicable lending office of the Lender is located or under the laws of any political subdivision or taxing authority of any such jurisdiction in which the Lender is organized or in which the principal office or applicable lending office of the Lender is located and for any withholding of taxes as the Lender shall determine are payable by, or withheld from, the Lender, in respect of such amounts so paid to or on behalf of the Lender pursuant to the preceding sentence and in respect of any amounts paid to or on behalf of the Lender pursuant to this sentence. The Borrowers will furnish to the Lender within 45 days after the date of payment of any Taxes is due pursuant to applicable law certified copies of tax receipts evidencing such payment by the Borrowers. The Borrowers agree to indemnify and hold harmless the Lender, and reimburse the Lender upon its written request, for the amount of any Taxes so levied or imposed and paid by the Lender.

(b)    The Lender agrees to use reasonable efforts (consistent with legal and regulatory restrictions and subject to overall policy considerations of the Lender) to file any certificate or document or to furnish to the Borrowers any information as reasonably requested by the Borrowers that may be necessary to establish any available exemption from, or reduction in the amount of, any Taxes; provided, however, that nothing in this Section 4.04(b) shall require the Lender to disclose any confidential information (including, without limitation, its tax returns or its calculations).

(c)    If the Borrowers pay any additional amount under this Section 4.04 to the Lender and the Lender determines in its sole discretion exercised in good faith that it has actually received or realized in connection therewith any refund or any reduction of, or credit against, its Tax liabilities in or with respect to the taxable year in which the additional amount is paid (a "Tax Benefit"), the Lender shall pay to the Borrowers an amount that the Lender shall, in its sole discretion exercised in good faith, determine is equal to the net benefit, after tax, which was obtained by the Lender in such year as a consequence of such Tax Benefit; provided, however, that (i) the Lender may determine, in its sole discretion exercised in good faith consistent with the policies of the Lender, whether to seek a Tax Benefit, (ii) any Taxes that are imposed on the Lender as a result

14

of a disallowance or reduction (including through the expiration of any tax credit carryover or carryback of the Lender that otherwise would not have expired) of any Tax Benefit with respect to which the Lender has made a payment to the Borrowers pursuant to this Section 4.04(c) shall be treated as a Tax for which the Borrowers are obligated to indemnify the Lender pursuant to this Section 4.04 without any exclusions or defenses, (iii) nothing in this Section 4.04(c) shall require the Lender to disclose any confidential information to the Borrowers (including, without limitation, its tax returns), and (iv) the Lender shall not be required to pay any amounts pursuant to this Section 4.04(c) at any time during which a Default or Event of Default exists.

4.05     Application of Proceeds.  All monies collected by the Lender upon any sale or other disposition of the Collateral of each Borrower, together with all other monies received by the Lender hereunder (except to the extent released in accordance with the applicable provisions of this Agreement or any other Credit Document), shall be applied to the payment of the Obligations as follows:

first, to the payment of all amounts owing the Lender as a result of (x) any and all sums advanced by the Lender in order to preserve the Collateral or preserve its security interest in the Collateral and/or (y) in the event of any proceeding for the collection or enforcement of any indebtedness, obligations or liabilities of any Borrower to the Lender incurred under, arising out of, or in connection with, this Agreement and the other Credit Documents, after an Event of Default shall have occurred and be continuing, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by the Lender of its rights hereunder, together with reasonable attorneys' fees and court costs;

second, to the extent proceeds remain after the application pursuant to the preceding clause (i), an amount equal to the outstanding Obligations shall be paid to the Lender; and

third, to the extent proceeds remain after the application pursuant to the preceding clauses (i) and (ii), to the Borrowers or such other Person entitled thereto under applicable law.

SECTION 5. Conditions Precedent to the Initial Borrowing Date. The obligation of the Lender to make Loans on the Initial Borrowing Date, is subject at the time of the making of such Loans to the satisfaction or waiver of the following conditions:

5.01     Effective Date; Notes. On or prior to the Initial Borrowing Date (i) the Effective Date shall have occurred and (ii) if requested by the Lender, there shall have been delivered to the Note for the Lender executed by the Borrowers, in each case in the amount, maturity and as otherwise provided herein.

5.02     Validity of Liens. On or prior to the Initial Borrowing Date, the Security Documents, upon entry of the Interim Order, shall be effective to create in favor of the Lender a legal, valid and enforceable perfected security interest in and lien on the

Collateral, with the priority described in Section 2.08, subject to the Carve-Out. All filings, recordings, deliveries of instruments and other actions reasonably requested by the Lender that are necessary or desirable in the reasonable opinion of the Lender to protect and preserve such security interests shall have been duly effected.

5.03    Margin Regulations. On the Initial Borrowing Date, all Loans and other financing to be made pursuant to this Agreement shall be in full compliance with all applicable requirements of law, including, without limitation, the provisions of the Regulations T, U and X of the Board of Governors of the Federal Reserve System (the "Margin Regulations").

5.04    No Conflicts. On the Initial Borrowing Date, after the making of the Loans and the performance by the Borrowers of the Credit Documents, the financings incurred in connection therewith and the other transactions contemplated hereby, there shall be no conflict with, or default under, any material agreement or contractual or other restriction which is binding for the Borrowers other than as permitted by the Interim Order.

5.05    Material Adverse Change. Nothing shall have occurred since the Petition Date which could reasonably be expected to have a Material Adverse Effect.

SECTION 6. Conditions Precedent to All Credit Events. The obligation of the Lender to make Loans (including Loans made on the Initial Borrowing Date) is subject, at the time of each such Credit Event (except as hereinafter indicated), to the satisfaction of the following conditions:

6.01    No Default; Representations and Warranties. At the time of each such Credit Event and also immediately after giving effect thereto (i) there shall exist no Default or Event of Default and (ii) all representations and warranties of the Borrowers contained herein or in any other Credit Document shall be true and correct in all material respects both before and after giving effect to such Credit Event with the same effect as though such representations and warranties had been made on the date of such Credit Event (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date).

6.02    Notice of Borrowing. Prior to the making of each Loan, the Lender shall have received the Notice of Borrowing required by Section 2.03.

6.03    Orders.  At the time of each such Credit Event and also after giving effect thereto, (i) if an extension of credit has been requested before the Final Order has been entered by the Bankruptcy Court, the Interim Order shall be in full force and effect and shall not have been vacated, reversed or stayed, or modified or amended in any material respect and (ii) if an extension of credit is requested after the Final Order has been entered by the Bankruptcy Court, the Lender shall have received a copy of the Final Order and the Final Order shall be in full force and effect and shall not have been vacated, reversed or stayed, or modified or amended in any material respect. If either the Interim

16

Order or the Final Order is the subject of a pending appeal in any respect, none of such Order, the making of the Loans or the performance by any Borrower of any of its obligations under any of the Credit Documents shall be the subject of a presently effective stay pending appeal. The Borrowers and the Lender shall be entitled to rely in good faith upon the Orders, notwithstanding objection thereto or appeal therefrom by any interested party. The Borrowers and the Lender shall be permitted and required to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction.

6.04     Expense Reimbursement, etc. At the time of each such Credit Event and also after giving effect thereto, the Borrowers shall have paid to the Lender all costs, expenses and other compensation contemplated in connection with this Agreement payable to the Lender pursuant hereto to the extent then due and invoiced at least three Business Days prior to such Borrowing Date.

6.05     Outstanding Loans. At the time of each such Credit Event and also after giving effect thereto, the amount of the proposed Credit Event shall not, when aggregated with the outstanding amount of existing Loans, exceed the aggregate amount authorized under the Interim Order or the Final Order, as applicable, at such time.

6.06     Material Adverse Change. At the time of the first Credit Event after the Final Order Entry Date, nothing shall have occurred since the Petition Date which could reasonably be expected to have a Material Adverse Effect.

The acceptance of the proceeds of each Credit Event shall constitute a representation and warranty by the Borrowers to the Lender that all of the applicable conditions specified in Section 5 and in this Section 6 and applicable to such Credit Event have been satisfied as of that time.

SECTION 7. Representations, Warranties and Agreements. In order to induce the Lender to enter into this Agreement and to make the Loans, each Borrower makes the following representations, warranties and agreements, in each case on the Effective Date, all of which shall survive the execution and delivery of this Agreement and the Notes (if any) and the making of the Loans, with the occurrence of each Credit Event on or after the Effective Date being deemed to constitute a representation and warranty that the matters specified in this Section 7 are true and correct in all material respects on and as of the Effective Date and on the date of each such Credit Event (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date):

7.01     Corporate/Limited Liability Company/Limited Partnership Status. Each Borrower (i) is a duly organized and validly existing corporation, limited liability company or limited partnership, as the case may be, (ii) has the corporate or other applicable power and authority to own its property and assets and to transact the business in which it is currently engaged and presently proposes to engage and (iii) is in good

17

standing (to the extent such concept exists) under the laws of the jurisdiction of its incorporation or formation, is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the conduct of its business as currently conducted requires such qualifications, except for failures to have such status or to be so qualified which could not reasonably be expected to have a Material Adverse Effect.

7.02    Corporate Power and Authority. Upon entry of the Interim Order, each Borrower has the corporate or other applicable power and authority to execute, deliver and perform the terms and provisions of each of the Credit Documents to which it is party and has taken all necessary corporate or other applicable action to authorize the execution, delivery and performance by it of each of such Credit Documents. Upon entry of the Interim Order, each Borrower has duly executed and delivered each of the Credit Documents to which it is party, and each of such Credit Documents constitutes the legal, valid and binding obligation of such Borrower enforceable against such Borrower in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

7.03    No Violation. Except as could not reasonably be expected to have a Material Adverse Effect, neither the execution, delivery or performance by any Borrower of the Credit Documents to which it is a party, nor compliance by it with the terms and provisions thereof, will (i) contravene any material provision of any applicable law, statute, rule or regulation or any applicable order, judgment, writ, injunction or decree of any court or governmental instrumentality, or (ii) conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents) upon any of the material properties or assets of any Borrower pursuant to the terms of any indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement, contract or instrument, to which any Borrower is a party or by which it or any of its material property or assets is bound or to which it may be subject (other than as permitted by the Orders). Neither the execution, delivery or performance by any Borrower of the Credit Documents to which it is a party, nor compliance by it with the terms and provisions thereof, will violate any provision of the Certificate of Incorporation or By-Laws (or equivalent organizational documents) of any Borrower.

7.04    Governmental Approvals. Except as otherwise provided in the Orders or to the extent not required by the Credit Documents, no order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except as have been obtained or made or, in the case of any filings or recordings in respect of the Security Documents will be made, to the extent required pursuant to the Credit Documents, within 10 days of the date such Security Document is required to be executed pursuant hereto), or exemption by, any governmental or public body or authority, or any subdivision thereof, is required to authorize, or is required in connection with, (i) the execution, delivery and performance by any Borrower of any Credit Document to which it is a party or (ii) the legality, validity, binding effect or

18

enforceability of any Credit Document to which any Borrower is a party against such Borrower, except entry of the Orders.

7.05     Material Adverse Change. Since the Petition Date, nothing has occurred that has had or could reasonably be expected to have a Material Adverse Effect.

7.06     Litigation. There are no unstayed actions, suits, investigations (conducted by any governmental or other regulatory body of competent jurisdiction) or proceedings pending or, to the knowledge of any Borrower, threatened against any Borrower that could reasonably be expected to have a Material Adverse Effect.

7.07     Use of Proceeds; Margin Regulations. (a) All proceeds of the Loans shall be used only for the following: (i) fund operating expenses and general corporate and working capital requirements of the Borrowers, and administrative expenses of the Chapter 11 Case, in each case in compliance with the terms hereof, (ii) make any Pre-Petition Payments to the extent expressly permitted hereunder, (iii) pay restructuring fees and expenses, and (iv) pay costs, expenses, interest and other Obligations owing to the Lender under the DIP Facility.

(b)     No part of the proceeds of any Loan will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock except to purchase or carry or extend credit for the purpose of purchasing or carrying such Margin Stock as may be permitted to be purchased or carried pursuant to the terms of Section 9.04. Neither the making of any Loan nor the use of the proceeds thereof nor the occurrence of any other Credit Event will violate the Margin Regulations.

7.08     Tax Returns and Payments. Except as could not reasonably be expected to have a Material Adverse Effect or to the extent any of the following is being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with IFRS: (i) each Borrower has timely filed all U.S. federal income tax returns, statements, forms and reports for taxes and all other material U.S. and material non-U.S. tax returns, statements, forms and reports for taxes required to be filed by or with respect to the income, properties or operations of such Borrower (the "Returns") and (ii) the Borrowers have at all times paid, or have provided adequate reserves (in accordance with IFRS) for the payment of, all taxes shown as due on the Returns and all other material U.S. federal, state and non-U.S. taxes payable by them.

7.09     The Security Documents. After the execution and delivery thereof, upon entry of the Orders and upon the taking of the actions mentioned in the immediately succeeding sentence, each of the Security Documents creates in favor of the Lender a legal, valid and enforceable fully perfected Lien on all right, title and interest of the Borrowers party thereto in the Collateral described therein, with the priority described in Section 2.08, subject to no other Liens except for Permitted Liens.

7.10     Compliance with Statutes, etc. Each Borrower is in compliance in all material respects with all applicable statutes, regulations and orders of, and all

applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property, except such non-compliances that could not reasonably be expected to have a Material Adverse Effect.

7.11    <u>Insurance</u>. The properties and business of the Borrowers are insured, including pursuant to policies of the type specifically required pursuant to Section 8, with financially sound and reputable insurance companies which may be Affiliates of the Borrowers, in such amounts (after giving effect to any self-insurance compatible with the following standards), with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the applicable Borrower operates.

7.12    <u>Concerning the Collateral Vessels</u>. As of the Effective Date, each Collateral Vessel is identified on Schedule II. Each Collateral Vessel is and will be operated in compliance with all applicable law, rules and regulations, except such noncompliance as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

7.13    <u>Orders</u>. (a) The Interim Order or the Final Order, as applicable, is in full force and effect, and has not been reversed, stayed or vacated or amended or modified in any material respect absent the written consent of the Lender.

(b)    Upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Lender shall, subject to the provisions of Section 10 and the applicable provisions of the Final Order, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder in accordance with the terms hereof, without further application to or order by the Bankruptcy Court.

(c)    If either the Interim Order or the Final Order is the subject of a pending appeal in any respect, none of such Order, the making of the Loans or the performance by any of the Borrowers of any of their obligations under any of the Credit Documents shall be the subject of a presently effective stay pending appeal. The Borrowers and the Lender shall be entitled to rely in good faith upon the Orders, notwithstanding objection thereto or appeal therefrom by any interested party. The Borrowers and the Lender shall be permitted and required to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction.

7.14    <u>Appointment of Trustee or Examiner; Liquidation</u>. No order has been entered in the Chapter 11 Case (i) for the appointment of a Chapter 11 trustee, (ii) for the appointment of a responsible officer or an examiner with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code or (iii) to convert the Chapter 11 Case to a case under Chapter 7 or to dismiss the Chapter 11 Case.

7.15     Perfection of Security Interest. Upon entry of the Interim Order, such Interim Order is effective to create in favor of the Lender a legal, valid and enforceable security interest in the Collateral and proceeds thereof.

7.16     Liens. On and after the Effective Date and the entry of the Interim Order, such Interim Order and the Credit Documents are sufficient to provide the Liens described in, and with the priority provided in, Section 2.08 of this Agreement.

SECTION 8. Affirmative Covenants. Each Borrower hereby covenants and agrees that on and after the Effective Date, and until the Commitments have terminated and the Loans, together with interest, and all other Obligations, are paid in full:

8.01     Maintenance of Property; Insurance. The Borrowers will (i) keep all material property necessary in its business in good working order and condition (ordinary wear and tear and loss or damage by casualty or condemnation excepted), and (ii) maintain insurance on the Collateral Vessels in at least such amounts and against at least such risks as are in accordance with normal industry practice for similarly situated insureds.

8.02     Compliance with Statutes, etc. Each Borrower will comply with all applicable statutes, regulations and orders of, and all applicable restrictions (including all laws and regulations relating to money laundering) imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property, except such non-compliances as could not reasonably be expected to have a Material Adverse Effect.

8.03     Use of Proceeds. The Borrowers will use the proceeds of the Loans only as provided in Section 7.07.

8.04     Performance of Post-Petition Obligations. Each Borrower will perform all of its material Post-Petition contractual obligations.

8.05     Payment of Taxes. Except as could not reasonably be expected to have a Material Adverse Effect or to the extent any of the following is being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with IFRS, each Borrower will pay and discharge all material Post-Petition taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims for sums that have become due and payable which, if unpaid, might become a Lien not otherwise permitted under Section 9.01.

SECTION 9. Negative Covenants. Each Borrower hereby covenants and agrees that on and after the Effective Date and until all Commitments have terminated and the Loans, together with interest, and all other Obligations, are paid in full:

9.01     Liens. None of the Borrowers will create, incur, assume or suffer to exist any Lien upon or with respect to any property or assets (real or personal, tangible

21

or intangible) of the Borrowers, whether now owned or hereafter acquired; <u>provided</u> that the provisions of this Section 9.01 shall not prevent the creation, incurrence, assumption or existence of the following (Liens described below are herein referred to as "<u>Permitted Liens</u>"):

(i)    Liens for Pre-Petition taxes, assessments or governmental charges or levies (<u>provided</u> that the enforcement and collection of the same are subject to the automatic stay in the Chapter 11 Case), inchoate Liens for taxes, assessments or governmental charges or levies not yet due and payable or Liens for taxes, assessments or governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with IFRS;

(ii)    Liens imposed by law, which were incurred in the ordinary course of business and do not secure Pre-Petition Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's and mechanics' liens and other similar Liens arising in the ordinary course of business;

(iii)    Liens in existence on the Effective Date (including all Existing Liens), and any renewals or extensions of such Liens, <u>provided</u> that the aggregate principal amount of the obligations (excluding interest and fees accrued thereon after the Petition Date), if any, secured by such Liens does not increase from that amount outstanding on the Effective Date (except to the extent otherwise permitted hereunder); <u>provided</u>, <u>further</u>, that the Lien of the Lender securing the Obligations shall be senior to any Liens granted by any Borrower on or after the Petition Date (including, without limitation, any replacement Liens granted pursuant to a Bankruptcy Court order approving the use of any cash collateral);

(iv)    Permitted Encumbrances;

(v)    Liens created pursuant to the Security Documents;

(vi)    Liens arising out of judgments, awards, decrees or attachments with respect to which the applicable Borrower shall in good faith be prosecuting an appeal or proceedings for review, <u>provided</u> that all such judgments, awards, decrees or attachments shall not constitute an Event of Default under Section 10.06;

(vii)    Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, Liens to secure the performance of tenders, statutory obligations (other than excise taxes), surety, stay, customs and appeal bonds, statutory bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar obligations in each case incurred in the ordinary course of business (exclusive of obligations for the payment of borrowed money) and Liens arising by virtue of deposits made in the ordinary course of business to secure liability for premiums to insurance carriers;

22

(viii)    Liens in respect of seamen's wages and other maritime Liens arising in the ordinary course of business; and

(ix)    Liens incurred in the ordinary course of business and not securing Indebtedness for borrowed money.

9.02    Consolidation, Merger, Purchase or Sale of Assets, etc. None of the Borrowers will wind up, liquidate or dissolve its affairs or enter into any transaction of merger, consolidation or amalgamation, or convey, sell, lease or otherwise dispose of (or agree to do any of the foregoing at any future time) all or any part of its property or assets (other than Margin Stock or sales of inventory, materials, equipment, goods and services in the ordinary course of business), or enter into any sale-leaseback transactions involving any of the property or assets of the Borrowers, or purchase or otherwise acquire (in one or a series of related transactions) all or substantially all of the property or assets (other than purchases or other acquisitions of inventory, materials, equipment, goods and services in the ordinary course of business) of any Person or a majority of the Equity Interests of any Person, except that:

(i)    the Borrowers may sell or discount, in each case without recourse and in the ordinary course of business, overdue accounts receivable arising in the ordinary course of business;

(ii)    the Borrowers may acquire, purchase or lease assets from any other Borrower;

(iii)    any Borrower may be merged into or consolidated or amalgamated with any other Borrower; provided that (i) if NH1 or NH2 is party to such transaction, then NH1 or NH2, as applicable,   is the surviving entity, and (ii) all actions necessary or desirable to preserve, protect and maintain the security interest and Lien of the Lender in any Collateral held by any Borrower involved in any such transaction are taken to the reasonable satisfaction of the Lender;

(iv)    the Borrowers may make Capital Expenditures;

(v)    the Borrowers may liquidate or otherwise dispose of obsolete or worn-out property in the ordinary course of business;

(vi)    the Borrowers may make any such dispositions, purchases or acquisitions in the ordinary course of business or pursuant to an order entered by the Bankruptcy Court;

(vii)    the Borrowers may grant licenses, sublicenses, leases or subleases to other Persons not materially interfering with the conduct of the business of the Borrowers, in each case so long as no such grant otherwise affects the Lender's security interest in the asset or property subject thereto;

(viii)    the Borrowers may convey, sell, lease or otherwise transfer all or any part of their business, properties and assets to a Borrower, so long as any security

23

interests granted to the Lender pursuant to the Security Documents in the assets so transferred shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such transfer);

(ix)     the Borrowers may make Investments permitted by Section 9.04;

(x)     the Borrowers may convey, sell or otherwise dispose of assets in accordance with an Acceptable Plan.

9.03     Indebtedness. None of the Borrowers will incur, assume or suffer to exist any Indebtedness other than:

(i)     Indebtedness incurred pursuant to this Agreement and the other Credit Documents;

(ii)     Indebtedness of the Borrowers outstanding on the Petition Date (including any interest and fees accrued thereon after the Petition Date);

(iii)     intercompany Indebtedness permitted pursuant to Section 9.04; and

(iv)     other Indebtedness incurred in the ordinary course of business or pursuant to an order entered by the Bankruptcy Court.

9.04     Advances, Investments and Loans. None of the Borrowers will lend money or make advances to any other Person or make any capital contribution to any other Person (each of the foregoing an "Investment" and, collectively, "Investments"), except that:

(i)     the Borrowers may acquire and hold (x) accounts receivable owing to any of them and (y) cash equivalents and other short-term investments satisfying the operational guidelines in effect from the United States Trustee for Region 2;

(ii)     the Borrowers may make intercompany loans and advances and equity Investments among one another, provided that any loans or advances to a Borrower pursuant to this clause shall be subordinated in right of payment to the Obligations of the respective Borrower;

(iii)     Investments existing on the Effective Date;

(iv)     the Borrowers may sell or transfer assets to the extent permitted by Section 9.02; and

(v)     the Borrowers may make other Investments in the ordinary course of business or pursuant to an order entered by the Bankruptcy Court.

9.05     Transactions with Affiliates. None of the Borrowers will enter into any transaction or series of related transactions with any Affiliate of such Person, other than (i) in the ordinary course of business, (ii) pursuant to an order entered by the

24

Bankruptcy Court, (iii) on terms and conditions no less favorable to such Person as would be obtained by such Person at that time in a comparable arm's-length transaction with a Person other than an Affiliate, (iv) loans and Investments and other transactions among the Borrowers to the extent not otherwise prohibited by the Credit Documents, (v) transactions in existence on the Effective Date, (vi) the transactions contemplated by the NH2 Management Agreement and the NH1 Management Agreement and (vii) payment of directors' fees, reimbursement of reasonable expenses of directors and officers and indemnification of directors and officers in the ordinary course of business.

9.06    Pre-Petition Payments. None of the Borrowers will make any Pre-Petition Payment other than (i) as permitted under the Orders, (ii) as permitted under any "first day order" or (iii) any Pre-Petition Payment permitted by order of the Bankruptcy Court.

9.07    Final Bankruptcy Court Order; Administrative Priority; Lien Priority; Payment of Claims. None of the Borrowers will:

(a)    prior to the date on which the Obligations have been paid in cash in full and the Commitments have been cancelled and terminated, (i) pay any administrative expense claims of the Borrowers except (A) the Obligations then due and payable hereunder or (B) other administrative expense and professional claims then due and payable in the ordinary course of the business of the Borrowers or the Chapter 11 Case, or otherwise authorized by the Bankruptcy Court, in each case to the extent and having the order of priority set forth in the Orders or (ii) file with the Bankruptcy Court any alternative debtor-in-possession financing proposal that does not provide for the Obligations to be paid in cash in full and for the Commitments to be cancelled and terminated; and

(b)    seek or consent to a sale of substantially all of the Collateral unless all of the Obligations are to be paid (or repaid) in cash from the proceeds thereof and the Commitments terminated.

SECTION 10. Events of Default. Upon the occurrence of any of the following specified events (each an "Event of Default"):

10.01    Payments. Any Borrower shall (i) default in the payment when due of any principal of any Loan or any Note or (ii) default, and such default shall continue unremedied for three or more Business Days, in the payment when due of any interest on any Loan or Note or any other amounts owing under any Credit Documents; or

10.02    Representations, etc. Any representation or warranty made by any Borrower herein or in any other Credit Document shall prove to be untrue in any material respect on the date as of which made or deemed made; or

10.03    Covenants. Any Borrower shall (i) default in the due performance or observance by it of any term, covenant or agreement contained in Section 2.07 or 8.03 or Section 9 or (ii) default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement or any other Credit Document and, in

25

the case of this clause (ii), such default shall continue unremedied for a period of 30 days after written notice to the Borrowers by the Lender; or

10.04    Security Documents. At any time after the execution and delivery thereof, any of the Security Documents shall cease to be in full force and effect, or shall cease in any material respect to give the Lender the Liens, rights, powers and privileges purported to be created thereby (including, without limitation, a perfected security interest in, and Lien on, all of the Collateral), in favor of the Lender, superior to and prior to the rights of all third Persons (except in connection with Permitted Liens), and subject to no other Liens (except Permitted Liens); or

10.05    Guarantees. After the execution and delivery thereof, any Guaranty, or any provision thereof, shall cease to be in full force or effect as to any Borrower or any Borrower (or Person acting by or on behalf of such Borrower) shall deny or disaffirm such Borrower's obligations under the Guaranty to which it is a party; or

10.06    Judgments. One or more Post-Petition judgments or decrees that could reasonably be expected to have a Material Adverse Effect (after giving effect to any coverage by a reputable and solvent insurance company) shall be entered against any Borrower, and such judgments and decrees either shall be final and non-appealable or shall not be vacated, discharged or stayed or bonded pending appeal for any period of 60 consecutive days; or

10.07    Change of Control. A Change of Control shall occur; or

10.08    Dismissal or Conversion of Chapter 11 Case. The Chapter 11 Case shall be dismissed (which dismissal does not require as a condition to such dismissal the termination of the Commitments and the payment in full in cash of all Obligations) or converted to a case under Chapter 7 of the Bankruptcy Code or the Borrowers shall file a motion or other pleading seeking the dismissal or conversion of the Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise without the consent of the Lender; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Chapter 11 Case; or

10.09    Relief from Automatic Stay. The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code pertaining to the Collateral to the holder or holders of any security interest to permit any actions that could reasonably be expected to have a Material Adverse Effect; or

10.10    Orders. (i) an order shall be entered reversing, amending, supplementing, staying for a period of 10 days or more, vacating or otherwise materially amending, supplementing or modifying the Interim Order and/or the Final Order without the prior written consent of the Lender, or any Borrower shall apply for authority to do so,

26

without the prior written consent of the Lender, (ii) the Interim Order and/or the Final Order shall cease to create a valid and perfected Lien (subject to Permitted Liens) on the Collateral, with the priority described in Section 2.08, or otherwise cease to be valid and binding and in full force and effect, (iii) any of the Borrowers shall fail to comply with any material provision (or any provision in such a way as is materially adverse to the interests of the Lender) of the Interim Order and/or the Final Order, or (iv) if any Borrower is enjoined, restrained or in any way prevented by court order from continuing or conducting all or any material part of its business or affairs; or

10.11    Pre-Petition Payments. Except as permitted by the DIP Facility, the Orders, or as otherwise agreed to by the Lender, the Borrowers shall make (or shall have made) any Pre-Petition Payment other than Pre-Petition Payments authorized by the Bankruptcy Court; or

10.12    Invalid Plan. A reorganization plan other than an Acceptable Plan shall be filed by any Borrower in the Chapter 11 Case; or

10.13    Disgorgement. The Bankruptcy Court shall enter an order avoiding or requiring disgorgement by the Lender of any amounts received in respect of the Obligations; or

10.14    Sale of Assets. The Bankruptcy Court shall enter an order or orders to sell, transfer, lease, exchange, alienate or otherwise dispose of all or substantially all of the assets, properties or Equity Interests of any Borrower pursuant to Section 363 of the Bankruptcy Code unless such order or orders contemplate the repayment in full in cash of and termination in full of all Commitments and Obligations under the DIP Facility upon consummation of such sale, transfer, lease, exchange, alienation or other disposition; or

10.15    Breach of Management Agreements.

(a)    NH2 fails to pay any amount due and payable to Synergy Management Services Limited under the management agreement dated January 4, 2013 between Nautilus Holdings No. 2 Limited and Synergy Management Services Limited (the "NH2 Management Agreement"), unless such failure to pay is caused by (i) administrative or technical error, (ii) a material disruption to those payment or communications systems or to those financial markets which are, in each case, required to operate in order for payments to be made in connection with the NH2 Management Agreement (or otherwise in order for the transactions contemplated by the NH2 Management Agreement to be carried out) which disruption is not caused by, and is beyond the control of NH2, or (iii) the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of NH2 preventing it from performing its payment obligations under the NH2 Management Agreement, and, in any such case, such payment is made within five Business Days of its due date; or

(b)    NH1 fails to pay any amount due and payable to Synergy Management Services Limited under the management agreement dated November 20, 2006, as amended by the deed of amendment dated January 4, 2013, between NH1 and Synergy

Management Services Limited (the "NH1 Management Agreement"), unless such failure to pay is caused by (i) administrative or technical error, (ii) a material disruption to those payment or communications systems or to those financial markets which are, in each case, required to operate in order for payments to be made in connection with the NH1 Management Agreement (or otherwise in order for the transactions contemplated by the NH1 Management Agreement to be carried out) which disruption is not caused by, and is beyond the control of NH1, or (iii) the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of NH1 preventing it from performing its payment obligations under the NH1 Management Agreement, and, in any such case, such payment is made within five Business Days of its due date;

then, subject to the terms, conditions and provisions of the applicable Order, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Lender, without any action or approval of the Bankruptcy Court, shall after seven days' written notice to the Borrowers and the United States Trustee for the Southern District of New York, take any or all of the following actions, without prejudice to the rights of the Lender or the holder of any Note to enforce its claims against any Borrower: (i) declare the Commitments terminated, whereupon all Commitments of the Lender shall forthwith terminate immediately without any other notice of any kind; (ii) declare the principal of and any accrued interest in respect of all Loans and the Notes and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind (except to the extent notice is expressly required pursuant to any order of the Bankruptcy Court or any Credit Document), all of which are hereby waived by each Borrower; and (iii) enforce all of the Liens and security interests created pursuant to the Security Documents. In addition, upon expiration of the seven day notice period referred to above, the automatic stay provided in Section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order of the Bankruptcy Court, and the Lender shall be entitled, in its sole discretion, to exercise all of its respective rights and remedies under the Credit Documents.

SECTION 11. Grant of Liens.  Each Borrower hereby grants to the Lender a security interest in all of the Collateral, whether now owned or at any time hereafter acquired by such Borrower or in which such Borrower now has or at any time in the future may acquire any right, title or interest, as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations.

SECTION 12. Miscellaneous.

12.01    Payment of Expenses, etc. Each Borrower agrees that it shall: (i) pay all reasonable out-of-pocket costs and expenses of the Lender (including, without limitation, the reasonable fees and disbursements of a single counsel to the Lender) in connection with the preparation, execution and delivery of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein and any amendment, waiver or consent relating hereto or thereto, and the consummation and

28

administration of the transactions contemplated hereby and thereby, and of the Lender in connection with the enforcement of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein; (ii) pay and hold the Lender harmless from and against any and all present and future stamp, documentary, transfer, sales and use, value added, excise and other similar taxes with respect to the foregoing matters and save the Lender harmless from and against any and all liabilities with respect to or resulting from any delay or omission (other than to the extent attributable to the Lender) to pay such taxes; and (iii) indemnify the Lender, and each of its officers, directors, trustees, employees, representatives and agents from and hold each of them harmless against any and all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including reasonable attorneys' and consultants' fees and disbursements) incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of any investigation, litigation or other proceeding related to the entering into and/or performance of this Agreement or any other Credit Document or the proceeds of any Loans hereunder or the consummation of any transactions contemplated herein, or in any other Credit Document or the exercise of any of their rights or remedies provided herein or in the other Credit Documents.

12.02    Right of Setoff. Subject to the Orders and in addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to the Bankruptcy Court, any Borrower or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all deposits (general or special) and any other Indebtedness at any time held or owing by the Lender to or for the credit or the account of any Borrower but in any event excluding assets held in trust for any such Person against and on account of the Obligations and liabilities of such Borrower (whether or not such Obligations are then due), to the Lender under this Agreement or under any of the other Credit Documents, and all other claims of any nature or description arising out of or connected with this Agreement or any other Credit Document, irrespective of whether or not the Lender shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured. The rights of the Lender under this Section 12.02 are in addition to other rights and remedies which it may have upon the occurrence and during the continuance of any Event of Default under the Credit Documents or the Orders.

12.03    Notices. Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including facsimile or e-mail communication) and mailed, faxed, e-mailed or delivered: if to any Borrower, at the address specified under its signature below; and if to the Lender, at its Notice Office; or, in any such case, at such other address as shall be designated by such party in a written notice to the other parties hereto. All such notices and communications shall, (i) when mailed, be effective three Business Days after being deposited in the mails, prepaid and properly addressed for delivery, (ii) when sent by overnight courier, be effective one Business Day after delivery to the overnight courier prepaid and properly addressed for

delivery on such next Business Day, or (iii) when sent by facsimile or e-mail, be effective when received by such party.

12.04      Benefit of Agreement. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; provided, however, that (i) no Borrower may assign, transfer, hypothecate or otherwise convey any of its rights, obligations, benefits or interest hereunder or under any other Credit Document without the prior written consent of the Lender, and (ii) the Lender may, with the consent of the Borrowers, transfer, assign or grant participations in its rights hereunder; provided that the Lender shall not transfer or grant any participation under which the participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (x) extend the final scheduled maturity of any Loan or Note in which such participant is participating, or reduce the rate or extend the time of payment of interest thereon or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitments shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (y) consent to the assignment or transfer by the Borrowers of any of their rights and obligations under this Agreement or (z) release all or substantially all of the Collateral under all of the Security Documents (except as expressly provided in the Credit Documents) securing the Loans hereunder in which such participant is participating. In the case of any such participation, the participant shall not have any rights under this Agreement or any of the other Credit Documents (the participant's rights against the Lender in respect of such participation to be those set forth in the agreement executed by the Lender in favor of the participant relating thereto) and all amounts payable by the Borrowers hereunder shall be determined as if the Lender had not sold such participation.

12.05      No Waiver; Remedies Cumulative. No failure or delay on the part of the Lender or any holder of any Note in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing between any Borrower and the Lender or the holder of any Note shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Lender or the holder of any Note would otherwise have. No notice to or demand on any Borrower in any case shall entitle any Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Lender or the holder of any Note to any other or further action in any circumstances without notice or demand (in any such case, except to the extent notice is expressly required pursuant to any order of the Bankruptcy Court or any Credit Document).

12.06    Calculations; Computations. (a) Unless otherwise noted, all references in this Agreement to IFRS shall mean the International Financial Reporting Standards, as issued by the International Accounting Standards Board.

(b)    All computations of interest for Loans hereunder shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed (including the first day but excluding the last day).

12.07    **GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL. (a) THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE. EXCEPT IN SO FAR AS THE BANKRUPTCY COURT HAS JURISDICTION OVER THE MATTER, ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, MAY, IF BY THE LENDER, AND SHALL, IF BY ANY BORROWER, BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE, LOCATED IN NEW YORK COUNTY IN THE CITY OF NEW YORK, ANY APPELLATE COURT FROM ANY THEREOF AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH BORROWER HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH BANKRUPTCY COURT, OR IF SUCH COURT DECLINES JURISDICTION, IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH BORROWER HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH BORROWER, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN ANY OF THE AFOREMENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH BORROWER. EACH PARTY HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.**

**(b)    EACH BORROWER FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED**

31

COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED MAIL, POSTAGE PREPAID, TO THE RELEVANT BORROWER AT ITS ADDRESS SET FORTH OPPOSITE ITS SIGNATURE BELOW, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE LENDER OR THE HOLDER OF ANY NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY BORROWER OR ITS PROPERTIES IN ANY OTHER JURISDICTION. IF AT ANY TIME DURING WHICH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT REMAINS IN EFFECT, ANY BORROWER DOES NOT MAINTAIN A REGULARLY FUNCTIONING OFFICE IN NEW YORK CITY, IT WILL DULY APPOINT, AND AT ALL TIMES MAINTAIN, AN AGENT IN NEW YORK CITY FOR THE SERVICE OF PROCESS OR SUMMONS, AND WILL PROVIDE TO THE LENDER WRITTEN NOTICE OF THE IDENTITY AND ADDRESS OF SUCH AGENT FOR SERVICE OF PROCESS OR SUMMONS; PROVIDED THAT ANY FAILURE ON THE PART OF THE BORROWERS TO COMPLY WITH THE FOREGOING PROVISIONS OF THIS SENTENCE SHALL NOT IN ANY WAY PREJUDICE OR LIMIT THE SERVICE OF PROCESS OR SUMMONS IN ANY OTHER MANNER DESCRIBED ABOVE IN THIS SECTION 12.07 OR OTHERWISE PERMITTED BY LAW.

(c)    SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, EACH BORROWER HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(d)    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

12.08    Counterparts. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. A set of counterparts executed by all the parties hereto shall be lodged with the Borrowers and the Lender.

12.09    Effectiveness. This Agreement shall become effective on the date (the "Effective Date") on which (i) the Borrowers who are initially party hereto and the

32

Lender shall have signed a counterpart hereof (whether the same or different counterparts) and shall have delivered the same to the Lender, and (ii) the Bankruptcy Court shall have entered the Interim Order, which Interim Order shall be in full force and effect and shall not have been amended, modified, stayed or reversed; <u>provided</u> that (x) if such Interim Order is the subject of a pending appeal in any respect, none of such Interim Order, the initial extensions of credit, or the performance by any of the Borrowers of any of the Obligations shall be the subject of a presently effective stay pending appeal, (y) the Borrowers and the Lender shall be entitled to rely in good faith upon such Interim Order, notwithstanding objection thereto or appeal therefrom by any interested party and (z) the Borrower and the Lender shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant order has been stayed by a court of competent jurisdiction. The Lender will give the Borrowers prompt written notice of the occurrence of the Effective Date.

12.10    <u>Headings Descriptive</u>. The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

12.11    <u>Amendment or Waiver; etc.</u> (a) Neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the Borrowers and the Lender.

12.12    <u>Survival</u>. All indemnities set forth herein shall survive the execution, delivery and termination of this Agreement and the Notes and the making and repayment of the Loans.

12.13    <u>Confidentiality</u>. (a) Subject to the provisions of clause (b) of this Section 12.13, the Lender agrees that it will use its best efforts not to disclose without the prior consent of the Borrowers (other than to its employees, auditors, advisors or counsel; provided such Persons shall be subject to the provisions of this Section 12.13 to the same extent as the Lender) any information with respect to the Borrowers which is now or in the future furnished pursuant to this Agreement or any other Credit Document, <u>provided</u> that the Lender may disclose any such information (a) as has become generally available to the public other than by virtue of a breach of this Section 12.13(a) by the Lender, (b) as may be required in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over the Lender, (c) as may be required in respect to any summons or subpoena or in connection with any litigation (provided that to the extent permitted by law, the Lender shall promptly notify the Borrowers thereof), and (d) in order to comply with any law, order, regulation or ruling applicable to the Lender.

(b)    Except as otherwise provided in this Section 12.13, the Lender will use all confidential information provided to it hereunder by or on behalf of the Borrowers solely for the purpose of providing the services which are the subject of this Agreement

and shall treat confidentially all such information and this Agreement and the other Credit Documents (and the respective terms and substance set forth herein and therein).

12.14    Register. Each Borrower hereby designates the Lender to serve as such Borrower's agent, solely for purposes of this Section 12.14, to maintain a register (the "Register") on which it will record the Commitments, the Loans made and each repayment and prepayment in respect of the principal amount of the Loans. Failure to make any such recordation, or any error in such recordation shall not affect the Borrowers' obligations in respect of such Loans. The transfer of the Commitments and the rights to the principal of, and interest on, any Loan made pursuant to such Commitments shall not be effective until such transfer is recorded on the Register maintained by the Lender with respect to ownership of such Commitments and Loans and prior to such recordation all amounts owing to the transferor with respect to such Commitments and Loans shall remain owing to the transferor.

12.15    Judgment Currency. If for the purposes of obtaining judgment in any court it is necessary to convert a sum due from the Borrowers hereunder or under any of the Notes in the currency expressed to be payable herein or under the Notes (the "specified currency") into another currency, the parties hereto agree, to the fullest extent that they may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures the Lender could purchase the specified currency with such other currency at the Lender's London office on the Business Day preceding that on which final judgment is given. The obligations of the Borrowers in respect of any sum due to the Lender hereunder or under any Note shall, notwithstanding any judgment in a currency other than the specified currency, be discharged only to the extent that on the Business Day following receipt by the Lender of any sum adjudged to be so due in such other currency the Lender may in accordance with normal banking procedures purchase the specified currency with such other currency; if the amount of the specified currency so purchased is less than the sum originally due to the Lender in the specified currency, each Borrower agrees, to the fullest extent that it may effectively do so, as a separate obligation and notwithstanding any judgment, to indemnify the Lender against such loss, and if the amount of the specified currency so purchased exceeds the sum originally due to the Lender in the specified currency, the Lender agrees to remit such excess to the Borrowers.

12.16    Language. All correspondence, including, without limitation, all notices, reports and/or certificates, delivered by any Borrower to the Lender shall, unless otherwise agreed by the respective recipients thereof, be submitted in the English language or, to the extent the original of such document is not in the English language, such document shall be delivered with a certified English translation thereof.

12.17    Waiver of Immunity. Each Borrower, in respect of itself, its and their process agents, and its and their properties and revenues, hereby irrevocably agrees that, to the extent that any Borrower or any of its or their properties has or may hereafter acquire any right of immunity from any legal proceedings to enforce or collect upon the Obligations of the Borrowers related to or arising from the transactions contemplated by any of the Credit Documents, including, without limitation, immunity from service of

process, immunity from jurisdiction or judgment of any court or tribunal, immunity from execution of a judgment, and immunity of any of its property from attachment prior to any entry of judgment, or from attachment in aid of execution upon a judgment, the Borrowers hereby expressly waive, to the fullest extent permissible under applicable law, any such immunity, and agree not to assert any such right or claim in any such proceeding.

        12.18     <u>Order</u>. In the event of any inconsistency between the terms and conditions of any of the Credit Documents and the Interim Order or the Final Order, whichever is in effect at the time of reference thereto, the provisions of the Interim Order or the Final Order, as the case may be, shall govern and control.

        12.19     <u>Parties Including Trustees; Bankruptcy Court Proceedings</u>. This Agreement, the other Credit Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Credit Document shall be binding upon each Borrower, the estate of each Borrower, and any trustee, other estate representative or any successor in interest of any Borrower in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code. This Agreement and the other Credit Documents shall be binding upon, and inure to the benefit of, the Lender and its permitted assigns, transferees and endorsees. Until the Commitments have expired or have been terminated and the principal of and interest on each Loan and all other Obligations payable hereunder shall have been paid in full, the Liens created by this Agreement and the other Credit Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of any Borrower to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Lender file financing statements or otherwise perfect its Liens under applicable law. Any such purported assignment, transfer, hypothecation or other conveyance by any Borrower without the prior express written consent of the Lender shall be void. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Borrower and the Lender with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Credit Documents.

        SECTION 13. <u>Guaranty</u>.

        13.01     <u>Guaranty</u>. In order to induce the Lender to enter into this Agreement and to extend credit hereunder and in recognition of the direct benefits to be received by the Borrowers from the proceeds of the Loans, each of the Borrowers hereby agrees with the Lender as follows: Each of the Borrowers hereby unconditionally and irrevocably guarantees as primary obligor and not merely as surety, the full and prompt payment when due, whether upon maturity, acceleration or otherwise, of any and all of the Obligations of the other Borrowers to the Lender and agrees that their obligations are joint and several with the other Borrowers hereunder and under the other Credit Documents. If any or all of the Obligations of any Borrower to the Lender becomes due and payable hereunder, each other Borrower unconditionally and irrevocably, promises to

pay such indebtedness to the Lender, or order, on demand, together with any and all reasonable documented out-of-pocket expenses which may be incurred by the Lender in collecting any of the Obligations. If a claim is ever made upon the Lender for repayment or recovery of any amount or amounts received in payment or on account of any of the Obligations and any of the aforesaid payees repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including the Borrowers), then and in such event, each Borrower agrees that any such judgment, decree, order, settlement or compromise shall be binding upon any Borrower, notwithstanding any revocation of this Guaranty or other instrument evidencing any liability of any Borrower, and such Borrower shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

13.02    Nature of Liability. The liability of each Borrower hereunder is primary, absolute, joint and several, and unconditional and is exclusive and independent of any security for or other guaranty of the indebtedness of the other Borrowers, whether executed by such Borrower, any other Borrower, any other guarantor or by any other party, and the liability of each Borrower hereunder shall not be affected or impaired by any circumstance or occurrence whatsoever, including, without limitation: (a) any direction as to application of payment by the Borrowers or any other party, (b) any other continuing or other guaranty, undertaking or maximum liability of a Borrower or of any other party as to the Obligations, (c) any payment on or in reduction of any such other guaranty or undertaking, (d) any dissolution, termination or increase, decrease or change in personnel by the Borrowers, (e) the failure of any Borrower to receive any benefit from or as a result of its execution, delivery and performance of the Guaranty contained in this Agreement, (f) to the extent permitted by applicable law, any payment made to the Lender on the indebtedness which the Lender repays to the Borrowers pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and each Borrower waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, (g) any action or inaction by the Borrowers as contemplated in Section 13.05, or (h) any invalidity, rescission, irregularity or unenforceability of all or any part of the Obligations or of any security therefor. Each Borrower understands, agrees and confirms that the Lender may enforce this Guaranty up to the full amount of the Obligations against such Borrower without proceeding against any other Borrower, or against any security for the Obligations, or under any other guaranty covering all or a portion of the Obligations. This Guaranty shall constitute a guaranty of payment, and not of collection.

13.03    Independent Obligation. The obligations of each Borrower hereunder are independent of the obligations of any other Borrower, any other guarantor or any other party, and a separate action or actions may be brought and prosecuted against each Borrower whether or not action is brought against any other Borrower, any other guarantor or any other party and whether or not any other Borrower, any other guarantor or any other party be joined in any such action or actions. Each Borrower waives, to the fullest extent permitted by applicable law, the benefits of any statute of

36

limitations affecting its liability hereunder or the enforcement thereof. Any payment by the Borrowers or other circumstance which operates to toll any statute of limitations as to the Borrowers shall operate to toll the statute of limitations as to each Borrower.

13.04    <u>Authorization</u>. Each Borrower authorizes the Lender (except as shall be required by applicable law, any order of the Bankruptcy Court or any Credit Document) at any time and from time to time without the consent of, or notice to, any Borrower, without incurring responsibility to such Borrower, and without affecting, releasing or impairing the Obligations or liability of such Borrower hereunder, upon or without any terms or conditions and in whole or in part, to:

(a)    in accordance with the terms and provisions of this Agreement and the other Credit Documents, change the manner, place or terms of payment of, and/or change or extend the time of payment of, renew, increase, accelerate or alter, any of the Obligations (including, without limitation, any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Guaranty shall apply to the Obligations as so changed, extended, increased, accelerated, renewed or altered;

(b)    take and hold security for the payment of the Obligations and sell, exchange, release, impair, surrender, realize upon or otherwise deal with in any manner and in any order any property or other Collateral by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset thereagainst;

(c)    exercise or refrain from exercising any rights against any Borrower, any other guarantor of the Borrowers, or others or otherwise act or refrain from acting;

(d)    release or substitute any one or more endorsers, other Borrowers, guarantors, or other obligors;

(e)    settle or compromise any of the Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Borrowers to their respective creditors other than the Lender;

(f)    apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of the Borrowers to the Lender regardless of what liability or liabilities of the Borrowers remain unpaid;

(g)    consent to or waive any breach of, or any act, omission or default under, this Agreement, any other Credit Document or any of the instruments or agreements referred to herein or therein, or, pursuant to the terms of the Credit Documents, otherwise amend, modify or supplement this Agreement, any other Credit Document or any of such other instruments or agreements;

37

(h)    act or fail to act in any manner which may deprive such Borrower of its right to subrogation against the other Borrowers to recover full indemnity for any payment made pursuant to the Guaranty hereunder; and/or

(i)    take any other action which would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of any Borrower from its liabilities under this Guaranty (including, without limitation, any action or omission whatsoever that might otherwise vary the risk of such Borrower or constitute a legal or equitable defense to or discharge of the liabilities of a guarantor or surety or that might otherwise limit recourse against such Borrower).

No invalidity, illegality, irregularity or unenforceability of all or any part of the Obligations, the Credit Documents or any other agreement or instrument relating to the Obligations or of any security or guarantee therefor shall affect, impair or be a defense to the Guaranty under this Agreement , and this Guaranty shall be primary, absolute and unconditional notwithstanding the occurrence of any event or the existence of any other circumstances which might constitute a legal or equitable discharge of a surety or guarantor except payment in full in cash of the Obligations.

13.05    Continuing Guaranty and Reliance. This Guaranty is a continuing one and all liabilities to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon. No failure or delay on the part of the Lender in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein expressly specified are cumulative and not exclusive of any rights or remedies which the Lender would otherwise have. No notice to or demand on any Borrower in any case shall entitle such Borrower to any other further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Lender to any other or further action in any circumstances without notice or demand (in any such case, except to the extent notice is expressly required pursuant to any order of the Bankruptcy Court or any Credit Document). It is not necessary for the Lender to inquire into the capacity or powers of each Borrower or the officers, directors, partners or agents acting or purporting to act on their behalf, and any Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

13.06    Subordination. Any indebtedness of the Borrowers now or hereafter held by and/or owing to any other Borrower is hereby subordinated in right of payment to the Obligations owing to the Lender; and if the Lender so requests at a time when an Event of Default exists and is continuing, all such indebtedness of the Borrowers to each of the other Borrowers shall be collected, enforced and received by any Borrower as trustee for the Lender and be paid over to the Lender on account of the Obligations, but without affecting or impairing in any manner the liability of any Borrower under the other provisions of this Guaranty. Without limiting the generality of the foregoing, each of the Borrowers hereby agrees with the Lender that they will not exercise any right of subrogation which they may at any time otherwise have as a result of this Guaranty

38

(whether contractual, under Section 509 of the Bankruptcy Code or otherwise) until all Obligations have been irrevocably paid in full in cash. If and to the extent required in order for the Obligations of each of the Borrowers to be enforceable under applicable federal, state and other laws relating to the insolvency of debtors, the maximum liability of the Borrowers hereunder shall be limited to the greatest amount which can lawfully be guaranteed by the Borrowers under such laws, after giving effect to any rights of contribution, reimbursement and subrogation arising under this Section 13.06.

13.07    Payments. All payments made by any Borrower hereunder will be made without setoff, counterclaim or other defense, will be made in the currency or currencies in which the respective Obligations are then due and payable and will be made on the same basis as payments are made by the other Borrowers under Sections 4.03 and 4.04 hereof.

13.08    Reinstatement. If any claim is ever made upon the Lender for repayment or recovery of any amount or amounts received in payment or on account of any of the Obligations and any of the aforesaid payees repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant, then and in such event each Borrower agrees that any such judgment, decree, order, settlement or compromise shall be binding upon such Borrower, notwithstanding any revocation hereof or the cancellation of any Note or any other instrument evidencing any liability of any Borrower, and such Borrower shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

13.09    Contribution. At any time a payment in respect of the Obligations is made under this Guaranty, the right of contribution of each Borrower against each other Borrower shall be determined as provided in the immediately following sentence, with the right of contribution of each Borrower to be revised and restated as of each date on which a payment (a "Relevant Payment") is made on the Obligations under this Guaranty. At any time that a Relevant Payment is made by a Borrower that results in the aggregate payments made by such Borrower in respect of the Obligations to and including the date of the Relevant Payment exceeding such Borrower's Contribution Percentage (as defined below) of the aggregate payments made by all Borrowers in respect of the Obligations to and including the date of the Relevant Payment (such excess, the "Aggregate Excess Amount"), each such Borrower shall have a right of contribution against each other Borrower who has made payments in respect of the Obligations to and including the date of the Relevant Payment in an aggregate amount less than such other Borrower's Contribution Percentage of the aggregate payments made to and including the date of the Relevant Payment by all Borrowers in respect of the Obligations (the aggregate amount of such deficit, the "Aggregate Deficit Amount") in an amount equal to (x) a fraction the numerator of which is the Aggregate Excess Amount of such Borrower and the denominator of which is the Aggregate Excess Amount of all Borrowers multiplied by (y) the Aggregate Deficit Amount of such other Borrower. A Borrower's right of contribution pursuant to the preceding sentences shall arise at the time of each

computation, subject to adjustment to the time of each computation; provided that no Borrower may take any action to enforce such right until the Obligations have been irrevocably paid in full in cash and the Commitment have been terminated, it being expressly recognized and agreed by all parties hereto that any Borrower's right of contribution arising pursuant to this Section 13.09 against any other Borrower shall be expressly junior and subordinate to such other Borrower's obligations and liabilities in respect of the Obligations and any other obligations owing under this Guaranty. As used in this Section 13.09: (i) each Borrower's "Contribution Percentage" shall mean the percentage obtained by dividing (x) the Adjusted Net Worth (as defined below) of such Borrower by (y) the aggregate Adjusted Net Worth of all Borrowers; (ii) the "Adjusted Net Worth" of each Borrower shall mean the greater of (x) the Net Worth (as defined below) of such Borrower and (y) zero; and (iii) the "Net Worth" of each Borrower shall mean the amount by which the fair saleable value of such Borrower's assets on the date of any Relevant Payment exceeds its existing debts and other liabilities (including contingent liabilities, but without giving effect to any Obligations arising under this Guaranty) on such date. All parties hereto recognize and agree that, except for any right of contribution arising pursuant to this Section 13.09, each Borrower who makes any payment in respect of the Obligations shall have no right of contribution or subrogation against any other Borrower in respect of such payment until all of the Obligations have been irrevocably paid in full in cash. Each Borrower recognizes and acknowledges that the rights to contribution arising hereunder shall constitute an asset in favor of the party entitled to such contribution. In this connection, each Borrower has the right to waive its contribution right against any Borrower to the extent that after giving effect to such waiver such Borrower would remain solvent, in the determination of the Lender.

13.10    Limitation on Obligations. Each Borrower and the Lender (by its acceptance of the benefits of this Guaranty) hereby confirms that it is its intention that this Guaranty not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act of any similar federal or state law. To effectuate the foregoing intention, each Borrower and the Lender (by its acceptance of the benefits of this Guaranty) hereby irrevocably agrees that the Obligations guaranteed by such Borrower shall be limited to such amount as will, after giving effect to such maximum amount and all other (contingent or otherwise) liabilities of such Borrower that are relevant under such laws and after giving effect to any rights to contribution pursuant to any agreement providing for an equitable contribution among such Borrower and the other Borrowers, result in the Obligations of such Borrower in respect of such maximum amount not constituting a fraudulent transfer or conveyance.

* * *

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

NAUTILUS HOLDINGS LIMITED
NAUTILUS HOLDINGS NO. 2 LIMITED
NAUTILUS SHIPHOLDINGS NO. 1 LIMITED
NAUTILUS SHIPHOLDINGS NO. 2 LIMITED
NAUTILUS SHIPHOLDINGS NO. 3 LIMITED


By: _____
    Name: Andreas Papathomas
    Title:
    Address:
    Telephone:
    Facsimile:


ABLE CHALLENGER LIMITED
CHARMING ENERGETIC LIMITED
DYNAMIC CONTINENTAL LIMITED
EARLSTOWN LIMITED
FINDHORN OSPREY LIMITED
FLORAL PENINSULA LIMITED
GOLDEN KNIGHTHEAD LIMITED
MAGIC PENINSULA LIMITED
METROPOLITAN HARBOUR LIMITED
METROPOLITAN VITALITY LIMITED
MILTONS WAY LIMITED
PERPETUAL JOY LIMITED
REGAL STONE LIMITED
RESPLENDENT SPIRIT LIMITED
SUPERIOR INTEGRITY LIMITED
VIVID MIND LIMITED


By: _____
    Name: Andreas Savvas Maroulletis
    Title:
    Address:
    Telephone:
    Facsimile:


[Signature Page]

SYNERGY MANAGEMENT SERVICES
LIMITED,
    as the Lender


By: _____
    Name:
    Title:

[Signature Page]

Schedule I

Nautilus Shipholdings No. 1 Limited
Nautilus Shipholdings No. 2 Limited
Nautilus Shipholdings No. 3 Limited
Able Challenger Limited
Charming Energetic Limited
Dynamic Continental Limited
Earlstown Limited
Findhorn Osprey Limited
Floral Peninsula Limited
Golden Knighthead Limited
Magic Peninsula Limited
Metropolitan Harbour Limited
Metropolitan Vitality Limited
Miltons Way Limited
Perpetual Joy Limited
Regal Stone Limited
Resplendent Spirit Limited
Superior Integrity Limited
Vivid Mind Limited

Schedule II

| Owner | Vessel |
|---|---|
| FLORAL PENINSULA LTD | ANL KARDINIA |
| GOLDEN KNIGHTHEAD LTD | APL TEXAS |
| FINDHORN OSPREY LTD | CAMELLIA |
| PERPETUAL JOY | CORCOVADO |
| EARLSTOWN LTD | DAHLIA |
| DYNAMIC CONTINENTAL LTD | HAMBURG |
| VIVID MIND LTD | ITAL ONESTA |
| MILTONS WAY LTD | LINEA MESSINA |
| CHARMING ENERGETIC LTD | ROTTERDAM |
| REGAL STONE LTD | VENEZIA |
| RESPLENDENT SPIRIT LTD | VIOLET |
| METROPOLITAN HARBOUR LTD | WASHINGTON |
| ABLE CHALLENGER LTD | YM ANTWERP |
| MAGIC PENINSULA LTD | YM BUSAN |
| SUPERIOR INTEGRITY LTD | YM KEELUNG |
| METROPOLITAN VITALITY LTD | YM OAKLAND |