IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
In re:                                    :    Chapter 11
                                          :
NAUTILUS HOLDINGS LIMITED, et al.,        :    Case No. 14-22885 (RDD)
                                          :
        Debtors.                          :    (Motion for Joint Administration
                                          :    Pending)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF JAMES A. MESTERHARM PURSUANT TO LOCAL
BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF THE DEBTORS'
CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, James A. Mesterharm, being duly sworn, hereby depose and state as follows:

1.      I am a Managing Director of AlixPartners, LLP ("AlixPartners") and

authorized representative of its affiliate, AP Services, LLC ("APS"), a Michigan limited liability

company, which has a place of business at 2000 Town Center, Suite 2400, Southfield, Michigan,

48075.  AlixPartners has served as restructuring advisor to the above-captioned debtors and

debtors in possession (collectively, the "Debtors")[1] since March 1, 2014.  As of the date hereof,

each of the Debtors has appointed me Chief Restructuring Officer ("CRO") as provided in the

engagement letter between APS and the Debtors.

---

[1]    The Debtors and, where applicable, the last four digits of their Hong Kong taxpayer identification codes are as follows: Nautilus Holdings Limited, Nautilus Holdings No. 2 Limited, Nautilus Shipholdings No. 1 Limited, Nautilus Shipholdings No. 2 Limited, Nautilus Shipholdings No. 3 Limited, Able Challenger Limited (8877), Charming Energetic Limited (0936), Dynamic Continental Limited (0928), Earlstown Limited (1898), Findhorn Osprey Limited (8075), Floral Peninsula Limited (4549), Golden Knighthead Limited (6376), Magic Peninsula Limited (0950), Metropolitan Harbour Limited (7969), Metropolitan Vitality Limited (9019), Miltons Way Limited (6180), Perpetual Joy Limited (0897), Regal Stone Limited (3636), Resplendent Spirit Limited (8114), Superior Integrity Limited (0934), and Vivid Mind Limited (7935). The Debtors maintain offices at 445 Hamilton Avenue, 11th Floor, White Plains, New York, 10601; 16/F-19/F Prince's Building, 10 Chater Road, Central, Hong Kong; and Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda.

2.     I submit this declaration (the "Declaration") pursuant to Rule 1007-2 of

the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy

Rules") and in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title

11 of the United States Code (the "Bankruptcy Code") and (b) various motions and applications,

filed concurrently herewith, including various "first day" motions (collectively, the "First Day

Pleadings"). I am over the age of 18, competent to testify, and authorized to submit this

Declaration in support of the Debtors' chapter 11 petitions and the First Day Pleadings described

herein.

3.     AlixPartners is a leading global restructuring turnaround advisory and

consulting firm. AlixPartners has a wealth of experience in solving distressed business issues and

enjoys an excellent reputation for services it has rendered in large and complex restructuring

cases.  I serve as co-head of the North America Turnaround and Restructuring Services practice

of AlixPartners.  I specialize in developing financial and operating strategies for

underperforming and troubled companies including serving in senior management positions such

as Chief Restructuring Officer, Chief Operating Officer and Chief Financial Officer.  In

particular, I or other AlixPartners professionals have been involved in large and complex chapter

11 cases for other companies such as: Eastman Kodak Company, General Growth Properties,

Inc., General Motors Corp., Motors Liquidation Company, Lyondell Chemical Company, Silicon

Graphics, Inc., Zenith Electronic Corp., Safety-Kleen Corp., Parmalat USA Corp., and, with

respect to chapter 11 cases of other companies in the shipping industry, Omega Navigation

Enterprises Inc., Sea Containers Ltd., TBS Shipping Services Inc., TMT USA Shipmanagement

LLC, and Trico Marine Services Inc.

4.      I am familiar with the Debtors' day-to-day operations, financial condition, business affairs, and books and records. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of my team, the Debtors' management, including their management team at Synergy Management Services Limited ("Synergy") or the Debtors' advisors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration.

5.      This Declaration is divided into four parts. Part I of this Declaration provides an overview of the Debtors' business and operations, including their corporate and capital structure. Part II describes the circumstances leading to the commencement of these chapter 11 cases and the Debtors' restructuring plans. Part III sets forth the relevant facts in support of each of the Debtors' First Day Pleadings. Part IV provides the specific information required by Local Bankruptcy Rule 1007-2.

## PART I: THE DEBTORS' BUSINESSES AND OPERATIONS

### A.      The Chapter 11 Filings

6.      On the date hereof (the "Petition Date"), each of the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Debtors have requested joint administration of these chapter 11 cases by motion filed concurrently herewith. No trustees or examiners have been appointed in these cases.

3

B.      **Overview of the Debtors' Businesses and Operations**

7.      The Debtors are a leading owner of container ships engaged in the seaborne transportation of containers worldwide. The Debtors' enterprise includes a fleet of 16 vessels. Each of these 16 vessels is wholly-owned by one of 16 separate, indirect subsidiaries of Nautilus Holdings Limited ("NHL") or Nautilus Holdings No. 2 Limited ("NH2L") (each such subsidiary, a "Vessel Owner"). The Debtors' fleet consists of container ships ranging in size from approximately 2,500 TEU to 7,000 TEU (together, the "Vessels") with a total carrying capacity of approximately 70,000 TEU, making the Debtors one of the world's top 25 independent container ship owners.[2]

8.      As is fairly typical in the shipping industry, the Debtors have no "rank and file" employees; however, they do have both a CEO and CFO and me as a CRO.  Rather than rely on an internal staff of employees, Synergy, a non-Debtor entity affiliated with Reminiscent Ventures, S.A., one of the Debtors' significant equity owners, provides management services to the Debtors. The chairman of Synergy, Andreas Papathomas, is also the chief executive officer and a director of each of NHL, NH2L, and the three intermediate holding company Debtors.

9.      Synergy manages the business and affairs of the Debtors pursuant to management agreements with NHL and NH2L. Synergy provides commercial management to source and negotiate charters, manages customer relationships and oversees the management of charter contracts. Synergy also provides general administrative and strategic management services to the Debtors, including financial and corporate management, business development and relationship management with banks and lenders on behalf of the Debtors.

---

[2]      The term "TEU" stands for "twenty-foot equivalent unit," which is the standard unit for measuring a container ship's cargo carrying capacity.

10.    Additionally, Synergy makes payment to certain vendors as agent for the Debtors and in general arranges for the purchase of certain services and supplies, such as obtaining insurance coverage and lubrication oils for the Vessels, on a consolidated basis to all the Debtors.  Synergy also provides oversight to the Vessels by closely monitoring/managing third-party technical management companies that provide technical ship management and crewing services.  Synergy's management of the Debtors as a unified enterprise provides the Debtors with a competitive advantage in sourcing charter contracts and controlling both the cost and quality of the Vessels' operations.

11.    Technical ship management and crewing services for the Vessels are provided through two ship management companies unaffiliated with Synergy, Anglo-Eastern Ship Management Limited and Univan Ship Management International Limited (together, the "Technical Managers").  The Technical Managers provide operational management services for all of the Vessels pursuant to discrete technical management agreements with each Vessel. These services are provided under agreements substantially in the form of shipping industry standard "Shipman 98" contracts and include, among other things, arranging for and managing crews, vessel maintenance, repairs, and maintaining regulatory and classification society compliance.  Synergy disburses monthly payments to the Technical Managers based upon an annual budget for each Vessel.  The Technical Managers, in turn, pay certain of the Vessel Owners' vendors as agent for the Vessel Owners.

12.    The Debtors' Vessels are employed under fixed-rate period charters to a diverse group of container liner companies, including many of the largest such companies globally. Customers have included A P Moller – Maersk A/S, CMA CGM S.A., Evergreen Marine Corp. (Taiwan) Ltd., Yang Ming Marine Transport Corp., Hapag-Lloyd AG, United

Arab Shipping Company (S.A.G.), and Compañia Chilena De Navegación Interoceánica S.A. The Vessels operate globally for the Debtors' customers on regularly scheduled routes between large commercial ports.

13.    From the inception of the Debtors' business operations, their strategy has been to employ their Vessels on long-term charters to take advantage of the associated stable cash flow and high utilization rates.  These long-term charters have allowed the Debtors to weather, until now, the downturn in the container shipping market which commenced in late 2008.[3]  Several historic long-term charter contracts are ongoing, however others have expired. The Debtors redeploy their Vessels according to their assessment of market conditions.  In the current market, shorter term charter contracts may be preferred to avoid locking in fixed rates at low levels. Although the Debtors' long-term strategy had included reinvestment of their accumulated cash from long-term charters into expanding their fleet, the downturn in the market posed an obstacle to such long-term plans.

## C.    Corporate Organization and Capital Structure

14.    A corporate organization chart is attached as Exhibit A hereto. As noted above, NHL and NH2L are holding companies and are the ultimate parents of each of the Debtors in these chapter 11 cases.  Each of these holding companies and the intermediate holding companies maintains registered addresses at Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda. The Vessel-owning Debtors maintain offices at 16/F-19/F Prince's Building, 10 Chater Road, Central, Hong Kong. All of the Debtors also maintain an office in White Plains, New York.

---

[3]    The Debtors' business is limited to providing vessels to third party users, as opposed to container liner companies that supply ancillary services to customers such as freight forward  and other ground-based services.

15.    NHL is currently owned 49.9% by Reminiscent Ventures S.A ("Reminiscent"), with the remaining 50.1% held collectively by NHL Investors (MD), Ltd., NHL Investors (ME), Ltd., ELQ Investors 11 Ltd., Eton Park Fund, L.P., and Eton Park Master Fund Ltd.  Separately, NH2L is currently owned 100% by Reminiscent.  Reminiscent's current equity ownership reflects the recent acquisition by Reminiscent of the 39.9% stake in each of NHL and NH2L that were formerly owned by GE Capital.   As noted above, Synergy and Reminiscent are affiliates of one another, and Synergy's chairman, Andreas Papathomas, is also the chief executive officer and a director of NHL, NH2L, and the Intermediate HoldCos (as defined herein).

16.    NHL and NH2L together own three intermediate holding companies, which in turn directly own 16 Debtors, each of which owns a single Vessel.  The three intermediate holdings companies are Nautilus Shipholdings No. 1 Limited, Nautilus Shipholdings No. 2 Limited, and Nautilus Shipholdings No. 3 Limited (each, an "Intermediate HoldCo"). As illustrated in Exhibit A, the Vessel Owners are organized into four separate groups or "silos" that reflect obligations to separate lenders under six separate loan facilities.  Each of these four silos and the related six secured debt facilities is described below.

17.    Each of the Debtors has property in this District.  That property includes cash retainers held by their counsel and an office lease.  Separately, each of the Debtors' existing stock certificates are being held in the district.

(a)    Silo 1 – "HSH Silo"

18.    The Columbia Facility. Debtor Miltons Way Limited (the "Columbia Debtor") is a borrower under that certain senior secured credit facility, dated as of July 6, 2007, utilized to partially finance the acquisition of one container vessel named *MV Columbia* (the "Columbia Credit Facility"). The unpaid principal balance of the Columbia Credit Facility is

7

approximately $41,400,000.  The Columbia Debtor's obligations under the Columbia Credit

Facility are secured by liens on substantially all of the Columbia Debtor's hard assets, including

the vessel and the Columbia Debtor's cash.  HSH Nordbank AG ("HSH Nordbank") is the swap

bank, agent, security trustee, and lender under the Columbia Facility. Nautilus Shipholdings No.

1 Limited is a party to a Guarantee dated as of July 6, 2007 pursuant to which it undertook to

guarantee the Columbia Debtor's obligations in connection with the Columbia Credit Facility.

      19.   The Flowers Facility. Debtors Resplendent Spirit Limited, Earlstown

Limited, Findhorn Osprey Limited and Floral Peninsula Limited (collectively known as the

"Flowers Debtors") are borrowers under that certain senior secured credit facility, dated as of

February 12, 2007, utilized to partially finance the acquisition of four container vessels named

*MV Camellia*, *MV Dahlia*, *MV ANL Kardinia*, and *MV Violet* (the "Flowers Credit Facility").

The unpaid principal balance of the Flowers Credit Facility is approximately $118,175,000.  The

Flowers Debtors' obligations under the Flowers Credit Facility are secured by liens on

substantially all of the Flowers Debtors' hard assets, including the vessels and the Flowers

Debtors' cash.  HSH Nordbank is the swap bank, agent, security trustee, and lender under the

Flowers Credit Facility. Nautilus Shipholdings No. 1 Limited is a party to a Guarantee dated as

of February 12, 2007 pursuant to which it undertook to guarantee the Flowers Debtors'

obligations in connection with the Flowers Credit Facility.

      (b)   Silo 2 – "HSH Syndicate Silo"

      20.   The HSH-YM Facility. Debtors Metropolitan Vitality Limited, Magic

Peninsula Limited, Able Challenger Limited and Superior Integrity Limited (collectively known

as the "HSH-YM Debtors") are borrowers under that certain senior secured credit facility, dated

as of April 12, 2007, utilized to partially finance four container vessels named the *MV YM*

*Oakland*, *MV YM Busan*, *MV YM Antwerp*, and *MV YM Keelung* (the "HSH-YM Credit Facility"). The unpaid principal balance of the HSH-YM Credit Facility is approximately $190,957,589. The HSH-YM Debtors' obligations under the HSH-YM Credit Facility are secured by first priority liens on substantially all of the HSH-YM Debtors' hard assets, including the vessels and the HSH-YM Debtors' cash, and second priority liens over the vessels owned by the Flowers Debtors. The lenders under the HSH-YM Credit Facility are HSH Nordbank, Unicredit Bank AG ("Unicredit") and Commerzbank AG ("Commerzbank"). HSH Nordbank is the swap bank, agent and security trustee. Nautilus Shipholdings No. 1 Limited is a party to a Guarantee dated as of April 12, 2007 pursuant to which it undertook to guarantee the HSH-YM Debtors HSH-YM Credit Facility' obligations in connection with the HSH-YM Credit Facility.

(c)      Silo 3 – "DVB Silo"

21.      Metropolitan Harbour (MH) – DVB Facility 1. Debtor Metropolitan Harbour Limited (the "MH Debtor") is a borrower under that certain senior secured credit facility, dated as of July 11, 2007, utilized to partially finance the *MV Washington* (the "DVB 1 Credit Facility"). The unpaid principal balance of the DVB 1 Credit Facility is approximately $73,191,500. The MH Debtor's obligations under the DVB 1 Credit Facility are secured by liens on substantially all of the MH Debtor's hard assets, including the vessel and the MH Debtor's cash. DVB Bank AG is the lender, swap bank, agent and security trustee under the DVB 1 Credit Facility. Nautilus Shipholdings No. 2 Limited is a party to a Guarantee dated as of July 11, 2007 pursuant to which it undertook to guarantee the MH Debtor's obligations in connection with the DVB 1 Credit Facility.

22.      Golden Knighthead (GK) – DVB Facility 2. Debtor Golden Knighthead Limited (the "GK Debtor") is a borrower under that certain senior secured credit facility, dated as of July 11, 2007, utilized to partially finance the *MV Texas* (the "DVB 2 Credit Facility"). The

unpaid principal balance of the DVB 2 Credit Facility is approximately $73,191,500. The GK Debtor's obligations under the DVB 2 Credit Facility are secured by liens on substantially all of the GK Debtor's hard assets, including the vessel and the GK Debtor's cash. DVB Bank AG is the lender, swap bank, agent and security trustee under the DVB 2 Credit Facility. Nautilus Shipholdings No. 2 Limited is a party to a Guarantee dated as of July 11, 2007 pursuant to which it undertook to guarantee the GK Debtor's obligations in connection with the DVB 2 Credit Facility.

(d)    Silo 4 – "Citi Silo"

23.    <u>Citi Credit Facility</u>. Debtors Charming Energetic Limited, Dynamic Continental Limited, Perpetual Joy Limited, Regal Stone Limited and Vivid Mind Limited (collectively known as the "<u>Citi Debtors</u>") are borrowers under that certain senior secured credit facility, dated as of September 25, 2007, as amended by that certain Supplemental Agreement dated September 7, 2012, utilized to partially finance the purchase of five container vessels named *MV Rotterdam*, *MV Hamburg*, *MV Venezia*, *MV Corcovado* and *MV Ital Onesta* (the "<u>Citi Credit Facility</u>"). The unpaid principal balance on the Citi Credit Facility is approximately $272,553,501. The Citi Credit Facility is composed of two tranches, with tranche B fully subordinated to tranche A.

24.    The Citi Debtors' obligations under the Citi Credit Facility are secured by liens on substantially all of the Citi Debtors' hard assets, including the vessels and the Citi Debtors' cash. The counterparties to the Citi Credit Facility are Citibank, N.A. and Bank of Scotland plc, in their capacity as swap banks, Citibank International plc as agent, Citibank, N.A. as security trustee, Citigroup Global Markets Limited as arranger and Citibank, N.A., Bank of Scotland plc, Lloyds TSB Bank plc, UniCredit Bank AG, Goldman Sachs Bank (Europe) Plc, Goldman Sachs International Bank and Sculptor Investments S.a.r.l. as lenders. Nautilus

Shipholdings No. 3 Limited is a party to a Guarantee dated as of September 25, 2007 pursuant to

which it undertook to guarantee the Citi Debtors' obligations in connection with the Citi Credit

Facility.

25.    The Facilities and swap agreements are summarized in the following

chart:

| Silo | Debt Instrument | Borrowers | Secured Parties | Guarantors | Number of Vessels Securing Debt | Approximate Swap Liability[4] | Approximate Amount Outstanding[5] |
|---|---|---|---|---|---|---|---|
| 1 | Flowers Facility (dated February 12, 2007) | Findhorn Osprey Limited; Earlstown Limited; Floral Peninsula Limited and Resplendent Spirit Limited | HSH Nordbank AG (Lender) | Nautilus Shipholdings No. 1 Limited | 4 | N/A | $118.2 million |
| | Columbia Facility (dated July 6, 2007) | Miltons Way Limited | HSH Nordbank AG (Lender) | Nautilus Shipholdings No. 1 Limited | 1 | N/A | $41.4 million |
| 2 | HSH-YM Facility (dated April 12, 2007) | Able Challenger Limited; Magic Peninsula Limited; Metropolitan Vitality Limited; and Superior Integrity Limited | HSH Nordbank AG; Unicredit Bank AG and Commerzbank AG. (Lenders) HSH Nordbank AG (Swap Bank) | Nautilus Shipholdings No. 1 Limited | 4 (as well as second-priority liens on the Flowers Facility vessels) | N/A | $191.0 million |

---

[4]    The amounts listed are non-discounted future cash flow estimates based on current LIBOR rates and remain subject to reconciliation.

[5]    The amounts listed as owing under the Debtors' various debt instruments represent the estimated outstanding principal balances as of June 23, 2014, are approximate, and remain subject to reconciliation.

| Silo | Debt Instrument | Borrowers | Secured Parties | Guarantors | Number of Vessels Securing Debt | Approximate Swap Liability[4] | Approximate Amount Outstanding[5] |
|------|-----------------|-----------|-----------------|------------|-------------------------------|-------------------------------|-----------------------------------|
| 3 | DVB 1 Credit Facility (dated July 11, 2007) | Metropolitan Harbour Limited | DVB Bank AG (Lenders) DVB Bank AG (Swap Bank) | Nautilus Shipholdings No. 2 Limited | 1 | $8.5 million | $73.2 million |
| | DVB 2 Credit Facility (dated July 11, 2007 ) | Golden Knighthead Limited | DVB Bank AG (Lenders) DVB Bank AG (Swap Bank) | Nautilus Shipholdings No. 2 Limited | 1 | $8.6 million | $73.2 million |
| 4 | Citi Credit Facility (dated September 25, 2007) | Vivid Mind Limited; Perpetual Joy Limited; Regal Stone Limited; Charming Energetic Limited; Dynamic Continental Limited | Citibank, N.A., Bank of Scotland plc and Lloyds TSB Bank plc, UniCredit Bank AG, Goldman Sachs Bank (Europe) Plc, Goldman Sachs International Bank and Sculptor Investments S.a.r.l. (Lenders) Citibank, N.A. and Bank of Scotland plc (Swap Banks) | Nautilus Shipholdings No. 3 Limited | 5 | $0.9 million ($0.4 million with Citibank N.A.; $0.4 million with Bank of Scotland plc) | $272.6 million |

## PART II: EVENTS LEADING TO THE CHAPTER 11 CASES

26.      The Debtors' profitability depends on the charter rates and duration of

existing charter contracts for the Vessels and on the rates they are able to charge for new charters

as existing contracts expire. Short term hire rates are inherently volatile, as imbalances between

the supply and demand for vessel capacity and for containers carried by sea internationally

fluctuates. The international container shipping industry has suffered a severe downturn in recent

years. The industry is affected by numerous factors, including but not limited to global and

regional economic conditions, the state of international trade, changes in transportation patterns

12

and structural changes in the container shipping industry. Since 2008, a combination of these factors has influenced overall supply and demand, bringing container vessel charter rates towards historic lows. The Debtors' business has experienced significant pressure as a result of the expiration of several existing long-term charter contracts with rates higher than current charter rates which reflect a depressed market for container vessels.

27.     The downturn in the container shipping industry has in part been driven by an oversupply of newbuildings, with approximately 1.3 and 1.4 million new TEU of capacity entering the market in 2012 and 2013, respectively.  Reduced cash flows as existing long-term, higher rate charters expire, combined with the Debtors' highly-leveraged capital structure, have left some of the Debtors struggling to service their debt. As a result, some of the Debtors have not been able to comply with certain covenants and payment obligations under their loan agreements.

28.     Despite well-publicized challenges in the container shipping industry, the Debtors believe they are uniquely positioned to perform relatively well due to a combination of (i) a favorable mix of various size container vessels, which primarily operate in sectors that have not been overbuilt and where demand is strengthening, (ii) a number of vessels currently operating under long term charters with favorable rates which do not mature until 2018/2019, giving more time for market rates to recover, and (iii) the Debtors' relationships with the top performing liner operators who are leading market consolidation efforts.  Further confidence in the Debtors' long term prospects is reflected by Reminiscent's recent acquisition from GE Capital of its 39.9% equity stake in each of NHL and NH2L and the debtor in possession subordinated financing commitment from Synergy, as discussed below.  Moreover, respected industry forecasters such as Marsoft, Maritime Strategies International Limited and Drewry Shipping

Consultants Limited are predicting that rates should begin to rebound over the next couple of years as economic conditions improve.

29.    More specifically, unlike many other vessel owners in the container shipping industry, certain of the Vessel Owners are parties to highly profitable, long-term charters.  Moreover, each silo generally generates sufficient revenue to cover its operating expenses.  Although on a per Vessel basis, certain Debtors have tighter cash constraints than others, overall the Debtors have accumulated very significant amounts of cash, and currently hold approximately $64 million in the aggregate in their accounts.  Moreover, the Debtors project that they will generate approximately $19 million in the aggregate in additional free cash flow, before restructuring expenses and debt service, between now and the end of this year.

30.    For many months prior to the filing of these chapter 11 cases, the Debtors have attempted to explore various restructuring alternatives with their lenders and shareholders. The process has been challenging on account of the different interests of the lenders and shareholders, in some instances, with respect to their respective silos.  The Debtors therefore commenced these chapter 11 cases, which will afford a centralized forum for the collective restructuring of the Debtors' various loan obligations.  They also did so in order to avoid possible precipitous action by certain lenders, which could have resulted in an ad hoc, piecemeal exercise of remedies that would have jeopardized enterprise value, including a potential loss of the Debtors' significant cash reserves.

31.    The Debtors concluded that the restructuring process would be improved by the appointment of an independent director with significant experience with restructuring and the chapter 11 process.  The Debtors chose Alan Carr to fill that role and appointed him as an independent director to each of the Debtors with the exception of NHL.  Mr. Carr is a

14

restructuring professional with experience as a legal advisor, as a principal and as a financial

advisor. I believe that Mr. Carr's experience and independence will further all constituents'

efforts in achieving a successful outcome to these cases.

## PART III: FIRST DAY PLEADINGS AND ORDERS

32.    Concurrently with the filing of these chapter 11 cases, the Debtors have

filed the following pleadings and, at the "first day" hearing, will seek orders approving the First

Day Pleadings and associated proposed orders (collectively, the "First Day Orders"), each as

listed on the attached Exhibit B, and respectfully request that the Court consider entering the

proposed orders granting such First Day Pleadings. I have reviewed each of the First Day

Pleadings and First Day Orders (including the exhibits thereto) and the facts set forth therein are

true and correct to the best of my knowledge, information and belief. Moreover, I believe that the

relief sought in each of the First Day Pleadings and First Day Orders is vital to the Debtors'

ability to transition to, and operate in, chapter 11 with minimum interruption or disruption to

their businesses or loss of productivity or value.

## A.    Administrative Pleadings.

33.    The Debtors have filed several "administrative" motions pursuant to which

they seek (a) joint administration of the Debtor's bankruptcy cases, (b) authorization to retain

Epiq Bankruptcy Solutions, LLC ("Epiq") as claims and noticing agent, (c) authorization to file a

single, consolidated list of the Debtors' 30 largest creditors and approve the notice of

commencement, (d) extension of the obligation to file schedules and statements and related

relief, and (e) confirmation of the protections of sections 362 and 365 of the Bankruptcy Code.

34.    **Joint Administration**. The Debtors are requesting that their chapter 11

cases be jointly administered. The Debtors consist of 21 entities, all of which are direct or

indirect subsidiaries of NHL or NH2L. I believe that the joint administration of these cases will

avoid the unnecessary time and expense of duplicative motions, applications, orders and other

pleadings that otherwise would need to be filed in each separate case absent joint administration,

thereby saving considerable time and expense for the Debtors and resulting in substantial savings

for their estates. I also believe that duplication of substantially identical documents would be

wasteful and would overburden the Clerk of the Court with duplicative filings. Further, joint

administration will protect parties-in-interest by ensuring that parties in each of the Debtors'

respective chapter 11 cases will be apprised of the various matters before the Court in these

cases.

35.     **Application to Retain Epiq Bankruptcy Solutions, LLC as Claims and
Noticing Agent**. The Debtors also seek authority to retain Epiq as Claims and Noticing Agent.  I

understand that such appointment is required by the rules of this Court. Moreover, such relief is

prudent in light of the numerous creditors, potential creditors, and parties-in-interest to whom

certain notices will be sent and from whom proofs of claims may be received. Accordingly, I

believe that the most effective and efficient manner by which to give notice in these cases is to

engage Epiq, an independent third party with significant experience in this role, to act as an agent

of the Court.

36.     **Authorization to File a Consolidated List of Creditors and to
Establish Notice Procedures**. The Debtors are requesting authorization to file a single

consolidated list of their top 30 creditors (the "Consolidated Top 30 List"). Rule 1007(d) of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") requires a debtor to file a list

containing information on its thirty largest unsecured creditors, excluding insiders (a "Top 30

List"). Fed. R. Bankr. P. 1007(d). The Top 30 List is intended to facilitate the appointment of a

creditors' committee by the United States Trustee (the "U.S. Trustee"). If a creditors' committee

is appointed, the Consolidated Top 30 List will be sufficient to aid in the U.S. Trustee's

appointment of a creditors' committee. In this context, requiring each Debtor to file a Top 30 List

would impose an unnecessary administrative burden on the Debtors, without conferring any

benefit upon the Debtor's estate or the U.S. Trustee.

        37.    The Debtors are requesting authorization to establish certain procedures

for providing notice to parties of the commencement of these chapter 11 cases and of the meeting

of creditors pursuant to section 341 of the Bankruptcy Code (the "Notice of Commencement").

Bankruptcy Rule 2002(a) provides that the clerk, or some other person as the court may direct,

shall give the debtor, the trustee, all creditors and indenture trustees at least 21 days' notice by

mail of the meeting of creditors under sections 341 or § 1104(b) of the Bankruptcy Code.

Furthermore, Bankruptcy Rule 2002 provides that notice of the order for relief shall be sent by

mail to all creditors and shareholders.  Fed. R. Bankr. P. 2002(d) and (f).  The Debtors request

authority for their claims and noticing agent (the "Noticing Agent") to serve by regular mail the

Notice of Commencement to creditors and shareholders in accordance with Bankruptcy Rule

2002. Bankruptcy Rule 2002(l) permits the Court to order "notice by publication if it finds that

notice by mail is impracticable or that it is desirable to supplement the notice."  Fed. R. Bankr. P

2002(1).  In addition to mailing the Notice of Commencement, the Debtors propose to publish, as

soon as reasonably practicable, (i) the Notice of Commencement on the website maintained by

the Noticing Agent, and (ii) a modified, condensed version of the Notice of Commencement in a

relevant periodical. These proposed Procedures will ensure that the Debtors' creditors and

shareholders receive prompt notice of the commencement of these chapter 11 cases and of the

meeting of creditors.

38.   **Schedules and Statements Motion**. The Debtors are requesting that the Court extend the time by which the Debtors must file their schedules of assets and liabilities and statements of financial affairs ("Schedules and Statements") to thirty (30) days after the current deadline. The requested extension would give the Debtors until forty-four (44) days after the Petition Date to file their Schedules and Statements. No creditor or other party in interest will be prejudiced by the requested extension of time for the filing of the Schedules and Statements.

39.   **Motion to Confirm the Protections of Sections 362 and 365 of the Bankruptcy Code**. The Debtors' business operations are conducted worldwide, with significant assets moving through international waters at any given time. As a result, the Debtors have many foreign creditors and counterparties to contracts who may not be well versed in the restrictions of the Bankruptcy Code. Many of these creditors do not transact business on a regular basis with companies that have filed for chapter 11, or are unfamiliar with the scope of a debtor in possession's authority to conduct its business. These creditors may be unfamiliar with the operation of the automatic stay and other provisions of the Bankruptcy Code.

40.   Thus, various interested parties may attempt to seize assets located outside of the United States to the detriment of the Debtors, their estates and creditors, or take other actions in contravention of the automatic stay of section 362 of the Bankruptcy Code. In addition, upon learning of the Debtors' bankruptcy, counterparties to leases and executory contracts may attempt to terminate those leases or contracts pursuant to ipso facto provisions in contravention of section 365 of the Bankruptcy Code.

41.   Accordingly, the Debtors seek an order, pursuant to sections 105(a), 362 and 365 of the Bankruptcy Code, enforcing and restating the automatic stay and ipso facto provisions of the Bankruptcy Code. The Debtors' intent is that a specific and explicit order from

this Court will protect the Debtors from improper actions from parties in foreign jurisdictions who are not familiar with the Bankruptcy Code or its protections and who might otherwise violate those sections.

**B.      Operational Motions**

42.      The Debtors have filed 3 "operational" motions, seeking authorization to (a) continue using their existing cash management system and dispense with requirements under section 345 of the Bankruptcy Code, (b) pay prepetition vendor claims, and (c) pay certain prepetition taxes and fees.

43.      **Cash Management Motion**. The Debtors have filed a motion to continue their ordinary course banking practices without modification for an interim period of forty-five (45) days. In that regard, I understand that the Debtors maintain approximately 24 European bank accounts out of which Synergy, on behalf of each of the Debtors, manages cash receipts and disbursements (the "Bank Accounts"). Even though the Bank Accounts are not at institutions fully insured by the Federal Deposit Insurance Corporation, I believe that the majority of the Debtors' cash is in Bank Accounts at internationally recognized and financially stable banking institutions,[6] some of which also serve as lenders to the Debtors, and that the Bank Accounts make up an established cash management system that the Debtors need to maintain in order to ensure smooth collections and disbursements in the ordinary course.

44.      In my opinion, the cash management procedures utilized by the Debtors constitute ordinary, usual and essential business practices and are similar to those used by other major enterprises in the shipping industry. This allows the Debtors to centrally manage all of

---

[6]      The Debtors' funds are maintained at 4 different institutions – Citibank (London and Geneva Branches), HSH Nordbank AG Hamburg, Deutsche Bank AG Hamburg and Societe Generale Private Banking (Suisse) SA, most of which are rated A2 by Moody's for long-term bank deposits.

their cash flow needs and includes the necessary accounting controls to enable the Debtors, as well as their creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable. I believe that the Debtors will continue to maintain detailed records reflecting all transfers of funds.

45.    Requiring the Debtors to alter their banking and business practices, including their use of numerous business forms (including, without limitation, letterhead, purchase orders, invoices, contracts and checks) would, I believe, cause disruption in the Debtors' businesses and would impair the Debtors' efforts to focus on their chapter 11 proceedings and pursue options to maximize the value of their estates. Moreover, such actions would be expensive, unnecessary and burdensome to the Debtors' estates and disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors. Consequently, I believe that maintenance of the existing cash management system and other banking and business practices during these chapter 11 cases is in the best interests of all creditors and other parties in interest.

46.    While the Debtors have no investment accounts, to the extent that the cash management system and related practices do not comply with the requirements of section 345(b) of the Bankruptcy Code and the U.S. Trustee's Guidelines with respect to "Authorized Depositories," I believe that the Debtors have shown sufficient cause to waive compliance with these requirements for forty-five (45) days. As stated above, I believe that the majority of the Debtors' cash is in Bank Accounts at financially stable banking institutions and that all of these accounts are integral to the Debtors' efficient management of cash. To the extent that such deposits do not conform with the approved practices identified in section 345 of the Bankruptcy Code, the Debtors seek to have such requirements waived for forty-five (45) days so as to allow

the applicable banking institutions to accept and hold the Debtors' funds consistent with

prepetition practices. Shortly before the expiration of the forty-five (45) day period, the Debtor

have requested that the Court set a final hearing on this motion, and enter a final order shortly

afterwards.

47.     **Motion to Continue to Pay Prepetition Vendor Claims.** The Debtors

seek relief on an interim and final basis (the "Vendor Motion") for authority, but not the

requirement, to pay certain vendors (the "Vendors") on whom the Debtors rely to supply goods,

materials and services without which I believe the Debtors' business either could not operate or

would operate at significantly reduced profitability. As described in more detail in the Vendor

Motion, the Debtors' Vendors are paid either (a) directly by the Debtors, (b) by their Technical

Managers from monthly amounts disbursed on behalf of each Vessel Owner based on a pre-

agreed annual budget for each Vessel, or (c) with respect to drydocking costs and associated

expenses or unforeseen expenses such as vessel repairs, by either the Debtors or their Technical

Managers, depending upon which entity can obtain the best value for the particular cost or

service.  The Vendor Motion proposes an estimate of $5.3 million to pay Vendor claims and

describes the assumptions that underlie that estimate.

48.     The Vendors provide the Debtors with the following categories of goods

and services:

(a)     **Technical Manager Fees.**  Like most international shipping companies,
the Debtors retain technical managers that oversee the maintenance and efficiency of the Vessels,
employ and compensate the crew that work on the Vessels, arrange for necessary ship provisions
and repairs, and organize the supply, transport and the handling of goods with the Debtors'
vendors and suppliers. Moreover, pursuant to standard shipping industry management
agreements, the Technical Managers act on behalf of the Debtors to disburse funding to certain
other critical vendors.  It is essential that the Technical Managers are paid and that they in turn
can disburse funds to the Debtors' Vendors so as not to disturb the smooth operations of the
Vessels worldwide.

(b)     **Agents' Expenses and Costs.** Agents provide the crew with assistance in joining/signing off of the Vessels, including travel expenses.  Moreover, they arrange for necessary ship provisions and repairs, and organize the supply, transport and the handling of goods.  It is essential that the agents are paid so as not to disturb the smooth operations of the Vessels worldwide.

(c)     **Port Expenses.** On occasion, port expenses are accrued by the Vessels (rather than the charter party) as they conduct their business throughout the world.  Pilotage, docking masters, towage, mooring, tugs, harbor dues, and tonnage dues are incurred in ports throughout the world.  It is essential that such foreign debts be paid in order to ensure the Vessels can continue to conduct business in foreign ports of call.

(d)     **Lubes.** Lube oil is crucial to the operation of the engine and most other mechanical functions on board the Vessels. The Debtors obtain lube oil through long-term relationships that offer significant volume discounts.  Any disruption to those relationships could have adverse economic consequences.

(e)     **Crew Costs.** The Debtors rely upon the mostly foreign-born highly skilled crew that work on their Vessels to maintain daily operations.  The Debtors cannot risk any impairment to their relationship with these crews.

(f)     **Cabin, Deck and Engine Stores and Spares.**  Stores consist of materials necessary to keep the Vessels operating.  These may include communication systems, engineer's tools, chemicals, gases, spare parts, paints, safety equipment, cloth and linen products, rigging, and equipment.  Stores are often supplied by foreign vendors in close physical proximity to the Vessels.  Stores are of a specialized nature, which makes it imperative that relationships with these vendors are maintained.

(g)     **Bunkers.**  Bunker fuel is liquid fuel which powers the Debtors' Vessels. Bunker fuel is typically paid for by container liner companies which charter the Debtors' Vessels. However, occasionally, the Debtors are responsible for paying for bunker fuel, including upon Vessel repositioning at the end of a charter.  It is essential to the locomotion of the Vessels that the Debtors are allowed to pay for bunker fuel.

(h)     **General Maintenance and Repair.**  It is essential that the Vessels (e.g. engines, decks, hulls, communications equipment, and radar) be maintained and repaired for safe and efficient operation.  Vendors providing these services are typically foreign, as close physical proximity to the vessels is required.

(i)     **Dry Docking and Special Surveys.**  The Vessels are subject to dry docking when special surveys are conducted every five years.  As of the Petition Date, five of the Vessels had been subject to dry docking and special survey between February and May of 2014. As a consequence, certain of the Debtors whose vessels are dry docked will incur significant "one time" expenses associated with dry docking and surveys, including shipyard expenses, paints, spares, and engineer services.

(j)     **Safety and Quality.** The Vessels and their machinery are on a continuous survey inspection to ensure safe operating conditions.  Likewise, the vessels continuously

22

maintain and add safety equipment to meet governmental and certification bureau standards.  In order to assure the quality of the vessels and the safety of the crew and others, it is necessary to satisfy those vendors who provide services and goods related to safety and quality of the vessels.

(k)      **Insurance.**  As part of their corporate risk program, and as a condition to their charter agreements and loan facilities, the Debtors maintain certain insurance policies to protect them against risks involved in the operation of their Vessels and general conduct of their business, as well as to meet certain legal requirements.

49.      I believe that the payment of the Vendors' prepetition claims (the "Vendor Claims") is vital to the Debtors' reorganization efforts.  Absent continued payment to the Vendors, the Debtors would be unable to properly operate their Vessels.  Consequently, the Debtors would be unable to maintain their obligations under their charter agreements and likely would be unable to enter into new charter agreements.  In various instances, the Vendors are the only source or the most preferred source from which the Debtors can procure certain goods and services within a timeframe, in a particular port, and at a price that will permit the Debtors to continue to smoothly operate their businesses.  A failure to pay the Vendor Claims would likely result in many of the Vendors refusing to provide goods and services to the Debtors post-petition and would impair the Debtors' ability to operate their Vessels or may force the Debtors to obtain such goods and services elsewhere at a much higher price or in a quantity or quality that is insufficient to satisfy the Debtors' requirements.

50.      A Vendor may be the exclusive or preferred supplier of products or services to the Debtors for a number of reasons.  In some cases, it may be that the products or services in quantities of the desired amount are only available through a particular Vendor at the time when such products or services are sought.  Additionally, in certain instances, it may be that a particular Vendor is the only vendor that can reliably procure and deliver the desired products or services.  For example, the Debtors' Vessels require highly specialized replacement parts, and there are simply not many vendors in the world that can deliver those parts reliably.  In other

23

cases, the Debtors have an established relationship with one Vendor, and there is simply no available supply from any other vendor, or, alternatively, the time and expense of getting another vendor "up to speed" with the Debtors' Vessels and needs is not cost effective.  In other instances, due to preferred pricing from existing business relationships, procuring a particular supply of a certain product from an alternative source would be too expensive.

51.     The Debtors are involved in a highly transactional and capital intensive business. As a result, the Debtors are highly dependent on their ability to order and receive materials from vendors in a particular timeframe. Current Vendors are familiar with the Debtors' numerous Vessels and if, for example, a replacement part or specialized lube is needed at any port which the Vessels frequent, the current Vendors can deliver the right product.

52.     I believe that, absent the ability to pay certain prepetition amounts owed to Vendors, the Debtors' access to necessary goods and services would be extinguished as the Vendors could refuse to continue doing business with the Debtors or may only do business if the Debtors provide trade term accommodations such as advance deposits or payment prior to delivery.

53.     Importantly, and unique to maritime bankruptcy cases such as these cases, some of the Vendors supply the Debtors' Vessels with goods or services that arguably could be considered "necessaries" as that term is understood under United States maritime law and the law of other jurisdictions.[7]  Creditors alleging claims for necessaries under maritime law may claim a maritime lien against the Debtors' Vessels. Maritime liens are "secret liens" in that a lien

---

[7]     The Debtors make no admission as to the nature of any claim or lien against any vessels based on necessaries, and reserve all rights with regard to same.

claimant need not take any steps to attach or perfect its lien. Any such claimant could seek to

attach and arrest the respective Debtor's Vessel should it come to port.

54.    While the automatic stay is likely to provide protection from such

attachment and arrest with regard to Vendors in the United States, I understand that there is no

guarantee that Vendors outside this Court's jurisdiction will respect the power of section 362 of

the Bankruptcy Code, especially as the Vessels enter far flung foreign ports across the globe.[8]

Some of these jurisdictions may eventually recognize the automatic stay of United States

bankruptcy law, but only after considerable delay and considerable effort on the part of the

Debtors.  Of course, other jurisdictions may never recognize United States bankruptcy law.

55.    Since the Vendors may arguably be secured creditors and may have the

ability to arrest the Debtors' Vessels in foreign ports around the world, I believe it is in the best

interests of all parties to satisfy the Vendor Claims as requested in the motion.

56.    **Motion to Pay Taxes and Fees**.  The Debtors seek the entry of interim

and final orders authorizing the Debtors, in their sole discretion, to pay up to $200,000 of

prepetition Taxes and Fees (as defined below) and authorizing and directing banks and other

financial institutions to receive, process, honor, and pay checks presented for payment and

electronic payment requests relating to the foregoing.

57.    The Debtors pay certain taxes, fees, and other similar charges and

assessments (collectively, the "Taxes and Fees") to various taxing, licensing, and other

governmental authorities (collectively, the "Taxing Authorities").  Generally, the following types

of Taxes and Fees constitute the bulk of Taxes and Fees paid by the Debtors: tonnage taxes,

---

[8]    For example, the Debtors' vessels recently entered port or are scheduled to enter port in, among other places, Malta; Jebel Ali (United Arab Emirates); Melbourne and Brisbane (Australia); Ningbo and Shekou (China); Hong Kong; Singapore; Yokohama (Japan); Samsun (Turkey); Nhava Sheva (India); Keelung (Taiwan); Bur Sudan (Republic of Sudan); Laem Chabang (Thailand); Tauranga (New Zealand); and San Vincent (Chile).

licensing fees, and similar charges and assessments. Each Debtor is required to remit a tonnage tax to the government under which its vessel is flagged. A tonnage tax is a tax levied on a ship-owning entity based on the net tonnage of the ships operated by such entity. The Debtors may also be subject to licensing and other environmental responsibility fees for Nontank Vessel Response Plans, Oil Spill Removal Organizations, and Certificates of Financial Responsibility. The Taxes and Fees are paid in the ordinary course to the respective Taxing Authorities.

58.     Due to the nature of the Debtors' business, and the frequency with which their vessels travel to various ports throughout the world, it is difficult to assess the exact amount of Taxes and Fees incurred or owed but not yet paid. Taxes and Fees that the Debtors intend to pay will be covered by the cash collateral budgets in these chapter 11 cases.

59.     If the Debtors are not granted the relief requested herein, I believe their ability to continue their businesses and service their customers may be jeopardized. Failure to pay certain Taxes and Fees may result in, among other things, invalidation of a vessel's certificate of registry or the imposition of maritime liens for accrued and unpaid amounts. In addition, I believe the Taxes and Fees at issue are appropriate for payment as they are generally either priority or secured claims that are payable in full, or alternatively, under the doctrine of necessity. Last, by paying the Taxes and Fees, I believe the Debtors will avoid unnecessarily expensive and time-consuming disputes with the Taxing Authorities, as well as distraction and disruption from their reorganization.

**C.     Financing Motions.**

60.     **Motion to Use Cash Collateral.** The Debtors request entry of interim and final orders pursuant to sections 105, 361, 362, 363, 507 and 552 of the Bankruptcy Code: (a) authorizing the Debtors use of cash collateral ("Cash Collateral") pursuant to and consistent with the budgets attached to the motion to use cash collateral (the "Cash Collateral Motion");

26

(b) granting certain adequate protection; (c) modifying the automatic stay to permit the Debtors to implement the terms of any orders approving the Cash Collateral Motion; (d) scheduling a final hearing for entry of an order authorizing and granting the relief requested in the Cash Collateral Motion on a final basis; and (e) granting related relief and such other and further relief as the Court deems just and proper.

61.     The Debtors have an immediate need to use Cash Collateral to continue to operate their businesses.  The operation of the Debtors' Vessels is extremely capital intensive, and any lapse in operation could have a devastating impact on the Debtors' business.  Without the use of Cash Collateral, the Debtors will not have adequate cash to pay their various vendors, the types of which are described above, in the normal course.  Without use of Cash Collateral, the Debtors will not be able to pay their direct operating expenses or obtain goods and services needed to run their businesses and meet customer demands in a manner that will prevent immediate and irreparable harm to the Debtors' estates.  Further, also as discussed above, failure to make payments to certain creditors may subject the Debtors' Vessels to maritime liens and threats of seizure.

62.     The Debtors believe their secured lenders will be adequately protected for the use of the Cash Collateral, by: (1) the granting of superpriority administrative claims, subject to the superpriority claims provided for in the DIP Order;[9] (2) subject to the liens provided for in the DIP Order, the granting of adequate protection liens, including replacement liens, liens on certain unencumbered property and junior liens on prepetition and postpetition property subject to existing liens; (3) reasonable access to the Debtors' personnel and non-privileged information; and (4) reimbursement of all reasonable fees and expenses incurred or accrued, whether prior to

---

[9]     "DIP Order" means the proposed interim order attached to the DIP Motion (defined below).

or after the Petition Date, by the Agents (as defined in the Cash Collateral Motion).  Most

importantly, the Debtors' ability to finance their operations and the availability to the Debtors of

sufficient working capital and liquidity through the use of Cash Collateral is vital to the

confidence of the Debtors' major suppliers and customers, and to the preservation and

maintenance of the secured lenders' collateral.  The preservation of collateral is fundamental

adequate protection for the secured lenders.

63.     For all the foregoing reasons, I believe that the relief requested in the Cash

Collateral Motion is in the best interests of the Debtors' estates and will enable the Debtors to

continue to operate their businesses in chapter 11 without disruption.

64.     **Motion to Approve DIP Financing.**  The Debtors are requesting entry of

an interim and final relief (the "DIP Motion") pursuant to section 364(c) of the Bankruptcy

Code:  (a) authorizing the Debtors to execute and enter into a secured debtor-in-possession credit

agreement (the "DIP Agreement", together with the other documents entered into in connection

therewith, the "DIP Documents") and obtain subordinated (with respect to prepetition secured

obligations) secured postpetition financing (the "DIP Facility"); (b) authorizing the Debtors to

immediately obtain loans in the aggregate principal amount of $550,000 under the DIP Facility

in accordance with the terms of the DIP Agreement; and (c) scheduling a final hearing for

approval of a final order.

65.     As a general matter, the Debtors generate enough cash to pay their

ongoing expenses in the ordinary course of business.  However, in the normal course of the

Debtors' business operations, there are sometimes timing discrepancies between the receipt of

revenue and the need to pay expenses, resulting in times during which a Debtor may experience

temporary liquidity constraints.  Additionally, a Debtor may be exposed to unanticipated

expenses due to unforeseen events, which may also create temporary or minor liquidity issues.

During a period of tight liquidity and without access to additional cash, a Debtor may be unable

to pay its expenses and continue normal operations.  Synergy has agreed to provide the Debtors

with the modest $5,000,000 DIP Facility, at an annual interest rate of 3.25%, which will allow

the Debtors to satisfy cash needs that may arise, without prejudicing the rights of the Debtors'

prepetition secured lenders.

66.     As described above, NHL is currently owned 49.9% by Reminiscent and

NH2L is currently owned 100% by Reminiscent.  Reminiscent's current equity ownership

reflects the recent acquisition by Reminiscent of the 39.9% stake in each of  NHL and NH2L that

were formerly owned by GE Capital.  Synergy is owned by Reminiscent, and the chairman of

Synergy, Andreas Papathomas, is also the chief executive officer and director of NHL and NH2L

and each Intermediate Holdco.  I believe that Synergy's offer of the subordinated DIP Facility

clearly demonstrates the majority equity holder's belief in the Debtors' enterprise and operations,

as well as confidence in a unified and successful restructuring of the Debtors under chapter 11.

Synergy has agreed to provide the DIP Facility on a (a) junior secured basis with respect to

property of the estate that is subject to valid and perfected liens in existence immediately prior to

the Petition Date or valid liens perfected after the Petition Date as permitted by section 546(b) of

the Bankruptcy Code and (b) first-priority secured basis with respect to property of the estate that

is not subject to valid liens in existence immediately prior to the Petition Date, all as described

more fully in the DIP Motion and the DIP Documents.  Additionally, the Debtors' obligations

under the DIP Agreement and other DIP Documents will be given superpriority treatment above

other administrative expenses.

67.     The Debtors did not believe it would be in their best interests to solicit

financing proposals prior to a filing due to the risk of material precipitous action by certain

prepetition lenders, including, but not limited to, a draw-down on the Debtors' cash.   Further, the

Debtors did not believe financing would be available on only an unsecured or administrative

priority basis.  Thus, the Debtors determined that a debtor-in-possession loan from Synergy was

the Debtors' best option for postpetition financing at this time, and negotiated in good faith with

Synergy, which agreed to provide financing on a subordinated basis (with respect to prepetition

secured obligations). Because of the subordinated nature of the DIP Facility, the prepetition

secured lenders will not be prejudiced.  Moreover, the Debtors are only seeking use of $550,000

on an interim basis and would entertain discussions, prior to the final hearing on the motion

authorizing the Debtors to obtain postpetition financing, with other potential lenders regarding a

DIP loan under superior terms than the DIP Facility  The DIP Facility is being provided for the

benefit of all of the Debtors and each of the Debtors will be jointly and severally liable for

obligations under the DIP Agreement.[10]

68.     For the foregoing reasons, I believe that the terms of the DIP Agreement

and the Interim Order related thereto are fair and reasonable, and were negotiated in good faith

by the Debtors, Synergy, and their respective counsel, and reflect the Debtors' reasonable

exercise of business judgment consistent with their fiduciary duties.

### PART IV: INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2

69.     Local Bankruptcy Rule 1007-2 requires that the Debtors provide certain

information, which is set forth below.

---

[10]   Pursuant to the DIP Agreement, if one Debtor's liability under the DIP Facility is ultimately for the benefit of another Debtor, the Debtor undertaking the liability would have an intercompany claim against the benefitting Debtor.

70.     As required under Local Bankruptcy Rule 1007-2(a)(3), to the best of the

Debtors' knowledge and belief, there have been no committees organized prior to the Petition

Date.

71.     As required under Local Bankruptcy Rule 1007-2(a)(4), Exhibit C lists the

following information with respect to each of the holders of the Debtors' thirty (30) largest

unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name,

address (including the number, street, apartment or suite number, and zip code, if not included in

the post office address), telephone number, the name(s) of person(s) familiar with the Debtors'

accounts, the amount of the claim, and an indication of whether the claim is contingent,

unliquidated, disputed or partially secured. In each case, the claim amounts listed on Exhibit C

are estimated and subject to verification. In addition, the Debtors reserve their rights to assert

remedies, defenses, counterclaims, and offsets with respect to each claim.

72.     As required under Local Bankruptcy Rule 1007-2(a)(5), Exhibit D

provides the following information with respect to each of the holders of the five (5) largest

secured claims against the Debtors on a consolidated basis: the creditor's name and address

(including the number, street, apartment or suite number, and zip code, if not included in the post

office address), the amount of the claim, a brief description of the claim, and whether the claim

or lien is disputed. In each case, the claim amounts listed on Exhibit D are estimated and subject

to verification. In addition, the Debtors reserve their rights to assert remedies, defenses,

counterclaims, and offsets with respect to each claim.

73.     As required under Local Bankruptcy Rule 1007-2(a)(6), the Debtors

submit that as of April 30, 2014 the Debtors' unaudited consolidated financial statements, as

prepared in accordance with IFRS for interim financial statements, aggregated $1,043,600,000 in

total assets and $787,600,000 in total liabilities.

74.      As required under Local Bankruptcy Rule 1007-2(a)(7), to the best of the

Debtors' knowledge and belief, as of the Petition Date, 238.147  million shares of NHL and

25.050 million of NH2L, respectively, were outstanding. Exhibit E lists those shares indirectly

held by the Debtors' officers and directors through companies wholly owned by the respective

directors and officers and the amounts held by those persons.

75.      As required under Local Bankruptcy Rule 1007-2(a)(8), to the best of the

Debtors' knowledge and belief, the Debtors do not have any property in the possession or

custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured

creditor, or agent for any such entity.

76.      As required under Local Bankruptcy Rule 1007-2(a)(9), Exhibit F

provides a list of the premises owned, leased, or held under other arrangement from which the

Debtors operate their business.

77.      As required under Local Bankruptcy Rule 1007-2(a)(10), Exhibit G

provides the location of the Debtors' substantial assets, the location of their books and records,

and the nature and location of assets held by the Debtors outside the territorial limits of the

United States.

78.      As required under Local Bankruptcy Rule 1007-2(a)(11), to the best of the

Debtors' knowledge and belief, there are no actions or proceedings, pending or threatened,

against the Debtors or their property where a judgment against the Debtors or a seizure of the

Debtors' property may be imminent.

79.     As required under Local Bankruptcy Rule 1007-2(a)(12), Exhibit H provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

80.     Local Bankruptcy Rule 1007-2(b)(1)-(2) requires the estimated amount, on a consolidated basis, to be paid to the Debtors' employees (not including officers, directors, and stockholders) for the 30-day period following the filing of the Debtors' chapter 11 petitions and the amount paid and proposed to be paid to officers, stockholders and directors and financial consultants for services for the thirty day period following the petition date. The Debtors have no employees other than their officers, so the amount to be paid to non-officer employees is $0. The estimated amount, on a consolidated basis, to be paid to the Debtors' officers for the 30-day period following the Petition Date is $75,000. Estimated payments to be made to the Debtors' directors are approximately $10,833.  Furthermore, the Debtors have budgeted approximately $695,000 to be paid to the Debtors' financial and business consultants for the 30-day period following the Petition Date.

81.     As required under Local Bankruptcy Rule 1007-2(b)(3), Exhibit I, the Debtors' cash collateral budget, provides a list of estimated cash receipts and disbursements, and net cash gain or loss other than professional fees, on a consolidated basis for the 4-week period following the Petition Date. The Debtors do not believe that they will accrue material obligations during such 4-week period that will not be satisfied in the ordinary course of business.

I swear under penalty of perjury that the foregoing is true and correct.

Dated:          June 23, 2014

By:    _/s/ James A. Mesterharm_
       Name:   James A. Mesterharm
       Title:    Chief Restructuring Officer

<u>**EXHIBIT A**</u>

**Corporate Organizational Chart**



## EXHIBIT B

## "FIRST-DAY" MOTIONS AND APPLICATIONS

## I.      Motions and Applications for Final Approval

**1.      "Joint Administration Motion"**

Debtors' Motion for Order (I) Under Fed. R. Bankr. P. 1015(b) Directing Joint
Administration of the Chapter 11 Cases and (II) Waiving Requirements of 11
U.S.C. § 342(c)(1) and Fed. R. Bankr. P. 1005 and 2002(n)

**2.      "Consolidated Creditors List Motion"**

Debtors' Motion for Order Under Fed. R. Bankr. P. 1007(d) and Local
Bankruptcy Rule 1007-1 (I) Waiving Certain Creditor List Filing
Requirements; (II) Authorizing the Filing of a Consolidated List of Top 30
Unsecured Creditors; and (III) Authorizing Debtors to Establish Procedures for
Notifying Parties of the Commencement of these Cases

**3.      "Schedules and Statements Motion"**

Debtors' Motion for Order Under 11 U.S.C. §§ 105(a) and 521 (I) Granting
Additional Time to File Schedules and Statements of Financial Affairs, (II)
Authorizing Debtors to File Required Monthly Operating Reports on a
Consolidated Basis, and (III) Establishing Certain Notice Procedures

**4.      "Claims Agent Retention Application"**

Debtors' Application for Order under 28 U.S.C. § 156(c), 11 U.S.C. §
503(b)(1)(A), Fed. R. Bankr. P. 2014(a) and 2016, and Local Bankruptcy Rule
5075-1 Authorizing the Employment and Retention of Epiq Bankruptcy
Solutions, LLC as Notice and Claims Agent

5.      **"Enforcement of Automatic Stay Motion"**

Debtors' Motion for the Entry of an Order Under Sections 105(a), 362, and 365 of the Bankruptcy Code Enforcing and Restating Automatic Stay and Ipso Facto Provisions

## II.     Motions for Interim Approval

6.      **"Cash Management Motion"**

Debtors' Motion for Interim and Final Orders Under 11 U.S.C. §§ 105, 345, 363, 364, 503, 1107, and 1108 (I) Authorizing Continued Use of Existing Cash Management System, Bank Accounts, Business Forms, and Payment of Related Prepetition Obligations and (II) Waiving Investment and Deposit Requirements

7.      **"Vendor Motion"**

Debtors' Motion for Interim and Final Orders Under 11 U.S.C. §§ 105(a), 363(b), 1107, and 1108 Authorizing the Debtors to Pay Vendor Claims in the Ordinary Course of Business

8.      **"Taxes Motion"**

Debtors' Motion for Interim and Final Orders Under 11 U.S.C. §§ 105(a), 506(a), 507(a)(8), 541, 1107, and 1108 (I) Authorizing, but Not Directing, the Debtors to Pay Certain Taxes and Fees and (II) Directing Banks to Honor Payments Relating to Such Taxes

9.      **"Cash Collateral Motion"**

Debtors' Motion for Entry Of Interim and Final Orders Under 11 U.S.C. §§ 105, 361, 362, 363(c) 363(e), 507 and 552, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014 and Local Rule 4001-2 (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, and (III) Scheduling a Final Hearing

2

10.    **''DIP Motion''**

Debtors' Motion for Entry Of Interim and Final Orders Under 11 U.S.C. § 364,
Bankruptcy Rules 4001 and 9014 and Local Bankruptcy Rule 4001-2 (I)
Authorizing the Debtors to Obtain Postpetition Financing (II) Scheduling a Final
Hearing

# EXHIBIT C

## List of Creditors Holding 30 Largest Unsecured Claims

The following is a list of those creditors holding the 30 largest unsecured claims against the Debtors, on a consolidated basis, as of June 23, 2014. This list has been prepared from the books and records of the Debtors, and in accordance with Bankruptcy Rule 1007(d), for filing in the Debtors' chapter 11 cases. This list does not include (1) persons who come within the definition of "insider" set forth in section 101 of the Bankruptcy Code, (2) secured creditors or (3) claims held by the Debtors' employees.

The information set forth herein shall not constitute an admission of liability by, nor is binding on, the Debtors and the failure to list a claim as contingent, disputed or subject to set off shall not be a waiver of any of the Debtors' rights relating thereto.

| Creditor Name | Creditor Address | Mgmt[1] | Nature of Debt | Contingent, Unliquidated, Disputed or Subject to Set Off | Unsecured Amount |
|---|---|---|---|---|---|
| 1. Associated Shipbroking S.A.M. | Gildo Pastor Center - Block C 4.20 7 rue du Gabian, Fontvieille MC 98000 Monaco FAX: (+377) 92 05 75 95 | SY | BROKER | | $1,023,687 |
| 2. UNIVAN Ship Management Limited | 18 Whitfield Road North Point Hong Kong, China FAX: (+6087) 429179 | SY | TECH MGR | Y | $557,283 [2] |
| 3. Anglo-Eastern Ship Management | 23rd Floor, 248 Queens Road Wanchai Hong Kong, China FAX: (+852) 2863-6422 | SY | TECH MGR | Y | $447,593 [2] |

---

[1]    A management company, as agent for the Debtors, generally pays the amounts owed to the Debtors' creditors, as indicated below. The Debtors currently have three management companies that act as agents for certain of the Debtors. They are: AE - Anglo-Eastern Ship Management; SY - Synergy Management Services Limited; and UV - UNIVAN Ship Management Limited.

[2]    The Debtors' technical managers have access to cash on hand and in bank accounts to offset these amounts. Further, the amounts listed herein include pre-petition crew wages payable by the technical managers.  This amount may also include payables owed to certain trade creditors that are independently listed on this schedule, as the technical managers pay such amounts to end vendors as agent for the Debtors.

| | | | | | |
|---|---|---|---|---|---|
| 4. Medpool Limited | 1-3 Spatharikou Street<br>Mesa Yeitonia<br>4003 Limassol, Cyprus<br>FAX: (+357) 25-823248 | SY | TRADE | | $275,247 |
| 5. Hyundai Heavy Industries Co Ltd | 1 Cheonha-Dong<br>Dong ku<br>Ulsan, South Korea<br>FAX: (+82) 52-202-9062 | AE | TRADE | | $132,882 [3] |
| 6. Marsh Brokers Ltd | 1 Michael Michaelides Steet<br>3030 Limassol, Cyprus<br>FAX: (+357) 25-355-869 | SY | TRADE | | $97,000 |
| 7. Chevron Marine Products LLC | 1500 Louisiana Street<br>Houston, TX 77002 USA<br>FAX: +1-914-285-7340 | SY | TRADE | | $57,482 |
| 8. Daihatsu Diesel East Japan | 2-1-13 Higashiueno, Taito-ku<br>Tokyo, Japan<br>FAX: +81-6-6454-2750 | AE | TRADE | | $50,152 [3] |
| 9. Fairwind Maritime Investments Company Limited | Office 20<br>2/6 Observatorniy Lane<br>Odessa, Ukraine<br>FAX: +380487373076 | UV | TRADE | | $42,076 [3] |
| 10. GEA Westfalia Separator (China) Ltd | 3 Lower Thames Street<br>London, EC3R6HE<br>United Kingdom<br> FAX: +86 10 6581 4610 | UV | TRADE | | $40,156 [3] |
| 11. Mitsui Engineering and Shipbuilding | 2 International Business Park<br>Singapore, 609930<br>FAX: (+65) 6773-3677 | AE | TRADE | | $38,877 [3] |
| 12. Wartsila Cyprus Ltd. | 8 Sinergatismou Street<br>3010 Limassol, Cyprus<br>FAX: (+357) 25-812-195 | SY | TRADE | | $30,376 |
| 13. Maxcorr Asia Pacific Pte Ltd. | No.22 Pioneer Crescent #02-07<br>West Park Biz Central<br>Singapore , 628556<br>FAX: (+65) 6265 1411 | UV | TRADE | | $29,084 [3] |
| 14. Wilhelmsen Ships Service Ltd. (Hong Kong) | 6 Hallimestarinkatu<br>Kaarina, 20780 Finland<br>FAX: (+47) 67 58 45 70 | UV | TRADE | | $28,642 [3] |

---

[3]   These amounts reflect Technical Managers' creditor amounts.

2

| 15. MAN Diesel & Turbo | 41 Teglhomsgade<br>Copenhagen, DK2450 Denmark<br>FAX: (+45) 33851030 | AE | TRADE | | $28,353 [3] |
| 16. American Bureau of shipping (China)<br>    Limited | 5th Floor, Silver Tower, No. 85 Taoyuan Road, Luwan District<br>Shanghai, 200021 P.R. China<br>FAX: +86-21-6360-5391 | UV | TRADE | | $28,166 [3] |
| 17. Korea Marine Service Co., Ltd | 1187-5, Choryang- 3 Dong<br>Busan, 601-838 South Korea<br>FAX: (032) 764-8217 | UV | TRADE | | $27,513 [3] |
| 18. Hyundai ETS Co., Ltd. | 507-5, Daejeo-1Dong, Gangseo-Gu Gangseo-gu<br>Busan, 614-040 Korea FAX: +82-52-202-2347 | UV | TRADE | | $26,450 [3] |
| 19. RMS Marine Service Company Ltd. | No.365, Gaodong No. 2 Road<br>Pudong District<br>Shanghai, 200137 China<br>FAX: +86-21-65380899 | AE | TRADE | | $26,053 [3] |
| 20. Jing Ming Engineering Enterprises | 43, Lane 9, Shin Sheng Rd<br>Chien Chen Dist<br>Kaohsiung, 80672 Taiwan<br>FAX: +886-7-815-4259 | AE | TRADE | | $25,192 [3] |
| 21. Hanil-Fuji (Korea) Co Ltd. | 8F Dongsung 1, Bldg 1145-11<br>Busan, 601-836 South Korea<br>FAX: 82-51-631-7735 | AE | TRADE | | $25,110 [3] |
| 22. HY Shipping & Trading Co. Ltd. | Room 603B , No.9, Lane 466 Tian Bao Road Jian Bang Building Shanghai, 200086 P.R. China FAX: +86 21 35304658 | SY | TRADE | | $25,000 |
| 23. Con-lash Supplies Pte Ltd. | 2 Tuas West Street<br>Singapore , 637450 Singapore<br>FAX: +65 6863 6428 | UV | TRADE | | $22,971 [3] |
| 24. Index-Cool Marine & Industry Pte. Ltd. | No.6, Jalan Pendamar Cempaka Emas Industria Estate Pandamaran, Selangor<br>Darul Ehsan, 42000 MY<br>FAX: (+65) 6288 8605 | UV | TRADE | | $21,216 [3] |
| 25. Jinsan Marine Management Co. Ltd. | 162-1, Jangsangpo-Dong Nam-Gu<br>Ulsan, 680060 South Korea<br>FAX: +82-52-228-7890 | UV | TRADE | | $17,275 [3] |
| 26. Neko Ship Supply BV Rotterdam | Klompenmakerstraat 71<br>3194 DD<br>Hoogvliet, The Netherlands<br>FAX: (+31) 10 800 5500 | UV | TRADE | | $16,604 [3] |

3

| 27. Drew Marine | 100 South Jefferson Road Whippany, NJ 07981 USA FAX: +1-973-263-4485 | AE | TRADE | | $16,574 [3] |
| 28. Fuji Trading (S) Pte Ltd | #24 Chia Ping Road Singapore, 619976 Singapore FAX: (+65) 6265-0443 | AE | TRADE | | $16,532 [3] |
| 29. Leistritz Trading Limited | Rm. 902, No.400, Zhejiang Zhong Rd. Shanghai, 200001 China FAX: +86-21-6352 3138 | UV | TRADE | | $15,377 [3] |
| 30. Videotel Marine Intl Asia Ltd. | Room 401, Yu Sung Boon Building 107-111 Des Voeux Road Hong Kong, China FAX: +44 (0) 20 7299 1818 | UV | TRADE | | $15,039 [3] |

## EXHIBIT D

### List of Creditors Holding 5 Largest Secured Claims

The following is a list of those creditors holding the 5 largest secured claims against the Debtors, on a consolidated basis, as of June 23, 2014. This list has been prepared from the books and records of the Debtors, and in accordance with Bankruptcy Rule 1007(d), for filing in the Debtors' chapter 11 cases.

The information set forth herein shall not constitute an admission of liability by, nor is binding on, the Debtors and the failure to list a claim as contingent, disputed or subject to set off shall not be a waiver of any of the Debtors' rights relating thereto.

| Lender | Claim | Description of Collateral |
|---|---|---|
| Citibank, N.A.<br>Citigroup Centre, 33 Canada Square<br>Canary Wharf, London E14 5LB | $272.6 million | 5 vessels |
| HSH Nordbank AG<br>(under the HSH-YM Facility)<br>Gerhart-Hauptmann-Platz 50<br>20095 Hamburg, Germany | $191.0 million | 4 vessels |
| HSH Nordbank AG<br>(under the Flowers Facility)<br>Gerhart-Hauptmann-Platz 50<br>20095 Hamburg, Germany | $118.2 million | 4 vessels |
| DVB Bank AG<br>(under the DVB 2 Credit Facility)<br>80 Cheapside<br>London EC2V 6EE | $73.2 million | 1 vessel |
| DVB Bank AG<br>(under the DVB 1 Credit Facility)<br>80 Cheapside<br>London EC2V 6EE | $73.2 million | 1 vessel |

## EXHIBIT E

### List of Officers' and Directors' Share Holdings

| Name | Position | Holdings |
|------|----------|----------|
| Andreas Papathomas (1) | Director (Class A) and Chairman of the Board | 118,835,591 shares of Nautilus Holdings Limited |
| Andreas Papathomas (1) | Director | 25,050,000 shares of Nautilus Holdings No. 2 Limited |

## NOTE:

(1) Shares indirectly held through Reminiscent Ventures S.A., a wholly owned company.

**EXHIBIT F**

**List of Premises Owned, Leased or Held Under Other Arrangement From Which
the Debtors Operate their Business**

| Premises Location | Interest in Property | Usage |
|---|---|---|
| Lapithion Tower, 5 Deligiorgi Street, 1066 Nicosia, Cyprus | Property is leased by Synergy and utilized by the Debtors pursuant to the management agreements between NHL, NH2L, and Synergy | Executive Offices – Debtors' business is run from this location |
| 445 Hamilton Avenue, 11th Floor, White Plains, New York, 10601 | Lease | Corporate office space |

## EXHIBIT G

### Location of Debtor's Substantial Assets, Books and Records

The Debtors' books and records are located in their executive offices in Nicosa, Cyprus. Certain of the Debtors' records – such as log books for the Vessels and original invoices for vendor purchases, crew costs, and certain other Vessel costs – are held with the Technical Managers at the following addresses:

Anglo-Eastern Ship Management
23rd Floor, 248 Queens Road
Wachai, Hong Kong

UNIVAN Ship Management Limited
18 Whitfield Road
North Point, Hong Kong

The Debtors' existing stock certificates are located in White Plains, New York.

As described in this Declaration, the Debtors' substantial assets are the 16 vessels that comprise their fleet. The list below provides details as to each vessel's estimated location as of June 23, 2014, but due to the nature of the Debtors' business the Debtors' fleet is transient and the positions listed below are subject to frequent change.

| | **Vessel Owner (Vessel)** | **Location** |
|---|---|---|
| 1 | Findhorn Osprey Limited (Camellia) | In transit from Malta to Thessaloniki, Greece |
| 2 | Floral Peninsula Limited (ANL Kardinia) | In transit from Tauranga, New Zealand to Brisbane, Australia |
| 3 | Earlstown Limited (Dahlia) | Laem Chabang, Thailand |
| 4 | Resplendent Spirit Limited (Violet) | In transit from Haydar Pasa, Turkey to Samsun, Turkey |
| 5 | Miltons Way Limited (Linea Messina; fka Columbia) | Jebel Ali, United Arab Emirates |
| 6 | Able Challenger Limited (YM Antwerp) | Melbourne, Australia |
| 7 | Magic Peninsula Limited (YM Busan) | In transit from Ningbo, China to Shekou, China |
| 8 | Metropolitan Vitality Limited (YM Oakland) | Hong Kong |
| 9 | Superior Integrity Limited (YM Keelung) | In transit from Brisbane, Australia to Sydney, Australia |

|    | **Vessel Owner (Vessel)** | **Location** |
|----|---------------------------|--------------|
| 10 | Metropolitan Harbour Limited (Washington) | Yokohama, Japan |
| 11 | Golden Knighthead Limited (Texas) | San Vicente, Chile |
| 12 | Perpetual Joy Limited (Corcovado) | In transit from Tauranga, New Zealand to Numea, New Caledonia |
| 13 | Vivid Mind Limited (Ital Onesta) | Shekou, China |
| 14 | Regal Stone Limited (Venezia) | Nhava Sheva, India |
| 15 | Charming Energetic Limited (Rotterdam) | In transit from Angamos, Chile to Keelung, China |
| 16 | Dynamic Continental Limited (Hamburg) | Bur Sudan, Republic of Sudan |

## EXHIBIT H

### The Debtors' Senior Management and Directors

The following is a list of the Debtors' senior management and directors, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name | Position |
|------|----------|
| Alan Carr | Independent Director |
| Robin Das | Chief Financial Officer |
| Alastair Farley | Director |
| James A. Mesterharm | Chief Restructuring Officer |
| Andreas S. Maroulletis | Director |
| Andreas Papathomas | Chief Executive Officer; Director |

**Alan Carr** was appointed independent director to all of the Debtors except for NHL as of the Petition Date.  Mr. Carr is an investment professional with almost 20 years of experience working from the principal and advisor side on complex, process-intensive financial situations. Mr. Carr is the founder of Drivetrain Advisors, a fiduciary services firm that supports the investment community in legally- and process-intensive investments as a representative, director, or trustee.  Prior to founding Drivetrain Advisors in 2013, Mr. Carr was a Managing Director at Strategic Value Partners, LLC ("Strategic Value Partners"), where he led financial restructurings for companies in North America and Europe, working in both the US and Europe over 9 years.  Mr. Carr joined Strategic Value Partners in 2003, where he served as Managing Director until he founded Drivetrain Advisors in 2013.  Prior to joining Strategic Value Partners, Mr. Carr was a corporate attorney at Skadden, Arps, Slate, Meagher & Flom, where he represented clients in various major transactions, including Mirant Corporation, Alamosa PCS, AES Corporation, America West Airlines, Global Crossing, and others.   Prior to that, he was an attorney at Ravin, Sarasohn, Baumgarten, Fisch & Rosen.  Mr. Carr currently serves on the Board of Directors of Tanker Investments Ltd., a publicly traded specialized investment company focused on the oil tanker market, a position he has held since January 2014.  Mr. Carr also currently serves on the Board of Directors of LightSquared Inc.  Mr. Carr currently does and has previously served on various boards of private companies in North America, Europe and Asia.  Mr. Carr's principal business address is 630 Third Avenue, 21st Floor; New York, New York 10017.

**Robin Das** is the Chief Financial Officer of the Debtors. Mr. Das is Director and founder of Auld Partners Ltd, a shipping and finance focused advisory boutique.  Until October 2011, Mr. Das was Global Head of Shipping at HSH Nordbank AG.  Before joining HSH Nordbank in 2005, he was Head of Shipping at WestLB and prior to this Mr. Das was joint Head of European Shipping at J.P. Morgan. He has worked in shipping finance and shipping investment banking since 1995.  Mr. Das holds a BSc (Hons) degree from the University of Strathclyde.

**Alastair Farley** has served as a director of the Debtors since November 2006. Mr. Farley is a qualified solicitor and a founding partner of Watson, Farley & Williams LLP, a firm of international lawyers, where he served as a senior partner from 1982-1999 and remains a senior advisor to the firm. Mr. Farley also served as chairman of Seaguard Offshore Group, Opus Portfolio Group, Gyroscopic Fund Limited, Braemar Shipping Services plc and J&P (Overseas) Limited. Mr. Farley formerly served as a non-executive director of Close Brothers Group plc.

**James A. Mesterharm** is the Chief Restructuring Officer of the Debtors. Mr. Mesterharm is co-head of the North America Turnaround and Restructuring Services practice of AlixPartners, LLP, which is an affiliate of AP Services, LLC, which has served as the Debtors' restructuring advisor since March 2014. Prior to serving as CRO of the Debtors, Mr. Mesterharm was involved in a number of complex restructuring cases, including Eastman Kodak Company, General Growth Properties, Zenith Electronic Corp., Parmalat USA,  and Safety-Kleen Corp. Mr. Mesterharm holds an MBA in finance, strategy, and organizational behavior from Northwestern University's Kellogg School of Management and a Bachelor of Science in accounting and management from Purdue University.

**Andreas S. Maroulletis** has served as a director of the Vessel owning Debtors since 2013.  Mr Maroulletis began his legal career working in-house for BP Amoco in London in 1999.  He qualified in New York as an Attorney-at-Law and moved to New York to join the maritime law firm of Fowler, Rodriguez & Chalos in 2000.  He then served as in-house lawyer for two marine insurance companies from 2003 to 2009 in London and Piraeus before joining the Synergy Group in 2009.  He has an undergraduate degree in Law (LL.B. Honours), and a Masters in International Business Law (LL.M) from University College London.  Mr Maroulletis is admitted to the State Bar of New York (Attorney-at-Law), Southern and Eastern Districts of New York (Attorney-at-Law), the Law Society, England & Wales (Solicitor), and previously the Athens Bar (Attorney-at-Law).

**Andreas Papathomas** is both Chief Executive Officer and a director of NHL, NH2L and each of the Intermediate HoldCos. He has served as chairman and CEO of Synergy Group since 1980.  Mr. Papathomas began his career at sea and has since been involved in all aspects of shipping, including chartering, sale and purchase, financing, insurance, operations and administration. Mr. Papathomas founded  Triships A/S with a major institutional investor in 2001 and founded Nautilus Holdings with four major institutional investors in 2006. Mr. Papathomas holds an MA (Hons) degree in economics from the University of Cambridge.

**<u>EXHIBIT I</u>**

**<u>Debtors' 4-Week Cash Flow Budget</u>**
*($ in 000's)*

**Nautilus Holdings No. 2 Ltd**
*Weekly Cash Forecast (for weeks ending)*

| 06/21/2014 | Forecast Week 1 6/28/14 | Forecast Week 2 7/5/14 | Forecast Week 3 7/12/14 | Forecast Week 4 7/19/14 | Total |
|---|---|---|---|---|---|
| **Receipts** | | | | | |
| Net Charter Income | - | - | - | - | - |
| Other Receipts | - | - | - | - | - |
| Total Receipts | - | - | - | - | - |
| **Disbursements** | | | | | |
| Total Operating Disbursements | - | - | | - | - |
| Total G&A Disbursements | (37) | (37) | (21,000) | (84) | (21,157) |
| Total Disbursements | (37) | (37) | (21,000) | (84) | (21,157) |
| **NOCF (before Fees & Debt Service)** | (37) | (37) | (21,000) | (84) | (21,157) |
| Total Restructuring Professional Fees | - | | - | | - |
| Total Management Fees | - | - | 291,266 | (174,507) | 116,759 |
| **NOCF (before Debt Service)** | (37) | (37) | 270,266 | (174,591) | 95,602 |
| **Borrowings/Debt Service** | | | | | |
| DIP Interest | - | - | - | - | - |
| DIP Borrowings/Repayments | - | - | - | - | - |
| **NCF** | (37) | (37) | 270,266 | (174,591) | 95,602 |
| Beg Earnings Account(s) Cash Balance | 1,464,645 | 1,464,608 | 1,464,572 | 1,734,838 | 1,464,645 |
| NOCF (before Fees & Debt Service) | (37) | (37) | (21,000) | (84) | (21,157) |
| Restructuring Professional Fees | - | - | - | - | - |
| Management Fees | - | - | 291,266 | (174,507) | 116,759 |
| Debt Service | - | - | - | - | - |
| **End Earnings Account(s) Cash Balance** | **1,464,608** | **1,464,572** | **1,734,838** | **1,560,247** | **1,560,247** |
| Beg Reserve Balance | | - | - | - | - |
| Interest Income | | - | - | - | - |
| **End Reserve Balance** | | **-** | **-** | **-** | **-** |
| **End Cash + Reserve and Term Balance** | **1,464,608** | **1,464,572** | **1,734,838** | **1,560,247** | **1,560,247** |
| Note: Week ending June 28, 2014 includes cash flows for five days (June 24 - 28) | | | | | |

**Flowers Silo (Consolidated)**
*Weekly Cash Forecast (for weeks ending)*

| 06/21/2014 | Forecast Week 1 6/28/14 | Forecast Week 2 7/5/14 | Forecast Week 3 7/12/14 | Forecast Week 4 7/19/14 | Total |
|---|---|---|---|---|---|
| **Receipts** | | | | | |
| Net Charter Income | 107,872 | 201,125 | 107,872 | 196,125 | 612,994 |
| Other Receipts | - | - | - | - | - |
| Total Receipts | 107,872 | 201,125 | 107,872 | 196,125 | 612,994 |
| **Disbursements** | | | | | |
| Total Operating Disbursements | (508,593) | (61,500) | (10,000) | (10,000) | (590,093) |
| Total G&A Disbursements | - | - | - | - | - |
| Total Disbursements | (508,593) | (61,500) | (10,000) | (10,000) | (590,093) |
| **NOCF (before Fees & Debt Service)** | (400,721) | 139,625 | 97,872 | 186,125 | 22,901 |
| Total Restructuring Professional Fees | - | - | - | - | - |
| Total Management Fees | - | - | (121,188) | - | (121,188) |
| **NOCF (before Debt Service)** | (400,721) | 139,625 | (23,316) | 186,125 | (98,287) |
| **Borrowings/Debt Service** | | | | | |
| DIP Interest | - | (104) | - | - | (104) |
| DIP Borrowings/Repayments | 250,000 | - | - | - | 250,000 |
| **NCF** | (150,721) | 139,521 | (23,316) | 186,125 | 151,609 |
| Beg Earnings Account(s) Cash Balance | 481,182 | 330,461 | 469,982 | 446,666 | 481,182 |
| NOCF (before Fees & Debt Service) | (400,721) | 139,625 | 97,872 | 186,125 | 22,901 |
| Restructuring Professional Fees | - | - | - | - | - |
| Management Fees | - | - | (121,188) | - | (121,188) |
| Debt Service | 250,000 | (104) | - | - | 249,896 |
| **End Earnings Account(s) Cash Balance** | 330,461 | 469,982 | 446,666 | 632,791 | 632,791 |
| Beg Reserve Balance | - | - | - | - | - |
| Interest Income | - | - | - | - | - |
| **End Reserve Balance** | - | - | - | - | - |
| **End Cash + Reserve and Term Balance** | 330,461 | 469,982 | 446,666 | 632,791 | 632,791 |

Note: Week ending June 28, 2014 includes cash flows for five days (June 24 - 28)

**Miltons' Way Ltd (MV Columbia)**
*Weekly Cash Forecast (for weeks ending)*

| | | Forecast Week 1 6/28/14 | Forecast Week 2 7/5/14 | Forecast Week 3 7/12/14 | Forecast Week 4 7/19/14 | Total |
|---|---|---|---|---|---|---|
| **06/21/2014** | | | | | | |
| **Receipts** | | | | | | |
| Net Charter Income | | - | - | 105,625 | - | 105,625 |
| Other Receipts | | - | - | - | - | - |
| Total Receipts | | - | - | 105,625 | - | 105,625 |
| **Disbursements** | | | | | | |
| Total Operating Disbursements | | (192,831) | (47,251) | (25,000) | (2,500) | (267,582) |
| Total G&A Disbursements | | - | - | - | - | - |
| Total Disbursements | | (192,831) | (47,251) | (25,000) | (2,500) | (267,582) |
| **NOCF (before Fees & Debt Service)** | | (192,831) | (47,251) | 80,625 | (2,500) | (161,957) |
| Total Restructuring Professional Fees | | - | - | - | - | - |
| Total Management Fees | | - | - | (34,819) | - | (34,819) |
| **NOCF (before Debt Service)** | | (192,831) | (47,251) | 45,806 | (2,500) | (196,776) |
| **Borrowings/Debt Service** | | | | | | |
| DIP Interest | | - | (63) | - | - | (63) |
| DIP Borrowings/Repayments | | 150,000 | 50,000 | - | - | 200,000 |
| **NCF** | | (42,831) | 2,687 | 45,806 | (2,500) | 3,162 |
| Beg Earnings Account(s) Cash Balance | | 106,446 | 63,615 | 66,302 | 112,108 | 106,446 |
| NOCF (before Fees & Debt Service) | | (192,831) | (47,251) | 80,625 | (2,500) | (161,957) |
| Restructuring Professional Fees | | - | - | - | - | - |
| Management Fees | | - | - | (34,819) | - | (34,819) |
| Debt Service | | 150,000 | 49,938 | - | - | 199,938 |
| **End Earnings Account(s) Cash Balance** | | 63,615 | 66,302 | 112,108 | 109,608 | 109,608 |
| Beg Reserve Balance | | - | - | - | - | - |
| Interest Income | | - | - | - | - | - |
| **End Reserve Balance** | | - | - | - | - | - |
| **End Cash + Reserve and Term Balance** | | 63,615 | 66,302 | 112,108 | 109,608 | 109,608 |
| Note: Week ending June 28, 2014 includes cash flows for five days (June 24 - 28) | | | | | | |

**HSH YM Silo (Consolidated)**
*Weekly Cash Forecast (for weeks ending)*

| 06/21/2014 | Forecast Week 1 6/28/14 | Forecast Week 2 7/5/14 | Forecast Week 3 7/12/14 | Forecast Week 4 7/19/14 | Total |
|---|---|---|---|---|---|
| **Receipts** | | | | | |
| Net Charter Income | 1,491,000 | - | 1,435,000 | (876,618) | 2,049,382 |
| Other Receipts | - | - | - | - | - |
| Total Receipts | 1,491,000 | - | 1,435,000 | (876,618) | 2,049,382 |
| **Disbursements** | | | | | |
| Total Operating Disbursements | (517,099) | (142,118) | (92,118) | (10,000) | (761,336) |
| Total G&A Disbursements | - | - | - | - | - |
| Total Disbursements | (517,099) | (142,118) | (92,118) | (10,000) | (761,336) |
| **NOCF (before Fees & Debt Service)** | 973,901 | (142,118) | 1,342,882 | (886,618) | 1,288,046 |
| Total Restructuring Professional Fees | - | - | - | - | - |
| Total Management Fees | - | - | (135,260) | - | (135,260) |
| **NOCF (before Debt Service)** | 973,901 | (142,118) | 1,207,622 | (886,618) | 1,152,787 |
| **Borrowings/Debt Service** | | | | | |
| DIP Interest | - | - | - | - | - |
| DIP Borrowings/Repayments | - | - | - | - | - |
| **NCF** | 973,901 | (142,118) | 1,207,622 | (886,618) | 1,152,787 |
| Beg Earnings Account(s) Cash Balance | 18,990,153 | 19,964,053 | 19,821,935 | 21,029,558 | 18,990,153 |
| NOCF (before Fees & Debt Service) | 973,901 | (142,118) | 1,342,882 | (886,618) | 1,288,046 |
| Restructuring Professional Fees | - | - | - | - | - |
| Management Fees | - | - | (135,260) | - | (135,260) |
| Debt Service | - | - | - | - | - |
| **End Earnings Account(s) Cash Balance** | 19,964,053 | 19,821,935 | 21,029,558 | 20,142,940 | 20,142,940 |
| Beg Reserve Balance | - | - | - | - | - |
| Interest Income | - | - | - | - | - |
| **End Reserve Balance** | - | - | - | - | - |
| **End Cash + Reserve and Term Balance** | 19,964,053 | 19,821,935 | 21,029,558 | 20,142,940 | 20,142,940 |
| Note: Week ending June 28, 2014 includes cash flows for five days (June 24 - 28) | | | | | |

**Nautilus Holdings Limited**
*Weekly Cash Forecast (for weeks ending)*

| 06/21/2014 | Forecast Week 1 6/28/14 | Forecast Week 2 7/5/14 | Forecast Week 3 7/12/14 | Forecast Week 4 7/19/14 | Total |
|---|---|---|---|---|---|
| **Receipts** | | | | | |
| Net Charter Income | - | - | - | - | - |
| Other Receipts | - | - | - | - | - |
| Total Receipts | - | - | - | - | - |
| **Disbursements** | | | | | |
| Total Operating Disbursements | - | - | - | - | - |
| Total G&A Disbursements | (37) | (37) | (20,805) | (84) | (20,962) |
| Total Disbursements | (37) | (37) | (20,805) | (84) | (20,962) |
| **NOCF (before Fees & Debt Service)** | (37) | (37) | (20,805) | (84) | (20,962) |
| Total Restructuring Professional Fees | - | - | - | - | - |
| Total Management Fees | - | - | 277,362 | (166,640) | 110,722 |
| **NOCF (before Debt Service)** | (37) | (37) | 256,557 | (166,724) | 89,760 |
| **Borrowings/Debt Service** | | | | | |
| DIP Interest | - | - | - | - | - |
| DIP Borrowings/Repayments | - | - | - | - | - |
| **NCF** | (37) | (37) | 256,557 | (166,724) | 89,760 |
| Beg Earnings Account(s) Cash Balance | 1,760,624 | 1,760,588 | 1,760,551 | 2,017,108 | 1,760,624 |
| NOCF (before Fees & Debt Service) | (37) | (37) | (20,805) | (84) | (20,962) |
| Restructuring Professional Fees | - | - | - | - | - |
| Management Fees | - | - | 277,362 | (166,640) | 110,722 |
| Debt Service | - | - | - | - | - |
| **End Earnings Account(s) Cash Balance** | 1,760,588 | 1,760,551 | 2,017,108 | 1,850,384 | 1,850,384 |
| Beg Reserve Balance | (0) | (0) | (0) | (0) | (0) |
| Interest Income | - | - | - | - | - |
| **End Reserve Balance** | (0) | (0) | (0) | (0) | (0) |
| **End Cash + Reserve and Term Balance** | 1,760,588 | 1,760,551 | 2,017,108 | 1,850,384 | 1,850,384 |
| Note: Week ending June 28, 2014 includes cash flows for five days (June 24 - 28) | | | | | |

**Metropolitan Harbour Ltd (MV APL Washington)**
*Weekly Cash Forecast (for weeks ending)*

| | **06/21/2014** | Forecast Week 1 6/28/14 | Forecast Week 2 7/5/14 | Forecast Week 3 7/12/14 | Forecast Week 4 7/19/14 | Total |
|---|---|---|---|---|---|---|
| **Receipts** | | | | | | |
| Net Charter Income | | - | - | (10,000) | 463,450 | 453,450 |
| Other Receipts | | - | - | - | - | - |
| Total Receipts | | - | - | (10,000) | 463,450 | 453,450 |
| **Disbursements** | | | | | | |
| Total Operating Disbursements | | (139,348) | (348,677) | (69,185) | (69,185) | (626,395) |
| Total G&A Disbursements | | - | (526) | - | (5,000) | (5,526) |
| Total Disbursements | | (139,348) | (349,203) | (69,185) | (74,185) | (631,921) |
| **NOCF (before Fees & Debt Service)** | | (139,348) | (349,203) | (79,185) | 389,265 | (178,471) |
| Total Restructuring Professional Fees | | - | - | - | - | - |
| Total Management Fees | | - | - | (72,351) | - | (72,351) |
| **NOCF (before Debt Service)** | | (139,348) | (349,203) | (151,536) | 389,265 | (250,822) |
| **Borrowings/Debt Service** | | | | | | |
| DIP Interest | | - | - | - | - | - |
| DIP Borrowings/Repayments | | - | - | - | - | - |
| **NCF** | | (139,348) | (349,203) | (151,536) | 389,265 | (250,822) |
| Beg Earnings Account(s) Cash Balance | | 893,794 | 754,446 | 405,244 | 253,707 | 893,794 |
| NOCF (before Fees & Debt Service) | | (139,348) | (349,203) | (79,185) | 389,265 | (178,471) |
| Restructuring Professional Fees | | - | - | - | - | - |
| Management Fees | | - | - | (72,351) | - | (72,351) |
| Debt Service | | - | - | - | - | - |
| **End Earnings Account(s) Cash Balance** | | **754,446** | **405,244** | **253,707** | **642,972** | **642,972** |
| Beg Reserve Balance | | 13,682,609 | 13,682,609 | 13,682,609 | 13,682,609 | 13,682,609 |
| Interest Income | | - | - | - | - | - |
| **End Reserve Balance** | | **13,682,609** | **13,682,609** | **13,682,609** | **13,682,609** | **13,682,609** |
| **End Cash + Reserve and Term Balance** | | **14,437,055** | **14,087,853** | **13,936,316** | **14,325,581** | **14,325,581** |
| Note: Week ending June 28, 2014 includes cash flows for five days (June 24 - 28) | | | | | | |

**Golden Knighthead Ltd (MV APL Texas)**
*Weekly Cash Forecast (for weeks ending)*

| | 06/21/2014 | | Forecast Week 1 6/28/14 | Forecast Week 2 7/5/14 | Forecast Week 3 7/12/14 | Forecast Week 4 7/19/14 | Total |
|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | |
| Net Charter Income | | | - | - | (10,000) | 463,450 | 453,450 |
| Other Receipts | | | - | - | - | - | - |
| Total Receipts | | | - | - | (10,000) | 463,450 | 453,450 |
| **Disbursements** | | | | | | | |
| Total Operating Disbursements | | | (152,179) | (369,716) | (75,943) | (75,943) | (673,782) |
| Total G&A Disbursements | | | - | (617) | - | (5,000) | (5,617) |
| Total Disbursements | | | (152,179) | (370,333) | (75,943) | (80,943) | (679,399) |
| **NOCF (before Fees & Debt Service)** | | | (152,179) | (370,333) | (85,943) | 382,507 | (225,949) |
| Total Restructuring Professional Fees | | | - | - | - | - | - |
| Total Management Fees | | | - | - | (72,351) | - | (72,351) |
| **NOCF (before Debt Service)** | | | (152,179) | (370,333) | (158,294) | 382,507 | (298,300) |
| **Borrowings/Debt Service** | | | | | | | |
| DIP Interest | | | - | - | - | - | |
| DIP Borrowings/Repayments | | | - | - | - | - | |
| **NCF** | | | (152,179) | (370,333) | (158,294) | 382,507 | (298,300) |
| Beg Earnings Account(s) Cash Balance | | | 1,056,606 | 904,427 | 534,093 | 375,799 | 1,056,606 |
| NOCF (before Fees & Debt Service) | | | (152,179) | (370,333) | (85,943) | 382,507 | (225,949) |
| Restructuring Professional Fees | | | - | - | - | - | - |
| Management Fees | | | - | - | (72,351) | - | (72,351) |
| Debt Service | | | - | - | - | - | - |
| **End Earnings Account(s) Cash Balance** | | | **904,427** | **534,093** | **375,799** | **758,306** | **758,306** |
| Beg Reserve Balance | | | 13,383,518 | 13,383,518 | 13,383,518 | 13,383,518 | 13,383,518 |
| Interest Income | | | - | - | - | - | - |
| **End Reserve Balance** | | | **13,383,518** | **13,383,518** | **13,383,518** | **13,383,518** | **13,383,518** |
| **End Cash + Reserve and Term Balance** | | | **14,287,945** | **13,917,612** | **13,759,317** | **14,141,824** | **14,141,824** |

Note: Week ending June 28, 2014 includes cash flows for five days (June 24 - 28)

**Citi Silo (Consolidated)**
*Weekly Cash Forecast (for weeks ending)*

| 06/21/2014 | Forecast Week 1 6/28/14 | Forecast Week 2 7/5/14 | Forecast Week 3 7/12/14 | Forecast Week 4 7/19/14 | Total |
|---|---|---|---|---|---|
| **Receipts** | | | | | |
| Net Charter Income | 216,228 | 308,400 | 511,603 | 308,400 | 1,344,631 |
| Other Receipts | - | - | - | - | - |
| Total Receipts | 216,228 | 308,400 | 511,603 | 308,400 | 1,344,631 |
| **Disbursements** | | | | | |
| Total Operating Disbursements | (663,685) | (169,756) | (116,451) | (81,451) | (1,031,343) |
| Total G&A Disbursements | - | - | (39) | (30) | (69) |
| Total Disbursements | (663,685) | (169,756) | (116,490) | (81,481) | (1,031,412) |
| **NOCF (before Fees & Debt Service)** | (447,457) | 138,644 | 395,113 | 226,919 | 313,219 |
| Total Restructuring Professional Fees | - | - | - | - | - |
| Total Management Fees | - | - | (132,660) | - | (132,660) |
| **NOCF (before Debt Service)** | (447,457) | 138,644 | 262,453 | 226,919 | 180,559 |
| **Borrowings/Debt Service** | | | | | |
| DIP Interest | - | - | - | - | - |
| DIP Borrowings/Repayments | - | - | - | - | - |
| **NCF** | (447,457) | 138,644 | 262,453 | 226,919 | 180,559 |
| Beg Earnings Account(s) Cash Balance | 5,906,322 | 5,458,865 | 5,597,509 | 5,859,962 | 5,906,322 |
| NOCF (before Fees & Debt Service) | (447,457) | 138,644 | 395,113 | 226,919 | 313,219 |
| Restructuring Professional Fees | - | - | - | - | - |
| Management Fees | - | - | (132,660) | - | (132,660) |
| Debt Service | - | - | - | - | - |
| **End Earnings Account(s) Cash Balance** | **5,458,865** | **5,597,509** | **5,859,962** | **6,086,881** | **6,086,881** |
| Beg Reserve Balance | 5,988,907 | 5,991,992 | 5,992,534 | 5,992,534 | 5,988,907 |
| Interest Income | 3,084 | 542 | - | - | 3,627 |
| **End Reserve Balance** | **5,991,992** | **5,992,534** | **5,992,534** | **5,992,534** | **5,992,534** |
| **End Cash + Reserve and Term Balance** | **11,450,856** | **11,590,043** | **11,852,496** | **12,079,415** | **12,079,415** |
| Note: Week ending June 28, 2014 includes cash flows for five days (June 24 - 28) | | | | | |