SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Jay M. Goffman
Mark A. McDermott
Shana A. Elberg
Suzanne D.T. Lovett
Four Times Square
New York, New York 10036
(212) 735-3000

Counsel for Debtors and
  Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|  |  |  |
|---|---|---|
|  | : |  |
| In re: | : | Chapter 11 |
|  | : |  |
| NAUTILUS HOLDINGS LIMITED, et al., | : | Case No. 14-22885 (RDD) |
|  | : |  |
|  | : |  |
| Debtors.[1] | : | (Jointly Administered) |
|  | : |  |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### NOTICE OF FILING OF SECOND AMENDED JOINT PLAN OF REORGANIZATION OF NAUTILUS HOLDINGS LIMITED AND CERTAIN OF ITS AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

       **PLEASE TAKE NOTICE** that, on December 4, 2014, Nautilus Holdings

Limited and certain of its affiliates, the debtors and debtors in possession in the above-captioned

---

[1]   The Debtors and, where applicable, the last four digits of their Hong Kong taxpayer identification codes are as follows: Nautilus Holdings Limited, Nautilus Holdings No. 2 Limited, Nautilus Shipholdings No. 1 Limited, Nautilus Shipholdings No. 2 Limited, Nautilus Shipholdings No. 3 Limited, Able Challenger Limited (8877), Charming Energetic Limited (0936), Dynamic Continental Limited (0928), Earlstown Limited (1898), Findhorn Osprey Limited (8075), Floral Peninsula Limited (4549), Golden Knighthead Limited (6376), Magic Peninsula Limited (0950), Metropolitan Harbour Limited (7969), Metropolitan Vitality Limited (9019), Miltons Way Limited (6180), Perpetual Joy Limited (0897), Regal Stone Limited (3636), Resplendent Spirit Limited (8114), Superior Integrity Limited (0934), and Vivid Mind Limited (7935). The Debtors maintain offices at 445 Hamilton Avenue, 11th Floor, White Plains, New York, 10601; 35th FL, Citicorp Centre, 18 Whitfield Road, North Point, Hong Kong; 23rd FL, 248 Queen's Road East, Wanchai, Hong Kong; and Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda.

cases (collectively, the "Debtors"), commenced solicitation of acceptances for their *Amended Joint Plan of Reorganization of Nautilus Holdings Limited and Certain of Its Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated November 19, 2014 [Docket No. 223] (the "First Amended Plan").

      **PLEASE TAKE FURTHER NOTICE** that attached hereto and dated as of the date hereof (i) as Exhibit A-1 is the *Second Amended Joint Plan of Reorganization of Nautilus Holdings Limited and Certain of Its Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Second Amended Plan") and (ii) Exhibit A-2 is a blackline reflecting changes made to the First Amended Plan that are incorporated into the Second Amended Plan.

      **PLEASE TAKE FURTHER NOTICE** that copies of the above documents may be obtained from (i) the office of the Clerk of the Bankruptcy Court (the "Clerk's Office") during normal business hours; (ii) the Bankruptcy Court's electronic case filing system at www.nysb.uscourts.gov (a PACER login and password are required to access documents on the Bankruptcy Court's website and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov); or (iii) the Debtors' solicitation agent, Epiq Bankruptcy Solutions, LLC (the "Voting Agent") (a) at the Debtors' restructuring website at http://dm.epiq11.com/NTH, (b) upon request by mail to the addresses set forth below or (c) upon request by telephone at (646) 282-2500.  **PLEASE NOTE: neither the staff of the Clerk's Office nor the Voting Agent can give legal advice.**

| IF BY FIRST-CLASS MAIL: | IF BY HAND DELIVERY OR OVERNIGHT COURIER: |
|---|---|
| Nautilus Holdings Limited<br>Ballot Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station, P.O. Box 5014<br>New York, NY 10150-5014 | Nautilus Holdings Limited<br>Ballot Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>757 Third Avenue, 3rd Floor<br>New York, NY 10017 |

**PLEASE TAKE FURTHER NOTICE** that a hearing to consider confirmation of the Second Amended Plan (the "Confirmation Hearing") will be held before the Honorable Robert D. Drain, United States Bankruptcy Judge for the Southern District of New York, in the Bankruptcy Court, 300 Quarropas Street, Room 118, White Plains, New York 10601, on **January 30, 2015 at 10:00 a.m. (Eastern Time)**, or as soon thereafter as counsel may be heard.  The Confirmation Hearing may be adjourned from time to time without further notice to creditors, equity holders, or parties in interest other than by an announcement in the Bankruptcy Court of such adjournment on the date scheduled for the Confirmation Hearing or as indicated in any notice of adjournment filed by the Debtors with the Bankruptcy Court, and the Plan may be further modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Dated: New York, New York
          January 9, 2015

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

By:      /s/ Jay M. Goffman
         Jay M. Goffman
         Mark A. McDermott
         Shana A. Elberg
         Suzanne D.T. Lovett
         Four Times Square
         New York, New York 10036
         (212) 735-3000

         Counsel for Debtors and
           Debtors in Possession

**<u>Exhibit A-1</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                              :
In re:                                                        :    Chapter 11
                                                              :
NAUTILUS HOLDINGS LIMITED, <u>et al.</u>,                     :    Case No. 14-22885 (RDD)
                                                              :
                                    Debtors.                  :    (Jointly Administered)
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

### SECOND AMENDED JOINT PLAN OF REORGANIZATION OF NAUTILUS HOLDINGS LIMITED AND CERTAIN OF ITS AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Jay M. Goffman
Mark A. McDermott
Shana A. Elberg
Suzanne D.T. Lovett
Four Times Square
New York, New York 10036
(212) 735-3000

Counsel for the Debtors and Debtors-in-Possession

Dated: January 9, 2015

# TABLE OF CONTENTS

Page

## INTRODUCTION

## ARTICLE I

## DEFINED TERMS AND RULES OF INTERPRETATION

| | | |
|---|---|---|
| 1.1 | Accrued Professional Compensation | 1 |
| 1.2 | Administrative Claim | 1 |
| 1.3 | Affiliate | 1 |
| 1.4 | Allowed | 1 |
| 1.5 | Allowed Claim | 2 |
| 1.6 | Amended and Restated DVB 1 Facility | 2 |
| 1.7 | Amended and Restated DVB 2 Facility | 2 |
| 1.8 | Amended and Restated HSH-YM Credit Agreement | 2 |
| 1.9 | Amended and Restated HSH-YM Facility | 2 |
| 1.10 | Amended and Restated HSH-YM Facility Documents | 2 |
| 1.11 | Avoidance Action | 3 |
| 1.12 | Ballot | 3 |
| 1.13 | Bankruptcy Code | 3 |
| 1.14 | Bankruptcy Court | 3 |
| 1.15 | Bankruptcy Rules | 3 |
| 1.16 | Bar Date | 3 |
| 1.17 | Business Day | 3 |
| 1.18 | Cash | 3 |
| 1.19 | Cash Collateral Order | 3 |
| 1.20 | Cause of Action | 3 |
| 1.21 | Chapter 11 Case(s) | 4 |
| 1.22 | Citi Agent | 4 |
| 1.23 | Citi Facility Claims | 4 |
| 1.24 | Citi Facility Documents | 4 |
| 1.25 | Citi Facility Swap Claims | 4 |
| 1.26 | Citi Facility Tranche A Claims | 4 |
| 1.27 | Citi Facility Tranche B Claims | 4 |
| 1.28 | Citi Lenders | 4 |
| 1.29 | Citi Retained Funds | 4 |
| 1.30 | Citi Silo Cash Collateral | 4 |
| 1.31 | Citi Silo Debtors | 5 |
| 1.32 | Citi Silo Management Agreement | 5 |
| 1.33 | Citi Silo MIP | 5 |
| 1.34 | Citi Silo Vessels | 5 |
| 1.35 | Claim | 5 |
| 1.36 | Claims Objection Deadline | 5 |

1.37       Class .................................................................................................5
1.38       Columbia Facility Claims ..................................................................5
1.39       Columbia Facility Documents ............................................................5
1.40       Confirmation ....................................................................................5
1.41       Confirmation Date ............................................................................5
1.42       Confirmation Hearing .......................................................................6
1.43       Confirmation Order ..........................................................................6
1.44       D&O Liability Insurance Policies ......................................................6
1.45       Debtors .............................................................................................6
1.46       DIP Financing Orders .......................................................................6
1.47       Disclosure Statement ........................................................................6
1.48       Disputed Claim .................................................................................6
1.49       DVB 1 Facility Claims ......................................................................6
1.50       DVB 2 Facility Claims ......................................................................6
1.51       DVB RSA ..........................................................................................6
1.52       DVB Silo Debtors .............................................................................7
1.53       DVB Silo Management Agreements ....................................................7
1.54       DVB Term Sheet ...............................................................................7
1.55       Effective Date ...................................................................................7
1.56       Entity ................................................................................................7
1.57       Equity-Related Entities ......................................................................7
1.58       Estate(s) ............................................................................................7
1.59       Executory Contract ...........................................................................7
1.60       Exhibit ..............................................................................................7
1.61       Existing Citi Credit Agreement .........................................................7
1.62       Existing Columbia Credit Agreement ................................................7
1.63       Existing DVB 1 Facility Documents ..................................................8
1.64       Existing DVB 2 Facility Documents ..................................................8
1.65       Existing Flowers Credit Agreement ...................................................8
1.66       Existing HSH-YM Credit Agreement .................................................8
1.67       Existing HSH-YM Facility Documents ...............................................8
1.68       Existing NHL Management Agreement ...............................................8
1.69       Existing NH2L Management Agreement .............................................8
1.70       F-C Consideration .............................................................................9
1.71       F-C Credit Agreements ......................................................................9
1.72       F-C Escrow ........................................................................................9
1.73       F-C Technical Manager Costs ............................................................9
1.74       F-C Termination Payments .................................................................9
1.75       Final Order ........................................................................................9
1.76       Flowers Facility Claims .....................................................................9
1.77       Flowers Facility Documents ...............................................................9
1.78       General Unsecured Claim .................................................................10
1.79       Holder .............................................................................................10
1.80       Holdco .............................................................................................10
1.81       Holdco Units ....................................................................................10
1.82       HSH-YM Facility Claims ..................................................................10

1.83    HSH-YM Facility Secured Parties ...................................................................10
1.84    Impaired ............................................................................................................10
1.85    Intercompany Claim ..........................................................................................10
1.86    Intercompany Interest ........................................................................................10
1.87    Interest ...............................................................................................................10
1.88    Lien ....................................................................................................................10
1.89    LLC Holdco Agreement .....................................................................................11
1.90    Mediation Agreement .........................................................................................11
1.91    Missed Milestone Obligations ...........................................................................11
1.92    New Credit Facilities ..........................................................................................11
1.93    NH2L Management Agreement ..........................................................................11
1.94    Other Priority Claim ...........................................................................................11
1.95    Other Secured Claim ..........................................................................................11
1.96    Participating Lenders ..........................................................................................11
1.97    Person .................................................................................................................11
1.98    Petition Date .......................................................................................................11
1.99    Plan .....................................................................................................................11
1.100   Plan Supplement .................................................................................................12
1.101   Priority Tax Claim ..............................................................................................12
1.102   Professional ........................................................................................................12
1.103   Professional Fee Claim .......................................................................................12
1.104   Professional Fee Escrow Account ......................................................................12
1.105   Professional Fee Reserve Amount ......................................................................12
1.106   Proof of Claim ....................................................................................................12
1.107   Reinstated ...........................................................................................................12
1.108   Released Party .....................................................................................................13
1.109   Reorganized Debtors ..........................................................................................13
1.110   Reorganized Citi Silo Debtors ...........................................................................13
1.111   Reorganized Citi Silo Debtors Intercompany Note ...........................................13
1.112   Reorganized Citi Silo Debtors' Working Capital ...............................................13
1.113   Retained Actions .................................................................................................13
1.114   Schedules ............................................................................................................14
1.115   Secured Claim .....................................................................................................14
1.116   Subordinated 510(b) Claim ................................................................................14
1.117   Unexpired Lease .................................................................................................14
1.118   Unimpaired .........................................................................................................14

## ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS

2.1    Administrative Claims ........................................................................................15
2.2    Priority Tax Claims .............................................................................................15
2.3    Professional Fee Claims .....................................................................................16

# ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

3.1    Classification And Settlement ..........................................................................16
3.2    Treatment Of Classes ......................................................................................18
3.3    Enforcement of Subordination Agreements. ....................................................25
3.4    Alternative Treatment ......................................................................................25
3.5    Special Provision Regarding Unimpaired Claims .............................................25

# ARTICLE IV

## ACCEPTANCE OR REJECTION OF THIS PLAN

4.1    Acceptance By Class Entitled To Vote .............................................................25
4.2    Presumed Acceptance or Rejection Of The Plan. .............................................26
4.3    Elimination Of Classes .....................................................................................26
4.4    Confirmation Matters. ......................................................................................26
4.5    Cramdown ........................................................................................................26

# ARTICLE V

## MEANS FOR IMPLEMENTATION OF THIS PLAN

5.1    Continued Legal Existence ...............................................................................26
5.2    Winding Up Certain Debtors.............................................................................27
5.3    Sources Of Cash For Distribution.....................................................................27
5.4    Approval And Authorization For The New Credit Facilities ..............................27
5.5    New Boards Of Reorganized Debtors................................................................27
5.6    Corporate Action..............................................................................................27
5.7    Preservation Of Retained Actions ....................................................................27
5.8    Effectuating Documents; Further Transactions .................................................28
5.9    Exemption From Certain Transfer Taxes And Recording Fees ..........................28
5.10   Further Authorization........................................................................................28
5.11   Cancellation Of Existing Securities And Agreements ........................................28
5.12   Check the Box Elections. ..................................................................................28

# ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

6.1    Allowed Claims ................................................................................................29
6.2    Distributions For Claims Allowed As Of The Effective Date .............................29
6.3    Interest And Penalties On Claims .....................................................................29
6.4    Means Of Cash Payment ..................................................................................29
6.5    Withholding And Reporting Requirements/Allocations .....................................29
6.6    Preservation Of Rights .....................................................................................29

# ARTICLE VII

## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

| 7.1 | Assumption Of Executory Contracts And Unexpired Leases | 30 |
| 7.2 | Termination of Existing Management Executory Contract. | 30 |
| 7.3 | D&O Liability Insurance Policies | 31 |
| 7.4 | Indemnification | 31 |
| 7.5 | Cure of Defaults Under Assumed Contracts | 31 |

# ARTICLE VIII

## CONFIRMATION AND CONSUMMATION OF THE PLAN

| 8.1 | Condition To Confirmation | 32 |
| 8.2 | Conditions To Effective Date | 32 |
| 8.3 | Waiver Of Conditions | 34 |

# ARTICLE IX

## EFFECT OF PLAN CONFIRMATION

| 9.1 | Binding Effect | 34 |
| 9.2 | Revesting Of Assets | 34 |
| 9.3 | Compromise And Settlement Of Claims, Interests And Controversies | 34 |
| 9.4 | Releases And Related Matters | 35 |
| 9.5 | Discharge Of The Debtors | 36 |
| 9.6 | Injunction | 37 |
| 9.7 | Exculpation And Limitation Of Liability | 37 |
| 9.8 | Term Of Bankruptcy Injunction Or Stays | 38 |
| 9.9 | Post-Confirmation Date Retention Of Professionals | 38 |

# ARTICLE X

## PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

| 10.1 | Disputed Claims | 38 |
| 10.2 | Objection Deadline | 38 |
| 10.3 | Prosecution of Objections | 38 |
| 10.4 | No Distributions Pending Allowance | 38 |

# ARTICLE XI

## RETENTION OF JURISDICTION

| 11.1 | Retention of Jurisdiction. | 38 |

# ARTICLE XII

## MISCELLANEOUS PROVISIONS

12.1      Payment Of Statutory Fees ...............................................................................40
12.2      Amendment Or Modification Of This Plan........................................................40
12.3      Severability Of Plan Provisions .......................................................................40
12.4      Successors And Assigns...................................................................................41
12.5      Revocation, Withdrawal, Or Non-Consummation ............................................41
12.6      Notice ..............................................................................................................41
12.7      Governing Law ................................................................................................42
12.8      Exhibits............................................................................................................42
12.9      Filing Of Additional Documents ......................................................................42
12.10    Conflicts ..........................................................................................................42

**EXHIBITS**

EXHIBIT A          Mediation Agreement
EXHIBIT B          Citi Silo MIP Material Terms
EXHIBIT C          Citi Silo Management Agreement Material Terms
EXHIBIT D          Terms of Reorganized Citi Silo Debtors Intercompany Note
EXHIBIT E          DVB Term Sheet

## INTRODUCTION

Nautilus Holdings Limited and certain of its affiliates, as debtors and debtors in possession, propose the following joint plan of reorganization for the resolution of the outstanding Claims against and Interests in the Debtors. Reference is made to the Disclosure Statement for a discussion of (i) the Debtors' history, business and operations, (ii) a summary and analysis of this Plan, and (iii) certain related matters, including risk factors relating to the consummation of this Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and the DVB RSA, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan prior to its substantial consummation.

## ARTICLE I

## DEFINED TERMS AND RULES OF INTERPRETATION

*Defined Terms.* As used herein, capitalized terms shall have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.1 *Accrued Professional Compensation* means, at any date, and regardless of whether such amounts are billed or unbilled, all of a Professional's accrued and unpaid fees (including success fees) and reimbursable expenses for services rendered in the Chapter 11 Cases through and including such date, whether or not such Professional has filed a fee application for payment of such fees and expenses, (i) all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been filed for any such amount) and (ii) after applying any retainer that has been provided by the Debtors to such Professional and not previously applied. No amount of a Professional's fees and expenses denied under a Final Order shall constitute Accrued Professional Compensation.

1.2 *Administrative Claim* means a Claim for costs and expenses of administration of the Chapter 11 Cases under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, but not limited to: (a) any actual and necessary costs and expenses, incurred on or after the Petition Date and through the Effective Date, of preserving the Estates and operating the businesses of the Debtors (b) Professional Fee Claims; (c) all fees and charges assessed against the Estates under Chapter 123 of Title 28 of the United States Code; (d) all amounts advanced pursuant to the Bankruptcy Court's DIP Financing Orders; and (e) all other claims entitled to administrative claim status pursuant to an order of the Bankruptcy Court.

1.3 *Affiliate* means, with respect to any Person, "affiliate" as defined in section 101(2) of the Bankruptcy Code as if such Person were a Debtor.

1.4 *Allowed* means, with respect to a Claim against any Debtor, except as otherwise provided herein, (a) a Claim that is (i) listed in the Schedules as of the Effective Date as neither disputed, contingent nor unliquidated, and for which no Proof of Claim has been timely filed, or (ii) evidenced by a valid Proof of Claim or request for payment of Administrative

Claim, as applicable, filed by the applicable Bar Date, and as to which the Debtors or other parties-in-interest have not filed an objection to the allowance thereof by the Claims Objection Deadline, or (b) a Claim that is Allowed under the Plan or any stipulation or settlement approved by, or Final Order of, the Bankruptcy Court; *provided*, *however*, that any Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court will not be considered "Allowed Claims" under the Plan. Notwithstanding the foregoing, a Claim shall not be Allowed and shall not be entitled to a distribution under the Plan to the extent it has been satisfied prior to the Effective Date. If a Claim is Allowed only in part, references to Allowed Claims include and are limited to the Allowed portion of such Claim. Notwithstanding anything to the contrary herein, no Claim that is disallowed in accordance with Bankruptcy Rule 3003 or section 502(d) of the Bankruptcy Code is Allowed and each such Claim shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

       1.5    ***Allowed Claim*** means an Allowed Claim of the particular type or Class described.

       1.6    ***Amended and Restated DVB 1 Facility*** means that certain amended and restated financing facility in a principal amount not to exceed $73,191,500 (exclusive of swap obligations) among the Reorganized Debtors Golden Knighthead Limited, as borrower, Nautilus Shipholdings No. 2 Limited, as guarantor, and the lenders party thereto as reflected in amended and restated forms of the Existing DVB 1 Facility Documents, which shall be filed as part of the Plan Supplement and entered into on the Effective Date.

       1.7    ***Amended and Restated DVB 2 Facility*** means that certain amended and restated financing facility in a principal amount not to exceed $73,191,500 (exclusive of swap obligations) among the Reorganized Debtors Metropolitan Harbour Limited, as borrower, Nautilus Shipholdings No. 2 Limited, as guarantor, and the lenders party thereto as reflected in amended and restated forms of the Existing DVB 2 Facility Documents, which shall be filed as part of the Plan Supplement and entered into on the Effective Date.

       1.8    ***Amended and Restated HSH-YM Credit Agreement*** means that certain loan agreement with respect to the Amended and Restated HSH-YM Facility, which shall be consistent with the terms set forth in the Mediation Agreement and otherwise in form and substance satisfactory to each of the HSH-YM Facility Secured Parties.

       1.9    ***Amended and Restated HSH-YM Facility*** means that certain amended and restated financing facility, evidenced by the Amended and Restated HSH-YM Facility Documents, to be entered into between Reorganized Debtors Able Challenger Limited, Magic Peninsula Limited, Metropolitan Vitality Limited, and Superior Integrity Limited and the HSH-YM Facility Secured Parties on the Effective Date.

       1.10    ***Amended and Restated HSH-YM Facility Documents*** means the Amended and Restated HSH-YM Credit Agreement and all documents, agreements and instruments executed or delivered in connection therewith, which shall be consistent with the terms set forth in the Mediation Agreement and otherwise in form and substance satisfactory to each of the HSH-YM Facility Secured Parties.

1.11   ***Avoidance Action*** means any claim or Cause of Action of an Estate arising out of or maintainable pursuant to sections 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code or under any other similar applicable law, regardless of whether or not such action has been commenced prior to the Effective Date.

1.12   ***Ballot*** means each of the ballot forms distributed to each Holder of a Claim that is entitled to vote to accept or reject this Plan and on which the Holder is to indicate, among other things, acceptance or rejection of this Plan.

1.13   ***Bankruptcy Code*** means Title 11 of the United States Code, as now in effect or hereafter amended, to the extent such amendments apply to the Chapter 11 Cases.

1.14   ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York, or any other court with jurisdiction over the Chapter 11 Cases.

1.15   ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

1.16   ***Bar Date*** means (i) October 31, 2014 at 5:00 p.m. (Eastern Time), the date by which each Holder of a Claim against any of the Debtors, unless such Claim falls within one of the exceptions, must have filed a Proof of Claim against such Debtor(s); (ii) the later of (a) October 31, 2014 at 5:00 p.m. (Eastern Time) and (b) 5:00 p.m. (Eastern Time) on the date that is 30 days after entry of a Bankruptcy Court order pursuant to which executory contracts or unexpired leases are rejected, the date by which any Holder of a Claim arising on account of any such rejected agreement must have filed a Proof of Claim against the Debtor(s); (iii) the later of (a) October 31, 2014 at 5:00 p.m. (Eastern Time) and (b) 5:00 p.m. (Eastern Time) on the date that is 30 days after the date that notice of any applicable amendment or supplement to the Schedules is served on a claimant, the date by which each Holder of a Claim affected by any such amendment or supplement to the Schedules must have filed a Proof of Claim against such Debtor(s); and (iv) December 22, 2014 at 5:00 p.m. (Eastern Time), the date by which each governmental unit with a Claim against any of the Debtors must have filed a Proof of Claim against such Debtor(s), as applicable in each case.

1.17   ***Business Day*** means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

1.18   ***Cash*** means legal tender of the United States of America and equivalents thereof.

1.19   ***Cash Collateral Order*** means that certain Amended Final Order (I) Authorizing the Debtors to Use Cash Collateral and (II) Granting Adequate Protection, Docket No. [___], or as such order has been further amended and approved by the Bankruptcy Court.

1.20   ***Cause of Action*** means any action, proceeding, agreement, Claim, cause of action, controversy, demand, debt, right, action, Avoidance Action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, recoupment, crossclaim, counterclaim, third-party claim, indemnity claim, contribution claim or any other claim known or unknown, contingent or non-contingent, matured or unmatured,

suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether pending in litigation or otherwise, in contract or in tort, in law or in equity or pursuant to any other theory of law, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date.

1.21   ***Chapter 11 Case(s)*** means (a) when used with reference to a particular Debtor, the case under Chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court and (b) when used with reference to all Debtors, the cases under Chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court.

1.22   ***Citi Agent*** means the administrative agent, including Citibank International Limited f/k/a Citibank International plc or any successor thereto, under the Existing Citi Credit Agreement.

1.23   ***Citi Facility Claims*** means Claims under the Citi Facility Documents. For the avoidance of doubt, Citi Facility Claims include Claims arising under any swap agreements related to the Existing Citi Credit Agreement, on a subordinated basis, as provided thereby, to Citi Facility Tranche A Claims and Citi Facility Tranche B Claims.

1.24   ***Citi Facility Documents*** means the Existing Citi Credit Agreement and all related documents, including, but not limited to, guarantees and pledges executed in connection therewith.

1.25   ***Citi Facility Swap Claims*** means Claims arising from (i) that certain Master Agreement dated September 25, 2007 by and among Debtors Vivid Mind Limited, Perpetual Joy Limited, Regal Stone Limited, Charming Energetic Limited, and Dynamic Continental Limited and Citibank, N.A. in its capacity as swap bank, or (ii) that certain Master Agreement dated September 25, 2007 by and among Debtors Vivid Mind Limited, Perpetual Joy Limited, Regal Stone Limited, Charming Energetic Limited, and Dynamic Continental Limited and Bank of Scotland plc, in its capacity as swap bank.

1.26   ***Citi Facility Tranche A Claims*** means Citi Facility Claims to the extent such Claims are senior tranche A claims under the Existing Citi Credit Agreement.

1.27   ***Citi Facility Tranche B Claims*** means Citi Facility Claims to the extent such Claims are subordinated tranche B claims under the Existing Citi Credit Agreement.

1.28   ***Citi Lenders*** means the lenders, including any successor lenders thereto, that are a party to the Citi Facility Documents.

1.29   ***Citi Retained Funds*** means certain adequate protection payments made by the Debtors to the Citi Agent pursuant to the Cash Collateral Order and held and applied by the Agent in accordance with the Citi Facility Documents and as directed by Clause 3.2(c) of the Plan.

1.30   ***Citi Silo Cash Collateral*** means as of the Effective Date, any and all cash or cash equivalents, of any kind, whether in reserved accounts, blocked accounts or otherwise,

4

including without limitation, any prepetition cash and cash equivalents, in which the Citi Agent or the Citi Lenders have a lien or other interest that secures the Citi Facility Claims.

1.31    *Citi Silo Debtors* means Debtors Vivid Mind Limited, Perpetual Joy Limited, Regal Stone Limited, Charming Energetic Limited, Dynamic Continental Limited, and Nautilus Shipholdings No. 3 Limited.

1.32    *Citi Silo Management Agreement* means the vessel management agreement to be entered into by the Reorganized Citi Silo Debtors and Synergy Management Services Limited, effective as of the Effective Date, a form of which shall be filed as part of the Plan Supplement and that shall be consistent with the term sheet attached hereto as Exhibit C and in form and substance satisfactory to the Citi Agent acting at the direction of the Citi Lenders in accordance with the Citi Facility Documents.

1.33    *Citi Silo MIP* means the management incentive plan to be implemented by Holdco, a form of which shall be filed as part of the Plan Supplement and that shall be consistent with the term sheet attached hereto as Exhibit B and in form and substance satisfactory to the Citi Agent, acting at the direction of the Citi Lenders in accordance with the Citi Facility Documents.

1.34    *Citi Silo Vessels* means collectively the vessels *MV Rotterdam*, *MV Hamburg*, *MV Venezia*, *MV Corcovado*, and *MV Ital Onesta*.

1.35    *Claim* means a "claim" as defined in section 101(5) of the Bankruptcy Code.

1.36    *Claims Objection Deadline* means (i) ninety (90) days following the Effective Date or (ii) such other later date that the Bankruptcy Court may establish upon a motion by the Debtors or Reorganized Debtors, which motion may be approved without a hearing and without notice to any party.

1.37    *Class* means a category of Claims or Interests, as described in Article III hereof.

1.38    *Columbia Facility Claims* means Claims under the Columbia Facility Documents.

1.39    *Columbia Facility Documents* means the Existing Columbia Credit Agreement and all related documents, including, but not limited to, guarantees and pledges executed in connection therewith.

1.40    *Confirmation* means the confirmation of this Plan by the Bankruptcy Court under section 1129 of the Bankruptcy Code.

1.41    *Confirmation Date* means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

1.42    **Confirmation Hearing** means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

1.43    **Confirmation Order** means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

1.44    **D&O Liability Insurance Policies** means all insurance policies for directors' and officers' liability maintained by the Debtors, including any directors' and officers' "tail policy."

1.45    **Debtors** means Nautilus Holdings Limited, Nautilus Holdings No. 2 Limited, Nautilus Shipholdings No. 1 Limited, Nautilus Shipholdings No. 2 Limited, Nautilus Shipholdings No. 3 Limited, Able Challenger Limited, Charming Energetic Limited, Dynamic Continental Limited, Earlstown Limited, Findhorn Osprey Limited, Floral Peninsula Limited, Golden Knighthead Limited, Magic Peninsula Limited, Metropolitan Harbour Limited, Metropolitan Vitality Limited, Miltons Way Limited, Perpetual Joy Limited, Regal Stone Limited, Resplendent Spirit Limited, Superior Integrity Limited, and Vivid Mind Limited. **.**

1.46    **DIP Financing Orders** means the Interim Order (I) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001 and 9014 and (II) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code, dated June 25, 2014 [Docket No. 25] and the Second Interim Order (I) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001 and 9014 and (II) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code, dated July 15, 2014 [Docket No. 60].

1.47    **Disclosure Statement** means the disclosure statement (including all exhibits and schedules thereto) relating to this Plan, as amended, modified or supplemented from time to time, and distributed contemporaneously herewith.

1.48    **Disputed Claim** means (a) any Claim as to which the Debtors have interposed an objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, or any Claim otherwise disputed by the Debtors, the Reorganized Debtors, or other party in interest in accordance with applicable law, which objection has not been withdrawn or determined by a Final Order, (b) any Claim scheduled by the Debtors as contingent, unliquidated, or disputed, (c) any Claim which amends a claim scheduled by the Debtors as contingent, unliquidated, or disputed, or (d) any Claim prior to it having become an Allowed Claim.

1.49    **DVB 1 Facility Claims** means Claims under the Existing DVB 1 Facility Documents, including, without limitation, obligations under the related swap agreement.

1.50    **DVB 2 Facility Claims** means Claims under the Existing DVB 2 Facility Documents, including, without limitation, obligations under the related swap agreement.

1.51    **DVB RSA** means that certain restructuring support agreement and exhibits thereto entered into among the Debtors, Reminiscent Ventures S.A., Synergy Management

Services Limited, and DVB Bank SE (f/k/a DVB Bank AG), dated September 19, 2014, and approved by order of the Bankruptcy Court dated October 3, 2014.

1.52    *DVB Silo Debtors* means Debtors Golden Knighthead Limited and Metropolitan Harbour Limited.

1.53    *DVB Silo Management Agreements* means the vessel management agreement to be entered into by (i) Reorganized Golden Knighthead Limited and Synergy Management Services Limited and (ii) Reorganized Metropolitan Harbour Limited and Synergy Management Services Limited, both effective as of the Effective Date and each on terms consistent with the DVB Term Sheet and in form and substance satisfactory to DVB Bank SE, forms of which will be filed with the Plan Supplement.

1.54    *DVB Term Sheet* means the term sheet between the Debtors and DVB Bank SE (f/k/a DVB Bank AG) attached to the DVB RSA and attached hereto as Exhibit E.

1.55    *Effective Date* means the Business Day this Plan becomes effective as provided in Article VIII hereof.

1.56    *Entity* means "entity" as defined in section 101(15) of the Bankruptcy Code.

1.57    *Equity-Related Entities* means Elektra Limited, Reminiscent Ventures S.A. (and its transferee Antigone Limited), and Synergy Management Services Limited.

1.58    *Estate(s)* means, individually, the estate of any of the Debtors and, collectively, the estates of all of the Debtors created under section 541 of the Bankruptcy Code.

1.59    *Executory Contract* means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.60    *Exhibit* means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement, as amended, modified or supplemented from time to time.

1.61    *Existing Citi Credit Agreement* means that certain Loan and Swap Agreement relating to a US$375,007,950 facility dated September 25, 2007, as amended by that certain Supplemental Agreement dated September 7, 2012, among Debtors Vivid Mind Limited, Perpetual Joy Limited, Regal Stone Limited, Charming Energetic Limited, and Dynamic Continental Limited, as borrowers; Nautilus Shipholdings No. 3 Limited, as guarantor; and Citibank, N.A. and Bank of Scotland plc, as swap banks, Citibank International Limited f/k/a Citibank International plc, as agent and the successor agents thereto, Citibank, N.A., as security trustee, Citigroup Global Markets Limited, as arranger, and Citibank, N.A., Bank of Scotland plc, Lloyds TSB Bank plc, UniCredit Bank AG, Goldman Sachs Bank (Europe) Plc, Goldman Sachs International Bank and Sculptor Investments S.a.r.l. as lenders and the successor lenders thereto.

1.62    *Existing Columbia Credit Agreement* means that certain Loan and Swap Agreement relating to a US$61,200,000 facility dated July 6, 2007, among Debtor Miltons Way

7

Limited, as borrower, Nautilus Shipholdings No. 1 Limited, as guarantor, and HSH Nordbank AG, as lender, swap bank, agent and security trustee.

1.63    *Existing DVB 1 Facility Documents* means that certain Loan Agreement, dated July 11, 2007, between Debtor Golden Knighthead Limited, as borrower, and DVB Bank SE (f/k/a DVB Bank AG), as lender, swap bank, agent and security trustee, relating to a US$91,237,500 financing facility and the various documents executed in connection with that facility, including, without limitation, the related swap agreement, guarantee, and all Finance Documents (as defined in the Loan Agreement).

1.64    *Existing DVB 2 Facility Documents* means that certain Loan Agreement, dated July 11, 2007, between Debtor Metropolitan Harbour Limited, as borrower, and DVB Bank SE (f/k/a DVB Bank AG), as lender, swap bank, agent and security trustee, relating to a US$91,237,500 financing facility and the various documents executed in connection with that facility, including, without limitation, the related swap agreement, guarantee, and all Finance Documents (as defined in the Loan Agreement).

1.65    *Existing Flowers Credit Agreement* means that certain Loan and Swap Agreement relating to a US $150,304,000 facility dated February 12, 2007, among Debtors Findhorn Osprey Limited, Earlstown Limited, Floral Peninsula Limited, and Resplendent Spirit Limited, as borrowers; Nautilus Shipholdings No. 1 Limited, as guarantor, and HSH Nordbank AG, as lender, swap bank, agent and security trustee.

1.66    *Existing HSH-YM Credit Agreement* means that certain Loan and Swap Agreement dated April 12, 2007, as amended, supplemented or otherwise modified from time to time, relating to a facility for the lower of (i) US$237,728,000 and (ii) the aggregate of a percentage of certain vessel construction prices among Debtors Able Challenger Limited, Magic Peninsula Limited, Metropolitan Vitality Limited, and Superior Integrity Limited, as borrowers; Nautilus Shipholdings No. 1 Limited, Findhorn Osprey Limited, Earlstown Limited, Floral Peninsula Limited, Resplendent Spirit Limited, as guarantors; HSH Nordbank AG, Unicredit Bank AG, and Commerzbank AG and any successors thereto, as lenders; and HSH Nordbank AG, as swap bank, agent and security trustee.

1.67    *Existing HSH-YM Facility Documents* means the Existing HSH-YM Credit Agreement and all related documents, agreements and instruments, including, but not limited to, swap agreements, guarantees, mortgages, assignments and pledges, executed or delivered in connection therewith (each as amended, supplemented or otherwise modified from time to time).

1.68    *Existing NHL Management Agreement* means that certain management agreement dated November 20, 2006, as amended by that certain deed of amendment dated January 4, 2013, and as may have been amended or supplemented from time to time, between Nautilus Holding Limited, as company and Synergy Management Services Limited, as manager.

1.69    *Existing NH2L Management Agreement* means that certain management agreement dated January 4, 2013, as may have been amended or supplemented from time to time,

between Nautilus Holding No. 2 Limited, as company and Synergy Management Services Limited, as manager.

1.70    ***F-C Consideration*** means (a) $2.1 million to be paid on the Effective Date by HSH Nordbank AG, as Holder of all of the Columbia Facility Claims and Flowers Facility Claims, to Resplendent Spirit Limited (for the benefit of all of the borrowers under the F-C Credit Agreements) plus (b) the F-C Escrow.

1.71    ***F-C Credit Agreements*** means the Existing Columbia Credit Agreement and the Existing Flowers Credit Agreement.

1.72    ***F-C Escrow*** means $200,000 to be placed into escrow by HSH Nordbank AG, as Holder of all of the Columbia Facility Claims and Flowers Facility Claims, for the benefit of the borrowers under the F-C Credit Agreements to cover any F-C Termination Payments. Any amounts remaining from the $200,000 F-C Escrow after paying all of the F-C Termination Payments shall be returned to HSH Nordbank AG.

1.73    ***F-C Technical Manager Costs*** means any amounts (1) owed to Univan Ship Management International Limited for post-Effective Date operations pursuant to the technical management agreements relating to the vessels securing the F-C Credit Agreements and (2) any termination, rejection, breakage or similar costs owed to Univan Ship Management International Limited pursuant to the technical management agreements relating to the vessels securing the F-C Credit Agreements; *provided*, *however*, the F-C Technical Manager Costs shall not include any true-up payments for 2013 and 2014.

1.74    ***F-C Termination Payments*** means termination, rejection, breakage and/or similar payments to any contract counterparties relating to the operation of the vessels securing the F-C Credit Agreements other than F-C Technical Manager Costs.

1.75    ***Final Order*** means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken for granted.

1.76    ***Flowers Facility Claims*** means Claims under the Flowers Facility Documents.

1.77    ***Flowers Facility Documents*** means the Existing Flowers Credit Agreement and all related documents, including, but not limited to, guarantees and pledges executed in connection therewith.

1.78    *General Unsecured Claim* means any Claim against any Debtor other than an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, a Citi Facility Claim, a Columbia Facility Claim, a DVB 1 Facility Claim, a DVB 2 Facility Claim, a Flowers Facility Claim, an HSH-YM Facility Claim, a Subordinated 510(b) Claim, or an Intercompany Claim.

1.79    *Holder* means a holder of a Claim or Interest, as applicable.

1.80    *Holdco* means a limited liability company to be formed under the laws of the Republic of the Marshall Islands on or before the Effective Date.  Holdco shall be an affiliate of the Reorganized Citi Silo Debtors.  The material terms of the formation and governance documents for Holdco shall be included in the Plan Supplement and shall be acceptable to the Citi Lenders whose Citi Facility Claims total more than 50 percent of such Claims. As of the Effective Date, Holdco shall not own any equity interest in Reorganized Nautilus Shipholdings No. 2 Limited.

1.81    *Holdco Units* means the equity interests in Holdco.

1.82    *HSH-YM Facility Claims* means Claims under the Existing HSH-YM Facility Documents.

1.83    *HSH-YM Facility Secured Parties* means (i) HSH Nordbank AG (as lender, swap bank, agent and security trustee under the Existing HSH-YM Facility Documents), (ii) Unicredit AG (as lender under the Existing HSH-YM Facility Documents), and (iii) York Global Finance BDH, LLC (as successor to Commerzbank AG, as lender under the Existing HSH-YM Facility Documents), in each case so long as such parties continue to hold HSH-YM Facility Claims and/or participations and/or sub-participations (whether proprietary or derivative), as applicable.

1.84    *Impaired* means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.85    *Intercompany Claim* means any and all Claims of a Debtor against another Debtor.

1.86    *Intercompany Interest* means an Interest in a Debtor held by another Debtor.

1.87    *Interest* means any equity security, including a limited liability company membership interest, in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized or outstanding shares of capital stock of the Debtors, together with any warrants, options or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto.

1.88    *Lien* means any lien, security interest, pledge, title retention agreement, encumbrance, charge, mortgage or hypothecation.

10

1.89    ***LLC Holdco Agreement*** means the limited liability company operating agreement governing the formation and governance of Holdco, in form and substance satisfactory to the Citi Lenders whose Citi Facility Claims total more than 50 percent of such Claims.

1.90    ***Mediation Agreement*** means that certain mediation agreement entered into by, among others, the Debtors and the lenders under the Existing HSH-YM Credit Agreement, dated December 10, 2014, attached hereto as <u>Exhibit A</u>.

1.91    ***Missed Milestone Obligations*** means the obligations of the Debtors under the DVB Term Sheet in the event the Debtors fail to achieve an Effective Date of January 31, 2015.

1.92    ***New Credit Facilities*** means the Amended and Restated DVB 1 Facility, the Amended and Restated DVB 2 Facility, Amended and Restated HSH-YM Facility, and the Reorganized Citi Silo Debtors Intercompany Note.

1.93    ***NH2L Management Agreement*** means the vessel management agreement to be entered into by Reorganized Nautilus Holdings No. 2 Limited and Synergy Management Services Limited, effective as of the Effective Date and providing for a market rate management fee to Synergy Management Services Limited for management of the vessels that are indirectly owned by Reorganized Nautilus Holdings No. 2 Limited, which shall be consistent with the terms set forth in the Mediation Agreement and otherwise in form and substance reasonably satisfactory to each of the HSH-YM Facility Secured Parties.

1.94    ***Other Priority Claim*** means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or Priority Tax Claim.

1.95    ***Other Secured Claim*** means any Secured Claim, other than a Citi Facility Claim, a Columbia Facility Claim, a DVB 1 Facility Claim, a DVB 2 Facility Claim, a Flowers Facility Claim, or an HSH-YM Facility Claim.

1.96    ***Participating Lenders*** means (i) the Citi Agent, in its capacity as agent, on behalf of the Citi Lenders; (ii) DVB Bank SE; (iii) HSH Nordbank AG (solely in its capacity as Holder of all of the Columbia Facility Claims and Flowers Facility Claims), and (iv) each of the HSH-YM Facility Secured Parties.

1.97    ***Person*** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, or other entity.

1.98    ***Petition Date*** means, with respect to a Debtor, the date on which such Debtor filed its petition for relief commencing its Chapter 11 Case.

1.99    ***Plan*** means this Chapter 11 plan of reorganization, including the Exhibits and all supplements, appendices, and schedules hereto, either in its current form or as the same may be altered, amended, supplemented, or modified from time to time.

1.100   **Plan Supplement** means the compilation of documents and forms of documents, schedules and exhibits to the Plan to be filed by the Debtors, in a form mutually acceptable to the Debtors and the parties affected by the particular document, no later than January 9, 2015, or such later date with respect to individual documents as the parties affected by such documents agree, *provided*, *however*, that (a) the Amended and Restated HSH-YM Credit Agreement, (b) the NH2L Management Agreement, (c) documents directly affecting Holders of DVB 1 Facility Claims and (d) documents directly affecting Holders of DVB 2 Facility Claims shall be filed no later than January 15, 2015, or such later date as the parties affected by such documents agree.

1.101   **Priority Tax Claim** means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

1.102   **Professional** means (a) any professional employed in these Chapter 11 Cases pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code or otherwise and (b) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

1.103   **Professional Fee Claim** means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred on or after the Petition Date and prior to and including the Effective Date.

1.104   **Professional Fee Escrow Account** means an escrow account to be funded with the Professional Fee Reserve Amount by the Debtors and Reorganized Debtors on the Effective Date solely for the purpose of paying all Allowed Professional Fee Claims.

1.105   **Professional Fee Reserve Amount** means the aggregate Accrued Professional Compensation through the Effective Date as estimated by the Professionals in accordance with Article 2.3(c).

1.106   **Proof of Claim** means a written proof of Claim filed against any Debtor in the Chapter 11 Cases.

1.107   **Reinstated** means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest so as to leave such Claim or Interest Unimpaired in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, (ii) reinstating the maturity of such Claim or Interest as such maturity existed before such default, (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, and (iv) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Interest entitles the Holder of such Claim or Interest; *provided*, *however*, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim or Interest is based, including, but not limited to, financial covenant ratios,

negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence, prohibiting certain transactions or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured or reinstated to achieve reinstatement.

1.108   ***Released Party*** means each of the following: (a) the Debtors; (b) the Participating Lenders; (c) the Citi Lenders; (d) the HSH-YM Facility Secured Parties; (e) the Equity-Related Entities; and (f) with respect to each of the foregoing persons in clauses (a) through (e), such Person's current and former subsidiaries, Affiliates, members, directors, officers, principals, agents, financial advisors, restructuring advisors, accountants, investment bankers, consultants, attorneys, employees, partners, equity holders,  representatives, and other professionals, in each case, only in their capacity as such.

1.109   ***Reorganized Debtors*** means the Debtors, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

1.110   ***Reorganized Citi Silo Debtors*** means collectively Reorganized Debtor Nautilus Shipholdings No. 3 Limited, Reorganized Vivid Mind Limited, Reorganized Perpetual Joy Limited, Reorganized Regal Stone Limited, Reorganized Charming Energetic Limited, and Reorganized Dynamic Continental Limited, or, for each of the foregoing entities, any successor thereto.

1.111   ***Reorganized Citi Silo Debtors Intercompany Note*** means that certain intercompany note that Reorganized Nautilus Shipholdings No. 3 Limited, as lender, may enter into on the Effective Date in accordance with Section 3.2(c)(iii)(3) of the Plan with Reorganized Vivid Mind Limited, Reorganized Perpetual Joy Limited, Reorganized Regal Stone Limited, Reorganized Charming Energetic Limited, and Reorganized Dynamic Continental Limited, as borrowers on a joint and several basis substantially on the terms set forth on Exhibit D hereto.

1.112   ***Reorganized Citi Silo Debtors' Working Capital*** means the aggregate amount of Citi Silo Cash Collateral, as determined by the Citi Lenders whose Citi Facility Claims total more than 50 percent of such Claims at least 3 Business Days prior to the Effective Date by the Citi Lenders and communicated in writing to the Citi Silo Debtors, to be retained as working capital by each of Reorganized Vivid Mind Limited, Reorganized Perpetual Joy Limited, Reorganized Regal Stone Limited, Reorganized Charming Energetic Limited, and Reorganized Dynamic Continental Limited.

1.113   ***Retained Actions*** means all claims, Causes of Action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, which any Debtor or any Debtor's Estate may hold against any Person, including, without limitation, (a) claims and Causes of Action brought prior to the Effective Date, (b) claims and Causes of Action against any Persons for failure to pay for products or services provided or rendered by any of the Debtors, (c) claims and Causes of Action seeking the recovery of any of the Debtors' or the Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of any of the Debtors' or the Reorganized Debtors' businesses, including, without limitation, claim overpayments and tax refunds, (d) all Avoidance Actions, and (e) any such claims, Causes of Action, rights of action, suits or proceedings listed in the

Disclosure Statement or any schedules filed by the Debtors in these cases, if any; *provided, however*, that Retained Actions shall not include those claims, Causes of Action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, released under Article IX herein.

1.114    ***Schedules*** means the Debtors' schedules of assets and liabilities and statements of financial affairs, filed under section 521 of the Bankruptcy Code and the Bankruptcy Rules, as amended, supplemented, or modified.

1.115    ***Secured Claim*** means a Claim that is secured by a Lien on property in which a Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

1.116    ***Subordinated 510(b) Claim*** means any Claim subordinated pursuant to Bankruptcy Code section 510(b), which shall include (a) any Claim arising from the rescission of a purchase or sale of (i) Interests in any of the Debtors or (ii) debt securities of any of the Debtors, (b) any Claim for damages arising from the purchase or sale of (i) any Interests in any of the Debtors or (ii) debt securities of any of the Debtors, or (c) any Claim for reimbursement, contribution or indemnification on account of any such Claim.

1.117    ***Unexpired Lease*** means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.118    ***Unimpaired*** means a Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

*Rules Of Interpretation And Computation Of Time*.  For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections and Articles are references to Sections and Articles of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) the rules

14

of construction set forth in section 102 of the Bankruptcy Code shall apply; (j) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; (k) "including" means "including without limitation;" and (l) with reference to any distribution under this Plan, "on" a date means on or as soon as reasonably practicable after that date.

*Exhibits*.  All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein, and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court on or after the Petition Date, but in any event, no later than ten (10) Business Days prior to the hearing at which the Bankruptcy Court considers whether to confirm the Plan. Holders of Claims and Interests may obtain a copy of the Exhibits upon written request to the Debtors.  Upon their filing, the Exhibits may be inspected (a) in the office of the clerk of the Bankruptcy Court or its designee during normal business hours; (b) on the Bankruptcy Court's website at http://nysb.uscourts.gov (registration required) or (c) at our noticing agent's website at http://dm.epiq11.com/NTH.  The documents contained in the Exhibits shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

## ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on this Plan.

2.1    ***Administrative Claims***.  On, or as soon as reasonably practicable after, the later of (a) the Effective Date, (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, or (c) the date on which an Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of such Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim.  Notwithstanding the foregoing, (w) any Professional Fee Claim shall not be paid except in accordance with an order of the Bankruptcy Court permitting such payment and in accordance with the DVB Term Sheet or applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, (x) Professional Fee Claims shall be allocated among the Debtors in a manner agreed among the Debtors and the Participating Lenders or ordered by the Bankruptcy Court in accordance with the Cash Collateral Order, (y) any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto, and (z) any Allowed Administrative Claim may be paid on such other terms as may be agreed to between the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors.

2.2    ***Priority Tax Claims***.  The legal and equitable rights of the Holders of Priority Tax Claims are Unimpaired by the Plan.  Unless the Holder of an Allowed Priority Tax Claim and the Debtors agree to a different treatment, on the Effective Date, each Holder of an Allowed Priority Tax Claim shall have such Claim Reinstated.

15

2.3    *Professional Fee Claims*.

(a)    Professionals shall submit final fee applications seeking approval of all Professional Fee Claims no later than thirty (30) days after the Effective Date.  These applications remain subject to Bankruptcy Court approval under the standards established by the Bankruptcy Code, including the requirements of sections 327, 328, 330, 331, 363, 503(b) and 1103 of the Bankruptcy Code, as applicable.  Payments to Professionals shall be made upon entry of an order approving such Professional Fee Claims.

(b)    The Allowed Professional Fee Claims shall be apportioned among the Debtors in accordance with the Cash Collateral Order.

(c)    On the Effective Date, the Debtors will establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account will be maintained in trust for the Professionals. The funds in such account will not be property of the Reorganized Debtors except that the Reorganized Debtors shall retain a residual interest to the extent the funds are not used for Allowed Professional Fee Claims.  The amount of Professional Fee Claims owing to the Professionals will be paid in Cash to such Professionals by the Reorganized Debtors, or at the Reorganized Debtors' direction, from the Professional Fee Escrow Account, without interest or other earnings therefrom, when such Claims are Allowed by Final Order; *provided*, *however*, that the Reorganized Debtors' liability for Professional Fee Claims shall not be limited nor be deemed to be limited to the funds available from the Professional Fee Escrow Account. After all Professional Fee Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, will be transferred to the applicable Reorganized Debtor that provided such excess amounts and subject to the liens of applicable lenders.

(d)    Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and deliver such estimate to the Debtors and the Participating Lenders at least five (5) days prior to the anticipated Effective Date.  If a Professional does not provide such estimate, the Debtors may estimate the unbilled fees and expenses of such Professional. The total amount so estimated will constitute the Professional Fee Reserve Amount; provided that such estimate will not be considered an admission or limitation with respect to the fees and expenses of such Professional by any party. The Professional Fee Reserve Amount and the estimated Accrued Professional Compensation amounts submitted by the Professionals will be subject to review by the Debtors and the Participating Lenders, and any objections to the Professional Fee Reserve Amount must be served on the Debtors prior to the Effective Date.

## ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

3.1    *Classification And Settlement*.  Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent

that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date. Each reference to "Class" or "Classes" shall include all sub-Classes of the respective Class or Classes, as applicable. Subject to the payment of Professional Fees set forth in Section 2.3 and any other joint and several obligations of the Debtors, each Debtor shall be responsible for satisfying the Claims and Administrative Claims against and Interests in such Debtor from such Debtor's assets.

In accordance with section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and holders of Claims and Interests and is fair, equitable and reasonable.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 .............. | Other Priority Claims | Unimpaired | No (deemed to accept) |
| Class 2 .............. | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 3 .............. | Citi Facility Claims | Impaired | Yes |
| Class 4 .............. | Columbia Facility Claims | Impaired | Yes |
| Class 5 .............. | DVB 1 Facility Claims | Impaired | Yes |
| Class 6 .............. | DVB 2 Facility Claims | Impaired | Yes |
| Class 7 .............. | Flowers Facility Claims | Impaired | Yes |
| Class 8 .............. | HSH-YM Facility Claims | Impaired | Yes |
| Class 9 .............. | General Unsecured Claims | Impaired | Yes |
| Class 10 ........... | Interests in Nautilus Holdings Limited and Nautilus Holdings No. 2 Limited | Unimpaired | No (deemed to accept) |
| Class 11 ........... | Intercompany Claims | Unimpaired | No (deemed to accept) |
| Class 12 ........... | Intercompany Interests in Other Debtors | Unimpaired | No (deemed to accept) |
| Class 13 ........... | Intercompany Interests in C-F Debtors | Impaired | Yes |
| Class 14 ........... | Intercompany Interests in Nautilus Shipholdings No. 3 Limited | Impaired | No (deemed to reject) |

17

3.2    ***Treatment Of Classes***.

(a)    *Class 1 – Other Priority Claims*

(i)    *Claims In Class:*  Class 1 consists of all Other Priority Claims that may exist against the Debtors.

(ii)    *Treatment:*  On, or as soon as reasonably practicable after, (a) the Effective Date if such Other Priority Claim is an Allowed Other Priority Claim on the Effective Date or (b) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, each Holder of an Allowed Class 1 Other Priority Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Priority Claim, Cash equal to the unpaid portion of such Allowed Other Priority Claim.

(iii)    *Voting:*  Claims in Class 1 are Unimpaired, and the Holders of Allowed Class 1 Other Priority Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject this Plan.

(b)    *Class 2 – Other Secured Claims*

(i)    *Claims In Class:*  Class 2 consists of all Other Secured Claims that may exist against the Debtors.

(ii)    *Treatment:*  On, or as soon as reasonably practicable after, the Effective Date, each Holder of an Allowed Class 2 Other Secured Claim shall have such claim Reinstated, subject to the terms of the DVB Term Sheet.

(iii)    *Voting:*  Claims in Class 2 are Unimpaired, and the Holders of Allowed Class 2 Other Secured Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject this Plan.

(c)    *Class 3 – Citi Facility Claims*

(i)    *Claims In Class:*  Class 3 consists of all Citi Facility Claims.

(ii)    *Treatment:*  The Citi Facility Claims shall be Allowed for all purposes in the aggregate amount of $273,757,991.37.  On, or as soon as reasonably practicable after, the Effective Date, each Holder of an Allowed Class 3 Citi Facility Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claims, its pro rata share of (a) the Citi Retained Funds, (b) the balance of the Citi Silo Cash Collateral after deducting the Reorganized Citi Silo Debtor Working Capital, subject to any deductions authorized by order of the Bankruptcy Court in connection with payment of any Professional Fee Claims, and (c) 100% of the Holdco Units (subject to dilution by interests distributable under the Citi Silo MIP).  On the Effective Date, Holdco (or any successor thereto) shall own 100% of Reorganized Nautilus Shipholdings No. 3 Limited (or any successor thereto),

18

and Reorganized Nautilus Shipholdings No. 3 Limited shall own 100% of the equity interests in each of Reorganized Vivid Mind Limited, Reorganized Perpetual Joy Limited, Reorganized Regal Stone Limited, Reorganized Charming Energetic Limited, and Reorganized Dynamic Continental Limited, or such other entities that own the Citi Silo Vessels. So long as the Citi Silo MIP is in effect, Holdco shall not transfer the Citi Silo Vessels to entity(ies) that are wholly-owned by all of the then-current equityholders of Holdco (other than the holders of the Citi Silo MIP) for the purpose of depriving the holders of the Citi Silo MIP of the economic benefit of the interests to be issued thereunder.  Notwithstanding anything herein to the contrary, in accordance with Section 3.3 hereof, no distribution shall be made to Holders of Allowed Citi Facility Tranche B Claims or Allowed Citi Facility Swap Claims.

For the avoidance of doubt, the treatment provided to Holders of Citi Facility Claims shall be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, all Claims arising under the Existing Citi Credit Agreement, and all guarantees relating to the Existing Citi Credit Agreement, including from Nautilus Shipholdings No. 3 Limited, shall be fully released as of the Effective Date.

(iii)     To implement the foregoing, the following shall be deemed automatically to occur in the following order on the Effective Date without any action required by any Person or Holder of an Allowed Class 3 Citi Facility Tranche A Claim:

(1)     Each Holder of an Allowed Citi Facility Tranche A Claim shall exchange its Citi Facility Tranche A Claims for its pro rata share of 100% of the equity interests in Reorganized Nautilus Shipholdings No. 3 Limited;

(2)     Each Holder of equity interests in Reorganized Nautilus Shipholdings No. 3 Limited received in clause (1) above, shall contribute such interests to Holdco and shall receive in exchange for such contribution its pro rata share of the Holdco Units as described above (subject to dilution by interests distributable under the Citi Silo MIP).  The Holders of Allowed Citi Facility Tranche A Claims shall receive Holdco Units in the same percentages as they held in Nautilus Shipholdings No. 3 Limited on the Effective Date.  Holders of Allowed Citi Facility Tranche A Claims shall not be required to execute the Holdco LLC Agreement and shall not be required to execute the Holdco LLC Agreement before receiving their respective distributions of Holdco Units or other interests in Holdco under the Plan; any such Persons who do not execute the Holdco LLC Agreement (in their capacity as members of Holdco) shall be deemed to be parties thereto without further action.  The Holdco LLC Agreement shall be adopted on the Effective Date and shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of Holdco Units shall be bound thereby.

(3)     At the election of the Citi Lenders whose Citi Facility Claims total more than 50 percent of such Claims, the Citi Facility Claims exchanged with Reorganized Nautilus Shipholdings No. 3 Limited in clause (1) above, shall remain outstanding in all or in part as intercompany

obligations substantially on the terms set forth on Exhibit D hereto where Reorganized Nautilus Shipholdings No. 3 is the lender and each of Reorganized Vivid Mind Limited, Reorganized Perpetual Joy Limited, Reorganized Regal Stone Limited, Reorganized Charming Energetic Limited, and Reorganized Dynamic Continental Limited a borrower as applicable, and shall have the terms satisfactory to the Citi Lenders whose Citi Facility Claims total more than 50 percent of such Claims, otherwise the Citi Facility Claims shall be cancelled and shall not continue as intercompany obligations between Reorganized Nautilus Shipholdings No. 3 Limited and Reorganized Vivid Mind Limited, Reorganized Perpetual Joy Limited, Reorganized Regal Stone Limited, Reorganized Charming Energetic Limited, and Reorganized Dynamic Continental Limited, *provided, however*, that such intercompany obligations shall not adversely impact or cause the vesting or exercisability of or otherwise adversely affect the interests distributable under the Citi Silo MIP or the Co-Investment Right described on Exhibit B hereto in a manner that is disproportionate to the common equity of Holdco.  In the event of a subsequent third party financing that will trigger the Co-Investment Right, such intercompany obligation may be subordinated, repaid or eliminated.

(iv)     *Voting:*  Claims in Class 3 are Impaired.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 3 Citi Facility Claim is entitled to vote to accept or reject this Plan.

(d)     *Classes 4A and 4B – Columbia Facility Claims*

(i)     *Claims In Class:*  Class 4 consists of all Columbia Facility Claims.  Class 4A consists of Columbia Facility Claims to the extent such Claims are Secured Claims. Class 4B consists of Columbia Facility Claims to the extent such Claims are not Secured Claims, if any.

(ii)     *Treatment:*  On, or as soon as reasonably practicable after, the Effective Date, the Holder of Allowed Class 4A and 4B Columbia Facility Claims shall (1) receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claims, the transfer to it or its nominee of the vessel securing such Claims, free and clear of any liens, claims, or encumbrances, (2) pay the F-C Consideration, and (3) assume the F-C Technical Manager Costs. The Debtors shall use the F-C Consideration to satisfy (i) all claims against the vessels securing the F-C Credit Agreements other than F-C Technical Manager Costs and (ii) amounts advanced to the Debtors obligated under the F-C Credit Agreements pursuant to the Bankruptcy Court's DIP Financing Orders (less the portion of the Synergy management fee paid by Metropolitan Harbour Limited and Golden Knighthead Limited and pooled at NHL, as set forth in the DVB Term Sheet).  For the avoidance of doubt, (1) all guarantees relating to the Existing Columbia Credit Agreement, including from Nautilus Shipholdings No. 1 Limited, shall be fully released as of the Effective Date, and (2) the return of the vessel shall include the transfer of all, to the extent that these items relate to the relevant vessel, (i) receivables, (ii) credits, and (iii) prepayments.  The Debtors shall not accelerate any receivables or the use of any credits or prepayments. For the avoidance of doubt, a transfer of the vessels to the nominee of the Holder of Allowed Class 4A and 4B Columbia Facility Claims shall satisfy the Debtors'

20

obligations in respect of the Allowed Class 4A and 4B Columbia Facility Claims as if they had been transferred to the Holder of such Claims.

(iii)    *Voting:*  Claims in Classes 4A and 4B are Impaired. Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 4A Columbia Facility Claim and each Holder of an Allowed Class 4B Columbia Facility Claim is entitled to vote to accept or reject this Plan.

(e)    *Class 5 – DVB 1 Facility Claims*

(i)    *Claims In Class:*  Class 5 consists of all DVB 1 Facility Claims.  Class 5 Claims are Allowed pursuant to the terms of the DVB RSA.

(ii)    *Treatment:*  On, or as soon as reasonably practicable after, the Effective Date, each Holder of an Allowed Class 5 DVB 1 Facility Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, (1) its pro rata share of the Amended and Restated DVB 1 Facility, (2) the other treatment described in the DVB Term Sheet, and (3) payment of all interest accrued and unpaid as of the Effective Date.  Swap agreement obligations arising under the Existing DVB 1 Facility Documents that accrued as of the Effective Date shall be paid in the ordinary course consistent with the terms of the existing swap agreement.

(iii)    *Voting:*  Claims in Class 5 are Impaired.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 5 DVB 1 Facility Claim is entitled to vote to accept or reject this Plan.

(f)    *Class 6 – DVB 2 Facility Claims*

(i)    *Claims In Class:*  Class 6 consists of all DVB 2 Facility Claims.  Class 6 Claims are Allowed pursuant to the terms of the DVB RSA.

(ii)    *Treatment:*  On, or as soon as reasonably practicable after, the Effective Date, each Holder of an Allowed Class 6 DVB 2 Facility Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, (1) its pro rata share of the Amended and Restated DVB 2 Facility, (2) the other treatment described in the DVB Term Sheet, and (3) payment of all interest accrued and unpaid as of the Effective Date.  Swap agreement obligations arising under the Existing DVB 2 Facility Documents that accrued as of the Effective Date shall be paid in the ordinary course consistent with the terms of the existing swap agreement.

(g)    *Voting:*  Claims in Class 6 are Impaired.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 6 DVB 2 Facility Claim is entitled to vote to accept or reject this Plan.

(h)    *Classes 7A and 7B – Flowers Facility Claims*

(i)    *Claims In Class:*  Class 7 consists of all Flowers Facility Claims. Class 7A consists of Flowers Facility Claims to the extent such Claims are Secured

21

Claims. Class 7B consists of Flowers Facility Claims to the extent such Claims are not Secured Claims, if any.

(ii)     *Treatment:*  On, or as soon as reasonably practicable after, the Effective Date, the Holder of Allowed Class 7A and 7B Flowers Facility Claims shall (1) receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claims, the transfer to it or its nominee of the vessels securing such Claims, free and clear of any liens, claims, or encumbrances, (2) pay the F-C Consideration, and (3) assume the F-C Technical Manager Costs.  The Debtors shall use the F-C Consideration to satisfy (i) all claims against the vessels securing the F-C Credit Agreements other than F-C Technical Manager Costs and (ii) amounts advanced to the Debtors obligated under the F-C Credit Agreements pursuant to the Bankruptcy Court's DIP Financing Orders (less the portion of the Synergy management fee paid by Metropolitan Harbour Limited and Golden Knighthead Limited and pooled at NHL, as set forth in the DVB Term Sheet). For the avoidance of doubt, (1) all guarantees relating to the Existing Flowers Credit Agreement, including from Nautilus Shipholdings No. 1 Limited, shall be fully released as of the Effective Date, and (2) the return of the vessels shall include the transfer of all, to the extent that these items relate to the relevant vessels, (i) receivables, (ii) credits, and (iii) prepayments. The Debtors shall not accelerate any receivables or the use of any credits or prepayments. For the avoidance of doubt, a transfer of the vessels to the nominee of the Holder of Allowed Class 7A and 7B Flowers Facility Claims shall satisfy the Debtors' obligations in respect of the Allowed Class 7A and 7B Flowers Facility Claims as if they had been transferred to the Holder of such Claims.

(iii)     *Voting:*  Claims in Classes 7A and 7B are Impaired. Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 7A Flowers Facility Claim and each Holder of an Allowed Class 7B Flowers Facility Claim is entitled to vote to accept or reject this Plan.

(i)     *Class 8 – HSH-YM Facility Claims*

(i)     *Claims In Class:*  Class 8 consists of all HSH-YM Facility Claims.  Class 8 Claims are Allowed.

(ii)     *Treatment:*  On, or as soon as reasonably practicable after, the Effective Date, each Holder of an Allowed Class 8 HSH-YM Facility Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, its pro rata share of the Amended and Restated HSH-YM Facility. For the avoidance of doubt, the treatment provided to Holders of Class 8 HSH-YM Facility Claims shall be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, all HSH-YM Facility Claims, including any Claims arising from or related to any second-priority liens on the vessels securing the Existing Flowers Credit Agreement, which liens shall be terminated and released. All guarantees relating to the Existing HSH-YM Credit Agreement, including from Nautilus Shipholdings No. 1 Limited, shall be fully released as of the Effective Date.

(iii)     *Voting:*  Claims in Class 8 are Impaired.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 8 HSH-YM Facility Claim is entitled to vote to accept or reject this Plan.

    (j)    *Class 9 – General Unsecured Claims*

    (i)    *Claims In Class:*  Class 9 consists of all General Unsecured Claims that may exist against the Debtors. Class 9 consists of 21 subclasses, with each subclass consisting of Claims against a particular Debtor.

    (ii)    *Treatment:*  Within ninety (90) days after the Effective Date or, if such General Unsecured Claim becomes Allowed after the Effective Date, as soon as reasonably practicable after the date at which such General Unsecured Claim becomes Allowed, each Holder of an Allowed Class 9 General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, the amount of such Allowed General Unsecured Claim, excluding interest accrued after the Petition Date.

    (iii)    *Voting:*  Claims in Class 9 are Impaired. Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 9 General Unsecured Claim is entitled to vote to accept or reject this Plan.

    (k)    *Class 10 – Interests in Nautilus Holdings Limited and Nautilus Holdings No. 2 Limited*

    (i)    *Interests In Class:*  Class 10 consists of all Interests in Nautilus Holdings Limited and Nautilus Holdings No. 2 Limited.

    (ii)    *Treatment:*  On the Effective Date, all Class 10 Interests in Nautilus Holdings Limited and Nautilus Holdings No. 2 Limited shall be Reinstated.

    (iii)    *Voting:*  Interests in Class 10 are Unimpaired, and the Holders of Allowed Class 10 Interests in Nautilus Holdings Limited and Nautilus Holdings No. 2 Limited are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of  Allowed Class 10 Interests in Nautilus Holdings Limited and Nautilus Holdings No. 2 Limited are not entitled to vote to accept or reject this Plan.

    (l)    *Class 11– Intercompany Claims*

    (i)    *Claims In Class:*  Class 11 consists of all Intercompany Claims.

    (ii)    *Treatment:*  On or prior to the Effective Date, except for Class 11 Intercompany Claims against the Citi Silo Debtors and Class 11 Intercompany Claims that the Citi Silo Debtors have against any non-Citi Silo Debtor, all Class 11 Intercompany Claims may be Reinstated subject to the terms of the DVB Term Sheet or, at the applicable Debtors' or Reorganized Debtors' option, be cancelled or compromised.  A chart of the Intercompany Claims to be cancelled will be filed as part of the Plan Supplement. No distribution shall be made on account of Class 11 Intercompany Claims.

The Class 11 Intercompany Claims between and against the Citi Silo Debtors and any Intercompany Claims that any of the Citi Silo Debtors have between and against any other Debtor shall be deemed cancelled or waived on the Effective Date.

(iii)    *Voting:*  Claims in Class 11 are Unimpaired, and the Holders of Allowed Class 11 Intercompany Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Allowed Class 11 Intercompany Claims are not entitled to vote to accept or reject this Plan.

(m)    *Class 12 – Intercompany Interests in Other Debtors*

(i)    *Interests In Class:*  Class 12 consists of all Intercompany Interests for each Debtor except Nautilus Holdings Limited, Nautilus Holdings No. 2 Limited, Nautilus Shipholdings No. 3 Limited, Miltons Way Limited, Findhorn Osprey Limited, Earlstown Limited, Floral Peninsula Limited, and Resplendent Spirit Limited.

(ii)    *Treatment:*  Except as otherwise provided herein, on or prior to the Effective Date, all Class 12 Intercompany Interests in Other Debtors shall be Reinstated.

(iii)    *Voting:*  Interests in Class 12 are Unimpaired, and the Holders of Allowed Class 12 Intercompany Interests in Other Debtors are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of  Allowed Class 12 Intercompany Interests in Other Debtors are not entitled to vote to accept or reject this Plan.

(n)    *Class 13 – Intercompany Interests in C-F Debtors*

(i)    *Interests In Class:*  Class 13 consists of all Intercompany Interests in Miltons Way Limited, Findhorn Osprey Limited, Earlstown Limited, Floral Peninsula Limited, and Resplendent Spirit Limited.

(ii)    *Treatment:*  On the Effective Date, all Intercompany Interests in Miltons Way Limited, Findhorn Osprey Limited, Earlstown Limited, Floral Peninsula Limited, and Resplendent Spirit Limited shall be deemed to be cancelled without further action by the Debtors or Reorganized Debtors.   Notwithstanding the foregoing, the Holder of such cancelled interests shall receive distribution(s) from the estates of Miltons Way Limited, Findhorn Osprey Limited, Earlstown Limited, Floral Peninsula Limited, and Resplendent Spirit Limited, to the extent there is any cash or assets remaining after the payment of the respective claims of such debtors.

(iii)    *Voting:*  Interests in Class 13 are Impaired. Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 13 Intercompany Interest in C-F Debtors is entitled to vote to accept or reject this Plan

(o)    *Class 14 – Intercompany Interests in Nautilus Shipholdings No. 3 Limited*

(i)    *Interests In Class*:  Class 14 consists of all Intercompany Interests in Nautilus Shipholdings No. 3 Limited.

(ii)     *Treatment*:  Class 14 Intercompany Interests in Nautilus Shipholdings No. 3 Limited shall be deemed to be cancelled automatically without further action by the Debtors or the Reorganized Debtors and all obligations thereunder shall be discharged in full.  Holders of Intercompany Interests in Nautilus Shipholdings No. 3 Limited shall not receive or retain any property under the Plan on account of such Interests.

(iii)     *Voting*:  Interests in Class 14 are Impaired.  The Holders of Class 14 Intercompany Interests are conclusively deemed to have rejected this Plan pursuant to section 1126 of the Bankruptcy Code.  Therefore, the Holders of Class 14 Intercompany Interests in Nautilus Shipholdings No. 3 Limited are not entitled to vote to accept or reject this Plan.

3.3     ***Enforcement of Subordination Agreements.***  Notwithstanding any provision herein to the contrary, in accordance with section 510 of the Bankruptcy Code, subordination agreements or arrangements to which any Debtor is a party, including but not limited to, any such subordination agreement set forth in the Citi Facility Documents, Columbia Facility Documents, Flowers Facility Documents, HSH-YSM Facility Documents, Existing DVB 1 Facility Documents, and Existing DVB 2 Facility Documents are enforceable, and nothing in the Plan shall affect or otherwise alter any such subordination agreement.

3.4     ***Alternative Treatment***.  Notwithstanding any provision herein to the contrary, any Holder of an Allowed Claim may receive, instead of the distribution or treatment to which it is entitled hereunder, any other distribution or treatment to which it and the Debtors or the Reorganized Debtors may agree in writing; *provided*, *however*, that under no circumstance may the Debtor or Reorganized Debtors agree to provide any other distribution or treatment to any Holder of an Allowed Claim that would adversely impair the distribution or treatment provided to any other Holder of an Allowed Claim.

3.5     ***Special Provision Regarding Unimpaired Claims***.  Except as otherwise provided in this Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including but not limited to all rights with respect to legal and equitable defenses to setoffs against or recoupments of Unimpaired Claims.

## ARTICLE IV

## ACCEPTANCE OR REJECTION OF THIS PLAN

4.1     ***Acceptance By Class Entitled To Vote***.  Classes 3, 4, 5, 6, 7, 8, 9, and 13 are the Classes of Claims of the Debtors that are entitled to vote to accept or reject this Plan.  Classes 3, 4, 5, 6, 7, 8, 9, and 13 shall have accepted this Plan if (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in each Class have voted to accept this Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in each Class have voted to accept this Plan, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code.  If there are no votes cast in a particular Class that is entitled to vote on the Plan, then the Plan shall be deemed accepted by such Class.

4.2    ***Presumed Acceptance or Rejection Of The Plan.***  Classes 1, 2, 10, 11, and 12 are Unimpaired.  Therefore, such Classes are deemed to have accepted this Plan by operation of law and are not entitled to vote to accept or reject the Plan. Class 14 is Impaired and shall not receive or retain any property under the Plan on account of such Interests. Therefore, the Holders of such Claims are conclusively presumed to have voted to reject the Plan by operation of law and are not entitled to vote to accept or reject the Plan.

4.3    ***Elimination Of Classes***.  To the extent applicable, any Class (including, for the avoidance of doubt, any sub-Class) that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed to have been deleted from this Plan for purposes of (a) voting to accept or reject this Plan and (b) determining whether it has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.

4.4    ***Confirmation Matters***.  Notwithstanding the combination of separate plans of reorganization for the Debtors in this joint plan of reorganization for purposes of, among other things, economy and efficiency, this Plan (i) will be deemed a separate chapter 11 plan for the Citi Silo Debtors if the Bankruptcy Court does not confirm this joint Plan with respect to all Debtors, and upon satisfaction of the confirmation requirements of section 1129 of the Bankruptcy Code with respect to the Citi Silo Debtors, the Bankruptcy Court may confirm this Plan as to the Citi Silo Debtors whether or not the Plan is confirmed with respect to any other Debtor and (ii) will be deemed a separate chapter 11 plan for the DVB Silo Debtors if the Bankruptcy Court does not confirm this joint Plan with respect to all Debtors, and upon satisfaction of the confirmation requirements of section 1129 of the Bankruptcy Code with respect to the DVB Silo Debtors, the Bankruptcy Court may confirm this Plan as to the DVB Silo Debtors whether or not the Plan is confirmed with respect to any other Debtor.

4.5    ***Cramdown***.  The Debtors request Confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to modify this Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THIS PLAN

5.1    ***Continued Legal Existence***.  Except as otherwise provided in this Plan, each of the Debtors will continue to exist after the Effective Date as a separate legal entity, with all the powers of such an entity (whether a corporation, limited liability company or other entity, as appropriate) under applicable law in the jurisdiction in which each applicable Debtor is incorporated or otherwise formed and pursuant to such Debtor's certificate or articles of incorporation and by-laws or other organizational documents in effect prior to the Effective Date, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date, *provided*, *however*, that the organizational documents for the Reorganized Debtors Able Challenger Limited, Magic Peninsula Limited, Metropolitan Vitality Limited, and Superior Integrity Limited shall be amended in a manner

consistent with the terms set forth in the Mediation Agreement and otherwise in form and substance reasonably satisfactory to each of the HSH-YM Facility Secured Parties.

5.2    *Winding Up Certain Debtors.*  On the Effective Date, Miltons Way Limited, Findhorn Osprey Limited, Earlstown Limited, Floral Peninsula Limited, and Resplendent Spirit Limited shall be deemed dissolved under applicable law for all purposes without the necessity for any other or further actions to be taken by or on behalf of such debtors.

5.3    *Sources Of Cash For Distribution*.  All Cash necessary for the Reorganized Debtors to make payments required by this Plan shall be obtained from (a) existing Cash balances, including balances in the applicable Debtors' accounts, (b) the operations of the applicable Debtors or Reorganized Debtors, and (c) the F-C Consideration.

5.4    *Approval And Authorization For The New Credit Facilities*.  Confirmation shall be deemed approval of each of the New Credit Facilities and authorization for the Reorganized Debtors to enter into each of the New Credit Facilities and execute such documents as may be required to effectuate the treatment afforded to the applicable lenders pursuant to each of the New Credit Facilities.

5.5    *New Boards Of Reorganized Debtors*.  The members of the Boards of the Reorganized Debtors shall be identified in the Plan Supplement. In addition, the members of the Boards of the Reorganized Citi Silo Debtors identified in the Plan Supplement shall be subject to the approval of the Citi Agent acting at the direction of the Citi Lenders.

5.6    *Corporate Action*.  Each of the matters provided for under this Plan involving the corporate structure of any Debtor or Reorganized Debtor or any corporate action to be taken by or required of any Debtor or Reorganized Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors or the Reorganized Debtors.

5.7    *Preservation Of Retained Actions*.  In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors will retain and may (but are not required to) enforce all Retained Actions.  After the Effective Date, the Reorganized Debtors, in their sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), without further approval of the Bankruptcy Court.  The Reorganized Debtors or any successors, in the exercise of their sole discretion, may pursue such Retained Actions so long as it is in the best interests of the Reorganized Debtors or any successors holding such rights of action.  The failure of the Debtors to specifically list any claim, right of action, suit, proceeding or other Retained Action in this Plan does not, and will not be deemed to, constitute a waiver or release by the Debtors or the Reorganized Debtors of such claim, right of action, suit, proceeding or other Retained Action, and the Reorganized Debtors will retain the right to pursue such claims, rights of action, suits, proceedings and other Retained Actions in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or

otherwise) or laches will apply to such claim, right of action, suit, proceeding, or other Retained Action upon or after the Confirmation or consummation of this Plan.

5.8    ***Effectuating Documents; Further Transactions***.  Each of the Debtors and Reorganized Debtors, and their respective officers and designees, is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan, or to otherwise comply with applicable law.

5.9    ***Exemption From Certain Transfer Taxes And Recording Fees***.  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or to any other Person or entity pursuant to this Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

5.10    ***Further Authorization***.  The Debtors and the Reorganized Debtors shall be entitled to seek such orders, judgments, injunctions, and rulings as they deem necessary to carry out the intentions and purposes, and to give full effect to the provisions, of this Plan.

5.11    ***Cancellation Of Existing Securities And Agreements***.  Except as provided in this Plan or in the Confirmation Order (including, without limitation, the amendment and restatement of the Existing DVB 1 Facility Documents, the Existing DVB 2 Facility Documents, certain of the Existing HSH-YM Facility Documents, and, in each case, related documents executed in connection with this Plan), on the Effective Date, all notes, stock, instruments, certificates, agreements, side letters, fee letters and other documents evidencing or giving rise to Claims and Interests in the Debtors shall be cancelled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote, or other approval or authorization by any Person.  The Holders of or parties to such notes, stock, instruments, certificates, agreements, side letters, fee letters, and other documents shall have no rights arising from or relating to such notes, stock, instruments, certificates, agreements, side letters, fee letters, and other documents or the cancellation thereof, except the rights provided pursuant to this Plan and the Confirmation Order.

5.12    ***Check the Box Elections***.  Each of the Citi Silo Debtors shall make and file, before the Effective Date, a check-the-box election on Internal Revenue Service Form 8832 (or successor form) (a "CTB Election") to be treated as a disregarded entity for United States federal income tax purposes, effective before the Effective Date.  Holdco shall make and file before the Effective Date, a CTB Election to be treated as a disregarded entity or a partnership, as applicable, for United States federal income tax purposes, effective as of its date of formation.

28

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

6.1     ***Allowed Claims***.  Notwithstanding any provision herein to the contrary, the Debtors or the Reorganized Debtors shall make distributions only to Holders of Allowed Claims.  A Holder of a Disputed Claim shall receive a distribution on account thereof only when and to the extent that such Holder's Disputed Claim becomes an Allowed Claim.

6.2     ***Distributions For Claims Allowed As Of The Effective Date***.  Except as otherwise provided under this Plan or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable.  Any distribution to be made on the Effective Date pursuant to this Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

6.3     ***Interest And Penalties On Claims***.  Unless otherwise specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest and penalties shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of this Plan.

6.4     ***Means Of Cash Payment***.  Payments of Cash made pursuant to this Plan shall be made, at the option and in the sole discretion of the applicable Reorganized Debtor, by (a) checks drawn on or wire transfer from a domestic bank selected by the Reorganized Debtor, (b) in accordance with the terms of the New Credit Facilities, or (c) by such means as are necessary or customary in a particular foreign jurisdiction.

6.5     ***Withholding And Reporting Requirements/Allocations***.  In connection with this Plan and all distributions hereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

6.6     ***Preservation Of Rights***.  Except as otherwise provided in this Plan, the Reorganized Debtors shall retain all rights arising under section 558 of the Bankruptcy Code or applicable nonbankruptcy laws, including, but not limited to, the right to set off against any Claim, the payments or other distributions to be made pursuant to this Plan in respect of such Claim, or claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized

Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Holder; *provided*, *further*, that the Holder of any Claim must assert any right to setoff prior to the Effective Date or such right shall be deemed waived on the Effective Date. Notwithstanding any other provision of the Plan, the United States' rights to setoff and recoupment are preserved.

## ARTICLE VII

## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

7.1    *Assumption Of Executory Contracts And Unexpired Leases*.

(a)    Except as otherwise provided in the Plan, on the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors shall be deemed assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease (a) has previously been rejected by order of the Bankruptcy Court in effect as of the Effective Date (which order may be the Confirmation Order); (b) is the subject of a motion to reject filed on or before the Effective Date; (c) is identified as an Executory Contract or Unexpired Lease to be rejected pursuant to the Plan Supplement before the Effective Date; or (d) expired or terminated pursuant to its own terms. An Executory Contract or Unexpired Lease that is deemed to be assumed pursuant to the foregoing sentence shall be referred to as an "Assumed Contract."

(b)    Entry of the Confirmation Order by the Bankruptcy Court shall constitute findings by the Bankruptcy Court that (a) the Reorganized Debtors have properly provided for the cure of any defaults that might have existed, (b) each assumption is in the best interest of the Reorganized Debtors, their Estates, and all parties in interest in the Chapter 11 Cases and (c) the requirements for assumption of any Executory Contract or Unexpired Lease to be assumed have been satisfied. Except as otherwise provided in the following sentence, all cure payments under any Assumed Contract shall be made by the Reorganized Debtors on the Effective Date or as soon as practicable thereafter. In the event of a dispute, cure payments required by section 365(b)(1) of the Bankruptcy Code shall be paid upon entry of a Final Order resolving such dispute.

(c)    In connection with the treatment of the Flowers Facility Claims and the Columbia Facility Claims, the Debtors shall (i) assume and assign to the lenders under the F-C Credit Agreements such contracts related to the vessels securing the F-C Credit Agreements that such lenders reasonably request the Debtors assume and assign; provided, that the contracts to be assumed and assigned are properly assumable and assignable, under section 365 of the Bankruptcy Code and (ii) reject such contracts that are (1) related to the vessels securing the F-C Credit Agreements; (2) capable of rejection; (3) are solely between one or more borrower(s) under the F-C Credit Agreements and a non-debtor contract counterparty; and (4) that such lenders reasonably request the Debtors to reject under section 365 of the Bankruptcy Code.

7.2    *Termination of Existing Management Executory Contract.* Prior to the Effective Date, the Debtors shall terminate the Existing NHL Management Agreement and the

Existing NH2L Management Agreement in accordance with their terms with such termination effective as of the Effective Date, and no liability, Claim or Administrative Claim shall arise or otherwise result against any of the Debtors or Reorganized Debtors from such rejection, other than for liabilities for which the Debtors are responsible pursuant to the Existing NHL Management Agreement or the Existing NH2L Management Agreement prior to the termination thereof already incurred but not yet paid, and any such liabilities, Claims or Administrative Claims are hereby deemed to be waived unconditionally and irrevocably upon the Effective Date.

7.3    ***D&O Liability Insurance Policies***.  As of the Effective Date, the D&O Liability Insurance Policies shall be treated as if they were Executory Contracts that are assumed under this Plan.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

7.4    ***Indemnification***.  Except as otherwise specifically limited in this Plan, any obligations or rights of the Debtors or Reorganized Debtors to defend, indemnify, reimburse, or limit the liability of the Debtors' present and former directors, officers, employees, agents, representatives, attorneys, accountants, financial advisors, restructuring advisors, investment bankers and consultants (the "Covered Persons") pursuant to the Debtors' or Reorganized Debtors' certificates of incorporation, by-laws, policy of providing employee indemnification, applicable law, or specific agreement in respect of any claims, demands, suits, Causes of Action, or proceedings against such Covered Persons based upon any act or omission related to such Covered Persons' service with, for, or on behalf of the Debtors prior to the Effective Date, shall be treated as if they were Executory Contracts that are assumed under this Plan and shall survive the Effective Date and remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement, or limitation of liability is owed in connection with an occurrence before or after the Petition Date.

7.5    ***Cure of Defaults Under Assumed Contracts***.  The Reorganized Debtors shall cure any monetary defaults under any Executory Contract and Unexpired Lease to be assumed pursuant to the Plan by paying to the non-Debtor counterparty the full amount of any monetary default in the ordinary course of business.  Accordingly, no party to an Assumed Contract need file any cure claim, and the Debtors need not file any lists of any proposed cure claims, with the Bankruptcy Court.  Notwithstanding the foregoing, the Reorganized Debtors and counter-parties to Assumed Contracts reserve all their rights in the event of a dispute over the amount of a cure claim.  If there is any such dispute that cannot be resolved consensually, then either party must file with the Bankruptcy Court a request for allowance and payment of such cure claim within seventy-five (75) days from the Effective Date.  Moreover, the Reorganized Debtors shall be authorized to reject any Executory Contract or Unexpired Lease to the extent the Reorganized Debtors, in the exercise of their sound business judgment, conclude that the amount of the cure claim as determined by the Bankruptcy Court, renders assumption of such Executory Contract or Unexpired Lease unfavorable to the Reorganized Debtors.

# ARTICLE VIII

# CONFIRMATION AND CONSUMMATION OF THE PLAN

8.1    ***Condition To Confirmation***.  Confirmation of the Plan is conditioned upon the Confirmation Order being reasonably acceptable in form and substance to the Debtors and the Participating Lenders, *provided*, *however*, that the Confirmation Order must only be reasonably acceptable to a particular Participating Lender to the extent the Participating Lender's claims, rights, or interests are affected by the terms thereof.

8.2    ***Conditions To Effective Date***.  The Debtors shall request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry.  The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Debtors and the Participating Lenders in accordance with the terms hereof, *provided*, *however*, that if this Plan is confirmed for one or more Debtors as provided for in Section 4.4, only the conditions applicable to such Debtors need to be satisfied or waived for the Effective Date to occur:

(a)    The Confirmation Order, in form and substance reasonably satisfactory to the Debtors and the Participating Lenders, shall have become a Final Order and shall, among other things, provide that the Debtors and the Reorganized Debtors are authorized to take all actions necessary or appropriate to enter into, implement, and consummate the agreements and documents created in connection with this Plan, *provided*, *however*, that the Confirmation Order must only be reasonably satisfactory to a particular Participating Lender to the extent the Participating Lender's claims, rights, or interests are affected by the terms thereof.

(b)    All documents related to, provided for therein, or contemplated by the New Credit Facilities shall have been executed and delivered, and all conditions precedent thereto shall have been satisfied (other than the occurrence of the Effective Date), which shall occur simultaneously with the satisfaction of all conditions precedent under the New Credit Facilities). Notwithstanding the foregoing, the failure to satisfy this condition shall not impair the Plan becoming effective with respect to the Citi Silo Debtors.

(c)    The Debtors shall have terminated the Existing NHL Management Agreement and the Existing NH2L Management Agreement, effective as of the Effective Date, as provided by Section 7.2 of the Plan.

(d)    Each of the Citi Silo Management Agreement and the Citi Silo MIP shall have become effective.

(e)    Each of the DVB Silo Management Agreements and the NH2L Management Agreement shall have become effective.  Notwithstanding the foregoing, the failure to satisfy this condition shall not impair the Plan becoming effective with respect to the Citi Silo Debtors.

(f)    Debtors Golden Knighthead Limited and Metropolitan Harbour Limited shall hold sufficient cash in their accounts to satisfy each of the terms and conditions

32

contained in the DVB Term Sheet.  Notwithstanding the foregoing, the failure to satisfy this condition shall not impair the Plan becoming effective with respect to the Citi Silo Debtors.

(g)    On the Effective Date, after giving effect to the payments required by the DVB Term Sheet and all accrued and unpaid professional fees, Debtors Golden Knighthead Limited and Metropolitan Harbour Limited shall have a minimum liquidity position of $5,000,000 in aggregate; *provided*, *however*, this condition may be waived by DVB Bank, SE in its sole discretion.  Notwithstanding the foregoing, the failure to satisfy this condition shall not impair the Plan becoming effective with respect to the Citi Silo Debtors.

(h)    Debtors Nautilus Shipholdings No. 2 Limited, Golden Knighthead Limited, and Metropolitan Harbour Limited shall be in full compliance with the terms of the Amended and Restated DVB 1 Facility and the Amended and Restated DVB 2 Facility, as applicable; *provided*, *however*, the applicable Debtor shall not be required to (i) satisfy any historic nonpayment defaults or (ii) satisfy any overdue principal amounts, whether coming due by acceleration or otherwise, to be deemed in full compliance as of the Effective Date. Notwithstanding the foregoing, the failure to satisfy this condition shall not impair the Plan becoming effective with respect to the Citi Silo Debtors.

(i)    The Amended and Restated HSH-YM Facility Documents shall be executed, fully enforceable and binding upon all parties thereto and all conditions precedent thereto shall be satisfied or waived in writing in accordance with the terms thereof.

(j)    Debtors Golden Knighthead Limited and Metropolitan Harbour Limited shall have satisfied all Claims entitled to administrative expense priority other than trade Claims incurred in the ordinary course of business that are not yet due and payable. Notwithstanding the foregoing, the failure to satisfy this condition shall not impair the Plan becoming effective with respect to the Citi Silo Debtors.

(k)    The Professional Fee Escrow Account shall have been funded.

(l)    The adversary proceeding filed by certain of the Debtors on December 5, 2014 (Adv. Proc. No. 14-08268 (RDD)) against HSH Nordbank AG shall be dismissed with prejudice.

(m)    *Debtors' Motion for an Order Pursuant to Bankruptcy Rule 2004* [Docket No. 197] shall be withdrawn with prejudice.

(n)    York Global Finance BDH, LLC shall be elevated to lender of record status under the Amended and Restated HSH-YM Facility.

(o)    All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of this Plan shall have been obtained.

(p)    The Holdco LLC Agreement shall be in full force and effect.

(q)    All other actions, documents, and agreements necessary to implement this Plan shall have been effected or executed.

33

8.3 **Waiver Of Conditions**. Except as expressly provided herein, each of the conditions to the Effective Date set forth herein may be waived in whole or in part by the mutual agreement of the Debtors and each affected Participating Lender, without any notice to parties in interest or the Bankruptcy Court and without a hearing. The failure to satisfy or waive any condition to the Effective Date may be asserted by the Debtors or any of the affected Participating Lenders regardless of the circumstances giving rise to the failure of such condition to be satisfied, including any action or inaction by the Debtors or any of the affected Participating Lenders. The failure of the Debtors or any of the affected Participating Lenders to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

## ARTICLE IX

## EFFECT OF PLAN CONFIRMATION

9.1 **Binding Effect**. This Plan shall be binding upon and inure to the benefit of the Debtors, their Estates, all present and former Holders of Claims and Interests, and their respective successors and assigns, including but not limited to the Reorganized Debtors.

9.2 **Revesting Of Assets**. Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estates (including Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in the Reorganized Debtors, free and clear of all Claims, Liens, charges, encumbrances, rights and Interests of creditors and equity security holders. As of the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of their property without supervision of the Bankruptcy Court, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or the Confirmation Order.

9.3 **Compromise And Settlement Of Claims, Interests And Controversies**. Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against or Interests in them and Causes of Action against other Persons.

9.4    ***Releases And Related Matters***

(a)    **Releases by the Debtors**

**Pursuant to section 1123(b) of the Bankruptcy Code and to the extent allowed by applicable law, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, the Estates and the Equity-Related Entities from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, the Reorganized Debtors, the Estates or the Equity-Related Entities have asserted or would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the Plan Supplement, the business or contractual arrangements between any Debtor, Reorganized Debtor, Estate or non-Debtor Affiliate and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments or other documents, or any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, *however* that nothing in this Section 9.4(a) shall be construed to release any party or entity from gross negligence, intentional fraud, willful misconduct, or criminal conduct, as determined by a Final Order of a court of competent jurisdiction.  For the avoidance of doubt, the Causes of Action and Claims underlying or relating in any way to (i) the adversary proceeding filed by certain of the Debtors on December 5, 2014 (Adv. Proc. No. 14-08268 (RDD)) against HSH Nordbank AG, as agent under the Existing HSH-YM Credit Agreement and (ii) *Debtors' Motion for an Order Pursuant to Bankruptcy Rule 2004* [Docket No. 197] are deemed released and discharged by the Debtors.**

(b)    **Third-Party Releases by Holders of Claims or Equity Interests**

**Except as otherwise provided in the Plan or the Plan Supplement, as of the Effective Date, each Holder of a Claim against or Interest in a Debtor, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Debtors, the Reorganized Debtors, the Estates, the Equity-Related Entities, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims assertable on behalf of a Debtor, whether**

35

known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan or the Plan Supplement, the business or contractual arrangements between any Debtor, Reorganized Debtor, Estate or non-Debtor Affiliate and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event or other occurrence including or pertaining to the Debtors and taking place on or before the Effective Date, *provided*, *however* that nothing in this Section 9.4(b) shall be construed to release any party or entity from gross negligence, intentional fraud, willful misconduct, or criminal conduct, as determined by a Final Order of a court of competent jurisdiction; *provided further*, however, that this Section 9.4(b) shall not release the Debtors, the Reorganized Debtors, the Estates, the Equity-Related Entities or the Released Parties from any Cause of Action held by a governmental entity existing as of the Effective Date based on (i) the Internal Revenue Code or other domestic state, city, or municipal tax code, (ii) the environmental laws of the United States or any domestic state, city, or municipality, (iii) any criminal laws of the United States or any domestic state, city, or municipality, (iv) the Securities and Exchange Act of 1934 (as now in effect or hereafter amended), the Securities Act, or other securities laws of the United States or any domestic state, city or municipality, (v) the Employee Retirement Income Security Act of 1974, as amended, or (vi) the laws and regulations of the Bureau of Customs and Border Protection of the United States Department of Homeland Security.  Notwithstanding anything to the contrary in this Section 9.4(b), a Holder of a Claim shall be deemed not to provide the releases set forth in this section if such Holder (i) votes to reject the Plan and (ii) "opts out" of the releases provided in this Section 9.4(b) of the Plan in a timely submitted, valid Ballot, *provided*, *however*, that nothing in this sentence shall limit the discharge contained in Section 9.5 of this Plan. For the avoidance of doubt, nothing in this Section 9.4(b) shall release any Claims relating to actions or conduct occurring after the Effective Date and arising under or relating to the New Credit Facilities.

9.5    *Discharge Of The Debtors*

(a)    Upon the Effective Date, the Debtors, and each of them, shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (i) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (iii) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (iv) the Holder of a Claim based upon such debt accepted this Plan.

(b)    As of the Effective Date, except as provided in this Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtors or the

Reorganized Debtors, any other or further Claims, debts, rights, Causes of Action, claims for relief, liabilities, or equity interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in this Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim.

### 9.6   *Injunction*

**Except as provided in this Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, or liability that is released or discharged under this Article IX are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors, and their respective Affiliates or their property on account of any such released or discharged Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, or liability: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any Lien or encumbrance; (d) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to any released Person; or (e) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order.**

### 9.7   *Exculpation And Limitation Of Liability*

**None of the Released Parties shall have or incur any liability to any Entity, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the formulation, negotiation, or implementation of this Plan, the solicitation of acceptances of this Plan, the pursuit of Confirmation of this Plan, the Confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; *provided*, *however*, that the foregoing provisions of this exculpation shall have no effect on the liability of any Released Party that results from any such act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted gross negligence or willful misconduct. Nothing in this Plan shall affect the ability of the United States to pursue any non-Debtors to the extent allowed by non-bankruptcy law for any liabilities that may be related to any federal tax liabilities owed by the Debtors or the Debtors' Estates. Additionally, the United States may pursue police and regulatory actions or proceedings with respect to the Released Parties in the manner, and by the administrative or judicial tribunals, in which the United States could have pursued such actions or proceedings as if this bankruptcy had never been commenced.**

9.8    ***Term Of Bankruptcy Injunction Or Stays***.  Except as provided otherwise in this Plan, from and after the Effective Date, the automatic stay of section 362(a) of the Bankruptcy Code shall terminate.

9.9    ***Post-Confirmation Date Retention Of Professionals***.  Upon the Confirmation Date, any requirement that professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate and the Reorganized Debtors will employ and pay professionals in the ordinary course of business.

## ARTICLE X

## PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

10.1    ***Disputed Claims***. All Disputed Claims against the Debtors shall be subject to the provisions of this Article X.

10.2    ***Objection Deadline***. Unless otherwise ordered by the Bankruptcy Court, objections to Claims shall be filed with the Bankruptcy Court and served upon the Holders of each such Claim to which objections are made on or before the Claims Objection Deadline. If an objection to a Claim is timely filed, a subsequent amendment to the objection shall also be deemed timely, even if filed subsequent to the deadline for filing the original Claim objection, and even if the amendment raises facts or legal theories not raised in the original Claim objection.

10.3    ***Prosecution of Objections***. After the Confirmation Date, the Debtors or the Reorganized Debtors, as the case may be, shall have the authority to file, litigate to final judgment, settle, or withdraw objections to Disputed Claims.

10.4    ***No Distributions Pending Allowance***. No payments or distributions shall be made with respect to any Claim to the extent it is a Disputed Claim unless and until all objections to such Disputed Claim are resolved and such Disputed Claim becomes an Allowed Claim in whole or in part.

## ARTICLE XI

## RETENTION OF JURISDICTION

11.1    ***Retention of Jurisdiction***. Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction (unless otherwise indicated) over all matters arising in, arising out of, and/or related to, the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    Resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

38

(b)    Decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date (which jurisdiction shall be non-exclusive as to any such non-core matters);

(c)    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan, the Disclosure Statement, or the Confirmation Order;

(d)    Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to this Plan, or any entity's rights arising from or obligations incurred in connection with this Plan or such documents;

(e)    Modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

(f)    Hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under sections 330, 331, 503(b), and 1129(a)(4) of the Bankruptcy Code; *provided*, *however*, that from and after the Confirmation Date the payment of fees and expenses by the Reorganized Debtors, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(g)    Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation, or enforcement of this Plan or the Confirmation Order;

(h)    Adjudicate controversies arising out of the administration of the Estates or the implementation of this Plan;

(i)    Resolve any cases, controversies, suits, or disputes that may arise in connection with General Unsecured Claims, including without limitation, the Bar Date, related notice, claim objections, allowance, disallowance, estimation and distribution;

(j)    Hear and determine Causes of Action by or on behalf of the Debtors or the Reorganized Debtors;

(k)    Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked, or vacated, or distributions pursuant to this Plan are enjoined or stayed;

(l)      Determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order;

(m)      Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

(n)      Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code; and

(o)      Enter an order closing the Chapter 11 Cases.

For the avoidance of doubt, the Bankruptcy Court shall not retain jurisdiction with respect to the following documents entered into by a Reorganized Debtor on or after the Effective Date: (i) the New Credit Facilities, (ii) the Citi Silo Management Agreement, (iii) the DVB Silo Management Agreements, or (iv) the NH2L Management Agreement.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

12.1    *Payment Of Statutory Fees*.  All fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid on the earlier of when due or the Effective Date.

12.2    *Amendment Or Modification Of This Plan*.  Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, the Debtors reserve the right to alter, amend, or modify this Plan at any time prior to or after the Confirmation Date but prior to the substantial consummation of this Plan, *provided*, *however*, that any Participating Lender must approve such alteration, amendment or modification if it affects such Participating Lender's claims, rights, or interests, which approval shall not be unreasonably withheld.  A Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

12.3    *Severability Of Plan Provisions*.  If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been

40

altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

12.4 ***Successors And Assigns***.  This Plan shall be binding upon and inure to the benefit of the Debtors, and their respective successors and assigns, including, without limitation, the Reorganized Debtors.  The rights, benefits, and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.

12.5 ***Revocation, Withdrawal, Or Non-Consummation***.  The Debtors reserve the right to revoke or withdraw this Plan at any time prior to the Confirmation Date and to file other plans of reorganization.  If the Debtors revoke or withdraw this Plan, or if Confirmation or consummation of this Plan does not occur, then (a) this Plan shall be null and void in all respects, (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Class of Claims), assumption of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, *provided*, *however*, that the Debtors' Missed Milestone Obligations shall survive pursuant to the terms of the DVB Term Sheet, and (c) nothing contained in this Plan, and no acts taken in preparation for consummation of this Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person, (ii) prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or (iii) constitute an admission of any sort by the Debtors or any other Person.

12.6 ***Notice***.  All notices, requests, and demands to or upon the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

NAUTILUS HOLDINGS LIMITED
Attn: Andreas Maroulletis
Lapithion Tower, 5
Deligiorgi Street, 1066
Nicosia, Cyprus
Facsimile: +357-22666173

and

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
Jay M. Goffman
Mark A. McDermott
Shana A. Elberg
Suzanne D.T. Lovett
Four Times Square
New York, New York 10036-6522
Facsimile: (212) 735-2000

Counsel for Debtors and Debtors in Possession

12.7    ***Governing Law***.  Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an Exhibit or schedule to this Plan or document contained in the Plan Supplement provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of New York without giving effect to the principles of conflicts of law of such jurisdiction.

12.8    ***Exhibits***.  All Exhibits to this Plan are incorporated and are a part of this Plan as if set forth in full herein.

12.9    ***Filing Of Additional Documents***.  On or before substantial consummation of this Plan, the Debtors shall file such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

12.10    ***Conflicts***.  In the event that provisions of the Disclosure Statement and provisions of this Plan conflict, the terms of this Plan shall govern.

*Remainder of Page Left Intentionally Blank*

Dated: January 9, 2015
      New York, New York

                                    NAUTILUS HOLDINGS LIMITED
                                    NAUTILUS HOLDINGS NO. 2 LIMITED
                                        (for themselves and on behalf of each of the other Debtors)

By:     */s/ James A. Mesterharm*
                     Name:  James A. Mesterharm
                     Title:   Chief Restructuring Officer

**Exhibit A**

**Mediation Agreement**

The attached reflect the terms of the deal reached at mediation on December 10, 2014

York Capital Management
Name: WYATT WACHTEL

HSH
Name: CORNELIA KIRSTEIN

Unicredit
Name: LORI ANN CURNYN

Mr. Andreas Papathomas

Mr. Alan Carr

Skadden, Arps, Slate, Meagher & Flom LLP
Name: Jay Goffman

White & Case
Name: Scott Greissman

Proskauer
Name: Vincent Indelicato

Lazard
Name: DANIEL M ARONSON

Blackstone
Name: Timothy R. Coleman

AP Services
Name: JAMES A. MESTERHARM

Mr. Joseph Farnan
Name: JOSEPH J. FARNAN JR.

2

Privileged and Confidential
Preliminary & Draft
Prepared at the Request of Counsel
For Internal Use Only

## Mediation Agreement

| Key Term | Mediation Agreement |
|---|---|
| **Senior Debt** | ▸ $126.9 million less initial paydown<br>▸ 1st Lien Secured |
| **Junior Debt** | ▸ $64.3 million less initial paydown<br>▸ 2nd Lien Secured |
| **Initial Pay Down** | ▸ 100% of excess cash above $3.0mm paid down<br>▸ Split 50/50 between Senior and Junior |
| **Interest Rate** | ▸ Senior Debt: L + 250 Cash Pay<br>▸ Junior Debt: 5.0% Cash Pay |
| **Maturity** | ▸ 12/31/2020 |
| **Quarterly Amortization** | ▸ $2.5 million in 2015-2016<br>▸ $1.875 million in 2017-2018<br>▸ $1.25 million in 2019 - 2020 |
| **Sweep** | ▸ 100% excess cash sweep allocated 50 / 50<br>▸ Minimum balance of $3.0mm through 2018 and $6.0mm thereafter |
| **Fee** | ▸ No Fee; $1.9 million used for additional debt paydown |

Privileged and Confidential
Preliminary & Draft
Prepared at the Request of Counsel
For Internal Use Only

## Mediation Agreement (cont.)

| Key Term | Mediation Agreement |
|---|---|
| **Covenants** | ▶ LTV Covenant: Senior Debt<br>  • Waiver from 2015 through 2018 charter period<br>  • 70% gross Senior LTV starting 12/31/2018 and thereafter<br>▶ LTV Covenant: Junior Debt<br>  • Waiver from 2015 through 2018 charter period<br>  • 110% gross Senior and Junior LTV starting 12/31/2018 and 103% starting in 12/31/2019 and thereafter<br>▶ Fixed Charge Covenant: Senior Debt Only<br>  • 1.20x defined as EBITDA divided by the Sum of (i) Dry Dock Reserve, plus (ii) Amortization, plus (iii) Interest<br>▶ Both LTV and Fixed Charge covenants can be cured; cure needs to be a minimum of $7.5mm investment in cash payable within 3 months of the testing date<br>▶ Covenants to be tested on December 31st |
| **Drydock** | ▶ Drydock reserve payments of $7.9mm total in equal annual installments over 2016-2018 |

Privileged and Confidential
Preliminary & Draft
Prepared at the Request of Counsel
For Internal Use Only

## Mediation Agreement (cont.)

| Key Term | Mediation Agreement |
|---|---|
| **Management Fees** | ▶ $650 per vessel per day<br>▶ 1.0% of revenues |
| **G&A** | ▶ $250K per vessel per year |
| **Bankruptcy Remoteness** | ▶ Vessels to be held by bankruptcy-remote SPVs pursuant to documentation to be agreed<br>　• Must include "golden share," bank-appointed director, or similar structure to ensure bankruptcy-remoteness recognized under applicable law |

**Exhibit B**

**Citi Silo MIP Material Terms**

| Provision | Terms |
|---|---|
| Option Amount | Synergy Management Services Limited (the "Manager") will be granted options exercisable into 5% of the new equity of Reorganized Debtor Nautilus Shipholdings No. 3 Limited (or any successor thereto, including such other holding company to be agreed) as of the Effective Date on a fully diluted basis.[1] |
| Strike Price | Par plus any accrued unpaid interest as of the Effective Date on the full amount of total Allowed Class 3 Citi Facility Claims. |
| Vesting | 25% per year over four years, subject to the continued provision by the Manager of commercial and technical management services to the Reorganized Citi Silo Debtors[2] pursuant to the Citi Silo Management Agreement entered into on the Effective Date.<br><br>All options shall immediately vest if Reorganized Debtor Nautilus Shipholdings No. 3 Limited  (or any successor thereto) secures debt financing at (i) 35%-50% loan-to-value ("LTV"), (ii)  with an interest rate of LIBOR + 400 bps or less, (iii) with an amortization profile based on an assumed 15-year or longer vessel life, and (iv) with a maturity of 5 years or longer (a "Qualified Loan"). |
| Tenor | 6 years |
| Co-Investment Right | If Reorganized Debtor Nautilus Shipholdings No. 3 Limited (or any successor thereto) |

---

[1]    Nautilus Shipholdings No. 3 Limited (or such other holding company to be agreed) shall own 100% of the equity interests in the entities that own the vessels *MV Rotterdam*, *MV Hamburg*, *MV Venezia*, *MV Corcovado*, and *MV Ital Onesta*.

[2]    Reorganized Citi Silo Debtors shall mean collectively Reorganized Debtors Nautilus Shipholdings No. 3 Limited, Vivid Mind Limited, Perpetual Joy Limited, Regal Stone Limited, Charming Energetic Limited, and Dynamic Continental Limited and for each of the foregoing, any successor thereto.

| Provision | Terms |
|---|---|
| | secures a Qualified Loan within one year of the Effective Date, then during the ten business day period following the closing of such Qualified Loan, the Manager shall have the option to purchase up to an additional 5% of the new equity of Reorganized Debtor Nautilus Shipholdings No. 3 Limited (or any successor thereto) as of the closing of such Qualified Loan at a valuation to be determined by the board of directors of Reorganized Debtor Nautilus Shipholdings No. 3 Limited (or any successor thereto) in its sole discretion. |
| Termination of Citi Silo Management Agreement | Upon termination by the Reorganized Citi Silo Debtors of the Citi Silo Management Agreement for cause (to be defined therein by agreement of the parties), all options, vested and unvested, shall immediately be forfeited.

Upon termination by the Reorganized Citi Silo Debtors of the Citi Silo Management Agreement not for cause (to be defined therein by agreement of the parties), all unvested options shall immediately be vested.

Upon termination by the Manager of the Citi Silo Management Agreement (other than due to material breach by any of the Reorganized Citi Silo Debtors of the Citi Silo Management Agreement, subject to cure periods as set forth therein), all options, vested and unvested, shall immediately be forfeited.

Upon termination by the Manager of the Citi Silo Management Agreement due to material breach by any of the Reorganized Citi Silo Debtors of the Citi Silo Management Agreement, subject to cure periods as set forth therein, all unvested options shall immediately be vested.

The definition of "Cause" in the Citi Silo Management Agreement will include the following, as applicable to the Manager or any |

| Provision | Terms |
|---|---|
| | management member thereof: |
| | (i)   The commission of any act or acts of intentional misconduct or gross negligence in the performance of its duties, responsibilities and obligations to the Reorganized Citi Silo Debtors or any of its affiliates (or, in the case of any management member, to the Manager or any of its affiliates), or substantial failure to perform any such duties, responsibilities and obligations; |
| | (ii)   Conviction of (or plea of nolo contendere to) a crime that constitutes a felony (or the equivalent of a felony in a jurisdiction other than the United States) or other crime involving moral turpitude; |
| | (iii)   A material breach of any provision of the Citi Silo Management Agreement or any other agreement with the Reorganized Citi Silo Debtors or any of their affiliates or any policy or procedure of the Reorganized Citi Silo Debtors governing the conduct of performing services on behalf of the Reorganized Citi Silo Debtors or their affiliates; |
| | (iv)   Fraud or misappropriation, embezzlement or misuse of funds or property belonging to the Reorganized Citi Silo Debtors, the Manager or their respective affiliates; and |
| | (v)   Failure to cooperate in any investigation by the Reorganized Citi Silo Debtors or the boards of directors of the Reorganized Citi Silo Debtors (or, in the case of any management member, by the |

| Provision | Terms |
|---|---|
| | Manager). |
| | Anything herein to the contrary notwithstanding, with respect to clauses (i), (iii) and (v) above, if and to the extent that any such occurrence is curable, such occurrence shall not constitute "Cause" if it is cured within ten (10) business days following receipt of written notice from the Reorganized Company specifying in reasonable detail the applicable occurrence. |
| Transfer | Neither the Manager nor any other award recipient may transfer its options, except (1) to Andreas Papathomas, up to 50% of the options, (2) to any other employee of the Manager, up to 25% of the options per employee, or (3) as otherwise approved by the board of directors of Reorganized Debtor Nautilus Shipholdings No. 3 Limited (or any successor thereto). |
| Tax Withholding | Reorganized Debtor Nautilus Shipholdings No. 3 Limited (or any successor thereto) and its affiliates are authorized to withhold from option proceeds amounts the Manager owes to the business with respect to taxes, or is required to be withheld under applicable tax laws. |

**Exhibit C**

**Citi Silo Management Agreement Material Terms**

| Provision | Terms |
|---|---|
| Entry into Citi Silo Management Agreement | In accordance with the terms of the Existing NHL Management Agreement, the Debtors shall terminate in full the Existing NHL Management Agreement effective as of the Effective Date without any further liabilities, other than for liabilities already incurred but not yet paid, to the Reorganized Citi Silo Debtors or their affiliates.<br><br>As of the Effective Date, the Reorganized Citi Silo Debtors shall enter into the Citi Silo Management Agreement consistent with the terms described herein. |
| Responsibilities of Manager[3] | Terms regarding commercial management and technical oversight with the primary commercial and technical management responsibilities as set forth below and other terms to be agreed by the parties. |
| Management Fee | $524 per vessel per day subject to an annual adjustment based on the OECD Consumer Price Index for "OECD – total, all items" plus reimbursement of the documented expenses associated with the technical operations that are outsourced, and other expenses allowed for under the Citi Silo Management Agreement, including administrative costs historically paid for directly by the vessels. |
| Term | Evergreen subject to the termination provisions set forth below. |

---

[3]    "Manager" shall mean Synergy Management Services Limited.

| Provision | Terms |
|---|---|
| Termination | Terminable without cause by either party with 60 days' notice. In the case of a sale of all or some of the vessels in which the Citi Silo Management Agreement is terminated for such vessels, then Synergy Management Services Limited will receive a partial severance based on the management fee (i.e., $524 x 180 days x number of vessels sold). |
| Severance | In event of termination by any of the Reorganized Citi Silo Debtors not for cause, the Manager shall be entitled to a termination payment equal to 6 months of management fees paid in a lump sum upon the end of the 60 day notice period or other date mutually agreed upon by the parties. |
| Approval Rights | The Reorganized Citi Silo Debtors or the boards of directors of the Reorganized Citi Silo Debtors (or the board of directors of Debtor Nautilus Shipholdings No. 3 Limited on their behalf), will be required to approve, among other things, (i) any new charter agreements for any of the Reorganized Citi Silo Debtors; and (ii) dry dock budgets for any of the Reorganized Citi Silo Debtors. |
| Information | Full information and financial disclosure to be provided by the Manager to each of the Reorganized Citi Silo Debtors through a monthly report the form and substance of which will be agreed upon as part of the definitive documentation of the Citi Silo Management Agreement including but not limited to: monthly TCE rates; positioning report; financial performance by vessel and any unusual items. |

**Exhibit D**

**Terms of Citi Silo Reorganized Citi Silo Debtors Intercompany Note**

| Provision | Terms |
|---|---|
| Issuer | Each of the Reorganized Citi Silo Debtor vessel-owning subsidiaries. |
| Lender | Reorganized Nautilus Shipholdings No. 3 Limited. |
| Principal Amount | $100-120 million. |
| Interest | 1.0% per annum, which interest may be capitalized as PIK interest. |
| Maturity | 10 years. |
| Collateral | The Note shall be secured by a perfected first priority security interest in and liens on the vessels owned by each of the Issuers. |

**Exhibit E**

**DVB Term Sheet**

**EXECUTION VERSION**

This term sheet (the "Term Sheet") and all annexes hereto reference a restructuring transaction (the "Restructuring") pursuant to which  DVB Bank SE ("DVB") agrees to support, and Nautilus Holdings Limited ("NHL"), Nautilus Holdings No. 2 Limited ("NH2L") and their debtor subsidiaries and affiliates (collectively, the "Debtors") agree to the terms of (1) a restructuring of certain obligations owed to DVB by Metropolitan Harbour Limited, Golden Knighthead Limited, and / or Nautilus Shipholdings No. 2 Limited with respect to the DVB Facilities (defined below), to be contained within a plan of reorganization proposed by the Debtors and filed in connection with their cases commenced under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), (2) the use of DVB's cash collateral ("DVB Cash Collateral") by Metropolitan Harbour Limited, Golden Knighthead Limited, and / or Nautilus Shipholdings No. 2 Limited, and (3) the debtor in possession facility (the "DIP Facility") proposed by the Debtors.  To the extent that the agreement of Synergy Management Services Limited ("Synergy"), Reminiscent Ventures S.A. ("Reminiscent") and Elektra Limited ("Elektra") to the terms of the Restructuring set forth herein is required, Synergy, Reminiscent and Elektra shall be parties to this Term Sheet solely to such extent.

Agreement to the terms and conditions in this Term Sheet and in negotiations between DVB and the Borrowers (as defined herein) remains subject to approval by the Bankruptcy Court for the Debtors to enter into this Term Sheet. This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the definitive documentation governing the Restructuring, such as terms that do not impact the DVB Facilities or the Borrowers' obligations with respect thereto, all of which remain subject to further discussion and negotiation between the Debtors on the one hand and their respective lender or lender group on the other.

**EXECUTION VERSION**

| Term Sheet | |
|---|---|
| **DVB Facilities** | The "DVB Facilities" shall mean:<br><br>i.     That certain Loan Agreement, dated as of July 11, 2007, between Golden Knighthead Limited, as borrower, and DVB, as lender, agent, swap bank, and security trustee, and relating to a $91,237,500 facility to finance, in part, the borrower's purchase of the container vessel currently named *M/V Texas* (the "Golden Knighthead Facility") and the various documents executed in connection therewith, including, without limitation, related swap agreement, guaranty, and security documents (together with the Golden Knighthead Facility and, as amended, modified, or supplemented, the "Golden Knighthead Facility Documents"); and<br><br>ii.    That certain Loan Agreement, dated as of July 11, 2007, between Metropolitan Harbour Limited, as borrower, and DVB, as lender, agent, swap bank, and security trustee, and relating to a $91,237,500 facility to finance, in part, the borrower's purchase of the container vessel currently named *M/V Washington* (the "Metropolitan Harbour Facility"), and the various documents executed in connection therewith, including, without limitation, related swap agreement, guaranty, and security documents (together with the Metropolitan Harbour Facility and, as amended, modified, or supplemented, the "Metropolitan Harbour Facility Documents"). |
| **Borrowers** | "Borrowers" shall mean the borrowers under the DVB Facilities (each a "Borrower"). |
| **Acceptable Plan** | "Acceptable Plan" shall mean a plan of reorganization consistent with the terms hereof and otherwise reasonably acceptable to DVB with respect to the terms that materially affect DVB and the restructuring of the DVB Facilities. |
| **Effective Date** | "Effective Date" shall be the date on which an Acceptable Plan shall become effective. |

**EXECUTION VERSION**

| Term Sheet | |
|---|---|
| **Loan Documents** | The Golden Knighthead Facility Documents and Metropolitan Harbour Facility Documents will be amended and restated to reflect their current terms, except as modified in accordance with the terms hereof and as necessary to conform such loan documents to DVB's current form of agreements; *provided, however*, that such modifications shall not materially impact the terms of the Restructuring and shall be in a form reasonably acceptable to the Debtors. |
| **Loan Amount** | • Golden Knighthead Facility:  $73,191,500.<br><br>• Metropolitan Harbour Facility: $73,191,500.<br><br>• Notwithstanding any other provision of this Term Sheet, upon the Effective Date, the principal amount of each of the Golden Knighthead Facility and the Metropolitan Harbour Facility shall be $73,191,500, prior to giving effect to the Initial Pay-Down and Supplemental Pay-Down as set forth herein. |
| **Interest Rate Swap** | The current interest rate swap agreements will continue, subject to the following terms:  Within five (5) days after Bankruptcy Court approval of (a) the use of DVB Cash Collateral, and (b) the RSA (as defined herein) (the last date of such approvals being the "RSA Approval Date"), the Debtors shall pay all overdue swap payments and shall make swap payments in accordance with the applicable loan documents thereafter; *provided, however*, that, at the sole option of the Borrowers, the timing of such payments (other than payments of overdue amounts) shall be aligned with the timing of the Interest Rate Payments described below; and, *provided, further*, that the Debtors shall reimburse DVB for any costs it may incur as a result of the foregoing alignment of payment dates (*e.g.*, breakage costs). |

**EXECUTION VERSION**

| Term Sheet | |
|---|---|
| **Interest Rate Payment** | Within five (5) days after the RSA Approval Date, the Debtors shall pay all overdue interest payments and shall make interest payments in accordance with the applicable loan documents thereafter; *provided*, *however*, that the timing of such interest payments (other than payments of overdue amounts) shall be modified to occur on the final day of each calendar quarter (*i.e.*, March 31, June 30, September 30, and December 31); and, *provided*, *further*, that the first payment of interest following such modification shall include any "stub" portion of the prior interest period such that the Debtors shall pay all interest that has accrued since the prior payment of interest without any duplication of any portion of any interest payment.<br><br>Notwithstanding the foregoing, the Debtors reserve all rights with respect to the application of any Interest Rate Payments made to the extent that the Restructuring is not consummated on the terms set forth herein. |
| **Maturity Date** | • Golden Knighthead Facility:  June 30, 2023.<br><br>• Metropolitan Harbour Facility:  June 30, 2023. |
| **Interest Rate** | Rate increased to LIBOR + 2.25% per annum for both facilities. |
| **Cash Sweep and Amortization** | From the Effective Date until December 31, 2017, the DVB Facilities shall be repaid via a Cash Sweep calculation as follows:<br><br>• "Excess Cash"  shall be calculated quarterly in arrears and based upon the unaudited management accounts for the preceding financial quarter, commencing from the Effective Date and quarterly (the first such calculation being performed 45 days after the end of the first full quarterly accounting period following the Effective Date) thereafter as follows:<br><br>• Cash at the end of the applicable quarter;<br><br>• *Plus or minus* changes in trade payables/receivables in the applicable quarter;<br><br>• *Minus* debt service obligations scheduled to be paid in the quarter following the quarter for which the Excess Cash calculation is being performed (including principal, interest, swap payments, and fees); |

**EXECUTION VERSION**

| Term Sheet |
|---|
| <ul><li>*Minus* amounts deposited into the applicable Dry Dock Reserve Account and  any restricted cash (*i.e.*, Reserve Account balance, Retention Account balance, and any cash collateralized obligations);</li><li>*Minus* $2,000,000 per vessel.</li></ul><br><ul><li>Each Borrower shall provide a provisional calculation of Excess Cash within three (3) business days after the final day of the three (3) month period to which the notice relates.  Each Borrower shall provide DVB with confirmation of the amount of Excess Cash within 45 days after the provisional calculation.  Within three (3) days of the applicable Borrower's sending its confirmation, DVB shall be authorized to transfer 100% of the Excess Cash, per the confirmed calculation, from the applicable vessel's Operating Account into the Retention Account where it will be held until the date of the next quarterly repayment / loan rollover when it will be applied in reduction of the amount outstanding under the applicable facility documents.   A Borrower's failure to provide a confirmed calculation as set forth in this paragraph shall be a default under the loan documents.</li></ul><br><ul><li>All applications as a result of the Cash Sweep will be in the inverse order of maturity.</li></ul><br><ul><li>For the avoidance of doubt, after giving effect to the cash sweep, Borrowers' cash position in their operating accounts will not be less than $2,000,000 per vessel.</li></ul><br>Commencing at the quarter end following the second anniversary of the Effective Date (*i.e.*, March 31, 2017) onwards, the DVB Facilities shall be repaid as follows:<br><ul><li>For 2017, quarterly repayments of $500,000 per vessel, per quarter shall be made.</li></ul><br><ul><li>For 2018 and beyond, quarterly repayments of $1,000,000 per vessel, per quarter, shall be made.</li></ul><br><ul><li>The first of such repayments shall fall due on the first quarter end following the second anniversary of the Effective Date (*i.e.*, March 31, 2017) for each of the Metropolitan Harbour and the Golden Knighthead Facilities.</li></ul> |

**EXECUTION VERSION**

| Term Sheet | |
|---|---|
|  | • Additionally, the Cash Sweep shall continue under the methodology outlined above until LTV drops below 80%, at which time the Cash Sweep shall be suspended and the Borrowers shall continue with scheduled amortization payments. <br><br> • A balloon payment equal to the remaining principal and interest outstanding on each vessel loan shall be paid on the Maturity Date. |
| **Pay-Down of Principal** | • All amounts currently held in the Reserve Accounts (currently approx. $27,066,127 in aggregate) shall at all times be held by the Borrowers in the Reserve Accounts unless expended in accordance with (a) this Term Sheet, (b) the order authorizing use of the DVB Cash Collateral on a final basis, or (c) the current and future 13 week cash flow reporting provided by the Borrowers. <br><br> • On the Effective Date, the Borrowers shall pay not less than $13,000,000 in aggregate to reduce the outstanding principal of the DVB Facilities (the "Initial Pay-Down"). The Initial Pay-Down shall be applied in an equal amount for each Borrower and in the inverse order of maturity. <br><br> • On the Effective Date, the Borrowers shall have a minimum liquidity position of $5,000,000 in aggregate, after giving effect to all accrued and unpaid professional fees ("Initial Free Liquidity Requirement"). <br><br> • If, after giving effect to the Initial Pay-Down and taking into account the accrued and unpaid fees and expenses of the Debtors' and DVB's professionals, the Borrowers' Operating Accounts and Reserve Accounts hold cash in excess of the Initial Free Liquidity Requirement, then all such amounts shall be immediately transferred to the appropriate Retention Account and applied to reduce the outstanding principal of the DVB Facilities in an equal amount for each Borrower and in the inverse order of maturity (the "Supplemental Pay-Down"). |

| **Term Sheet** | |
|---|---|
| **Shortfall Guarantee** | • After the Effective Date, Synergy will ensure that the Borrowers continue to have sufficient liquidity to meet operating costs and meet the debt service obligations as detailed herein, subject always to a maximum liability of $2,500,000 in the aggregate.  This commitment will be in the form of a shortfall guarantee (the "Shortfall Guarantee") for up to $2,500,000 in aggregate, and shall be used as necessary to cover such costs and expenses.<br><br>• Any drawings under the Shortfall Guarantee shall be evidenced to the Lender and an account shall be maintained of drawings under this arrangement.  Such account shall be notified to DVB on a quarterly basis and verified on an annual basis.  Any amount advanced under this arrangement shall be non-interest bearing.  Monies drawn by the Borrowers pursuant to the Shortfall Guarantee shall be repaid to Synergy if, in DVB's reasonable discretion, the applicable Borrower will be in compliance with all covenants immediately after giving effect to such repayment.  Any such repayment shall be made from Excess Cash on a 50/50 basis with amounts to be repaid under the applicable loan, subject to a minimum threshold of $100,000.  Any such repayment shall reinstate the availability of such amount under the Shortfall Guarantee.<br><br>• In the event that the Shortfall Guarantee is fully drawn at any time after the end of the first quarter following the second year anniversary of the Effective Date (*i.e.*,  March 31, 2017), the Borrowers may elect in writing, and DVB shall so consent, to cause the waiver of the  obligation to make one or more of the subsequent scheduled quarterly amortization installments for the calendar year January 1, 2017 through December 31, 2017; *provided*, *however*, that any such waiver shall not in any way alter the Debtors' obligation during any waiver period to comply with the Cash Sweep of Excess Cash. |
| **LTV Covenant** | • LTV covenant waiver until December 31, 2017.<br><br>• From January 2018 onwards, the ratio of the total amount outstanding under the applicable facility documents (excluding the mark to market value of any hedging instruments on a quarterly basis as of quarter end) compared to the combined FMV of the applicable vessel must not exceed the following percentages: |

**EXECUTION VERSION**

| Term Sheet | |
|---|---|
| | <ul><li>Until December 31, 2018: 115%</li><li>Until December 31, 2019: 110%</li><li>Until December 31, 2020: 95%</li><li>Thereafter: 80%</li></ul><br><ul><li>Should the FMV of the vessel fail to meet the minimum level, DVB shall have the right to require the Borrower and / or the Guarantor to prepay a portion of the applicable facility, sufficient to restore compliance, within 30 days, or to provide additional security, such additional security to be of a form and substance reasonably acceptable to DVB. Any additional security will remain in place for a minimum six (6) months following the date upon which the FMV of the vessel is sufficient to once again comply with the LTV covenant.</li></ul> |
| **Minimum Cash Covenant** | The current minimum cash covenant shall be modified to require each Borrower to maintain a minimum cash balance of $500,000 per vessel. This amount shall be measured on an aggregate basis (excluding monies held in any Reserve, Retention, and Dry Dock Reserve Account) and shall be retained in the Operating Accounts. |
| **Dry-Dock Reserve Account** | <ul><li>Withhold 20% of dry-docking budget per annum per vessel in a special reserve account to finance dry-docking costs.</li><li>Special reserve account to be pledged as security for applicable facility.</li></ul> |

**EXECUTION VERSION**

| Term Sheet |
|---|

| **Operating / Retention and Dry-Dock Reserve Accounts** | • The Borrowers shall open new Operating Accounts on or before the Effective Date, which shall be used for the collection of revenue for each vessel.<br><br>• The Borrower shall also open Retention Accounts and Dry-Dock Reserve Accounts on or before the Effective Date. On the last business day of each month following the Effective Date, each Borrower shall make monthly deposits into the applicable Retention Account equal to one-third (1/3) of the next due interest and principal payment, if any such principal payment is scheduled to be paid in the following quarter.<br><br>• All accounts of the Borrowers shall be pledged to DVB as security for the DVB Facilities and, at the sole option of DVB, all accounts of the Borrowers shall be maintained with DVB; *provided, however*, that all banking-related fees charged to the Borrowers in connection with such accounts shall be no greater than the fees charged to the Borrowers in connection with the Borrowers' existing banking facilities. |

| Term Sheet | |
|---|---|
| **Management Fee** | • Commencing with the first management fee payment to come due after the RSA Approval Date, the portion of the monthly management fee (the "Synergy Management Fee") payable by the Borrowers towards the payment made to Synergy shall be reduced to $25,000 per vessel per month (subject to annual adjustment of 3% for inflation) for the remainder of the term of the Synergy management agreement and for any future extensions or renewals thereof or replacements thereto (any increase in fees for subsequent terms to be subject to DVB's consent, not to be unreasonably withheld).<br><br>• If all of the obligations under the Golden Knighthead Loan Documents and Metropolitan Harbour Loan Documents have been satisfied, DVB shall have no objection to the payment of 1% of gross proceeds received from the disposition of any vessel being paid to Synergy.<br><br>• Debtors to return the portion of the Synergy Management Fee paid by the Borrowers and currently pooled at NHL (*i.e.*, 40% of amounts upstreamed by the Borrowers for payment of the Synergy Management Fee since commencement of bankruptcy cases) upon the Effective Date, except to the extent such amounts may be used to repay the DIP Facility as set forth in this Term Sheet. |
| **Dividends / Shareholders Loans** | The prior written consent of DVB shall be required for any dividend, repayment of existing shareholder loans, or grant of new shareholder loans. |
| **Reporting Requirements** | In addition to existing reporting requirements, each Borrower shall provide:<br><br>i. Evidence Supporting the Cash Sweep Payment – Borrower shall deliver to DVB, not more than 45 days after the relevant quarter end date, the documentary evidence satisfactory to DVB, acting in its reasonable discretion, which demonstrates with regard to the relevant quarter the following:<br><br>• Status of the vessel, including any changes in class certificates / class status;<br><br>• The unaudited management accounts which show the results of the operation of the vessel during the preceding financial quarter and the daily operating costs of the vessel, |

**EXECUTION VERSION**

| Term Sheet | | |
|---|---|---|
| | | its balance sheet and its profit and loss accounts and which are certified as to their correctness by a duly authorized signatory of the Borrowers. |
| | ii. | <u>Operating Costs</u> – Annual budgets of the operational expenses of each of the Vessels to be presented by the Borrower to DVB not more than 70 days after the end of each calendar year and agreed to by DVB within five (5) business days thereafter (quarterly variance reports to be provided not more than 45 days after the relevant quarter end date).  If, in the reasonable opinion of DVB, there is a material degradation in the performance with respect to the operational expenses of the vessel, the Borrower will (i) obtain a detailed explanation from the technical manager and (ii) provide an action plan satisfactory to DVB setting out how to deal with the underperformance. |
| **Cross-collateralization and Treatment of Shareholder Loans** | • | The Metropolitan Harbour Facility shall be further secured on a junior basis by the collateral securing the Golden Knighthead Facility and *vice versa*. |
| | • | On the Effective Date, all existing shareholders loans shall be extinguished or converted into equity, which shall be subject to existing share pledges in favor of DVB. |

| Term Sheet | |
|---|---|
| **Management Agreement** | Synergy management agreement to remain in effect for the duration of its term, subject to the Debtors' rights to terminate contained within such agreement. DVB hereby consents to any subsequent management agreement with Synergy; provided, that (i) with respect to the Borrowers, Synergy shall be entitled to compensation under such subsequent management agreement solely in accordance with the Management Fee provision set forth herein, and (ii) any other material provisions shall be subject to the mutual consent of the parties, such consent not to be unreasonably withheld |
| **Technical Management** | Technical Management of *M/V Washington* and *M/V Texas* to be performed by third-party technical manager mutually acceptable to DVB and the Borrowers chosen from industry-recognized Technical Managers, including, without limitation, those technical managers set forth on Schedule A hereto (the "Technical Manager List"), each of which shall be deemed mutually acceptable to DVB and the Borrowers; *provided*, *however*, that, upon mutual agreement, the parties may remove any entity from the Technical Manager List and, upon mutual agreement, the parties may add any entity to the Technical Manager List. Such removals or additions to the Technical Manager List shall be deemed to occur on December 31st of the year in which notice was given or mutual agreement was made. |
| **Operation in the Ordinary Course** | The Debtors shall continue to operate the Borrowers' vessels in the ordinary course of business consistent with past practices. |
| **Lender's Fees & Expenses** | To the extent not already paid, the Debtors shall pay DVB's properly incurred fees and expenses on DVB's demand on a reasonably prompt basis. |
| **Releases** | As of and conditioned upon the occurrence of the Effective Date:<br><br>• Standard / customary mutual release between DVB, on the one side, and the Debtors on the other (to the extent claims are not otherwise released pursuant to an order of the bankruptcy court); and<br><br>• Standard / customary mutual release between DVB, on the one side, and Synergy, Reminiscent and Elektra on the other.<br><br>• The Debtors and Reminiscent shall release any claims they may hold against DVB arising from or related to any fee |

| Term Sheet | |
|---|---|
| | or charge or the application of an alternative rate of interest to the DVB Facilities, including, without limitation, breakage fees or market disruption interest.<br><br>• For the avoidance of doubt, neither the Debtors, Synergy, Reminiscent, Elektra nor DVB shall be released from any obligations under this Term Sheet, the Restructuring Support Agreement ("RSA") (described below), or any claims of any of the parties hereto arising out of actions or inactions in connection with the restructured DVB Facilities, but solely to the extent that such claims arise after the Effective Date and are not  pre-petition claims or otherwise discharged and released in the Restructuring.<br><br>• For the further avoidance of doubt, the release of Elektra by DVB shall be conditioned upon receipt of a representation from Andreas Papathomas that he owns or controls Elektra<br><br>• Reminiscent, Elektra and Synergy agree to be parties to a Restructuring Support Agreement as set forth below and to support the Debtors' motion for Bankruptcy Court approval of this Term Sheet and an Acceptable Plan. |
| **DIP Financing and Use of Cash Collateral** | The Debtors acknowledge that the agreement of DVB to consent to the Debtors' request to use the DVB Cash Collateral and DIP financing (as modified herein) is in consideration of the Debtors' adherence to the terms and milestones set forth herein unless otherwise mutually agreed upon by the parties. |

**EXECUTION VERSION**

| Term Sheet | |
|---|---|
| **Limits on Use of Cash Collateral** | • Use of the DVB Cash Collateral and any final order authorizing same shall terminate on January 31, 2015 (the "<u>Effective Date Deadline</u>"), subject to the Borrowers' right to seek an extension of time from the Bankruptcy Court to use the DVB Cash Collateral.<br><br>• The Debtors shall not modify the current allocation of restructuring professional fees among the prepetition lenders in any way that would increase the percentage of such fees currently allocated to DVB.  For the avoidance of doubt, nothing herein shall affect DVB's rights to object to any request for payment or allowance of fees or expenses submitted to the Bankruptcy Court.<br><br>• For the duration of the chapter 11 cases, the Debtors shall provide DVB with a rolling 13-week budget for the Borrowers on not less than seven (7) days' notice.  DVB may request an explanation for any item in the Debtors' budget for the Borrowers within three (3) days after receipt of same. Notwithstanding the foregoing, the prior written consent of DVB, not to be unreasonably withheld, shall be required for the expenditure of amounts in excess of the greater of $50,000 and 15% more than the sum of the line items titled Total Disbursements and Total Management Fees of the Debtors' weekly budget for the Borrowers. |
| **Conditions to use of DIP Facility** | • Notwithstanding anything to the contrary in any DIP Facility document, including, without limitation, the interim and final orders authorizing the DIP Facility (the "<u>DIP Orders</u>"), the existing encumbrances on the assets of the Borrowers and / or Nautilus Shipholdings No. 2 Limited in favor of DVB and any lien on such assets securing any obligation under the Golden Knighthead Loan Documents or Metropolitan Harbour Loan Documents now or hereafter held by DVB, regardless of how acquired, shall be senior in all respects and prior to the any claim, lien, or interest granted in connection with the DIP Facility; *provided*, *however*, that the preceding sentence does not include any claims for payment of fees and expenses of the DIP Lender, to the extent allowed as set forth in the DIP Facility, or for any amounts payable under the Carve-Out (as defined in the DIP Orders).<br><br>• Except as set forth herein, obligations under the DIP Facility shall not be satisfied before the full and complete satisfaction |

**EXECUTION VERSION**

| Term Sheet |
|---|

| | of all obligations under the Golden Knighthead Loan Documents or Metropolitan Harbour Loan Documents; *provided, however*, that DVB shall consent to the use of up to $250,000 from the portion of the Synergy Management Fee paid by the Borrowers and currently pooled at NHL (*i.e.*, 40% of amounts upstreamed by the Borrowers for payment of the Synergy Management Fee since commencement of bankruptcy cases) to satisfy obligations under the DIP Facility (whether arising under an interim or final order); and, *provided, further*, that the Borrowers shall have no further liability for DIP Facility obligations until the full and complete satisfaction of all obligations under the Golden Knighthead Loan Documents and Metropolitan Harbour Loan Documents. |
|---|---|
| | • In addition, DVB shall have the exclusive right to enforce rights, exercise remedies and make determinations regarding the release, disposition, or restrictions with respect to any assets securing any obligation under the Golden Knighthead Loan Documents or Metropolitan Harbour Loan Documents, without any consultation with, or consent of, Synergy in its capacity as lender under the DIP Facility; *provided, however*, that nothing herein shall be deemed a modification of the automatic stay and all parties rights with respect thereto are expressly reserved. |
| **Milestones** | • The Debtors agree to pursue an Acceptable Plan consistent with this Term Sheet, in good faith.  DVB agrees to support an Acceptable Plan and the Debtors' continued use of the DVB Cash Collateral consistent with the terms hereof; *provided*, that: |
| | • The Bankruptcy Court shall enter an order authorizing the Debtors' entry into  this Term Sheet, in connection with approval of the RSA or otherwise; |
| | • The Motion seeking approval of the RSA shall be filed with the Bankruptcy Court contemporaneously with or prior to the entry of an order approving the Debtors' use of the DVB Cash Collateral; *provided, however*, that the RSA shall be in a form mutually agreeable to the parties at the time of filing; |
| | • The Debtors shall file an Acceptable Plan and related |

| Term Sheet |
| --- |

<table>
<tr><td></td><td>

disclosure statement on or before October 15, 2014;

- The Bankruptcy Court shall enter an order approving the disclosure statement for an Acceptable Plan on or before December 1, 2014;

- The Bankruptcy Court shall enter an order confirming an Acceptable Plan on or before January 15, 2015; and

- The Effective Date shall occur on or before January 31, 2015.

- If the Debtors fail to achieve any of the foregoing milestones or fail to comply with the terms and conditions of this Term Sheet, including, without limitation, DVB's consent to the Debtors' use of the DVB Cash Collateral, then the Term Sheet shall terminate and this Term Sheet shall become unenforceable against all parties hereto; *provided*, *however*, that, if the Debtors fail to achieve any of the foregoing milestones after Bankruptcy Court approval of the RSA, then the parties' termination rights shall be governed by those set forth in the RSA, which rights shall expressly preserve DVB's rights to seek termination of the Debtors' rights to use the DVB Cash Collateral, notwithstanding any provision to the contrary in any order previously approved by the Bankruptcy Court. For the avoidance of doubt, the foregoing milestones shall be incorporated into the RSA and the Debtors' failure to achieve any such milestone shall permit DVB to terminate the RSA.

- In the event the Debtors fail to achieve an Effective Date of January 31, 2015 (the "Effective Date Milestone"):

  - The Debtors shall waive any objection to a motion by DVB to shorten the notice period to ten (10) days for a motion to obtain relief from the stay or to terminate exclusivity;

  - DVB shall waive any objection to a motion by the Debtors to shorten the notice period to ten (10) days for a motion to seek approval to use the DVB Cash Collateral (the "DVB Cash Collateral Hearing") and hereby consent to the Debtors' use of DVB Cash Collateral during the interim period between the Effective Date Milestone and

</td></tr>
</table>

**EXECUTION VERSION**

| Term Sheet |
| --- |
| the DVB Cash Collateral Hearing;<br><br>• The Debtors shall make a one-time, non-refundable payment (the "<u>Missed Milestone Payment</u>") in the amount of $1,500,000, which Missed Milestone Payment shall be applied in its entirety to the Pay-Down of Principal; and<br><br>• From the Effective Date Milestone onward, any professional fees expended in the Chapter 11 Cases shall be borne by the Borrowers under the DVB Facilities only to the extent that such professional fees are incurred in connection with the DVB Facilities.<br><br>• For the avoidance of doubt, the foregoing provisions relating to Effective Date Milestones shall survive termination of the Term Sheet and / or the RSA. |

**EXECUTION VERSION**

| Term Sheet |
|---|

| | |
|---|---|
| **Conditions Precedent to Effective Date** | The Effective Date shall not occur, and an Acceptable Plan shall not become effective, unless and until the following conditions are satisfied in full, or waived by DVB (except as set forth below):<br><br>• The Borrowers shall hold sufficient cash in their accounts to satisfy each of the terms and conditions contained in this Term Sheet;<br><br>• On the Effective Date, after giving effect to the Initial Pay-Down and  all accrued and unpaid professional fees, shall have a minimum liquidity position of $5,000,000 in aggregate; *provided*, *however*, this condition may be waived by DVB in its sole discretion;<br><br>• The Borrowers and Nautilus Shipholdings No. 2 Limited shall be in full compliance with the Golden Knighthead Facility Documents and the Metropolitan Harbour Facility Documents, as applicable; *provided*, *however*, that the Borrowers and Nautilus Shipholdings No. 2 Limited shall not be required to (i) satisfy any historic nonpayment defaults or (ii) satisfy any overdue principal amounts, whether coming due by acceleration or otherwise, to be deemed in full compliance as of the Effective Date;<br><br>• The Borrowers shall have satisfied all general unsecured claims entitled to administrative expense priority other than trade claims incurred in the ordinary course of business that are not yet due and payable; and<br><br>• DVB and the Borrowers shall have executed amended and restated Golden Knighthead Facility Documents and Metropolitan Harbour Facility Documents;<br><br>• Additional and mutually reasonable acceptable conditions precedent customary for transactions of this type. |
| **Bankruptcy Filings** | • The RSA, the Acceptable Plan, and any documents to be filed with respect to such documents shall be consistent in all material respects with the parties' agreement as reflected in this Term Sheet and shall be subject to the prior reasonable approval of DVB. |

**EXECUTION VERSION**

| Term Sheet | |
|---|---|
| **Bankruptcy Court Approval** | • DVB, Synergy, Reminiscent, Elektra and the Debtors shall enter into the RSA, which shall contain reasonable and customary terms, and shall jointly seek Bankruptcy Court approval of the RSA and the Debtors' entry into this Term Sheet at a hearing to be held on the date set for approval of the use of the DVB Cash Collateral (such date that the order is entered, the "<u>RSA Approval Date</u>").<br><br>• This Term Sheet may be annexed, in whole or in redacted form (in the Debtors' discretion), as an exhibit to the motion seeking approval of the RSA. |

This Term Sheet does not contain all terms, conditions, and other provisions relating to the Restructuring and the transactions contemplated by this Term Sheet are subject to conditions to be set forth in definitive documents.  Drafts of this Term Sheet constitute a settlement proposal in furtherance of settlement discussions and are entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and any other similar rule or statute. This Term Sheet contains material non-public information and the information contained herein is strictly confidential.  Disclosure of this Term Sheet or the information contained herein in a manner inconsistent with the manner expressly set forth above is prohibited without the express written consent of all parties hereto.

**EXECUTION VERSION**

AGREED TO THIS ___ DAY OF SEPTEMBER, 2014

DVB BANK SE

By: _____
    Name:
    Title:

DVB BANK SE

By: _____
    Name:
    Title:

NAUTILUS HOLDINGS LIMITED
NAUTILUS HOLDINGS NO. 2 LIMITED (ON BEHALF
OF THEMSELVES AND THEIR DEBTOR
SUBSIDIARIES)

By: _____
    Name: Andreas Papathomas
    Title:  Director

GOLDEN KNIGHTHEAD LIMITED
METROPOLITAN HARBOUR LIMITED

By: _____
    Name: Andreas Savvas Maroulletis
    Title:  Director

AGREED TO THIS ___ DAY OF SEPTEMBER, 2014

DVB BANK SE

By: _____

  Name: KEITH MCRAE
  Title: SENIOR VICE PRESIDENT

DVB BANK SE

By: _____

  Name: J. GASCOIGNE
  Title: VICE PRESIDENT

NAUTILUS HOLDINGS LIMITED
NAUTILUS HOLDINGS NO. 2 LIMITED (ON BEHALF
OF THEMSELVES AND THEIR DEBTOR
SUBSIDIARIES)

By: _____

  Name: Andreas Papathomas
  Title:  Director

GOLDEN KNIGHTHEAD LIMITED
METROPOLITAN HARBOUR LIMITED

By: _____

  Name: Andreas Savvas Maroulletis
  Title:  Director

21

**EXECUTION VERSION**

SYNERGY MANAGEMENT SERVICES LIMITED,

By: _____

Name:  ANDREAS PAPATHOMAS

Title:  DIRECTOR

REMINISCENT VENTURES S.A.

By: _____

Name:  ANDREAS PAPATHOMAS

Title:  DIRECTOR

ELEKTRA LIMITED,

By: _____

Name:  ANDREAS PAPATHOMAS

Title:  DIRECTOR

SCHEDULE A

(PRE-APPROVED TECHNICAL MANAGER LIST)

1. [REDACTED

2. [REDACTED]

3. [REDACTED]

4. [REDACTED]

5. [REDACTED]

**Exhibit A-2**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x
- - - - -

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| NAUTILUS HOLDINGS LIMITED, <u>et al.</u>, | : | Case No. 14-22885 (RDD) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - x
- - - - -

### SECOND AMENDED JOINT PLAN OF REORGANIZATION OF NAUTILUS HOLDINGS LIMITED AND CERTAIN OF ITS AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Jay M. Goffman
Mark A. McDermott
Shana A. Elberg
Suzanne D.T. Lovett
Four Times Square
New York, New York 10036
(212) 735-3000

Counsel for the Debtors and Debtors-in-Possession

Dated: November 19January 9, 2014
2015

# TABLE OF CONTENTS

Page

## INTRODUCTION

## ARTICLE I

## DEFINED TERMS AND RULES OF INTERPRETATION

1.1        Accrued Professional Compensation .................................................. 1
1.2        Administrative Claim ........................................................................ 1
1.3        Affiliate ............................................................................................ 1
1.4        Allowed ............................................................................................ 1
1.5        Allowed ~~...~~ Claim ............................................................................ 2
1.6        Amended and Restated ~~Citi~~DVB 1 Facility ...................................... 2
1.7        Amended and Restated DVB ~~1~~2 Facility .......................................... 2
1.8        Amended and Restated ~~DVB 2 Facility~~HSH-YM Credit Agreement .... 2
1.9        Amended and Restated HSH-YM Facility .......................................... 2
1.10       Amended and Restated HSH-YM Facility Documents ........................ 2
~~1.10~~1.11   Avoidance Action ............................................................................. ~~2~~3
~~1.11~~1.12   Ballot ............................................................................................... 3
~~1.12~~1.13   Bankruptcy Code .............................................................................. 3
~~1.13~~1.14   Bankruptcy Court ............................................................................. 3
~~1.14~~1.15   Bankruptcy Rules ............................................................................. 3
~~1.15~~1.16   Bar Date .......................................................................................... 3
~~1.16~~1.17   Business Day .................................................................................... 3
~~1.17~~1.18   Cash ................................................................................................ 3
1.19       Cash Collateral Order ...................................................................... 3
~~1.18~~1.20   Cause of Action ............................................................................... 3
~~1.19~~1.21   Chapter 11 Case(s) .......................................................................... 4
1.22       Citi Agent ........................................................................................ 4
~~1.20~~1.23   Citi Facility Claims .......................................................................... 4
~~1.21~~1.24   Citi Facility Documents .................................................................... 4
~~1.22~~1.25   Citi Facility Swap Claims ................................................................ 4
~~1.23~~1.26   Citi Facility Tranche A Claims ......................................................... 4
~~1.24~~1.27   Citi Facility Tranche B Claims ......................................................... 4
1.28       Citi Lenders .................................................................................... 4
1.29       Citi Retained Funds ......................................................................... 4
1.30       Citi Silo Cash Collateral .................................................................. 4
1.31       Citi Silo Debtors ............................................................................. 5
~~1.25~~1.32   Citi Silo Management Agreement ...................................................... ~~4~~5
1.33       Citi Silo MIP .................................................................................. 5
1.34       Citi Silo Vessels ............................................................................. 5
~~1.26~~1.35   Claim ............................................................................................... ~~4~~5

i

1.27 1.36    Claims Objection Deadline .......................................................... 45
1.28 1.37    Class ............................................................................................ 45
1.29 1.38    Columbia Facility Claims ........................................................... 45
1.30 1.39    Columbia Facility Documents ..................................................... 45
1.31 1.40    Confirmation ................................................................................ 5
1.32 1.41    Confirmation Date ........................................................................ 5
1.33 1.42    Confirmation Hearing ................................................................. 56
1.34 1.43    Confirmation Order ..................................................................... 56
1.35 1.44    D&O Liability Insurance Policies ............................................... 56
1.36 1.45    Debtors ........................................................................................ 56
1.37 1.46    DIP Financing Orders .................................................................. 56
1.38 1.47    Disclosure Statement .................................................................. 56
1.39 1.48    Disputed Claim ............................................................................ 56
1.40 1.49    DVB 1 Facility Claims ................................................................. 56
1.41 1.50    DVB 2 Facility Claims ................................................................. 6
1.42 1.51    DVB RSA ...................................................................................... 6
1.52        DVB Silo Debtors ......................................................................... 7
1.53        DVB Silo Management Agreements ............................................. 7
1.43 1.54    DVB Term Sheet ........................................................................... 67
1.44 1.55    Effective Date .............................................................................. 67
1.45 1.56    Entity ........................................................................................... 67
1.46 1.57    Equity-Related Entities ............................................................... 67
1.47 1.58    Estate(s) ....................................................................................... 67
1.48 1.59    Executory Contract ...................................................................... 67
1.49 1.60    Exhibit ......................................................................................... 67
1.50 1.61    Existing Citi Credit Agreement ................................................... 67
1.51 1.62    Existing Columbia Credit Agreement .......................................... 67
1.52 1.63    Existing DVB 1 Facility Documents ............................................ 68
1.53 1.64    Existing DVB 2 Facility Documents ............................................ 78
1.54 1.65    Existing Flowers Credit Agreement ............................................ 78
1.55 1.66    Existing HSH-YM Credit Agreement ........................................... 78
1.67        Existing HSH-YM Facility Documents ........................................ 8
1.68        Existing NHL Management Agreement ........................................ 8
1.69        Existing NH2L Management Agreement ...................................... 8
1.56 1.70    F-C Consideration ........................................................................ 79
1.57 1.71    F-C Credit Agreements ................................................................ 79
1.58 1.72    F-C Escrow ................................................................................... 79
1.59 1.73    F-C Technical Manager Costs ...................................................... 79
1.60 1.74    F-C Termination Payments .......................................................... 89
1.61 1.75    Final Order .................................................................................. 89
1.62 1.76    Flowers Facility Claims ............................................................... 89
1.63 1.77    Flowers Facility Documents ........................................................ 89
1.64 1.78    General Unsecured Claim ............................................................ 810
1.65 1.79    Holder .......................................................................................... 810
1.80        Holdco ......................................................................................... 10
1.81        Holdco Units ................................................................................ 10

Redline Nautilus - Revised Plan 1893678v14 and Nautilus - Second Amended Plan 1014617v3
1/9/2015 7:49:48 PM

| | | | |
|---|---|---|---|
| ~~1.66~~1.82 | HSH-YM Facility Claims | ~~8~~10 | |
| ~~1.67~~1.83 | HSH-YM Facility ~~Documents~~ | ~~8~~Secured Parties | 10 |
| ~~1.68~~1.84 | Impaired | ~~8~~10 | |
| ~~1.69~~1.85 | Intercompany Claim | ~~8~~10 | |
| ~~1.70~~1.86 | Intercompany Interest | ~~8~~10 | |
| ~~1.71~~1.87 | Interest | ~~8~~10 | |
| ~~1.72~~1.88 | Lien | ~~9~~10 | |
| 1.89 | LLC Holdco Agreement | 11 | |
| 1.90 | Mediation Agreement | 11 | |
| ~~1.73~~1.91 | Missed Milestone Obligations | ~~9~~11 | |
| ~~1.74~~1.92 | New Credit Facilities | ~~9~~11 | |
| ~~1.75~~ | ~~NHL Management Agreement~~ | ~~9~~ | |
| ~~1.76~~1.93 | NH2L Management Agreement | ~~9~~11 | |
| ~~1.77~~1.94 | Other Priority Claim | ~~9~~11 | |
| ~~1.78~~1.95 | Other Secured Claim | ~~9~~11 | |
| ~~1.79~~1.96 | Participating Lenders | ~~9~~11 | |
| ~~1.80~~1.97 | Person | ~~9~~11 | |
| ~~1.81~~1.98 | Petition Date | ~~9~~11 | |
| ~~1.82~~1.99 | Plan | ~~10~~11 | |
| ~~1.83~~1.100 | Plan Supplement | ~~10~~12 | |
| ~~1.84~~1.101 | Priority Tax Claim | ~~10~~12 | |
| ~~1.85~~1.102 | Professional | ~~10~~12 | |
| ~~1.86~~1.103 | Professional Fee Claim | ~~10~~12 | |
| ~~1.87~~1.104 | Professional Fee Escrow Account | ~~10~~12 | |
| ~~1.88~~1.105 | Professional Fee Reserve Amount | ~~10~~12 | |
| ~~1.89~~1.106 | Proof of Claim | ~~10~~12 | |
| ~~1.90~~1.107 | Reinstated | ~~10~~12 | |
| ~~1.91~~1.108 | Released Party | ~~11~~13 | |
| ~~1.92~~1.109 | Reorganized Debtors | ~~11~~13 | |
| 1.110 | Reorganized Citi Silo Debtors | 13 | |
| 1.111 | Reorganized Citi Silo Debtors Intercompany Note | 13 | |
| 1.112 | Reorganized Citi Silo Debtors' Working Capital | 13 | |
| ~~1.93~~1.113 | Retained Actions | ~~11~~13 | |
| ~~1.94~~1.114 | Schedules | ~~11~~14 | |
| ~~1.95~~1.115 | Secured Claim | ~~11~~14 | |
| ~~1.96~~1.116 | Subordinated 510(b) Claim | ~~11~~14 | |
| ~~1.97~~1.117 | Unexpired Lease | ~~12~~14 | |
| ~~1.98~~1.118 | Unimpaired | ~~12~~14 | |

## ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS

| | | |
|---|---|---|
| 2.1 | Administrative Claims | ~~13~~15 |
| 2.2 | Priority Tax Claims | ~~13~~15 |
| 2.3 | Professional Fee Claims | ~~13~~16 |

Redline Nautilus - Revised Plan 1893678v14 and Nautilus - Second Amended Plan 1014617v3
1/9/2015 7:49:48 PM

# ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

| | | |
|---|---|---|
| 3.1 | Classification And Settlement | ~~14~~16 |
| 3.2 | Treatment Of Classes | ~~15~~18 |
| 3.3 | Enforcement of Subordination Agreements. | 25 |
| ~~3.3~~3.4 | Alternative Treatment | ~~21~~25 |
| ~~3.4~~3.5 | Special Provision Regarding Unimpaired Claims | ~~21~~25 |

# ARTICLE IV

## ACCEPTANCE OR REJECTION OF THIS PLAN

| | | |
|---|---|---|
| 4.1 | Acceptance By Class Entitled To Vote | ~~21~~25 |
| 4.2 | Presumed Acceptance or Rejection Of The Plan. | ~~22~~26 |
| 4.3 | Elimination Of Classes | ~~22~~26 |
| 4.4 | Confirmation Matters. | 26 |
| ~~4.4~~4.5 | Cramdown | ~~22~~26 |

# ARTICLE V

## MEANS FOR IMPLEMENTATION OF THIS PLAN

| | | |
|---|---|---|
| 5.1 | Continued Legal Existence | ~~22~~26 |
| 5.2 | Winding Up Certain Debtors | ~~22~~27 |
| 5.3 | Sources Of Cash For Distribution | ~~22~~27 |
| 5.4 | Approval And Authorization For The New Credit Facilities | ~~22~~27 |
| 5.5 | New Boards Of Reorganized Debtors | ~~22~~27 |
| 5.6 | Corporate Action | ~~23~~27 |
| 5.7 | Preservation Of Retained Actions | ~~23~~27 |
| 5.8 | Effectuating Documents; Further Transactions | ~~23~~28 |
| 5.9 | Exemption From Certain Transfer Taxes And Recording Fees | ~~23~~28 |
| 5.10 | Further Authorization | ~~23~~28 |
| 5.11 | Cancellation Of Existing Securities And Agreements | ~~24~~28 |
| 5.12 | Check the Box Elections. | 28 |

# ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

| | | |
|---|---|---|
| 6.1 | Allowed Claims | ~~24~~29 |
| 6.2 | Distributions For Claims Allowed As Of The Effective Date | ~~24~~29 |
| 6.3 | Interest And Penalties On Claims | ~~24~~29 |
| 6.4 | Means Of Cash Payment | ~~24~~29 |
| 6.5 | Withholding And Reporting Requirements/Allocations | ~~24~~29 |

iv

6.6          Preservation Of Rights ........................................................ 2529

## ARTICLE VII

## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

7.1          Assumption Of Executory Contracts And Unexpired Leases ............ 2530
7.2          Termination of Existing Management Executory Contract. .......... 30
7.27.3       D&O Liability Insurance Policies ............................................ 2631
7.37.4       Indemnification ................................................................. 2631
7.47.5       Cure of Defaults Under Assumed Contracts ............................ 2631

## ARTICLE VIII

## CONFIRMATION AND CONSUMMATION OF THE PLAN

8.1          Condition To Confirmation .................................................. 2732
8.2          Conditions To Effective Date ............................................... 2732
8.3          Waiver Of Conditions ........................................................ 2834

## ARTICLE IX

## EFFECT OF PLAN CONFIRMATION

9.1          Binding Effect .................................................................. 2834
9.2          Revesting Of Assets ........................................................... 2834
9.3          Compromise And Settlement Of Claims, Interests And Controversies ... 2834
9.4          Releases And Related Matters ............................................... 2935
9.5          Discharge Of The Debtors .................................................... 3036
9.6          Injunction ....................................................................... 3137
9.7          Exculpation And Limitation Of Liability ................................. 3137
9.8          Term Of Bankruptcy Injunction Or Stays ................................ 3238
9.9          Post-Confirmation Date Retention Of Professionals .................... 3238

## ARTICLE X

## PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

10.1         Disputed Claims ............................................................... 3238
10.2         Objection Deadline ............................................................ 3238
10.3         Prosecution of Objections ................................................... 3238
10.4         No Distributions Pending Allowance ...................................... 3238

Redline Nautilus - Revised Plan 1893678v14 and Nautilus - Second Amended Plan 1014617v3
1/9/2015 7:49:48 PM

# ARTICLE XI

## RETENTION OF JURISDICTION

11.1          Retention of Jurisdiction.                                    38

# ARTICLE XII

## MISCELLANEOUS PROVISIONS

12.1     Payment Of Statutory Fees .................................................. ~~34~~40
12.2     Amendment Or Modification Of This Plan ......................... ~~34~~40
12.3     Severability Of Plan Provisions ........................................ ~~34~~40
12.4     Successors And Assigns ..................................................... ~~35~~41
12.5     Revocation, Withdrawal, Or Non-Consummation ............. ~~35~~41
12.6     Notice ................................................................................. ~~35~~41
12.7     Governing Law ................................................................... ~~36~~42
12.8     Exhibits .............................................................................. ~~36~~42
12.9     Filing Of Additional Documents ....................................... ~~36~~42
12.10    Conflicts ............................................................................. ~~36~~42

Redline Nautilus - Revised Plan 1893678v14 and Nautilus - Second Amended Plan 1014617v3
1/9/2015 7:49:48 PM

**EXHIBITS**

| | |
|---|---|
| EXHIBIT A | ~~Amended and Restated HSH YM Facility Material Terms~~<u>Mediation Agreement</u> |
| EXHIBIT B | ~~Amended and Restated~~ Citi ~~Facility~~<u>Silo MIP</u> Material Terms |
| EXHIBIT C | Citi Silo ~~Warrants~~<u>Management Agreement</u> Material Terms |
| <u>EXHIBIT D</u> | <u>Terms of Reorganized Citi Silo Debtors Intercompany Note</u> |
| EXHIBIT ~~D~~E | DVB Term Sheet |

Redline Nautilus - Revised Plan 1893678v14 and Nautilus - Second Amended Plan 1014617v3
1/9/2015 7:49:48 PM

## INTRODUCTION

Nautilus Holdings Limited and certain of its affiliates, as debtors and debtors in possession, propose the following joint plan of reorganization for the resolution of the outstanding Claims against and Interests in the Debtors. Reference is made to the Disclosure Statement, distributed contemporaneously herewith, for a discussion of (i) the Debtors' history, business and operations, (ii) a summary and analysis of this Plan, and (iii) certain related matters, including risk factors relating to the consummation of this Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and the DVB RSA, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan prior to its substantial consummation.

## ARTICLE I

## DEFINED TERMS AND RULES OF INTERPRETATION

*Defined Terms.* As used herein, capitalized terms shall have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.1    ***Accrued Professional Compensation*** means, at any date, and regardless of whether such amounts are billed or unbilled, all of a Professional's accrued and unpaid fees (including success fees) and reimbursable expenses for services rendered in the Chapter 11 Cases through and including such date, whether or not such Professional has filed a fee application for payment of such fees and expenses, (i) all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been filed for any such amount) and (ii) after applying any retainer that has been provided by the Debtors to such Professional and not previously applied. No amount of a Professional's fees and expenses denied under a Final Order shall constitute Accrued Professional Compensation.

1.2    ***Administrative Claim*** means a Claim for costs and expenses of administration of the Chapter 11 Cases under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, but not limited to: (a) any actual and necessary costs and expenses, incurred on or after the Petition Date and through the Effective Date, of preserving the Estates and operating the businesses of the Debtors (b) Professional Fee Claims; (c) all fees and charges assessed against the Estates under Chapter 123 of Title 28 of the United States Code; (d) all amounts advanced pursuant to the Bankruptcy Court's DIP Financing Orders; and (e) all other claims entitled to administrative claim status pursuant to an order of the Bankruptcy Court.

1.3    ***Affiliate*** means, with respect to any Person, "affiliate" as defined in section 101(2) of the Bankruptcy Code as if such Person were a Debtor.

1.4    ***Allowed*** means, with respect to a Claim against any Debtor, except as otherwise provided herein, (a) a Claim that is (i) listed in the Schedules as of the Effective

Date as neither disputed, contingent nor unliquidated, and for which no Proof of Claim has been timely filed, or (ii) evidenced by a valid Proof of Claim or request for payment of Administrative Claim, as applicable, filed by the applicable Bar Date, and as to which the Debtors or other parties-in-interest have not filed an objection to the allowance thereof by the Claims Objection Deadline, or (b) a Claim that is Allowed under the Plan or any stipulation or settlement approved by, or Final Order of, the Bankruptcy Court; *provided*, *however*, that any Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court will not be considered "Allowed Claims" under the Plan. Notwithstanding the foregoing, a Claim shall not be Allowed and shall not be entitled to a distribution under the Plan to the extent it has been satisfied prior to the Effective Date. If a Claim is Allowed only in part, references to Allowed Claims include and are limited to the Allowed portion of such Claim. Notwithstanding anything to the contrary herein, no Claim that is disallowed in accordance with Bankruptcy Rule 3003 or section 502(d) of the Bankruptcy Code is Allowed and each such Claim shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

       1.5    ***Allowed ... Claim*** means an Allowed Claim of the particular type or Class described.

       ~~1.6    *Amended and Restated Citi Facility* means that certain amended and restated financing facility in a principal amount of $131,330,000 to be entered into between Reorganized Debtors Vivid Mind Limited, Perpetual Joy Limited, Regal Stone Limited, Charming Energetic Limited, and Dynamic Continental Limited and the Holders of Allowed Citi Facility Claims on the Effective Date, with the material terms set forth on Exhibit B, a form of which will be filed as part of the Plan Supplement.~~

       ~~1.7~~1.6 ***Amended and Restated DVB 1 Facility*** means that certain amended and restated financing facility in a principal amount not to exceed $73,191,500 (exclusive of swap obligations) among the Reorganized Debtors Golden Knighthead Limited, as borrower, Nautilus Shipholdings No. 2 Limited, as guarantor, and the lenders party thereto as reflected in amended and restated forms of the Existing DVB 1 Facility Documents, which shall be filed as part of the Plan Supplement and entered into on the Effective Date.

       ~~1.8~~1.7 ***Amended and Restated DVB 2 Facility*** means that certain amended and restated financing facility in a principal amount not to exceed $73,191,500 (exclusive of swap obligations) among the Reorganized Debtors Metropolitan Harbour Limited, as borrower, Nautilus Shipholdings No. 2 Limited, as guarantor, and the lenders party thereto as reflected in amended and restated forms of the Existing DVB 2 Facility Documents, which shall be filed as part of the Plan Supplement and entered into on the Effective Date.

       1.8    ***Amended and Restated HSH-YM Credit Agreement*** means that certain loan agreement with respect to the Amended and Restated HSH-YM Facility, which shall be consistent with the terms set forth in the Mediation Agreement and otherwise in form and substance satisfactory to each of the HSH-YM Facility Secured Parties.

1.9    ***Amended and Restated HSH-YM Facility*** means that certain amended and restated financing facility, evidenced by the Amended and Restated HSH-YM Facility Documents, to be entered into between Reorganized Debtors Able Challenger Limited, Magic Peninsula Limited, Metropolitan Vitality Limited, and Superior Integrity Limited and the Holders of Allowed HSH-YM Facility ClaimsSecured Parties on the Effective Date, with the material terms set forth on Exhibit A, a form of which will be filed as part of the Plan Supplement.

1.10    ***Amended and Restated HSH-YM Facility Documents*** means the Amended and Restated HSH-YM Credit Agreement and all documents, agreements and instruments executed or delivered in connection therewith, which shall be consistent with the terms set forth in the Mediation Agreement and otherwise in form and substance satisfactory to each of the HSH-YM Facility Secured Parties.

1.101.11    ***Avoidance Action*** means any claim or Cause of Action of an Estate arising out of or maintainable pursuant to sections 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code or under any other similar applicable law, regardless of whether or not such action has been commenced prior to the Effective Date.

1.111.12    ***Ballot*** means each of the ballot forms distributed to each Holder of a Claim that is entitled to vote to accept or reject this Plan and on which the Holder is to indicate, among other things, acceptance or rejection of this Plan.

1.121.13    ***Bankruptcy Code*** means Title 11 of the United States Code, as now in effect or hereafter amended, to the extent such amendments apply to the Chapter 11 Cases.

1.131.14    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York, or any other court with jurisdiction over the Chapter 11 Cases.

1.141.15    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

1.151.16    ***Bar Date*** means (i) October 31, 2014 at 5:00 p.m. (Eastern Time), the date by which each Holder of a Claim against any of the Debtors, unless such Claim falls within one of the exceptions, must have filed a Proof of Claim against such Debtor(s); (ii) the later of (a) October 31, 2014 at 5:00 p.m. (Eastern Time) and (b) 5:00 p.m. (Eastern Time) on the date that is 30 days after entry of a Bankruptcy Court order pursuant to which executory contracts or unexpired leases are rejected, the date by which any Holder of a Claim arising on account of any such rejected agreement must have filed a Proof of Claim against the Debtor(s); (iii) the later of (a) October 31, 2014 at 5:00 p.m. (Eastern Time) and (b) 5:00 p.m. (Eastern Time) on the date that is 30 days after the date that notice of any applicable amendment or supplement to the Schedules is served on a claimant, the date by which each Holder of a Claim affected by any such amendment or supplement to the Schedules must have filed a Proof of Claim against such Debtor(s); and (iv) December 22, 2014 at 5:00 p.m.

3

(Eastern Time), the date by which each governmental unit with a Claim against any of the Debtors must have filed a Proof of Claim against such Debtor(s), as applicable in each case.

1.16 1.17    ***Business Day*** means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

1.17 1.18    ***Cash*** means legal tender of the United States of America and equivalents thereof.

1.19    ***Cash Collateral Order*** means that certain Amended Final Order (I) Authorizing the Debtors to Use Cash Collateral and (II) Granting Adequate Protection, Docket No. [___], or as such order has been further amended and approved by the Bankruptcy Court.

1.18 1.20    ***Cause of Action*** means any action, proceeding, agreement, Claim, cause of action, controversy, demand, debt, right, action, Avoidance Action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, recoupment, crossclaim, counterclaim, third-party claim, indemnity claim, contribution claim or any other claim known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether pending in litigation or otherwise, in contract or in tort, in law or in equity or pursuant to any other theory of law, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date.

1.19 1.21    ***Chapter 11 Case(s)*** means (a) when used with reference to a particular Debtor, the case under Chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court and (b) when used with reference to all Debtors, the cases under Chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court.

1.22    ***Citi Agent*** means the administrative agent, including Citibank International Limited f/k/a Citibank International plc or any successor thereto, under the Existing Citi Credit Agreement.

1.20 1.23    ***Citi Facility Claims*** means Claims under the Citi Facility Documents. For the avoidance of doubt, Citi Facility Claims include Claims arising under any swap agreements related to the Existing Citi Credit Agreement, on a pari passu basis subordinated basis, as provided thereby, to Citi Facility Tranche A Claims and Citi Facility Tranche B Claims.

1.21 1.24    ***Citi Facility Documents*** means the Existing Citi Credit Agreement and all related documents, including, but not limited to, guarantees and pledges executed in connection therewith.

1.22 1.25    ***Citi Facility Swap Claims*** means all Claims arising from swap obligations under the Existing Citi Credit Agreement. (i) that certain Master Agreement dated September 25, 2007 by and among Debtors Vivid Mind Limited, Perpetual Joy Limited, Regal

4

Stone Limited, Charming Energetic Limited, and Dynamic Continental Limited and Citibank, N.A. in its capacity as swap bank, or (ii) that certain Master Agreement dated September 25, 2007 by and among Debtors Vivid Mind Limited, Perpetual Joy Limited, Regal Stone Limited, Charming Energetic Limited, and Dynamic Continental Limited and Bank of Scotland plc, in its capacity as swap bank.

1.23 1.26    ***Citi Facility Tranche A Claims*** means Citi Facility Claims to the extent such Claims are senior tranche A claims under the Existing Citi Credit Agreement.

1.24 1.27    ***Citi Facility Tranche B Claims*** means Citi Facility Claims to the extent such Claims are subordinated tranche B claims under the Existing Citi Credit Agreement.

1.28    ***Citi Lenders*** means the lenders, including any successor lenders thereto, that are a party to the Citi Facility Documents.

1.29    ***Citi Retained Funds*** means certain adequate protection payments made by the Debtors to the Citi Agent pursuant to the Cash Collateral Order and held and applied by the Agent in accordance with the Citi Facility Documents and as directed by Clause 3.2(c) of the Plan.

1.30    ***Citi Silo Cash Collateral*** means as of the Effective Date, any and all cash or cash equivalents, of any kind, whether in reserved accounts, blocked accounts or otherwise, including without limitation, any prepetition cash and cash equivalents, in which the Citi Agent or the Citi Lenders have a lien or other interest that secures the Citi Facility Claims.

1.31    ***Citi Silo Debtors*** means Debtors Vivid Mind Limited, Perpetual Joy Limited, Regal Stone Limited, Charming Energetic Limited, Dynamic Continental Limited, and Nautilus Shipholdings No. 3 Limited.

1.25 1.32    ***Citi Silo Management Agreement*** means the vessel management agreement, a form of which will be filed with the Plan Supplement, to be entered into by the Reorganized Citi Silo Debtors Vivid Mind Limited, Perpetual Joy Limited, Regal Stone Limited, Charming Energetic Limited, and Dynamic Continental Limited, and Synergy Management Services Limited, effective as of the Effective Date and for an initial term of (5) years, and providing for a market rate management fee to Synergy Management Services Limited for the vessels securing the Existing Citi Credit Agreement., a form of which shall be filed as part of the Plan Supplement and that shall be consistent with the term sheet attached hereto as Exhibit C and in form and substance satisfactory to the Citi Agent acting at the direction of the Citi Lenders in accordance with the Citi Facility Documents.

1.33    ***Citi Silo MIP*** means the management incentive plan to be implemented by Holdco, a form of which shall be filed as part of the Plan Supplement and that shall be consistent with the term sheet attached hereto as Exhibit B and in form and substance satisfactory to the Citi Agent, acting at the direction of the Citi Lenders in accordance with the Citi Facility Documents.

Redline Nautilus - Revised Plan 1893678v14 and Nautilus - Second Amended Plan 1014617v3
1/9/2015 7:49:48 PM

1.34    *Citi Silo Vessels* means collectively the vessels *MV Rotterdam, MV Hamburg, MV Venezia, MV Corcovado,* and *MV Ital Onesta.*

1.261.35    *Claim* means a "claim" as defined in section 101(5) of the Bankruptcy Code.

1.271.36    *Claims Objection Deadline* means (i) ninety (90) days following the Effective Date or (ii) such other later date that the Bankruptcy Court may establish upon a motion by the Debtors or Reorganized Debtors, which motion may be approved without a hearing and without notice to any party.

1.281.37    *Class* means a category of Claims or Interests, as described in Article III hereof.

1.291.38    *Columbia Facility Claims* means Claims under the Columbia Facility Documents.

1.301.39    *Columbia Facility Documents* means the Existing Columbia Credit Agreement and all related documents, including, but not limited to, guarantees and pledges executed in connection therewith.

1.311.40    *Confirmation* means the confirmation of this Plan by the Bankruptcy Court under section 1129 of the Bankruptcy Code.

1.321.41    *Confirmation Date* means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

1.331.42    *Confirmation Hearing* means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

1.341.43    *Confirmation Order* means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

1.351.44    *D&O Liability Insurance Policies* means all insurance policies for directors' and officers' liability maintained by the Debtors, including any directors' and officers' "tail policy."

1.361.45    *Debtors* means Nautilus Holdings Limited, Nautilus Holdings No. 2 Limited, Nautilus Shipholdings No. 1 Limited, Nautilus Shipholdings No. 2 Limited, Nautilus Shipholdings No. 3 Limited, Able Challenger Limited, Charming Energetic Limited, Dynamic Continental Limited, Earlstown Limited, Findhorn Osprey Limited, Floral Peninsula Limited, Golden Knighthead Limited, Magic Peninsula Limited, Metropolitan Harbour Limited, Metropolitan Vitality Limited, Miltons Way Limited, Perpetual Joy Limited, Regal Stone Limited, Resplendent Spirit Limited, Superior Integrity Limited, and Vivid Mind Limited. ,

1.37 1.46    ***DIP Financing Orders*** means the Interim Order (I) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001 and 9014 and (II) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code, dated June 25, 2014 [Docket No. 25] and the Second Interim Order (I) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001 and 9014 and (II) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code, dated July 15, 2014 [Docket No. 60].

1.38 1.47    ***Disclosure Statement*** means the disclosure statement (including all exhibits and schedules thereto) relating to this Plan, as amended, modified or supplemented from time to time, and distributed contemporaneously herewith.

1.39 1.48    ***Disputed Claim*** means (a) any Claim as to which the Debtors have interposed an objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, or any Claim otherwise disputed by the Debtors, the Reorganized Debtors, or other party in interest in accordance with applicable law, which objection has not been withdrawn or determined by a Final Order, (b) any Claim scheduled by the Debtors as contingent, unliquidated, or disputed, (c) any Claim which amends a claim scheduled by the Debtors as contingent, unliquidated, or disputed, or (d) any Claim prior to it having become an Allowed Claim.

1.40 1.49    ***DVB 1 Facility Claims*** means Claims under the Existing DVB 1 Facility Documents, including, without limitation, obligations under the related swap agreement.

1.41 1.50    ***DVB 2 Facility Claims*** means Claims under the Existing DVB 2 Facility Documents, including, without limitation, obligations under the related swap agreement.

1.42 1.51    ***DVB RSA*** means that certain restructuring support agreement and exhibits thereto entered into among the Debtors, Reminiscent Ventures S.A., Synergy Management Services Limited, and DVB Bank SE (f/k/a DVB Bank AG), dated September 19, 2014, and approved by order of the Bankruptcy Court dated October 3, 2014.

1.52    ***DVB Silo Debtors*** means Debtors Golden Knighthead Limited and Metropolitan Harbour Limited.

1.53    ***DVB Silo Management Agreements*** means the vessel management agreement to be entered into by (i) Reorganized Golden Knighthead Limited and Synergy Management Services Limited and (ii) Reorganized Metropolitan Harbour Limited and Synergy Management Services Limited, both effective as of the Effective Date and each on terms consistent with the DVB Term Sheet and in form and substance satisfactory to DVB Bank SE, forms of which will be filed with the Plan Supplement.

1.43 1.54    ***DVB Term Sheet*** means the term sheet between the Debtors and DVB Bank SE (f/k/a DVB Bank AG) attached to the DVB RSA and attached hereto as Exhibit D E.

1.44 1.55    ***Effective Date*** means the Business Day this Plan becomes effective as provided in Article VIII hereof.

1.45 1.56    ***Entity*** means "entity" as defined in section 101(15) of the Bankruptcy Code.

1.46 1.57    ***Equity-Related Entities*** means Elektra Limited, Reminiscent Ventures S.A. (and its transferee Antigone Limited), and Synergy Management Services Limited.

1.47 1.58    ***Estate(s)*** means, individually, the estate of any of the Debtors and, collectively, the estates of all of the Debtors created under section 541 of the Bankruptcy Code.

1.48 1.59    ***Executory Contract*** means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.49 1.60    ***Exhibit*** means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement, as amended, modified or supplemented from time to time.

1.50 1.61    ***Existing Citi Credit Agreement*** means that certain Loan and Swap Agreement relating to a US$375,007,950 facility dated September 25, 2007, as amended by that certain Supplemental Agreement dated September 7, 2012, among Debtors Vivid Mind Limited, Perpetual Joy Limited, Regal Stone Limited, Charming Energetic Limited, and Dynamic Continental Limited, as borrowers; Nautilus Shipholdings No. 3 Limited, as guarantor; and Citibank, N.A. and Bank of Scotland plc, as swap banks, Citibank International Limited f/k/a Citibank International plc, as agent and the successor agents thereto, Citibank, N.A., as security trustee, Citigroup Global Markets Limited, as arranger, and Citibank, N.A., Bank of Scotland plc, Lloyds TSB Bank plc, UniCredit Bank AG, Goldman Sachs Bank (Europe) Plc, Goldman Sachs International Bank and Sculptor Investments S.a.r.l. as lenders and the successor lenders thereto.

1.51 1.62    ***Existing Columbia Credit Agreement*** means that certain Loan and Swap Agreement relating to a US$61,200,000 facility dated July 6, 2007, among Debtor Miltons Way Limited, as borrower, Nautilus Shipholdings No. 1 Limited, as guarantor, and HSH Nordbank AG, as lender, swap bank, agent and security trustee.

1.52 1.63    ***Existing DVB 1 Facility Documents*** means that certain Loan Agreement, dated July 11, 2007, between Debtor Golden Knighthead Limited, as borrower, and DVB Bank SE (f/k/a DVB Bank AG), as lender, swap bank, agent and security trustee, relating to a US$91,237,500 financing facility and the various documents executed in connection with that facility, including, without limitation, the related swap agreement, guarantee, and all Finance Documents (as defined in the Loan Agreement).

1.53 1.64    ***Existing DVB 2 Facility Documents*** means that certain Loan Agreement, dated July 11, 2007, between Debtor Metropolitan Harbour Limited, as borrower, and DVB Bank SE (f/k/a DVB Bank AG), as lender, swap bank, agent and security trustee, relating to a US$91,237,500 financing facility and the various documents executed in connection with that facility, including, without limitation, the related swap agreement, guarantee, and all Finance Documents (as defined in the Loan Agreement).

1.54 1.65    ***Existing Flowers Credit Agreement*** means that certain Loan and Swap Agreement relating to a US $150,304,000 facility dated February 12, 2007, among Debtors Findhorn Osprey Limited, Earlstown Limited, Floral Peninsula Limited, and Resplendent Spirit Limited, as borrowers; Nautilus Shipholdings No. 1 Limited, as guarantor, and HSH Nordbank AG, as lender, swap bank, agent and security trustee.

1.55 1.66    ***Existing HSH-YM Credit Agreement*** means that certain Loan and Swap Agreement dated April 12, 2007, as amended, supplemented or otherwise modified from time to time, relating to a facility for the lower of (i) US$237,728,000 and (ii) the aggregate of a percentage of certain vessel construction prices among Debtors Able Challenger Limited, Magic Peninsula Limited, Metropolitan Vitality Limited, and Superior Integrity Limited, as borrowers; Nautilus Shipholdings No. 1 Limited, Findhorn Osprey Limited, Earlstown Limited, Floral Peninsula Limited, Resplendent Spirit Limited, as guarantors; and HSH Nordbank AG, Unicredit Bank AG, and Commerzbank AG and any successors thereto, as lenders; and HSH Nordbank AG, as swap bank, agent and security trustee.

1.67    ***Existing HSH-YM Facility Documents*** means the Existing HSH-YM Credit Agreement and all related documents, agreements and instruments, including, but not limited to, swap agreements, guarantees, mortgages, assignments and pledges, executed or delivered in connection therewith (each as amended, supplemented or otherwise modified from time to time).

1.68    ***Existing NHL Management Agreement*** means that certain management agreement dated November 20, 2006, as amended by that certain deed of amendment dated January 4, 2013, and as may have been amended or supplemented from time to time, between Nautilus Holding Limited, as company and Synergy Management Services Limited, as manager.

1.69    ***Existing NH2L Management Agreement*** means that certain management agreement dated January 4, 2013, as may have been amended or supplemented from time to time, between Nautilus Holding No. 2 Limited, as company and Synergy Management Services Limited, as manager.

1.56 1.70    ***F-C Consideration*** means (a) $2.1 million to be paid on the Effective Date by HSH Nordbank AG, as Holder of all of the Columbia Facility Claims and Flowers Facility Claims, to Resplendent Spirit Limited (for the benefit of all of the borrowers under the F-C Credit Agreements) plus (b) the F-C Escrow.

1.57 1.71    ***F-C Credit Agreements*** means the Existing Columbia Credit Agreement and the Existing Flowers Credit Agreement.

9

1.58 1.72    ***F-C Escrow*** means $200,000 to be placed into escrow by HSH Nordbank AG, as Holder of all of the Columbia Facility Claims and Flowers Facility Claims, for the benefit of the borrowers under the F-C Credit Agreements to cover any F-C Termination Payments.  Any amounts remaining from the $200,000 F-C Escrow after paying all of the F-C Termination Payments shall be returned to HSH Nordbank AG.

1.59 1.73    ***F-C Technical Manager Costs*** means any amounts (1) owed to Univan Ship Management International Limited for post-Effective Date operations pursuant to the technical management agreements relating to the vessels securing the F-C Credit Agreements and (2) any termination, rejection, breakage or similar costs owed to Univan Ship Management International Limited pursuant to the technical management agreements relating to the vessels securing the F-C Credit Agreements; *provided*, *however*, the F-C Technical Manager Costs shall not include any true-up payments for 2013 and 2014.

1.60 1.74    ***F-C Termination Payments*** means termination, rejection, breakage and/or similar payments to any contract counterparties relating to the operation of the vessels securing the F-C Credit Agreements other than F-C Technical Manager Costs.

1.61 1.75    ***Final Order*** means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken for granted.

1.62 1.76    ***Flowers Facility Claims*** means Claims under the Flowers Facility Documents.

1.63 1.77    ***Flowers Facility Documents*** means the Existing Flowers Credit Agreement and all related documents, including, but not limited to, guarantees and pledges executed in connection therewith.

1.64 1.78    ***General Unsecured Claim*** means any Claim against any Debtor other than an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, a Citi Facility Claim, a Columbia Facility Claim, a DVB 1 Facility Claim, a DVB 2 Facility Claim, a Flowers Facility Claim, an HSH-YM Facility Claim, a Subordinated 510(b) Claim, or an Intercompany Claim.

1.65 1.79    ***Holder*** means a holder of a Claim or Interest, as applicable.

1.80    ***Holdco*** means a limited liability company to be formed under the laws of the Republic of the Marshall Islands on or before the Effective Date.  Holdco shall be an affiliate of the Reorganized Citi Silo Debtors.  The material terms of the formation and

10

governance documents for Holdco shall be included in the Plan Supplement and shall be acceptable to the Citi Lenders whose Citi Facility Claims total more than 50 percent of such Claims. As of the Effective Date, Holdco shall not own any equity interest in Reorganized Nautilus Shipholdings No. 2 Limited.

1.81    ***Holdco Units*** means the equity interests in Holdco.

1.66 1.82    ***HSH-YM Facility Claims*** means Claims under the Existing HSH-YM Facility Documents.

1.67 1.83    ***HSH-YM Facility Documents Secured Parties*** means (i) HSH Nordbank AG (as lender, swap bank, agent and security trustee under the Existing HSH-YM Credit Agreement and all related documents, including, but not limited to, guarantees and pledges executed in connection therewith. Facility Documents), (ii) Unicredit AG (as lender under the Existing HSH-YM Facility Documents), and (iii) York Global Finance BDH, LLC (as successor to Commerzbank AG, as lender under the Existing HSH-YM Facility Documents), in each case so long as such parties continue to hold HSH-YM Facility Claims and/or participations and/or sub-participations (whether proprietary or derivative), as applicable.

1.68 1.84    ***Impaired*** means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.69 1.85    ***Intercompany Claim*** means any and all Claims of a Debtor against another Debtor.

1.70 1.86    ***Intercompany Interest*** means an Interest in a Debtor held by another Debtor.

1.71 1.87    ***Interest*** means any equity security, including a limited liability company membership interest, in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized or outstanding shares of capital stock of the Debtors, together with any warrants, options or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto.

1.72 1.88    ***Lien*** means any lien, security interest, pledge, title retention agreement, encumbrance, charge, mortgage or hypothecation.

1.89    ***LLC Holdco Agreement*** means the limited liability company operating agreement governing the formation and governance of Holdco, in form and substance satisfactory to the Citi Lenders whose Citi Facility Claims total more than 50 percent of such Claims.

1.90    ***Mediation Agreement*** means that certain mediation agreement entered into by, among others, the Debtors and the lenders under the Existing HSH-YM Credit Agreement, dated December 10, 2014, attached hereto as Exhibit A.

11

1.73 1.91    ***Missed Milestone Obligations*** means the obligations of the Debtors under the DVB Term Sheet in the event the Debtors fail to achieve an Effective Date of January 31, 2015.

1.74 1.92    ***New Credit Facilities*** means ~~the Amended and Restated Citi Facility,~~ the Amended and Restated DVB 1 Facility, the Amended and Restated DVB 2 Facility, ~~and the~~ Amended and Restated HSH-YM Facility, and the Reorganized Citi Silo Debtors Intercompany Note.

~~1.75    *NHL Management Agreement* means the vessel management agreement to be entered into by Reorganized Nautilus Holdings Limited and Synergy Management Services Limited, effective as of the Effective Date, for management of the vessels securing the Existing DVB 1 Facility Documents and the Existing DVB 2 Facility Documents on terms consistent with the DVB Term Sheet, a form of which will be filed with the Plan Supplement.~~

1.76 1.93    ***NH2L Management Agreement*** means the vessel management agreement to be entered into by Reorganized Nautilus Holdings No. 2 Limited and Synergy Management Services Limited, effective as of the Effective Date and ~~for an initial term of five (5) years, and~~ providing for a market rate management fee to Synergy Management Services Limited for management of the vessels that are indirectly owned by Reorganized Nautilus Holdings No. 2 Limited, ~~a form of which will be filed with the Plan Supplement.~~ which shall be consistent with the terms set forth in the Mediation Agreement and otherwise in form and substance reasonably satisfactory to each of the HSH-YM Facility Secured Parties.

1.77 1.94    ***Other Priority Claim*** means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or Priority Tax Claim.

1.78 1.95    ***Other Secured Claim*** means any Secured Claim, other than a Citi Facility Claim, a Columbia Facility Claim, a DVB 1 Facility Claim, a DVB 2 Facility Claim, a Flowers Facility Claim, or an HSH-YM Facility Claim.

1.79 1.96    ***Participating Lenders*** means (i) the Citi Agent, in its capacity as agent, on behalf of the Citi Lenders; (ii) DVB Bank SE ~~and~~; (iii) HSH Nordbank AG (solely in its capacity as Holder of all of the Columbia Facility Claims and Flowers Facility Claims), and (iv) each of the HSH-YM Facility Secured Parties.

1.80 1.97    ***Person*** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, or other entity.

1.81 1.98    ***Petition Date*** means, with respect to a Debtor, the date on which such Debtor filed its petition for relief commencing its Chapter 11 Case.

1.821.99    ***Plan*** means this Chapter 11 plan of reorganization, including the Exhibits and all supplements, appendices, and schedules hereto, either in its current form or as the same may be altered, amended, supplemented, or modified from time to time.

1.831.100    ***Plan Supplement*** means the compilation of documents and forms of documents, schedules and exhibits to the Plan to be filed by the Debtors, in a form mutually acceptable to the Debtors and the parties affected by the particular document, no later than December 15January 9, 20142015, or such later date with respect to individual documents as the parties affected by such documents agree., *provided, however,* that (a) the Amended and Restated HSH-YM Credit Agreement, (b) the NH2L Management Agreement, (c) documents directly affecting Holders of DVB 1 Facility Claims and (d) documents directly affecting Holders of DVB 2 Facility Claims shall be filed no later than January 15, 2015, or such later date as the parties affected by such documents agree.

1.841.101    ***Priority Tax Claim*** means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

1.851.102    ***Professional*** means (a) any professional employed in these Chapter 11 Cases pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code or otherwise and (b) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

1.861.103    ***Professional Fee Claim*** means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred on or after the Petition Date and prior to and including the Effective Date.

1.871.104    ***Professional Fee Escrow Account*** means an escrow account to be funded with the Professional Fee Reserve Amount by the Debtors and Reorganized Debtors on the Effective Date solely for the purpose of paying all Allowed Professional Fee Claims.

1.881.105    ***Professional Fee Reserve Amount*** means the aggregate Accrued Professional Compensation through the Effective Date as estimated by the Professionals in accordance with Article 2.3(c).

1.891.106    ***Proof of Claim*** means a written proof of Claim filed against any Debtor in the Chapter 11 Cases.

1.901.107    ***Reinstated*** means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest so as to leave such Claim or Interest Unimpaired in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, (ii) reinstating the maturity of such Claim or Interest as such maturity

13

existed before such default, (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, and (iv) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Interest entitles the Holder of such Claim or Interest; *provided*, *however*, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim or Interest is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence, prohibiting certain transactions or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured or reinstated to achieve reinstatement.

1.91 1.108    ***Released Party*** means each of the following: (a) the Debtors; (b) the Participating Lenders; (c) the Citi Lenders; (d) the HSH-YM Facility Secured Parties; (e) the Equity-Related Entities; and (df) with respect to each of the foregoing persons in clauses (a) through (ee), such Person's current and former subsidiaries, Affiliates, members, directors, officers, principals, agents, financial advisors, restructuring advisors, accountants, investment bankers, consultants, attorneys, employees, partners, equity holders,  representatives, and other professionals, in each case, only in their capacity as such.

1.92 1.109    ***Reorganized Debtors*** means the Debtors, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

1.110    ***Reorganized Citi Silo Debtors*** means collectively Reorganized Debtor Nautilus Shipholdings No. 3 Limited, Reorganized Vivid Mind Limited, Reorganized Perpetual Joy Limited, Reorganized Regal Stone Limited, Reorganized Charming Energetic Limited, and Reorganized Dynamic Continental Limited, or, for each of the foregoing entities, any successor thereto.

1.111    ***Reorganized Citi Silo Debtors Intercompany Note*** means that certain intercompany note that Reorganized Nautilus Shipholdings No. 3 Limited, as lender, may enter into on the Effective Date in accordance with Section 3.2(c)(iii)(3) of the Plan with Reorganized Vivid Mind Limited, Reorganized Perpetual Joy Limited, Reorganized Regal Stone Limited, Reorganized Charming Energetic Limited, and Reorganized Dynamic Continental Limited, as borrowers on a joint and several basis substantially on the terms set forth on Exhibit D hereto.

1.112    ***Reorganized Citi Silo Debtors' Working Capital*** means the aggregate amount of Citi Silo Cash Collateral, as determined by the Citi Lenders whose Citi Facility Claims total more than 50 percent of such Claims at least 3 Business Days prior to the Effective Date by the Citi Lenders and communicated in writing to the Citi Silo Debtors, to be retained as working capital by each of Reorganized Vivid Mind Limited, Reorganized Perpetual Joy Limited, Reorganized Regal Stone Limited, Reorganized Charming Energetic Limited, and Reorganized Dynamic Continental Limited.

1.93<u>1.113</u>    ***Retained Actions*** means all claims, Causes of Action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, which any Debtor or any Debtor's Estate may hold against any Person, including, without limitation, (a) claims and Causes of Action brought prior to the Effective Date, (b) claims and Causes of Action against any Persons for failure to pay for products or services provided or rendered by any of the Debtors, (c) claims and Causes of Action seeking the recovery of any of the Debtors' or the Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of any of the Debtors' or the Reorganized Debtors' businesses, including, without limitation, claim overpayments and tax refunds, (d) all Avoidance Actions, and (e) any such claims, Causes of Action, rights of action, suits or proceedings listed in the Disclosure Statement or any schedules filed by the Debtors in these cases, if any; *provided, however*, that Retained Actions shall not include those claims, Causes of Action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, released under Article IX herein.

1.94<u>1.114</u>    ***Schedules*** means the Debtors' schedules of assets and liabilities and statements of financial affairs, filed under section 521 of the Bankruptcy Code and the Bankruptcy Rules, as amended, supplemented, or modified.

1.95<u>1.115</u>    ***Secured Claim*** means a Claim that is secured by a Lien on property in which a Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

1.96<u>1.116</u>    ***Subordinated 510(b) Claim*** means any Claim subordinated pursuant to Bankruptcy Code section 510(b), which shall include (a) any Claim arising from the rescission of a purchase or sale of (i) Interests in any of the Debtors or (ii) debt securities of any of the Debtors, (b) any Claim for damages arising from the purchase or sale of (i) any Interests in any of the Debtors or (ii) debt securities of any of the Debtors, or (c) any Claim for reimbursement, contribution or indemnification on account of any such Claim.

1.97<u>1.117</u>    ***Unexpired Lease*** means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.98<u>1.118</u>    ***Unimpaired*** means a Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

*Rules Of Interpretation And Computation Of Time*.  For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on

Redline Nautilus - Revised Plan 1893678v14 and Nautilus - Second Amended Plan 1014617v3
1/9/2015 7:49:48 PM

such terms and conditions; (c) any reference in this Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections and Articles are references to Sections and Articles of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (j) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; (k) "including" means "including without limitation;" and (l) with reference to any distribution under this Plan, "on" a date means on or as soon as reasonably practicable after that date.

*Exhibits*. All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein, and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court on or after the Petition Date, but in any event, no later than ten (10) Business Days prior to the hearing at which the Bankruptcy Court considers whether to confirm the Plan. Holders of Claims and Interests may obtain a copy of the Exhibits upon written request to the Debtors. Upon their filing, the Exhibits may be inspected (a) in the office of the clerk of the Bankruptcy Court or its designee during normal business hours; (b) on the Bankruptcy Court's website at http://nysb.uscourts.gov (registration required) or (c) at our noticing agent's website at http://dm.epiq11.com/NTH. The documents contained in the Exhibits shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

## ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on this Plan.

2.1    ***Administrative Claims***. On, or as soon as reasonably practicable after, the later of (a) the Effective Date, (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, or (c) the date on which an Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of such Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim. Notwithstanding the foregoing, (*w) any Professional Fee Claim shall not be paid except in accordance with an order of the Bankruptcy Court permitting such payment and in accordance with the DVB Term Sheet or applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, (x) Professional Fee

16

Claims shall be allocated among the Debtors in a manner agreed among the Debtors and the Participating Lenders or ordered by the Bankruptcy Court in accordance with the Cash Collateral Order, (y) any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto, and (z) any Allowed Administrative Claim may be paid on such other terms as may be agreed to between the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors.

2.2    ***Priority Tax Claims***.  The legal and equitable rights of the Holders of Priority Tax Claims are Unimpaired by the Plan.  Unless the Holder of an Allowed Priority Tax Claim and the Debtors agree to a different treatment, on the Effective Date, each Holder of an Allowed Priority Tax Claim shall have such Claim Reinstated.

2.3    ***Professional Fee Claims***.

(a)    Professionals shall submit final fee applications seeking approval of all Professional Fee Claims no later than thirty (30) days after the Effective Date.  These applications remain subject to Bankruptcy Court approval under the standards established by the Bankruptcy Code, including the requirements of sections 327, 328, 330, 331, 363, 503(b) and 1103 of the Bankruptcy Code, as applicable.  Payments to Professionals shall be made upon entry of an order approving such Professional Fee Claims. ~~Allowed Professional Fee Claims shall be apportioned among the Debtors first based upon the ratio between the relevant Debtor's gross revenue for the year ended December 31, 2013 and the aggregate gross revenue for all of the Debtors for the year ended December 31, 2013 (the "2013 Revenue Allocation"); *provided, however,* Professional Fee Claims shall in all events constitute the joint and several liability of all Debtors to the extent provided for in any particular Professional's engagement letter. Notwithstanding anything herein to the contrary, that all payment and apportionment of Professional Fee Claims shall be subject to the DVB Term Sheet.~~

(b)    The Allowed Professional Fee Claims shall be apportioned among the Debtors in accordance with the Cash Collateral Order.

(~~b~~c)    On the Effective Date, the Debtors will establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account will be maintained in trust for the Professionals. The funds in such account will not be property of the Reorganized Debtors except that the Reorganized Debtors shall retain a residual interest to the extent the funds are not used for Allowed Professional Fee Claims. The amount of Professional Fee Claims owing to the Professionals will be paid in Cash to such Professionals by the Reorganized Debtors, or at the Reorganized Debtors' direction, from the Professional Fee Escrow Account, without interest or other earnings therefrom, when such Claims are Allowed by Final Order; *provided, however,* that the Reorganized Debtors' liability for Professional Fee Claims shall not be limited nor be deemed to be limited to the funds available from the Professional Fee Escrow Account. After all Professional Fee Claims have been paid in full, amounts remaining in the Professional Fee

17

Escrow Account, if any, will be transferred to the applicable Reorganized Debtor that provided such excess amounts and subject to the liens of applicable lenders.

(ed)    Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and deliver such estimate to the Debtors and the Participating Lenders at least five (5) days prior to the anticipated Effective Date.  If a Professional does not provide such estimate, the Debtors may estimate the unbilled fees and expenses of such Professional. The total amount so estimated will constitute the Professional Fee Reserve Amount; provided that such estimate will not be considered an admission or limitation with respect to the fees and expenses of such Professional by any party. The Professional Fee Reserve Amount and the estimated Accrued Professional Compensation amounts submitted by the Professionals will be subject to review by the Debtors and the Participating Lenders, and any objections to the Professional Fee Reserve Amount must be served on the Debtors prior to the Effective Date.

## ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

3.1    *Classification And Settlement*.  Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.  Each reference to "Class" or "Classes" shall include all sub-Classes of the respective Class or Classes, as applicable. Subject to the payment of Professional Fees set forth in Section 2.3 and any other joint and several obligations of the Debtors, each Debtor shall be responsible for satisfying the Claims and Administrative Claims against and Interests in such Debtor from such Debtor's assets.

In accordance with section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and holders of Claims and Interests and is fair, equitable and reasonable.

18

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 3 | Citi Facility Claims | Impaired | Yes |
| Class 4 | Columbia Facility Claims | Impaired | Yes |
| Class 5 | DVB 1 Facility Claims | Impaired | Yes |
| Class 6 | DVB 2 Facility Claims | Impaired | Yes |
| Class 7 | Flowers Facility Claims | Impaired | Yes |
| Class 8 | HSH-YM Facility Claims | Impaired | Yes |
| Class 9 | General Unsecured Claims | Impaired | Yes |
| Class 10 | Interests in Nautilus Holdings Limited and Nautilus Holdings No. 2 Limited | Unimpaired | No (deemed to accept) |
| Class 11 | Intercompany Claims | Unimpaired | No (deemed to accept) |
| Class 12 | Intercompany Interests in Other Debtors | Unimpaired | No (deemed to accept) |
| Class 13 | Intercompany Interests in C-F Debtors | Impaired | Yes |
| Class 14 | Intercompany Interests in Nautilus Shipholdings No. 3 Limited | Impaired | ~~Yes~~No (deemed to reject) |

3.2    ***Treatment Of Classes***.

(a)    *Class 1 – Other Priority Claims*

(i)    *Claims In Class:*  Class 1 consists of all Other Priority Claims that may exist against the Debtors.

(ii)    *Treatment:*  On, or as soon as reasonably practicable after, (a) the Effective Date if such Other Priority Claim is an Allowed Other Priority Claim on the Effective Date or (b) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, each Holder of an Allowed Class 1 Other Priority Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Priority Claim, Cash equal to the unpaid portion of such Allowed Other Priority Claim.

(iii)    *Voting:*  Claims in Class 1 are Unimpaired, and the Holders of Allowed Class 1 Other Priority Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject this Plan.

Redline Nautilus - Revised Plan 1893678v14 and Nautilus - Second Amended Plan 1014617v3
1/9/2015 7:49:48 PM

(b)    *Class 2 – Other Secured Claims*

(i)    *Claims In Class:*  Class 2 consists of all Other Secured Claims that may exist against the Debtors.

(ii)    *Treatment:*  On, or as soon as reasonably practicable after, the Effective Date, each Holder of an Allowed Class 2 Other Secured Claim shall have such claim Reinstated, subject to the terms of the DVB Term Sheet.

(iii)    *Voting:*  Claims in Class 2 are Unimpaired, and the Holders of Allowed Class 2 Other Secured Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject this Plan.

(c)    ~~*Classes*~~*Class* ~~*3A and 3B*~~ *– Citi Facility Claims*

(i)    *Claims In Class:*  Class 3 consists of all Citi Facility Claims.  ~~Class 3A consists of Citi Facility Claims to the extent such Claims are Secured. Class 3B consists of Citi Facility Claims to the extent such Claims are not Secured, if any.~~

(ii)    *Treatment:*  The Citi Facility Claims shall be Allowed for all purposes in the aggregate amount of $273,757,991.37.  On, or as soon as reasonably practicable after, the Effective Date, each Holder of an Allowed Class 3~~A~~ Citi Facility Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claims, its pro rata share of (a) the ~~Amended and Restated Citi Facility, and each Holder of an Allowed Class 3B Citi Facility Claim, if any, shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such~~ Citi Retained Funds, (b) the balance of the Citi Silo Cash Collateral after deducting the Reorganized Citi Silo Debtor Working Capital, subject to any deductions authorized by order of the Bankruptcy Court in connection with payment of any Professional Fee Claims, ~~its pro rata share of~~ and (c) 100% of the ~~stock~~ Holdco Units (subject to dilution by ~~warrants)~~ interests distributable under the Citi Silo MIP).  On the Effective Date, Holdco (or any successor thereto) shall own 100% of Reorganized Nautilus Shipholdings No. 3 Limited (or any successor thereto), and Reorganized Nautilus Shipholdings No. 3 Limited shall own 100% of the equity interests in each of Reorganized Vivid Mind Limited, Reorganized Perpetual Joy Limited, Reorganized Regal Stone Limited, Reorganized Charming Energetic Limited, and Reorganized Dynamic Continental Limited, or such other entities that own the Citi Silo Vessels. So long as the Citi Silo MIP is in effect, Holdco shall not transfer the Citi Silo Vessels to entity(ies) that are wholly-owned by all of the then-current equityholders of Holdco (other than the holders of the Citi Silo MIP) for the purpose of depriving the holders of the Citi Silo MIP of the economic benefit of the interests to be issued thereunder.  Notwithstanding anything herein to the contrary, in accordance with Section 3.3 hereof, no distribution shall be made to Holders of Allowed Citi Facility Tranche B Claims ~~until the Holders of Citi Facility Tranche A Claims have been paid in full, and no distribution to Holders of~~ or Allowed Citi Facility Swap Claims ~~shall be made until Holders of Allowed Citi Facility Tranche A Claims and Allowed Citi Facility Tranche B Claims have been paid in full.~~

For the avoidance of doubt, the treatment provided to Holders of Citi Facility Claims shall be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, all Claims arising under the Existing Citi Credit Agreement, and all guarantees relating to the Existing Citi Credit Agreement, including from Nautilus Shipholdings No. 3 Limited, shall be fully released as of the Effective Date.

(iii)    To implement the foregoing, the following shall be deemed automatically to occur in the following order on the Effective Date without any action required by any Person or Holder of an Allowed Class 3 Citi Facility Tranche A Claim:

(1)    Each Holder of an Allowed Citi Facility Tranche A Claim shall exchange its Citi Facility Tranche A Claims for its pro rata share of 100% of the equity interests in Reorganized Nautilus Shipholdings No. 3 Limited;

(2)    Each Holder of equity interests in Reorganized Nautilus Shipholdings No. 3 Limited received in clause (1) above, shall contribute such interests to Holdco and shall receive in exchange for such contribution its pro rata share of the Holdco Units as described above (subject to dilution by interests distributable under the Citi Silo MIP).  The Holders of Allowed Citi Facility Tranche A Claims shall receive Holdco Units in the same percentages as they held in Nautilus Shipholdings No. 3 Limited on the Effective Date.  Holders of Allowed Citi Facility Tranche A Claims shall not be required to execute the Holdco LLC Agreement and shall not be required to execute the Holdco LLC Agreement before receiving their respective distributions of Holdco Units or other interests in Holdco under the Plan; any such Persons who do not execute the Holdco LLC Agreement (in their capacity as members of Holdco) shall be deemed to be parties thereto without further action.  The Holdco LLC Agreement shall be adopted on the Effective Date and shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of Holdco Units shall be bound thereby.

(3)    At the election of the Citi Lenders whose Citi Facility Claims total more than 50 percent of such Claims, the Citi Facility Claims exchanged with Reorganized Nautilus Shipholdings No. 3 Limited in clause (1) above, shall remain outstanding in all or in part as intercompany obligations substantially on the terms set forth on Exhibit D hereto where Reorganized Nautilus Shipholdings No. 3 is the lender and each of Reorganized Vivid Mind Limited, Reorganized Perpetual Joy Limited, Reorganized Regal Stone Limited, Reorganized Charming Energetic Limited, and Reorganized Dynamic Continental Limited a borrower as applicable, and shall have the terms satisfactory to the Citi Lenders whose Citi Facility Claims total more than 50 percent of such Claims, otherwise the Citi Facility Claims shall be cancelled and shall not continue as intercompany obligations between Reorganized Nautilus Shipholdings No. 3 Limited and Reorganized Vivid Mind Limited, Reorganized

21

Perpetual Joy Limited, Reorganized Regal Stone Limited, Reorganized Charming Energetic Limited, and Reorganized Dynamic Continental Limited, *provided, however,* that such intercompany obligations shall not adversely impact or cause the vesting or exercisability of or otherwise adversely affect the interests distributable under the Citi Silo MIP or the Co-Investment Right described on Exhibit B hereto in a manner that is disproportionate to the common equity of Holdco.  In the event of a subsequent third party financing that will trigger the Co-Investment Right, such intercompany obligation may be subordinated, repaid or eliminated.

(iiiiv)    *Voting:*  Claims in ~~Classes~~Class 3~~A and 3B~~ are Impaired. Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 3~~A Citi Facility Claim and each Holder of an Allowed Class 3B~~ Citi Facility Claim is entitled to vote to accept or reject this Plan.

(d)    *Classes 4A and 4B – Columbia Facility Claims*

(i)    *Claims In Class:*  Class 4 consists of all Columbia Facility Claims.  Class 4A consists of Columbia Facility Claims to the extent such Claims are Secured Claims. Class 4B consists of Columbia Facility Claims to the extent such Claims are not Secured Claims, if any.

(ii)    *Treatment:*  On, or as soon as reasonably practicable after, the Effective Date, the Holder of Allowed Class 4A and 4B Columbia Facility Claims shall (1) receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claims, the ~~return~~transfer to it or its nominee of the vessel securing such Claims, free and clear of any liens, claims, or encumbrances, (2) pay the F-C Consideration, and (3) assume the F-C Technical Manager Costs. The Debtors shall use the F-C Consideration to satisfy (i) all claims against the vessels securing the F-C Credit Agreements other than F-C Technical Manager Costs and (ii) amounts advanced to the Debtors obligated under the F-C Credit Agreements pursuant to the Bankruptcy Court's DIP Financing Orders (less the portion of the Synergy management fee paid by Metropolitan Harbour Limited and Golden Knighthead Limited and pooled at NHL, as set forth in the DVB Term Sheet).  For the avoidance of doubt, (1) all guarantees relating to the Existing Columbia Credit Agreement, including from Nautilus Shipholdings No. 1 Limited, shall be fully released as of the Effective Date, and (2) the return of the vessel shall include the transfer of all, to the extent that these items relate to the relevant vessel, (i) receivables, (ii) credits, and (iii) prepayments.  The Debtors shall not accelerate any receivables or the use of any credits or prepayments. For the avoidance of doubt, a transfer of the vessels to the nominee of the Holder of Allowed Class 4A and 4B Columbia Facility Claims shall satisfy the Debtors' obligations in respect of the Allowed Class 4A and 4B Columbia Facility Claims as if they had been transferred to the Holder of such Claims.

(iii)    *Voting:*  Claims in Classes 4A and 4B are Impaired. Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 4A

22

(g)      *Voting:*  Claims in Class 6 are Impaired.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 6 DVB 2 Facility Claim is entitled to vote to accept or reject this Plan.

(h)      *Classes 7A and 7B – Flowers Facility Claims*

(i)      *Claims In Class:*  Class 7 consists of all Flowers Facility Claims. Class 7A consists of Flowers Facility Claims to the extent such Claims are Secured Claims. Class 7B consists of Flowers Facility Claims to the extent such Claims are not Secured Claims, if any.

(ii)      *Treatment:*  On, or as soon as reasonably practicable after, the Effective Date, the Holder of Allowed Class 7A  and 7B Flowers Facility Claims shall (1) receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claims, the ~~return~~transfer to it or its nominee of the vessels securing such Claims, free and clear of any liens, claims, or encumbrances, (2) pay the F-C Consideration, and (3) assume the F-C Technical Manager Costs.  The Debtors shall use the F-C Consideration to satisfy (i) all claims against the vessels securing the F-C Credit Agreements other than F-C Technical Manager Costs and (ii) amounts advanced to the Debtors obligated under the F-C Credit Agreements pursuant to the Bankruptcy Court's DIP Financing Orders (less the portion of the Synergy management fee paid by Metropolitan Harbour Limited and Golden Knighthead Limited and pooled at NHL, as set forth in the DVB Term Sheet). For the avoidance of doubt, (1) all guarantees relating to the Existing Flowers Credit Agreement, including from Nautilus Shipholdings No. 1 Limited, shall be fully released as of the Effective Date, and (2) the return of the vessels shall include the transfer of all, to the extent that these items relate to the relevant vessels, (i) receivables, (ii) credits, and (iii) prepayments.  The Debtors shall not accelerate any receivables or the use of any credits or prepayments. For the avoidance of doubt, a transfer of the vessels to the nominee of the Holder of Allowed Class 7A and 7B Flowers Facility Claims shall satisfy the Debtors' obligations in respect of the Allowed Class 7A and 7B Flowers Facility Claims as if they had been transferred to the Holder of such Claims.

(iii)      *Voting:*  Claims in Classes 7A and 7B are Impaired. Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 7A Flowers Facility Claim and each Holder of an Allowed Class 7B Flowers Facility Claim is entitled to vote to accept or reject this Plan.

(i)      *Class 8 – HSH-YM Facility Claims*

(i)      *Claims In Class:*  Class 8 consists of all ~~Class 8A and Class 8B~~ HSH-YM Facility Claims.  Class 8~~A consists of HSH-YM Facility Claims to the extent such~~ Claims are ~~Secured Claims. Class 8B consists of HSH-YM Facility Claims to the extent such Claims are not Secured Claims~~Allowed.

(ii)      *Treatment:*  On, or as reasonably practicable after, the Effective Date, each Holder of an Allowed Class 8~~A~~ HSH-YM Facility Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such ~~Claims~~Claim, its pro rata share of ~~the tranche A loans under the Amended and Restated HSH-~~

24

~~YM Facility, and each Holder of an Allowed Class 8B HSH-YM Facility Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claims, its pro rata share of the tranche B loans under~~ the Amended and Restated HSH-YM Facility. ~~If 60% or greater of Class 8 votes to accept this Plan, the Amended and Restated HSH-YM Facility shall have the terms set forth in Option A on Exhibit A, in addition to any terms of treatment that the Court orders. If less than 60% of Class 8 votes to accept this Plan, the Amended and Restated HSH-YM Facility shall have the terms set forth in Option B on Exhibit A, in addition to any terms of treatment that the Court orders.~~

For the avoidance of doubt, the treatment provided to Holders of Class 8 HSH-YM Facility Claims shall be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, all ~~Claims arising under the Existing HSH-YM Credit Agreement~~HSH-YM Facility Claims, including any Claims arising from or related to any second-priority liens on the vessels securing the Existing Flowers Credit Agreement, which liens shall be terminated and released.  All guarantees relating to the Existing HSH-YM Credit Agreement, including from Nautilus Shipholdings No. 1 Limited, shall be fully released as of the Effective Date.

        (iii)    *Voting:*  Claims in Class 8 are Impaired.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 8 HSH-YM Facility Claim is entitled to vote to accept or reject this Plan.

        (j)    *Class 9 – General Unsecured Claims*

        (i)    *Claims In Class:*  Class 9 consists of all General Unsecured Claims that may exist against the Debtors. Class 9 consists of 21 subclasses, with each subclass consisting of Claims against a particular Debtor.

        (ii)    *Treatment:*  Within ninety (90) days after the Effective Date or, if such General Unsecured Claim becomes Allowed after the Effective Date, as soon as reasonably practicable after the date at which such General Unsecured Claim becomes Allowed, each Holder of an Allowed Class 9 General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, the amount of such Allowed General Unsecured Claim, excluding interest accrued after the Petition Date.

        (iii)    *Voting:*  Claims in Class 9 are Impaired. Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 9 General Unsecured Claim is entitled to vote to accept or reject this Plan.

(k)    *Class 10 – Interests in Nautilus Holdings Limited and Nautilus Holdings No. 2 Limited*

(i)    *Interests In Class:*  Class 10 consists of all Interests in Nautilus Holdings Limited and Nautilus Holdings No. 2 Limited.

(ii)    *Treatment:*  On the Effective Date, all Class 10 Interests in Nautilus Holdings Limited and Nautilus Holdings No. 2 Limited shall be Reinstated.

(iii)    *Voting:*  Interests in Class 10 are Unimpaired, and the Holders of Allowed Class 10 Interests in Nautilus Holdings Limited and Nautilus Holdings No. 2 Limited are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of  Allowed Class 10 Interests in Nautilus Holdings Limited and Nautilus Holdings No. 2 Limited are not entitled to vote to accept or reject this Plan.

(l)    *Class 11– Intercompany Claims*

(i)    *Claims In Class:*  Class 11 consists of all Intercompany Claims.

(ii)    *Treatment:*  On or prior to the Effective Date, except for Class 11 Intercompany Claims against the Citi Silo Debtors and Class 11 Intercompany Claims that the Citi Silo Debtors have against any non-Citi Silo Debtor, all Class 11 Intercompany Claims may be Reinstated subject to the terms of the DVB Term Sheet or, at the applicable Debtors' or Reorganized Debtors' option, be cancelled or compromised.  A chart of the Intercompany Claims to be cancelled will be filed as part of the Plan Supplement. No distribution shall be made on account of Class 11 Intercompany Claims.

The Class 11 Intercompany Claims between and against the Citi Silo Debtors and any Intercompany Claims that any of the Citi Silo Debtors have between and against any other Debtor shall be deemed cancelled or waived on the Effective Date.

(iii)    *Voting:*  Claims in Class 11 are Unimpaired, and the Holders of Allowed Class 11 Intercompany Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Allowed Class 11 Intercompany Claims are not entitled to vote to accept or reject this Plan.

Redline Nautilus - Revised Plan 1893678v14 and Nautilus - Second Amended Plan 1014617v3
1/9/2015 7:49:48 PM

(m)    *Class 12 – Intercompany Interests in Other Debtors*

(i)    *Interests In Class:*  Class 12 consists of all Intercompany Interests for each Debtor except Nautilus Holdings Limited, Nautilus Holdings No. 2 Limited, Nautilus Shipholdings No. 3 Limited, Miltons Way Limited, Findhorn Osprey Limited, Earlstown Limited, Floral Peninsula Limited, and Resplendent Spirit Limited.

(ii)    *Treatment:*  Except as otherwise provided herein, on or prior to the Effective Date, all Class 12 ~~Other~~ Intercompany Interests in Other Debtors shall be Reinstated.

(iii)    *Voting:*  Interests in Class 12 are Unimpaired, and the Holders of Allowed Class 12 ~~Other~~ Intercompany Interests in Other Debtors are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of  Allowed Class 12 ~~Other~~ Intercompany Interests in Other Debtors are not entitled to vote to accept or reject this Plan.

(n)    *Class 13 – Intercompany Interests in C-F Debtors*

(i)    *Interests In Class:*  Class 13 consists of all Intercompany Interests in Miltons Way Limited, Findhorn Osprey Limited, Earlstown Limited, Floral Peninsula Limited, and Resplendent Spirit Limited.

(ii)    *Treatment:*  On the Effective Date, all Intercompany Interests in Miltons Way Limited, Findhorn Osprey Limited, Earlstown Limited, Floral Peninsula Limited, and Resplendent Spirit Limited shall be deemed to be cancelled without further action by the Debtors or Reorganized Debtors.   Notwithstanding the foregoing, the Holder of such cancelled interests shall receive distribution(s) from the estates of Miltons Way Limited, Findhorn Osprey Limited, Earlstown Limited, Floral Peninsula Limited, and Resplendent Spirit Limited, to the extent there is any cash or assets remaining after the payment of the respective claims of such debtors.

(iii)    *Voting:*  Interests in Class 13 are Impaired. Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 13 Intercompany Interest in C-F Debtors is entitled to vote to accept or reject this Plan

(o)    *Class 14 – Intercompany Interests in Nautilus Shipholdings No. 3 Limited*

(i)    *Interests In Class*:  Class 14 consists of all Intercompany Interests in Nautilus Shipholdings No. 3 Limited.

(ii)    *Treatment*:  ~~Except as otherwise provided herein, on or prior to the Effective Date, each Holder of a~~ Class 14 Intercompany ~~Interest~~ Interests in Nautilus Shipholdings No. 3 Limited shall ~~receive its pro rata share of the warrants described in Exhibit C. A form of warrant agreement shall be filed with~~ be deemed to be cancelled automatically without further action by the Debtors or the Reorganized Debtors and all

27

obligations thereunder shall be discharged in full.  Holders of Intercompany Interests in Nautilus Shipholdings No. 3 Limited shall not receive or retain any property under the Plan Supplementon account of such Interests.

     (iii) *Voting*:  Interests in Class 14 are Impaired. Pursuant The Holders of Class 14 Intercompany Interests are conclusively deemed to have rejected this Plan pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed.  Therefore, the Holders of Class 14 Intercompany InterestInterests in Nautilus Shipholdings No. 3 Limited isare not entitled to vote to accept or reject this Plan,.

   **3.3** ***Enforcement of Subordination Agreements.*** Notwithstanding any provision herein to the contrary, in accordance with section 510 of the Bankruptcy Code, subordination agreements or arrangements to which any Debtor is a party, including but not limited to, any such subordination agreement set forth in the Citi Facility Documents, Columbia Facility Documents, Flowers Facility Documents, HSH-YSM Facility Documents, Existing DVB 1 Facility Documents, and Existing DVB 2 Facility Documents are enforceable, and nothing in the Plan shall affect or otherwise alter any such subordination agreement.

   3.33.4 ***Alternative Treatment***.  Notwithstanding any provision herein to the contrary, any Holder of an Allowed Claim may receive, instead of the distribution or treatment to which it is entitled hereunder, any other distribution or treatment to which it and the Debtors or the Reorganized Debtors may agree in writing.; *provided, however,* that under no circumstance may the Debtor or Reorganized Debtors agree to provide any other distribution or treatment to any Holder of an Allowed Claim that would adversely impair the distribution or treatment provided to any other Holder of an Allowed Claim.

   3.43.5 ***Special Provision Regarding Unimpaired Claims***.  Except as otherwise provided in this Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including but not limited to all rights with respect to legal and equitable defenses to setoffs against or recoupments of Unimpaired Claims.

**ARTICLE IV**

**ACCEPTANCE OR REJECTION OF THIS PLAN**

   4.1 ***Acceptance By Class Entitled To Vote***.  Classes 3, 4, 5, 6, 7, 8, 9, and 13 and 14 are the Classes of Claims of the Debtors that are entitled to vote to accept or reject this Plan.  Classes 3, 4, 5, 6, 7, 8, 9, and 13 and 14 shall have accepted this Plan if (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in each Class have voted to accept this Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in each Class have voted to accept this Plan, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code.  If there are no votes cast in a particular Class that is entitled to vote on the Plan, then the Plan shall be deemed accepted by such Class.

28

4.2    ***Presumed Acceptance or Rejection Of The Plan.***  Classes 1, 2, 10, 11, and 12 are Unimpaired.  Therefore, such Classes are deemed to have accepted this Plan by operation of law and are not entitled to vote to accept or reject the Plan. Class 14 is Impaired and shall not receive or retain any property under the Plan on account of such Interests. Therefore, the Holders of such Claims are conclusively presumed to have voted to reject the Plan by operation of law and are not entitled to vote to accept or reject the Plan.

4.3    ***Elimination Of Classes***.  To the extent applicable, any Class (including, for the avoidance of doubt, any sub-Class) that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed to have been deleted from this Plan for purposes of (a) voting to accept or reject this Plan and (b) determining whether it has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.

4.4    ***Confirmation Matters***.  Notwithstanding the combination of separate plans of reorganization for the Debtors in this joint plan of reorganization for purposes of, among other things, economy and efficiency, this Plan (i) will be deemed a separate chapter 11 plan for the Citi Silo Debtors if the Bankruptcy Court does not confirm this joint Plan with respect to all Debtors, and upon satisfaction of the confirmation requirements of section 1129 of the Bankruptcy Code with respect to the Citi Silo Debtors, the Bankruptcy Court may confirm this Plan as to the Citi Silo Debtors whether or not the Plan is confirmed with respect to any other Debtor and (ii) will be deemed a separate chapter 11 plan for the DVB Silo Debtors if the Bankruptcy Court does not confirm this joint Plan with respect to all Debtors, and upon satisfaction of the confirmation requirements of section 1129 of the Bankruptcy Code with respect to the DVB Silo Debtors, the Bankruptcy Court may confirm this Plan as to the DVB Silo Debtors whether or not the Plan is confirmed with respect to any other Debtor.

4.44.5    ***Cramdown***.  The Debtors request Confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to modify this Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THIS PLAN

5.1    ***Continued Legal Existence***.  Except as otherwise provided in this Plan, each of the Debtors will continue to exist after the Effective Date as a separate legal entity, with all the powers of such an entity (whether a corporation, limited liability company or other entity, as appropriate) under applicable law in the jurisdiction in which each applicable Debtor is incorporated or otherwise formed and pursuant to such Debtor's certificate or articles of incorporation and by-laws or other organizational documents in effect prior to the Effective Date, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date., *provided, however,* that the organizational documents for the Reorganized Debtors Able Challenger Limited, Magic Peninsula Limited, Metropolitan Vitality Limited, and Superior Integrity Limited shall be

amended in a manner consistent with the terms set forth in the Mediation Agreement and otherwise in form and substance reasonably satisfactory to each of the HSH-YM Facility Secured Parties.

        5.2    ***Winding Up Certain Debtors.***  On the Effective Date, Miltons Way Limited, Findhorn Osprey Limited, Earlstown Limited, Floral Peninsula Limited, and Resplendent Spirit Limited shall be deemed dissolved under applicable law for all purposes without the necessity for any other or further actions to be taken by or on behalf of such debtors.

        5.3    ***Sources Of Cash For Distribution***.  All Cash necessary for the Reorganized Debtors to make payments required by this Plan shall be obtained from (a) existing Cash balances, including balances in the applicable Debtors' accounts, (b) the operations of the applicable Debtors or Reorganized Debtors, and (c) the F-C Consideration.

        5.4    ***Approval And Authorization For The New Credit Facilities***.  Confirmation shall be deemed approval of each of the New Credit Facilities and authorization for the Reorganized Debtors to enter into each of the New Credit Facilities and execute such documents as may be required to effectuate the treatment afforded to the applicable lenders pursuant to each of the New Credit Facilities.

        5.5    ***New Boards Of Reorganized Debtors***.  The members of the Boards of the Reorganized Debtors shall be identified in the Plan Supplement. In addition, the members of the Boards of the Reorganized Citi Silo Debtors identified in the Plan Supplement shall be subject to the approval of the Citi Agent acting at the direction of the Citi Lenders.

        5.6    ***Corporate Action***.  Each of the matters provided for under this Plan involving the corporate structure of any Debtor or Reorganized Debtor or any corporate action to be taken by or required of any Debtor or Reorganized Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors or the Reorganized Debtors.

        5.7    ***Preservation Of Retained Actions***.  In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors will retain and may (but are not required to) enforce all Retained Actions. After the Effective Date, the Reorganized Debtors, in their sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), without further approval of the Bankruptcy Court. The Reorganized Debtors or any successors, in the exercise of their sole discretion, may pursue such Retained Actions so long as it is in the best interests of the Reorganized Debtors or any successors holding such rights of action. The failure to specifically list any claim, right of action, suit, proceeding or other Retained Action in this Plan does not, and will not be deemed to, constitute a waiver or release by the Debtors or the Reorganized Debtors of such claim, right of action, suit, proceeding or other Retained Action, and the Reorganized Debtors will retain the right to pursue such claims,

rights of action, suits, proceedings and other Retained Actions in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches will apply to such claim, right of action, suit, proceeding, or other Retained Action upon or after the Confirmation or consummation of this Plan.

5.8     **_Effectuating Documents; Further Transactions_**.  Each of the Debtors and Reorganized Debtors, and their respective officers and designees, is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan, or to otherwise comply with applicable law.

5.9     **_Exemption From Certain Transfer Taxes And Recording Fees_**.  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or to any other Person or entity pursuant to this Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

5.10     **_Further Authorization_**.  The Debtors and the Reorganized Debtors shall be entitled to seek such orders, judgments, injunctions, and rulings as they deem necessary to carry out the intentions and purposes, and to give full effect to the provisions, of this Plan.

5.11     **_Cancellation Of Existing Securities And Agreements_**.  Except as provided in this Plan or in the Confirmation Order (including, without limitation, the amendment and restatement of the Existing DVB 1 Facility Documents and, the Existing DVB 2 Facility Documents, certain of the Existing HSH-YM Facility Documents, and, in each case, related documents executed in connection with this Plan), on the Effective Date, all notes, stock, instruments, certificates, agreements, side letters, fee letters and other documents evidencing or giving rise to Claims and Interests in the Debtors shall be cancelled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote, or other approval or authorization by any Person.  The Holders of or parties to such notes, stock, instruments, certificates, agreements, side letters, fee letters, and other documents shall have no rights arising from or relating to such notes, stock, instruments, certificates, agreements, fee letters, and other documents or the cancellation thereof, except the rights provided pursuant to this Plan and the Confirmation Order.

31

5.12   ***Check the Box Elections***.  Each of the Citi Silo Debtors shall make and file, before the Effective Date, a check-the-box election on Internal Revenue Service Form 8832 (or successor form) (a "CTB Election") to be treated as a disregarded entity for United States federal income tax purposes, effective before the Effective Date.  Holdco shall make and file before the Effective Date, a CTB Election to be treated as a disregarded entity or a partnership, as applicable, for United States federal income tax purposes, effective as of its date of formation.

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

6.1   ***Allowed Claims***.  Notwithstanding any provision herein to the contrary, the Debtors or the Reorganized Debtors shall make distributions only to Holders of Allowed Claims.  A Holder of a Disputed Claim shall receive a distribution on account thereof only when and to the extent that such Holder's Disputed Claim becomes an Allowed Claim.

6.2   ***Distributions For Claims Allowed As Of The Effective Date***.  Except as otherwise provided under this Plan or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable.  Any distribution to be made on the Effective Date pursuant to this Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

6.3   ***Interest And Penalties On Claims***.  Unless otherwise specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest and penalties shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of this Plan.

6.4   ***Means Of Cash Payment***.  Payments of Cash made pursuant to this Plan shall be made, at the option and in the sole discretion of the applicable Reorganized Debtor, by (a) checks drawn on or wire transfer from a domestic bank selected by the Reorganized Debtor, (b) in accordance with the terms of the New Credit Facilities, or (c) by such means as are necessary or customary in a particular foreign jurisdiction.

6.5   ***Withholding And Reporting Requirements/Allocations***.  In connection with this Plan and all distributions hereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration

exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

6.6    *Preservation Of Rights*.  Except as otherwise provided in this Plan, the Reorganized Debtors shall retain all rights arising under section 558 of the Bankruptcy Code or applicable nonbankruptcy laws, including, but not limited to, the right to set off against any Claim, the payments or other distributions to be made pursuant to this Plan in respect of such Claim, or claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Holder; *provided*, *further*, that the Holder of any Claim must assert any right to setoff prior to the Effective Date or such right shall be deemed waived on the Effective Date. Notwithstanding any other provision of the Plan, the United States' rights to setoff and recoupment are preserved.

## ARTICLE VII

## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

7.1    *Assumption Of Executory Contracts And Unexpired Leases*.

(a)    Except as otherwise provided in the Plan, on the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors shall be deemed assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease (a) has previously been rejected by order of the Bankruptcy Court in effect as of the Effective Date (which order may be the Confirmation Order); (b) is the subject of a motion to reject filed on or before the Effective Date; (c) is identified as an Executory Contract or Unexpired Lease to be rejected pursuant to the Plan Supplement before the Effective Date; or (d) expired or terminated pursuant to its own terms.  An Executory Contract or Unexpired Lease that is deemed to be assumed pursuant to the foregoing sentence shall be referred to as an "Assumed Contract."

(b)    Entry of the Confirmation Order by the Bankruptcy Court shall constitute findings by the Bankruptcy Court that (a) the Reorganized Debtors have properly provided for the cure of any defaults that might have existed, (b) each assumption is in the best interest of the Reorganized Debtors, their Estates, and all parties in interest in the Chapter 11 Cases and (c) the requirements for assumption of any Executory Contract or Unexpired Lease to be assumed have been satisfied.  Except as otherwise provided in the following sentence, all cure payments under any Assumed Contract shall be made by the Reorganized Debtors on the Effective Date or as soon as practicable thereafter.  In the event of a dispute, cure payments required by section 365(b)(1) of the Bankruptcy Code shall be paid upon entry of a Final Order resolving such dispute.

33

(c)     In connection with the treatment of the Flowers Facility Claims and the Columbia Facility Claims, the Debtors shall (i) assume and assign to the lenders under the F-C Credit Agreements such contracts related to the vessels securing the F-C Credit Agreements that such lenders reasonably request the Debtors assume and assign; provided, that the contracts to be assumed and assigned are properly assumable and assignable, under section 365 of the Bankruptcy Code and (ii) reject such contracts that are (1) related to the vessels securing the F-C Credit Agreements; (2) capable of rejection; (3) are solely between one or more borrower(s) under the F-C Credit Agreements and a non-debtor contract counterparty; and (4) that such lenders reasonably request the Debtors to reject under section 365 of the Bankruptcy Code.

**7.2    *Termination of Existing Management Executory Contract.*** Prior to the Effective Date, the Debtors shall terminate the Existing NHL Management Agreement and the Existing NH2L Management Agreement in accordance with their terms with such termination effective as of the Effective Date, and no liability, Claim or Administrative Claim shall arise or otherwise result against any of the Debtors or Reorganized Debtors from such rejection, other than for liabilities for which the Debtors are responsible pursuant to the Existing NHL Management Agreement or the Existing NH2L Management Agreement prior to the termination thereof already incurred but not yet paid, and any such liabilities, Claims or Administrative Claims are hereby deemed to be waived unconditionally and irrevocably upon the Effective Date.

7.27.3   ***D&O Liability Insurance Policies***.  As of the Effective Date, the D&O Liability Insurance Policies shall be treated as if they were Executory Contracts that are assumed under this Plan.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

7.37.4   ***Indemnification***.  Except as otherwise specifically limited in this Plan, any obligations or rights of the Debtors or Reorganized Debtors to defend, indemnify, reimburse, or limit the liability of the Debtors' present and former directors, officers, employees, agents, representatives, attorneys, accountants, financial advisors, restructuring advisors, investment bankers and consultants (the "Covered Persons") pursuant to the Debtors' or Reorganized Debtors' certificates of incorporation, by-laws, policy of providing employee indemnification, applicable law, or specific agreement in respect of any claims, demands, suits, Causes of Action, or proceedings against such Covered Persons based upon any act or omission related to such Covered Persons' service with, for, or on behalf of the Debtors prior to the Effective Date, shall be treated as if they were Executory Contracts that are assumed under this Plan and shall survive the Effective Date and remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement, or

34

limitation of liability is owed in connection with an occurrence before or after the Petition Date.

       7.47.5 *Cure of Defaults Under Assumed Contracts*.  The Reorganized Debtors shall cure any monetary defaults under any Executory Contract and Unexpired Lease to be assumed pursuant to the Plan by paying to the non-Debtor counterparty the full amount of any monetary default in the ordinary course of business.  Accordingly, no party to an Assumed Contract need file any cure claim, and the Debtors need not file any lists of any proposed cure claims, with the Bankruptcy Court.  Notwithstanding the foregoing, the Reorganized Debtors and counter-parties to Assumed Contracts reserve all their rights in the event of a dispute over the amount of a cure claim.  If there is any such dispute that cannot be resolved consensually, then either party must file with the Bankruptcy Court a request for allowance and payment of such cure claim within seventy-five (75) days from the Effective Date.  Moreover, the Reorganized Debtors shall be authorized to reject any Executory Contract or Unexpired Lease to the extent the Reorganized Debtors, in the exercise of their sound business judgment, conclude that the amount of the cure claim as determined by the Bankruptcy Court, renders assumption of such Executory Contract or Unexpired Lease unfavorable to the Reorganized Debtors.

## ARTICLE VIII

## CONFIRMATION AND CONSUMMATION OF THE PLAN

      8.1    *Condition To Confirmation*.  Confirmation of the Plan is conditioned upon the Confirmation Order being reasonably acceptable in form and substance to the Debtors and the Participating Lenders, *provided*, *however*, that the Confirmation Order must only be reasonably acceptable to a particular Participating Lender to the extent the Participating Lender's claims, rights, or interests are ~~materially~~ affected by the terms thereof.

      8.2    *Conditions To Effective Date*.  The Debtors shall request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry.  The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Debtors and the Participating Lenders in accordance with the terms hereof*, provided, however, that if this Plan is confirmed for one or more Debtors as provided for in Section 4.4, only the conditions applicable to such Debtors need to be satisfied or waived for the Effective Date to occur*:

      (a)    The Confirmation Order, in form and substance reasonably satisfactory to the Debtors and the Participating Lenders, shall have become a Final Order and shall, among other things, provide that the Debtors and the Reorganized Debtors are authorized to take all actions necessary or appropriate to enter into, implement, and consummate the agreements and documents created in connection with this Plan, *provided*, *however*, that the Confirmation Order must only be reasonably satisfactory to ~~the~~a particular

35

Participating ~~Lenders~~Lender to the extent ~~each~~the Participating Lender's claims, rights, or interests are ~~materially~~ affected by the terms thereof.

(b)    All documents related to, provided for therein, or contemplated by the New Credit Facilities shall have been executed and delivered, and all conditions precedent thereto shall have been satisfied (other than the occurrence of the Effective Date)~~.~~, which shall occur simultaneously with the satisfaction of all conditions precedent under the New Credit Facilities). Notwithstanding the foregoing, the failure to satisfy this condition shall not impair the Plan becoming effective with respect to the Citi Silo Debtors.

(c)    The Debtors shall have terminated the Existing NHL Management Agreement and the Existing NH2L Management Agreement, effective as of the Effective Date, as provided by Section 7.2 of the Plan.

(d)    Each of the Citi Silo Management Agreement and the Citi Silo MIP shall have become effective.

(~~c~~e)    Each of the ~~Citi~~DVB Silo Management ~~Agreement, the NHL Management Agreement,~~Agreements and the NH2L Management Agreement shall have become effective.  Notwithstanding the foregoing, the failure to satisfy this condition shall not impair the Plan becoming effective with respect to the Citi Silo Debtors.

(~~d~~f)    Debtors Golden Knighthead Limited and Metropolitan Harbour Limited shall hold sufficient cash in their accounts to satisfy each of the terms and conditions contained in the DVB Term Sheet.  Notwithstanding the foregoing, the failure to satisfy this condition shall not impair the Plan becoming effective with respect to the Citi Silo Debtors.

(~~e~~g)    On the Effective Date, after giving effect to the payments required by the DVB Term Sheet and all accrued and unpaid professional fees, Debtors Golden Knighthead Limited and Metropolitan Harbour Limited shall have a minimum liquidity position of $5,000,000 in aggregate; *provided*, *however*, this condition may be waived by DVB Bank, SE in its sole discretion.  Notwithstanding the foregoing, the failure to satisfy this condition shall not impair the Plan becoming effective with respect to the Citi Silo Debtors.

(~~f~~h)    Debtors Nautilus Shipholdings No. 2 Limited, Golden Knighthead Limited, and Metropolitan Harbour Limited shall be in full compliance with the terms of the Amended and Restated DVB 1 Facility and the Amended and Restated DVB 2 Facility, as applicable; *provided*, *however*, the applicable Debtor shall not be required to (i) satisfy any historic nonpayment defaults or (ii) satisfy any overdue principal amounts, whether coming due by acceleration or otherwise, to be deemed in full compliance as of the Effective Date. Notwithstanding the foregoing, the failure to satisfy this condition shall not impair the Plan becoming effective with respect to the Citi Silo Debtors.

(i)    The Amended and Restated HSH-YM Facility Documents shall be executed, fully enforceable and binding upon all parties thereto and all conditions precedent thereto shall be satisfied or waived in writing in accordance with the terms thereof.

36

(g̶j)    Debtors Golden Knighthead Limited and Metropolitan Harbour Limited shall have satisfied all Claims entitled to administrative expense priority other than trade Claims incurred in the ordinary course of business that are not yet due and payable. Notwithstanding the foregoing, the failure to satisfy this condition shall not impair the Plan becoming effective with respect to the Citi Silo Debtors.

(h̶k)    The Professional Fee Escrow Account shall have been funded.

(l)    The adversary proceeding filed by certain of the Debtors on December 5, 2014 (Adv. Proc. No. 14-08268 (RDD)) against HSH Nordbank AG shall be dismissed with prejudice.

(m)    *Debtors' Motion for an Order Pursuant to Bankruptcy Rule 2004* [Docket No. 197] shall be withdrawn with prejudice.

(n)    York Global Finance BDH, LLC shall be elevated to lender of record status under the Amended and Restated HSH-YM Facility.

(i̶o)    All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of this Plan shall have been obtained.

(p)    The Holdco LLC Agreement shall be in full force and effect.

(j̶q)    All other actions, documents, and agreements necessary to implement this Plan shall have been effected or executed.

8.3    ***Waiver Of Conditions***.    Except as expressly provided herein, each of the conditions to the Effective Date set forth herein may be waived in whole or in part by the mutual agreement of the Debtors and t̶h̶e̶each affected Participating L̶e̶n̶d̶e̶r̶s̶Lender, without any notice to parties in interest or the Bankruptcy Court and without a hearing. The failure to satisfy or waive any condition to the Effective Date may be asserted by the Debtors or any of the affected Participating Lenders regardless of the circumstances giving rise to the failure of such condition to be satisfied, including any action or inaction by the Debtors or any of the affected Participating Lenders. The failure of the Debtors or any of the affected Participating Lenders to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

# ARTICLE IX

# EFFECT OF PLAN CONFIRMATION

9.1    ***Binding Effect***.    This Plan shall be binding upon and inure to the benefit of the Debtors, their Estates, all present and former Holders of Claims and Interests, and their respective successors and assigns, including but not limited to the Reorganized Debtors.

9.2    ***Revesting Of Assets***.    Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estates (including Retained Actions,

but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in the Reorganized Debtors, free and clear of all Claims, Liens, charges, encumbrances, rights and Interests of creditors and equity security holders.  As of the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of their property without supervision of the Bankruptcy Court, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or the Confirmation Order.

      9.3    ***Compromise And Settlement Of Claims, Interests And Controversies***. Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against or Interests in them and Causes of Action against other Persons.

      9.4    ***Releases And Related Matters***

      (a)    **Releases by the Debtors**

**Pursuant to section 1123(b) of the Bankruptcy Code and to the extent allowed by applicable law, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, the Estates and the Equity-Related Entities from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, the Reorganized Debtors, the Estates or the Equity-Related Entities have asserted or would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the Plan Supplement, the business or contractual arrangements between any Debtor, Reorganized**

Redline Nautilus - Revised Plan 1893678v14 and Nautilus - Second Amended Plan 1014617v3
1/9/2015 7:49:48 PM

Debtor, Estate or non-Debtor Affiliate and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments or other documents, or any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, *however* that nothing in this Section 9.4(a) shall be construed to release any party or entity from gross negligence, intentional fraud, willful misconduct, or criminal conduct, as determined by a Final Order. of a court of competent jurisdiction.  For the avoidance of doubt, the Causes of Action and Claims underlying or relating in any way to (i) the adversary proceeding filed by certain of the Debtors on December 5, 2014 (Adv. Proc. No. 14-08268 (RDD)) against HSH Nordbank AG, as agent under the Existing HSH-YM Credit Agreement and (ii) *Debtors' Motion for an Order Pursuant to Bankruptcy Rule 2004* [Docket No. 197] are deemed released and discharged by the Debtors.

        (b)      **Third-Party Releases by Holders of Claims or Equity Interests**

Except as otherwise provided in the Plan or the Plan Supplement, as of the Effective Date, each Holder of a Claim against or Interest in a Debtor, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Debtors, the Reorganized Debtors, the Estates, the Equity-Related Entities, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan or the Plan Supplement, the business or contractual arrangements between any Debtor, Reorganized Debtor, Estate or non-Debtor Affiliate and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event or other occurrence including or pertaining to the Debtors and taking place on or before the Effective Date, *provided*, *however* that nothing in this Section 9.4(b) shall be construed to release any party or entity from gross negligence, intentional fraud, willful misconduct, or criminal conduct, as determined by a Final Order of a court of competent jurisdiction; *provided further*, however, that this Section 9.4(b) shall not release the Debtors, the Reorganized Debtors, the Estates, the Equity-Related Entities or the Released Parties from any Cause of Action held by a governmental entity existing as of the Effective Date based on (i) the Internal Revenue Code or other

39

and their respective Affiliates or their property on account of any such released or discharged Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, or liability: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any Lien or encumbrance; (d) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to any released Person; or (e) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order.

### 9.7    *Exculpation And Limitation Of Liability*

None of the Released Parties shall have or incur any liability to any Entity, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the formulation, negotiation, or implementation of this Plan, the solicitation of acceptances of this Plan, the pursuit of Confirmation of this Plan, the Confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; *provided*, *however*, that the foregoing provisions of this exculpation shall have no effect on the liability of any Released Party that results from any such act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted gross negligence or willful misconduct.  Nothing in this Plan shall affect the ability of the United States to pursue any non-Debtors to the extent allowed by non-bankruptcy law for any liabilities that may be related to any federal tax liabilities owed by the Debtors or the Debtors' Estates.  Additionally, the United States may pursue police and regulatory actions or proceedings with respect to the Released Parties in the manner, and by the administrative or judicial tribunals, in which the United States could have pursued such actions or proceedings as if this bankruptcy had never been commenced.

### 9.8    *Term Of Bankruptcy Injunction Or Stays*.  Except as provided otherwise in this Plan, from and after the Effective Date, the automatic stay of section 362(a) of the Bankruptcy Code shall terminate.

### 9.9    *Post-Confirmation Date Retention Of Professionals*.  Upon the Confirmation Date, any requirement that professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate and the Reorganized Debtors will employ and pay professionals in the ordinary course of business.

41

# ARTICLE X

## PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

10.1    *Disputed Claims*. All Disputed Claims against the Debtors shall be subject to the provisions of this Article X.

10.2    *Objection Deadline*. Unless otherwise ordered by the Bankruptcy Court, objections to Claims shall be filed with the Bankruptcy Court and served upon the Holders of each such Claim to which objections are made on or before the Claims Objection Deadline. If an objection to a Claim is timely filed, a subsequent amendment to the objection shall also be deemed timely, even if filed subsequent to the deadline for filing the original Claim objection, and even if the amendment raises facts or legal theories not raised in the original Claim objection.

10.3    *Prosecution of Objections*. After the Confirmation Date, the Debtors or the Reorganized Debtors, as the case may be, shall have the authority to file, litigate to final judgment, settle, or withdraw objections to Disputed Claims.

10.4    *No Distributions Pending Allowance*. No payments or distributions shall be made with respect to any Claim to the extent it is a Disputed Claim unless and until all objections to such Disputed Claim are resolved and such Disputed Claim becomes an Allowed Claim in whole or in part.

# ARTICLE XI

## RETENTION OF JURISDICTION

11.1    *Retention of Jurisdiction*. Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction (unless otherwise indicated) over all matters arising in, arising out of, and/or related to, the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    Resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(b)    Decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date (which jurisdiction shall be non-exclusive as to any such non-core matters);

(c)    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases,

42

instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order;

(m)    Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

(n)    Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code; and

(o)    Enter an order closing the Chapter 11 Cases.

For the avoidance of doubt, the Bankruptcy Court shall not retain jurisdiction with respect to the following documents entered into by a Reorganized Debtor on or after the Effective Date: (i) the New Credit Facilities, (ii) the Citi Silo Management Agreement, (iii) the NHLDVB Silo Management AgreementAgreements, or (iv) the NH2L Management Agreement.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

12.1    ***Payment Of Statutory Fees***.  All fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid on the earlier of when due or the Effective Date.

12.2    ***Amendment Or Modification Of This Plan***.  Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, the Debtors reserve the right to alter, amend, or modify this Plan at any time prior to or after the Confirmation Date but prior to the substantial consummation of this Plan, *provided*, *however*, that theany Participating LendersLender must approve of such alteration, amendment or modification if it materially affects the respectivesuch Participating Lender's claims, rights, or interests, which approval shall not be unreasonably withheld.  A Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

12.3    ***Severability Of Plan Provisions***.  If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan,

44

Dated: ~~November 19~~January 9, ~~2014~~2015
      New York, New York

                            NAUTILUS HOLDINGS LIMITED
                            NAUTILUS HOLDINGS NO. 2 LIMITED
                                (for themselves and on behalf of each of the
                                other Debtors)

                            By:    */s/ James A. Mesterharm*____
                                Name:  James A. Mesterharm
                                Title:    Chief Restructuring Officer

Redline Nautilus - Revised Plan 1893678v14 and Nautilus - Second Amended Plan 1014617v3
1/9/2015 7:49:48 PM

**Exhibit A**

**Mediation Agreement**
**Amended and Restated HSH YM Facility Material Terms[1]**

| Provision | Terms – Option A | Terms – Option B |
|-----------|------------------|------------------|
| Facility Size[2] | Total: $191,194,322 After Initial Paydown: $176,194,322 | Total: $191,194,322 |
| Initial Paydown | $15,000,000 | N/A |
| Maturity Date | December 31, 2022 | December 31, 2022 |
| Amortization | $2,930,000 quarterly | $2,930,000 quarterly |
| Interest Rate[3] | Tranche A: Libor plus 100 basis points | Tranche A: Libor plus 100 basis points |
| | Tranche B: Libor plus 300 basis points | Tranche B: Libor plus 300 basis points |
| Cash Sweeps | 75% cash flow sweep | N/A |

[1]  If 60% or greater of Class 8 votes to accept this Plan, the Amended and Restated HSH YM Facility shall have the terms set forth in Option A. If less than 60% of Class 8 votes to accept this Plan, the Amended and Restated HSH YM Facility shall have the terms set forth in Option B.

[2]  The gross amount of the Amended and Restated HSH YM Facility shall be divided into two tranches—one tranche of secured loans ("Tranche A"), and one tranche of unsecured loans ("Tranche B"). Holders of Claims in Class 8A shall receive secured loans in Tranche A and Holders of Claims in Class 8B shall receive unsecured loans in Tranche B.

[3]  To the extent, in a cramdown, the Court determines that the Interest Rate needs to be adjusted higher for either Tranche A or Tranche B, the Debtors reserve the right to adjust the amount of the Initial Paydown and/or determine to pay part of the interest as PIK interest.

Redline Nautilus - Revised Plan 1893678v14 and Nautilus - Second Amended Plan 1014617v3
1/9/2015 7:49:48 PM

**Exhibit B**

~~Amended and Restated~~ Citi ~~Facility~~**Silo MIP** Material Terms

| ~~Provision~~ | ~~Terms~~ |
|---|---|
| ~~Facility Size~~ | ~~Equal to the amount of Allowed Class 3A Citi Facility Claims~~ |
| ~~Maturity Date~~ | ~~December 31, 2022~~ |
| ~~Amortization~~ | ~~An amount consistent with a 20 year financing life~~ |
| ~~Interest Rate~~**Provision** | ~~Libor plus 225 basis points~~**Terms** |
| Option Amount | Synergy Management Services Limited (the "Manager") will be granted options exercisable into 5% of the new equity of Reorganized Debtor Nautilus Shipholdings No. 3 Limited (or any successor thereto, including such other holding company to be agreed) as of the Effective Date on a fully diluted basis.[1] |
| Strike Price | Par plus any accrued unpaid interest as of the Effective Date on the full amount of total Allowed Class 3 Citi Facility Claims. |
| Vesting | 25% per year over four years, subject to the continued provision by the Manager of commercial and technical management services to the Reorganized Citi Silo Debtors[2] pursuant to the Citi Silo Management Agreement entered into on the Effective Date. |

---

[1] Nautilus Shipholdings No. 3 Limited (or such other holding company to be agreed) shall own 100% of the equity interests in the entities that own the vessels *MV Rotterdam, MV Hamburg, MV Venezia, MV Corcovado,* and *MV Ital Onesta.*

[2] Reorganized Citi Silo Debtors shall mean collectively Reorganized Debtors Nautilus Shipholdings No. 3 Limited, Vivid Mind Limited, Perpetual Joy Limited, Regal Stone Limited, Charming Energetic Limited, and Dynamic Continental Limited and for each of the foregoing, any successor thereto.

| Provision | Terms |
|---|---|
|  | All options shall immediately vest if Reorganized Debtor Nautilus Shipholdings No. 3 Limited  (or any successor thereto) secures debt financing at (i) 35%-50% loan-to-value ("LTV"), (ii)  with an interest rate of LIBOR + 400 bps or less, (iii) with an amortization profile based on an assumed 15-year or longer vessel life, and (iv) with a maturity of 5 years or longer (a "Qualified Loan"). |
| Tenor | 6 years |
| Co-Investment Right | If Reorganized Debtor Nautilus Shipholdings No. 3 Limited (or any successor thereto) secures a Qualified Loan within one year of the Effective Date, then during the ten business day period following the closing of such Qualified Loan, the Manager shall have the option to purchase up to an additional 5% of the new equity of Reorganized Debtor Nautilus Shipholdings No. 3 Limited (or any successor thereto) as of the closing of such Qualified Loan at a valuation to be determined by the board of directors of Reorganized Debtor Nautilus Shipholdings No. 3 Limited (or any successor thereto) in its sole discretion. |
| Termination of Citi Silo Management Agreement | Upon termination by the Reorganized Citi Silo Debtors of the Citi Silo Management Agreement for cause (to be defined therein by agreement of the parties), all options, vested and unvested, shall immediately be forfeited. Upon termination by the Reorganized Citi Silo Debtors of the Citi Silo Management Agreement not for cause (to be defined therein by agreement of the parties), all unvested options shall immediately be vested. Upon termination by the Manager of the Citi Silo Management Agreement (other than due to material breach by any of the Reorganized Citi Silo Debtors of the Citi Silo Management |

2

| Provision | Terms |
|---|---|
| | Agreement, subject to cure periods as set forth therein), all options, vested and unvested, shall immediately be forfeited. |
| | Upon termination by the Manager of the Citi Silo Management Agreement due to material breach by any of the Reorganized Citi Silo Debtors of the Citi Silo Management Agreement, subject to cure periods as set forth therein, all unvested options shall immediately be vested. |
| | The definition of "Cause" in the Citi Silo Management Agreement will include the following, as applicable to the Manager or any management member thereof: |
| | (i)     The commission of any act or acts of intentional misconduct or gross negligence in the performance of its duties, responsibilities and obligations to the Reorganized Citi Silo Debtors or any of its affiliates (or, in the case of any management member, to the Manager or any of its affiliates), or substantial failure to perform any such duties, responsibilities and obligations; |
| | (ii)     Conviction of (or plea of nolo contendere to) a crime that constitutes a felony (or the equivalent of a felony in a jurisdiction other than the United States) or other crime involving moral turpitude; |
| | (iii)     A material breach of any provision of the Citi Silo Management Agreement or any other agreement with the Reorganized Citi Silo Debtors or any of their affiliates or any policy or procedure of the Reorganized |

Redline Nautilus - Revised Plan 1893678v14 and Nautilus - Second Amended Plan 1014617v3
1/9/2015 7:49:48 PM

| Provision | Terms |
|---|---|
| | Citi Silo Debtors governing the conduct of performing services on behalf of the Reorganized Citi Silo Debtors or their affiliates; |
| | (iv)   Fraud or misappropriation, embezzlement or misuse of funds or property belonging to the Reorganized Citi Silo Debtors, the Manager or their respective affiliates; and |
| | (v)   Failure to cooperate in any investigation by the Reorganized Citi Silo Debtors or the boards of directors of the Reorganized Citi Silo Debtors (or, in the case of any management member, by the Manager). |
| | Anything herein to the contrary notwithstanding, with respect to clauses (i), (iii) and (v) above, if and to the extent that any such occurrence is curable, such occurrence shall not constitute "Cause" if it is cured within ten (10) business days following receipt of written notice from the Reorganized Company specifying in reasonable detail the applicable occurrence. |
| Transfer | Neither the Manager nor any other award recipient may transfer its options, except (1) to Andreas Papathomas, up to 50% of the options, (2) to any other employee of the Manager, up to 25% of the options per employee, or (3) as otherwise approved by the board of directors of Reorganized Debtor Nautilus Shipholdings No. 3 Limited (or any successor thereto). |
| Tax Withholding | Reorganized Debtor Nautilus Shipholdings No. 3 Limited (or any successor thereto) and its affiliates are authorized to withhold from option proceeds amounts the Manager owes to the business with respect to taxes, or is required to be withheld under applicable tax laws. |

4

Redline Nautilus - Revised Plan 1893678v14 and Nautilus - Second Amended Plan 1014617v3
1/9/2015 7:49:48 PM

**Exhibit C**

**Citi Silo ~~Warrants~~Management Agreement Material Terms**

| Provision | Terms |
|---|---|
| Entry into Citi Silo Management Agreement | In accordance with the terms of the Existing NHL Management Agreement, the Debtors shall terminate in full the Existing NHL Management Agreement effective as of the Effective Date without any further liabilities, other than for liabilities already incurred but not yet paid, to the Reorganized Citi Silo Debtors or their affiliates.<br><br>As of the Effective Date, the Reorganized Citi Silo Debtors shall enter into the Citi Silo Management Agreement consistent with the terms described herein. |
| Responsibilities of Manager[3] | Terms regarding commercial management and technical oversight with the primary commercial and technical management responsibilities as set forth below and other terms to be agreed by the parties. |
| Management Fee | $524 per vessel per day subject to an annual adjustment based on the OECD Consumer Price Index for "OECD – total, all items" plus reimbursement of the documented expenses associated with the technical operations that are outsourced, and other expenses allowed for under the Citi Silo Management Agreement, including administrative costs historically paid for directly by the vessels. |
| Term | Evergreen subject to the termination provisions set forth below. |

---

[3]    "Manager" shall mean Synergy Management Services Limited.

| Provision | Terms |
|---|---|
| Termination | Terminable without cause by either party with 60 days' notice. In the case of a sale of all or some of the vessels in which the Citi Silo Management Agreement is terminated for such vessels, then Synergy Management Services Limited will receive a partial severance based on the management fee (i.e., $524 x 180 days x number of vessels sold). |
| Severance | In event of termination by any of the Reorganized Citi Silo Debtors not for cause, the Manager shall be entitled to a termination payment equal to 6 months of management fees paid in a lump sum upon the end of the 60 day notice period or other date mutually agreed upon by the parties. |
| ~~Amount~~Approval Rights | The Reorganized Citi Silo Debtors or the boards of directors of the Reorganized Citi Silo Debtors (or the board of directors of Debtor Nautilus Shipholdings No. 3 Limited on their behalf), will be required to approve, among other things, (i) any new charter agreements for any of the Reorganized Citi Silo Debtors; and (ii) dry dock budgets for any of the Reorganized Citi Silo Debtors. ~~Exercisable to 15% of equity of each of Reorganized Debtors Nautilus Shipholdings No. 3 Limited, Vivid Mind Limited, Perpetual Joy Limited, Regal Stone Limited, Charming Energetic Limited, and Dynamic Continental Limited on fully diluted basis~~ |

Redline Nautilus - Revised Plan 1893678v14 and Nautilus - Second Amended Plan 1014617v3
1/9/2015 7:49:48 PM

| Provision | Terms |
|---|---|
| ~~Strike Price~~<ins>Information</ins> | <ins>Full information and financial disclosure to be provided by the Manager to each of the Reorganized Citi Silo Debtors through a monthly report the form and substance of which will be agreed upon as part of the definitive documentation of the Citi Silo Management Agreement including but not limited to:  monthly TCE rates; positioning report; financial performance by vessel and any unusual items.</ins> ~~A strike price that equates to an enterprise value that is equal to Allowed Class 3 Citi Facility Claims plus interest through the term of the warrant~~ |
| ~~Tenor~~ | ~~5 Years~~ |

**Exhibit D**

**Terms of Citi Silo Reorganized Citi Silo Debtors Intercompany Note**

| Provision | Terms |
|---|---|
| Issuer | Each of the Reorganized Citi Silo Debtor vessel-owning subsidiaries. |
| Lender | Reorganized Nautilus Shipholdings No. 3 Limited. |
| Principal Amount | $100-120 million. |
| Interest | 1.0% per annum, which interest may be capitalized as PIK interest. |
| Maturity | 10 years. |
| Collateral | The Note shall be secured by a perfected first priority security interest in and liens on the vessels owned by each of the Issuers. |

**Exhibit E**

**DVB Term Sheet**